**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

SUNTRUST MORTGAGE, INC.,

        Plaintiff,

    v.

UNITED GUARANTY CORPORATION,
*et al.*,

        Defendants.

Civil Action No. 3:09cv00529

**MEMORANDUM IN SUPPORT OF
DEFENDANT UNITED GUARANTY'S MOTION TO COMPEL
AND IN RESPONSE TO
SUNTRUST MORTGAGE, INC.'S MOTION FOR PROTECTIVE ORDER,
REQUEST FOR IN CAMERA REVIEW OF CERTAIN DOCUMENTS, AND
MEMORANDUM IN RESPONSE TO THE COURT'S FEBRUARY 11, 2010
ORDER REGARDING PRIVILEGE ISSUES**

Christyne K. Brennan (Va. Bar No. 48114)
John C. Millian (admitted pro hac vice)
Brian C. Baldrate (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
*telephone/fax/email on signature page*

Wyatt B. Durrette, Jr. (Va. Bar No. 04719)
DURRETTEBRADSHAW PLC
Bank of America Center
1111 East Main Street, 16th Floor
Richmond, VA  23219
*telephone/fax/email on signature page*

*Counsel of Record for Defendant United Guaranty
Residential Insurance Company of North Carolina*

Filed:  February 22, 2010

**TABLE OF CONTENTS**

INDEX TO EXHIBITS.................................................................................................... iv

I.INTRODUCTION ........................................................................................................ 1

II.PROCEDURAL POSTURE ....................................................................................... 3

II.FACTUAL BACKGROUND ..................................................................................... 4

    A.    SunTrust's Creation of and Reliance on Fraudulent Documents to Support Its
Claims Against United Guaranty .......................................................................... 4

        1.    The Fake June 20, 2005 Email................................................................. 6

        2.    The Fake February 1, 2006 Email............................................................ 8

        3.    The Fake February 22, 2008 Email.......................................................... 9

    B.    SunTrust's Selective Disclosure of Attorney-Client Communications and Work
Product, And Its Effort to Block Inquiry Into the Truth of Its Representations .. 10

        1.    At the Status Conference, SunTrust's Counsel States "I Don't Have
Anything to Hide" and Makes Specific Factual Representations Intended
to Mitigate the Blame Due SunTrust For Submitting and Relying on
Fraudulent Evidence ............................................................................. 10

        2.    In Its Voluntary "Response" to the Already-Decided Motion for
Emergency Relief, SunTrust Makes Further Factual Representations In an
Effort to Minimize the Impact of Disclosing That Its Senior Vice President
Concocted Additional Fake E-Mails Not Previously Mentioned By
SunTrust................................................................................................. 13

        3.    SunTrust Withholds Key Documents Necessary to Determine the Truth of
the Facts It Has Represented to the Court, And Omits Key Material From
Its Privilege Log.................................................................................... 15

        4.    At the Court-Ordered Depositions SunTrust Blocks Inquiry Into the Truth
of the Facts It Has Represented to the Court ......................................... 16

III.LEGAL ARGUMENT.............................................................................................. 17

    A.    Virginia Law Narrowly Construes The Attorney Client Privilege ..................... 17

    B.    The Work Product Doctrine is a Qualified Privilege That May Be Overcome by
Demonstrating a Substantial Need that Cannot Be Overcome Without an Undue
Hardship........................................................................................................... 19

C.   Both the Attorney-Client Privilege and the Work Product Doctrine Can Be Waived Explicitly or By Implication .................................................................... 19

D.   SunTrust's Partial Disclosure Clearly Waives Any Attorney-Client Privilege and Fact Work Product That Might Otherwise Attach to Communications Surrounding the Creation, Transmission, Investigation and Use of the Fraudulent Documents ........................................................................................................... 21

E.   The Crime-Fraud Exception Also Applies to the Communications and Documents that SunTrust Seeks to Shield From Disclosure ................................................... 25

   1.   Standard for Crime Fraud ........................................................................ 25

   2.   The Crime Fraud Exception Applies to Attorney-client and All Fact Work Product By Virtue of Pettitt's Scheme ..................................................... 26

   3.   The Crime Fraud Exception Waives All Opinion Work Product From the Time that SunTrust's Counsel Knew of Pettitt's Falsification of Documents ................................................................................................. 29

IV. CONCLUSION ..................................................................................................... 30

# INDEX TO EXHIBITS

Transcript of January 8, 2010 Status Conference ........................................................................1

SunTrust's Objections and Response to United Guaranty's
Interrogatory Regarding February 22, 2008 Email ......................................................................2

Transcript of Joann Clack Deposition (February 16, 2010) ........................................................3

Genuine June 20, 2005 Email ......................................................................................................4

Fake June 20, 2005 Email ............................................................................................................5

Transcript of Susan Thurman Deposition (February 17, 2010) ...................................................6

Genuine February 1, 2006 Email .................................................................................................7

Fake February 1, 2006 Email .......................................................................................................8

Genuine February 22, 2008 Email ...............................................................................................9

Fake February 22, 2008 Email ...................................................................................................10

Transcript of Mary Pettitt Deposition (February 12, 2010) .......................................................11

SunTrust Privilege Log regarding February 22, 2008 Email .....................................................12

## I.    INTRODUCTION

At the Status Conference held in this matter on January 8, 2010, SunTrust's counsel announced on his client's behalf that "I don't have anything to hide" regarding the fact that a SunTrust Senior Vice President, Mary Pettitt ("Pettitt"), had created fraudulent evidence to support SunTrust's position in this litigation and that SunTrust had cited and relied upon this evidence in its Amended Complaint.  He then proceeded to lift the veil of the attorney-client and work product privileges to make factual representations as to "how the document came to [Reed Smith]," and subsequently noted—in an effort to demonstrate SunTrust's good faith—that both his law firm and SunTrust were "looking very closely at all of Ms. Pettitt's emails to make sure that there are no other issues out there."

In the intervening six weeks, however, the picture has changed dramatically.  Facing the depositions of several key witnesses, SunTrust has been forced to disclose that there most certainly *are* "other issues out there"—*yet more fraudulent documents*—and that SunTrust has known this fact for a very long time (even if it somehow neglected to disclose this to its own lead outside counsel).  To deal with this, SunTrust has since come forward with a *new* set of factual representations, again selectively disclosing attorney-client communications and work product in order to do so.  Leaving no doubt, however, that it still has much left "to hide," SunTrust has at the same time vociferously and illegitimately blocked on purported privilege grounds United Guaranty's attempts to determine the truth of SunTrust's representations—although evidence is still leaking out around the edges strongly suggesting that a number of these representations are false.

SunTrust's February 16, 2010 Response to the Court's February 11, 2010 Order Regarding Privilege Issues and Request for *In Camera* Review of Certain Documents and in Support of Its Motion for Protective Order ("SunTrust Priv. Mem.") sets forth why SunTrust

contends it should be permitted to withhold key evidence regarding its own fraudulent conduct. SunTrust's submission advances two main arguments. SunTrust first argues that it has the right to maintain the "privileged" status of the documents sought by Pettitt's counsel, that turning over documents to Pettitt could constitute a waiver of its privilege protections, and that even though United Guaranty has agreed to refrain from asserting a waiver SunTrust worries about the risk of waiver as to unnamed "third parties." Next, SunTrust argues that the crime-fraud exception does not apply, and thus United Guaranty should not be permitted to penetrate the protections afforded by the applicable privileges. SunTrust asserts as a purported fact that only Pettitt participated in or knew of the alteration of the February 22 Email, and that given this United Guaranty cannot demonstrate that communications by anyone other than possibly Pettitt were made for an unlawful purpose or reflect an ongoing or future unlawful scheme.

Both of SunTrust's arguments must be rejected by this Court, for two central reasons. First, SunTrust's representations regarding the creation, investigation and use of the fraudulent documents—disclosed on its own accord and for its own benefit—manifestly waive any claim of privilege that SunTrust could have. SunTrust cannot proffer its side of the story and then hide behind the privilege cloak to prevent its story from being examined and challenged. Additionally, even if SunTrust had not waived its privilege claims, United Guaranty would still be entitled to the materials at issue because of the crime-fraud exception to the privilege doctrine. That exception applies to all attorney-client communications and fact work product related to Pettitt's schemes. Moreover, the crime-fraud exception applies to all opinion work product from the time that SunTrust's counsel knew of Pettitt's falsification of documents. Accordingly, the Court should deny SunTrust's motion for protective order, grant United Guaranty's motion to compel, and require SunTrust to disclose documents and testimony regarding its fraud.

## II.        PROCEDURAL POSTURE

On December 29, 2009, United Guaranty filed its Motion for Emergency Relief due to conclusive evidence that SunTrust deliberately altered the content of a key document in this case—the February 22 Email.  In response, this Court ordered "expedited" discovery to include, *inter alia*, the deposition of Pettitt and Pettitt's supervising superior, Joann Clack ("Clack"), and service of an interrogatory on SunTrust soliciting its official explanation for the altered February 22 Email.  *See* Memorandum Order, December 29, 2009.  The Court also subsequently approved a deposition of SunTrust in-house counsel Susan Thurman ("Thurman").

At a status conference held on January 8, 2010, SunTrust's counsel stated "I don't have anything to hide" and proffered an explanation of "how the [altered February 22 Email] came to [counsel]."  Transcript of Jan. 8, 2010 Status Conference ("Status Conf. Tr.") at 11:10-17 (Ex. 1).  The same day, United Guaranty served its interrogatory on SunTrust.  On January 27, 2009, SunTrust submitted a plainly inadequate "Objections and Response" to that interrogatory, stating in part that "[s]ince SunTrust's counsel has not been able to interview Pettitt . . . SunTrust does not know the reason(s) that Pettitt apparently created [the altered February 22, 2008 email], and thus cannot fully respond with its 'official explanation . . . .'"  (Ex. 2).

On February 3, 2010, with Pettitt's deposition imminent, SunTrust filed an untimely and unsolicited "response" to the Motion for Emergency Relief for the obvious purpose of preemptively disclosing that the February 22 Email was but one of *at least three* documents that Pettitt "modified" (the "Fake Emails").  SunTrust's Memorandum in Response to United Guaranty's Motion for Emergency Relief  ("ST Response").   After United Guaranty noticed Pettitt's deposition, on February 9, 2010, Pettitt's counsel filed a Motion for a Protective Order Requiring SunTrust to Produce Documents ("Pettitt Motion") related to her communications with SunTrust in order to understand her "potential criminal liability and whether she should

invoke her Fifth Amendment privilege against self-incrimination in the deposition." Pettitt Motion at 3-4.

Over SunTrust's objection, on February 11, 2010 the Court ruled that Pettitt's deposition would go forward and ordered an expedited briefing schedule requiring SunTrust to produce for *in camera* inspection all documents SunTrust alleges are privileged related to the Pettitt Motion.

On February 12, 2010, Pettitt's deposition went forward and Pettitt generally refused to answer substantive questions, invoking her Fifth Amendment right against self-incrimination.  In addition, SunTrust repeatedly objected to United Guaranty's inquiries by asserting that the communications or documents related to the altered emails were privileged.

On February 16 and 17, 2010, United Guaranty deposed Clack and Thurman, respectively.  Throughout these depositions, SunTrust repeatedly directed Clack and Thurman not to answer questions by asserting that communications related to the altered emails were protected by the attorney-client privilege and work-product doctrine.

On February 16, 2010, SunTrust submitted its Brief currently at issue.

## II.    FACTUAL BACKGROUND

**A.    SunTrust's Creation of and Reliance on Fraudulent Documents to Support Its Claims Against United Guaranty**

Although many key facts regarding SunTrust's creation and use of fake evidence are still hidden due to SunTrust's unfounded privilege assertions, it is now apparent that in August of 2008 SunTrust Senior Vice President Pettitt doctored at least *three* key emails, expressly for purposes of supporting SunTrust's position in its dispute with United Guaranty.  To put the privilege issues regarding these events in context, we start by briefly explaining the significance of the three known Fake Emails.

Both parties agree that whether the Combo second mortgage loans at issue in this litigation are "covered" by the Mortgage Insurance Policy depends (at least in part) on whether the Combo loans conformed to the operative coverage "guidelines." *See, e.g.,* Second Amended Complaint ¶ 13; Counterclaim ¶ 13. With respect to the "IOF Combo 100 Loans"—second mortgage loans with a total loan-to-value ("CLTV") ratio up to 100%, made in "combination" with interest-only first ("IOF") mortgage loans—the central question is whether or not those guidelines included a requirement that the accompanying IOF loan be underwritten using the "Desktop Underwriter" computer program (or the similar "Loan Prospector" program) and obtain an "approved" rating (the "DU Approval requirement"). The parties disagree on this key issue. *See* Second Amended Complaint ¶ 26; Counterclaim ¶ 37.

The DU Approval requirement was set forth in numerous guideline spreadsheet matrices (the "Guideline Spreadsheets") prepared by Pam Gavin of United Guaranty and provided to and reviewed by Mary Pettitt and Chris Stumbo at SunTrust beginning in February 2005. The parties understood these Guideline Spreadsheets to be the operative guidelines for insurance coverage purposes, and hence for coverage to apply to IOF Combo 100 Loans SunTrust was required to obtain DU Approval on the accompanying IOF Loans. SunTrust failed to seek or obtain such DU Approval, however, on a substantial number of such loans.

SunTrust alleges that United Guaranty began denying coverage on IOF Combo 100 Loans for lack of DU Approval as early as "the spring of 2007." Second Amended Complaint ("SAC") ¶ 25. Initially SunTrust *agreed* with these coverage denials. In 2008, however, SunTrust changed its position and started asserting that no DU Approval requirement existed for IOF Combo 100 Loans. To get around the rather inconvenient fact that the requirement was plainly set forth in the Guideline Spreadsheets, SunTrust came up with the theory that the

5

Guideline Spreadsheets were merely "internal" to United Guaranty and thus not operative, and instead coverage was determined by the "guidelines" in SunTrust's own lending manual. SunTrust also went hunting for some communication that it could assert comprised an "approval" by United Guaranty of "guidelines" under which coverage existed on IOF Combo 100 Loans even where the accompanying IOF loan had been underwritten *only* through "traditional underwriting" and no DU Approval had been obtained.

In August 2008, SunTrust undertook to find written evidence, as Pettitt's boss Joanne Clack put it, "to show what documents we relied upon to evidence approval by United Guaranty of our guidelines."  Clack Tr. at 46:15-17 (Ex. 3).  As both Pettitt and Clack understood, "this was an exercise in collecting documents that would be used in the dispute with United Guaranty to support SunTrust's position."  *Id.* at 46:18-25.  Clack thus talked to Pettitt "about providing documentation that reflected approval of the agreed-upon guidelines between United Guaranty and SunTrust Mortgage," and "ask[ed] her to find documents that reflected that approval."  *Id.* at 41:6-12.

Apparently unable to find genuine documentation to support SunTrust's position, Pettitt instead concocted at least three pieces of fraudulent evidence for the purpose.  Each is briefly discussed below.

### 1.      The Fake June 20, 2005 Email

The first doctored email is dated June 20, 2005 (the "Fake June 20, 2005 Email").  That email was from Gavin to Pettitt and Stumbo, and transmitted one of the earlier versions of the

Guideline Spreadsheets, referred to in that email as the "PM2nd Matrix."[1]  The genuine version

of the email (the "Genuine June 20, 2005 Email") states, in pertinent part:

> The PM2d Matrix and PDF document are operational – just want to confirm the data we
> have here, its exchange, and its accuracy.

Ex. 4.  Thus, the genuine email makes clear that (1) the Guideline Spreadsheets are

"operational"—that is, govern the parties' insurance arrangement, and (2) SunTrust is on notice

to check and "confirm" that the Guideline Spreadsheets were accurate.

Both of these points are devastating to SunTrust's position in this dispute.  Accordingly,

Pettitt doctored the email to change the meaning of the "operational" reference and to eliminate

entirely the reference to having SunTrust check the accuracy of the spreadsheet.  The Fake

June 20, 2005 Email replaces the above language with the following.

> The PM2nd Matrix and PDF document are *UG internal* operational.

Ex. 5 (emphasis added).  Thus, Pettitt turns a genuine document that is harmful to SunTrust into

a fraudulent one that supports its position—that the Guideline Spreadsheets are merely "internal"

to United Guaranty.  *See* Clack Tr. at 76:1-6 (agreeing that the changes "made the document

more favorable to SunTrust's position") (Ex. 3).

It appears clear that this fake document was sent by Pettitt to Clack and to Thurman, and

that Thurman then referenced and "talked about [the] email of June 20, 2005" in a draft letter

intended to go to United Guaranty to press SunTrust's case (SunTrust has refused to produce the

draft letter).  *Id.* at 74:9-14.  When Clack reviewed the draft letter, however, she realized that the

Fake June 20, 2005 Email from Pettitt was different than the Genuine version from United

---

[1]  "PM2nd" stands for "purchase money second."  The Combo loans generally were purchase
money second mortgage loans.

Guaranty, a revelation that left Clack "stunned." *Id.* at 28:24-29:1. Not surprisingly, the draft letter was never sent, and before long numerous personnel at SunTrust in addition to Pettitt and Clack, including CEO Sterling Edmonds, in-house counsel Thurman and Debra Hovatter, and outside counsel Josh Gold of Anderson Kill & Olick, knew that Pettitt had created the Fake June 20, 2005 Email to support SunTrust's claims. Thurman Tr. at 43:5-17, 44:13-45:2, 55:12-56:3, 58:23-25 (Ex. 6); Clack Tr. at 15:1-8 (Ex. 3).

### 2. The Fake February 1, 2006 Email

The second fraudulent email is dated February 1, 2006 (the "Fake February 1, 2006 Email"), and purports to be a response from Gavin to a Pettitt email dated January 27, 2006. The initial email asks that United Guaranty approve insurance coverage for a specific "enhancement" (change) to SunTrust's Combo 100 Loan program. In the genuine email response (the "Genuine February 1, 2005 Email"), Gavin states:

> Rick [Hughes of UG] approved the request – ***I'll add to the guideline sheets and send them to you!***
>
> Hope you're out of the cave soon!!!!

Ex. 7 (emphasis added). This email also supports United Guaranty, since it makes clear that the "guideline sheets" reflect the operative insurance requirements. For this reason, Pettitt edited this document to eliminate entirely the reference to the guideline spreadsheets. As "modified," the Fake February 1, 2006 Email simply states:

> Rick approved the request – Hope you are out of the cave soon!!!!

Ex. 8.

This document is of particular importance because *SunTrust cites and relies on the January 27/February 1, 2006 email exchange in its Amended Complaint*. Further, the same people who knew that the Fake June 20, 2005 Email was created by Pettitt to support SunTrust's

case also knew that she likewise created the Fake February 1, 2006 Email for the same fraudulent purpose.   Thurman Tr. at 43:5-17, 44:13-45:2, 55:12-56:3, 58:23-25 (Ex. 6).

### 3.    The Fake February 22, 2008 Email

The third doctored email is dated February 22, 2008 (the "Fake February 22, 2008 Email"), and is the email cited in the Amended Complaint that prompted the filing of United Guaranty's Motion for Emergency Relief.  That email is a purported response to a request from Pettitt to Gavin to look in United Guaranty's files for a copy of a SunTrust document "that requested multiple combo enhancements."  The genuine version of Gavin's response (the "Genuine February 22, 2008 Email") states:

> We located the document from SunTrust that requested multiple combo enhancements. In that document is the request to insure a combo behind an IO 1st.  Sue Huber asked for the guideline enhancement on 12/1/03.  The Risk Committee approved an IO first on DU approved loans in March of '04.
>
> Rick went back thru his records in November and December of '03.  We had only looked March '03 forward.  ***So that's why we originally missed it -***

Ex. 9 (emphasis added).  This document likewise supports United Guaranty's case, as it explicitly references the existence of the DU Approval requirement on the IOF loans accompanying the IOF Combo Loans.  Pettitt also tried to create a silk purse out of this (from SunTrust's perspective) sow's ear.  In an effort to suggest—falsely—that United Guaranty had approved guidelines not only for IOF Combo 100 Loans where the IOF loans had DU Approval, but also where the IOF loans had been "traditionally underwritten" and no DU Approval was obtained, Pettitt rewrote the email as follows:

> We located the document from SunTrust that requested multiple combo enhancements. In that document is the request to insure a combo behind an IO 1st.  Sue Huber asked for the guideline enhancement on 12/1/03.  The Risk Committee approved an IO first on DU approved loans in March of '04.
>
> Rick went back thru his records in November and December of '03.  We had only looked March '03 forward.  ***So that's why we originally missed the approval for traditionally underwritten guidelines -***

Ex. 10 (emphasis added).  There is now no dispute that SunTrust cited and relied on this fraudulent document in its Amended Complaint.

**B.      SunTrust's Selective Disclosure of Attorney-Client Communications and Work Product, And Its Effort to Block Inquiry Into the Truth of Its Representations**

In its several court filings and in the deposition testimony of Clack and Thurman, SunTrust has chosen to make specific factual representations and to disclose attorney-client communications and fact work product regarding the creation and use of the Fake Emails in an attempt to minimize their significance to this litigation.  At the same time, however, SunTrust has generally blocked inquiry into the *truth* of its factual representations on purported privilege grounds.  SunTrust's selective representations and disclosures have come in several stages, *and have in significant instances been seriously inaccurate*.  We address below the selective "story" that SunTrust has told, the evidence available to date indicating that SunTrust's story is not to be trusted, and SunTrust's efforts to block further inquiry into the truth of what it has said.

**1.      At the Status Conference, SunTrust's Counsel States "I Don't Have Anything to Hide" and Makes Specific Factual Representations Intended to Mitigate the Blame Due SunTrust For Submitting and Relying on Fraudulent Evidence**

To start, at the Status Conference held in this matter on January 8, 2010, SunTrust affirmatively chose to "tell the Court and Mr. Millian today how the document [the February 22 Email] came to us," even though the Court made clear that "I'm not requiring you to."  In a statement that now seems rather misplaced, SunTrust's counsel responded, "I don't have anything to hide."  Status Conf. Tr. at 11:11-17 (Ex. 1).  SunTrust thereupon chose of its own accord and for its own benefit to disclose and represent certain facts to the Court expressly for the purpose of convincing the Court that no one at SunTrust apart from Pettitt had reason to

suspect that the February 22, 2008 Email might be a fake.  SunTrust accordingly represented

that:

(1)    An in-house attorney at SunTrust (later identified as Susan Thurman) received "the suspect version" of the February 22, 2008 Email "from Ms. Pettit in August of 2008"—*but* in the communication of the Fake February 22, 2008 Email "there was no indication whatsoever to the attorney in-house who received it that there was anything amiss with regard to it."  Status Conf. Tr. at 11:20-12:2 (Ex. 1).

(2)    The "suspect version" of the February 22, 2008 Email "was forwarded to us [Reed Smith] by in-house counsel at SunTrust . . . and it was sent to us in good faith as being a record of the company."  The document was forwarded because "an inquiry was made as to is there any more detail that you [SunTrust] can furnish us [Reed Smith]?"  *Id.* at 11:20-23; 12:2-3, 22-23.

SunTrust's affirmative representation that there was "no indication" of "anything amiss"

in those communications was misleading in the extreme given that Thurman had actual

knowledge that at least two other  emails "received" from Pettitt were fakes.[2]  Of more

importance for present purposes, however,  SunTrust has *deliberately chosen to disclose and*

*represent* (a) what purportedly was (or wasn't) communicated between Pettitt and Thurman; (b)

certain specifics of communications between in-house counsel Thurman and outside counsel;

and (c) Ms. Thurman's knowledge regarding the *bona fides* of the Fake February 22, 2008

Email.  SunTrust, however, now refuses to produce the communications at issue or to permit any

inquiry into them, thus making it impossible to determine whether in fact there was nothing

"amiss" in them and whether in fact the Fake February 22, 2008 Email was sent to outside

counsel "in good faith."

---

[2]  United Guaranty assumes that SunTrust's counsel, Mr. Dumville, was unaware as of the date of the Status Conference that SunTrust had already discovered two of Pettitt's forgeries, or else would never have made such a statement.  Ms. Hovatter of SunTrust, sitting next to Mr. Dumville, however, most assuredly knew this information.

SunTrust also made two other important factual representations at the Status Conference—both of which, like the statement that SunTrust had no reason to think anything was "amiss," were (to put it charitably) highly misleading.  Towards the end of the conference, SunTrust's counsel stated:

> MR. DUMVILLE: I will affirmatively tell the Court that because of this revelation we are and SunTrust is looking very closely at all of Ms. Pettitt's e-mail traffic **to make sure that there are no other issues out there.**
>
> THE COURT: Yeah, I'm sure you are.

Status Conf. Tr. at 34:8-13 (emphasis added) (Ex. 1).  The statement that SunTrust was seeking to "make sure" there were "no other issues out there" can only be read as an assurance to the Court that SunTrust was *not* aware of other fake evidence or similar issues beyond the Fake February 22, 2008 Email—which we now know not to be true.

A second statement at the status conference was also clearly false.  In response to a question from the Court whether Pettitt's hard drive had been imaged in January 2009 "relating to these issues"—a fact that would show that SunTrust knew *at least a year ago* there were "issues" with Pettitt forging documents—SunTrust vociferously denied any such notion:

> MR. DUMVILLE: ***No, no, no.*** Relating to the lawsuit, Your Honor. ***It was simply, obviously, Ms. Petit was one of the people who was very much involved in the communications back and forth on the policy at issue, and SunTrust took the precaution of imaging her computer***, as well as, I understand, two or three other people who were more or less significantly involved in the business transactions.

Status Conf. Tr. at 5:4-11 (emphasis added) (Ex. 1).  Thurman, however, testified precisely the opposite at her deposition, stating that Pettitt's hard drive (and only hers) was imaged in January 2009 as "*part of the investigation into the discrepancies in the emails*."  Thurman Tr. at 66:20-67:1; 67:7-11 (Ex. 6).

SunTrust may come back and claim that its false representations to the Court were just "mistakes" or "miscommunications."  This would be hard to believe, but the bigger point for present purposes is that SunTrust has *affirmatively chosen* to reveal *some* of its attorney-client communications and work product, those communications were in furtherance of a scheme to create fake evidence to support SunTrust's case—and it is clear that what SunTrust claims did and did not occur during that scheme cannot be trusted.

> **2.      In Its Voluntary "Response" to the Already-Decided Motion for Emergency Relief, SunTrust Makes Further Factual Representations In an Effort to Minimize the Impact of Disclosing That Its Senior Vice President Concocted Additional Fake E-Mails Not Previously Mentioned By SunTrust**

On February 3, 2010, as noted, SunTrust filed an untimely, unrequested, and unnecessary "response" ("ST Response") to United Guaranty's Motion for Emergency Relief.  The obvious purpose of this odd filing was to disclose preemptively what SunTrust realized United Guaranty and the Court were about to learn anyway through the upcoming depositions of Pettitt, Clack and Thurman.  SunTrust affirmatively represented that:

(1)   "At the time Ms. Pettitt created the different versions of the February 22 Email [in August 2008], SunTrust was in the process of gathering documents relevant to its ongoing dispute with United Guaranty over the coverage of the Combo 100 Loans at issue.  Ms. Pettit was one of several SunTrust employees who provided documents to Ms. Thurman as a part of that effort.  Among the documents provided by Ms. Pettit to Ms. Thurman were copies of a number of emails that *Ms. Pettitt represented* had been sent back and forth between her and employees of United Guaranty."  ST Response at 5 (emphasis added).

(2)   Although SunTrust discovered the Fake June 20, 2005 Email and the Fake February 1, 2006 Email in August 2008, "*SunTrust was unable to question Ms. Pettit regarding the emails for several months* [until January 2009] after the discovery of the differences *because she was on an FMLA leave of absence*." Id. at 6 n.6 (emphasis added).

(3)   "In January, 2009, Ms. Pettitt was questioned regarding the discrepancies in the United Guaranty versions and her versions of these two emails, and *she provided what appeared to be a plausible explanation* for the differences. . . . SunTrust accepted Ms. Pettit's explanation."  Id. at 6 (emphasis added).

13

(4) "*Based on the information SunTrust has been able to obtain so far, SunTrust believes that only Ms. Pettitt was involved* in creating the versions of the February 22 Email that differ from the "sent" version.  SunTrust's analysis of the ESI relating to the creation of the Exhibit D-3, D-4 and D-5 versions of the email indicates those versions were created on Ms. Pettitt's laptop in August, 2008.  To the best of SunTrust's knowledge, no one other than Ms. Pettitt was able to use this computer since it was password protected."  Id. at 5 (emphasis added).

(5) "*SunTrust has not relied and will not rely on the 'Pettitt versions'* of either of these two emails for any purpose in this litigation."  Id. at 6 n.5 (emphasis added).

As a starting point, several of SunTrust's representations in *this* submission are *also* false or misleading.  First, it is simply not true that SunTrust's very lengthy delay in quizzing Pettitt regarding the Fake Emails resulted from her being on FMLA leave.  In one of the few bits of substantive testimony she gave, Pettitt revealed that she was "out of the office" for only three weeks during the relevant 2008 time period, that during those three weeks "part of that time [she was] on FMLA leave, part of that time [she was] working from home," and that even while at home "[i]n this environment with Blackberry and e-mail, people can reach me any time."  Pettitt Tr. at 35:2-37:23 (Ex. 11).  SunTrust's attempt to explain its delay with this "FMLA leave story" is thus utter nonsense, and brings home that what SunTrust has to say about this matter simply cannot be trusted.

Second, SunTrust's representation that in January 2009 Pettitt was questioned and offered up a "plausible explanation" for the "discrepancies" in the Fake Emails is also incorrect.  Thurman testified that Pettitt gave *no explanation* at this January interview, and did not offer her so-called "plausible explanation" until March of 2009.  Thurman Tr. at 56:12-19; 57:19-21 (Ex. 6).  Further, while SunTrust has steadfastly blocked inquiry into what exactly Pettitt supposedly said, the notion that it was "plausible" is at best dubious.  Clack in fact testified, when pressed,

that "I don't know that it was plausible. . . . I'm not sure it was fully explained." Clack Tr. at

17:11-17 (Ex. 3).

Potentially most significant, SunTrust has affirmatively represented to the Court that it

"has not relied and will not rely on the 'Pettitt versions' of either of these [other] two emails for

any purpose in this litigation."  The truth of this statement is far from self-evident, particularly

because *SunTrust cites and relies on the January 27/February 1, 2006 email exchange in its

Amended Complaint*.  It is quite possible that SunTrust *did* send its outside counsel the Fake

February 1, 2005 Email, along with the Fake February 22, 2008 Email and other documents, in

response to  Reed Smith's "inquiry . . . as to is there any more detail that you [SunTrust] can

furnish us?"  Thurman testified that what she did in response to Reed Smith's inquiry was—

incredibly—simply to forward Pettitt's email from August 2008 attaching a number of supposed

supporting documents.  Thurman Tr. at 78:21-79:21 (Ex. 6).  That email, or others sent to Reed

Smith by Thurman during the same time frame, well could have included the Fake February 1,

2005 Email, and indeed it seems rather more likely that Reed Smith received the Fake February

1, 2005 Email this way and used it in drafting the Amended Complaint than that it received the

Genuine February 1, 2005 Email through some other, unknown channel, and used it instead.

United Guaranty does not know whether this has occurred.  But SunTrust has put this

question, and others, directly at issue by selectively disclosing attorney-client communications

and work product to support its position against United Guaranty.

### 3. SunTrust Withholds Key Documents Necessary to Determine the Truth of the Facts It Has Represented to the Court, And Omits Key Material From Its Privilege Log

Despite putting the foregoing issues into play, SunTrust has withheld a large volume of

documents on privilege grounds that comprise the "story" regarding the Fake Emails.  *See*, *e.g.*,

Ex. 12.  SunTrust also has failed to list documents on the log that have been withheld on

privilege grounds.  At her deposition, for example, Thurman conceded that she had kept handwritten notes of her January 2009 interview with Pettitt but that these were not on the privilege log.  Thurman Tr. at 89:14-21 (Ex. 6).

> **4.** **At the Court-Ordered Depositions SunTrust Blocks Inquiry Into the Truth of the Facts It Has Represented to the Court**

As discussed above, some information came out in the depositions of Pettitt, Clack and Thurman that casts serious doubt on the accuracy of what SunTrust has represented to the Court is the "story" regarding the three presently known fraudulent emails.  Again and again, however, SunTrust asserted unfounded privilege objections that have blocked United Guaranty's ability to get to the truth.

With respect to the deposition of the central witness in this saga, Mary Pettitt, her counsel invoked Pettitt's Fifth Amendment right not to give incriminating testimony and instructed her not to answer virtually every substantive question asked during her deposition, from "When did you become a Senior Vice President of SunTrust?" to every question "regarding the matters that are at issue in the pending litigation."  *See, e.g.,* Pettitt Tr. at 28:14-18, 69:24-71:5 (Ex. 11).  It is thus plain that United Guaranty has no ability to obtain testimony from Pettitt.  Although not directly relevant to the present motion, United Guaranty cannot help but note that SunTrust appears to have engineered Pettitt's silence.[3]

---

[3] SunTrust has, quite noticeably, not tried very hard to secure her testimony.  As this Court is aware, Pettitt's attorneys have stated that she will not consider waiving her Fifth Amendment rights unless SunTrust provides them with documents that comprise or reflect communications between Pettitt and others at SunTrust regarding this matter.  *See* Witness Mary Pettitt's Motion for Protective Order at 3-4.  SunTrust initially refused to provide these documents on the basis that "they are privileged and if the documents are provided to Ms. Pettitt's counsel, it is likely that United Guaranty will claim that SunTrust has thereby waived the applicable privileges."  ST Response at 5.  After United Guaranty agreed that it

[Footnote continued on next page]

Setting aside Pettitt's Fifth Amendment claims, SunTrust has blocked deposition testimony, including from Pettitt, on the very same topics that it has chosen to make factual representations to the Court.  Examples of SunTrust's instructions not to answer deposition questions regarding the truth of its factual representations to the Court are set forth in the Appendix to this Memorandum.  As we discuss below, SunTrust's privilege instructions, and its refusal to produce "privileged" documents, runs square afoul of settled case law.

### III.    LEGAL ARGUMENT

SunTrust's documents and communications related to the altered emails are not protected by the attorney-client privilege or the work product doctrine for two separate but equally valid reasons—the protection has been implicitly waived, and the crime-fraud exception applies.  Both waiver and crime-fraud vitiate the privilege not just for a narrow category of documents, but for the entire subject matter at issue.  This Court should therefore order that SunTrust produce to United Guaranty all documents, communications and testimony related to the Fake Emails, and to any other altered document of which SunTrust is aware.

### A.    Virginia Law Narrowly Construes The Attorney Client Privilege

"In diversity cases, privileges are determined according to the state law that supplies the rule of decision." *Hatfill v. The New York Times Company*, 459 F. Supp. 2d 462 (E.D.VA.

---

[Footnote continued from previous page]

would *not* make any such claim, SunTrust came up with a new excuse:  that unnamed "third parties" in some unspecified not-yet-existing proceeding might claim a privilege waiver. SunTrust Priv. Mem. at 11-12.  Finally, for good measure, SunTrust fired Pettitt just four days before her deposition, Pettitt Tr. at 30:2-7, and *now claims her termination as one of the reasons* why SunTrust cannot disclose documents to her without risking a waiver.  SunTrust Priv. Mem. at 11.  Thus, although SunTrust laments its own supposed inability to get information from Pettitt—and has used that as an excuse not to provide key information regarding what motivated the creation of the Fake Emails—one cannot help but think of the man who kills his own parents and then asks for mercy because he is a orphan.

2006); *see also* Fed. R. Evid. 501.  SunTrust's Brief asserts that the attorney-client privilege is "a bedrock principle of the adversary system."  SunTrust Priv. Mem. at 8.  While that may be true, "[n]evertheless, the privilege is an exception to the general duty to disclose, is an obstacle to investigation of the truth, and should be strictly construed." *Commonwealth v. Edwards*, 235 Va. 499, 509 (Va. 1988); *see also Hawkins v. Stables*, 148 F.3d 379, 383 (4th Cir. 1998) (the attorney-client privilege  "impedes [the] full and free discovery of the truth," and therefore "is to be narrowly construed.").[4]  The privilege applies only if the party supporting the privilege can show that:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982).  The proponent—in this case SunTrust—has the burden of establishing "that the attorney-client relationship existed, that the communications under consideration are privileged, and that the privilege was not waived." *Edwards*, 235 Va. at 509, *citing Jones*, 696 F.2d at 1072.

---

[4]  United Guaranty agrees with SunTrust that application of the attorney-client privilege in this case is determined under Virginia law, while application of the work-product doctrine is determined under federal law.  *See* SunTrust Priv. Mem. at 8 n.7.  As application of the attorney-client privilege in this case is virtually identical under Virginia and federal law, United Guaranty cites to both as authority for its positions.

**B.      The Work Product Doctrine is a Qualified Privilege That May Be Overcome by Demonstrating a Substantial Need that Cannot Be Overcome Without an Undue Hardship**

The work-product doctrine limits discovery of materials made "in anticipation of litigation." *See* Rule 26(b)(3); *Sanford v. Virginia*, 2009 WL 2421787 (E.D. Va. July 31, 2009), Civ. Act. No. 3:08 cv835 ("It is settled Fourth Circuit law that a document must have been prepared 'because of' the potential for litigation in order to be protected by the work product doctrine"). There are two types of work-product: work product "which involves an attorney's mental impressions, opinions, legal theories, or conclusions, and that which does not. The former is absolutely protected from discovery. The latter, however, can be discovered if the requesting party shows substantial need for the information and that they cannot acquire equivalent materials without undue hardship." *Chase v. City of Portsmouth*, 236 F.R.D. 263, 269 (E.D. Va. 2006) (internal citations omitted). *See Duck v. Warren*, 160 F.R.D. 80, 83 (E.D. Va. 1995) ("substantial need can be established by showing the document is necessary for impeachment purposes"); *see e.g., In re Grand Jury Subpoenas 89-3 and 89-4*, 734 F. Supp. 1207, 1214-15 (E.D. Va. 1990) ("sufficiently strong showing of need to overcome the work product privilege" where "several critical Movant employees . . . have chosen to invoke the Fifth Amendment right to remain silent"), *partially overruled on other grounds*, 902 F.2d 244 (4th Cir. 1990).

**C.      Both the Attorney-Client Privilege and the Work Product Doctrine Can Be Waived Explicitly or By Implication**

"The [attorney client] privilege may be expressly waived by the client, or a waiver may be implied from the client's conduct." *Edwards*, 235 Va. at 509. Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives that privilege. *Jones*, 696 F.2d at 1072. The waiver need not be intentional, and may be implied from a client's

conduct.  *Edwards*, 235 Va. at 509.  Selective disclosure of privileged information for tactical purposes, such as to gain an advantage in litigation, waives the attorney-client privilege—and with good reason.  *See*, *e.g.*, *Jones*, 696 F.2d at 1072 (*citing In re Sealed Case*, 676 F.2d 793, 808-09 (D.C. Cir. 1982)).  "There is always also the objective consideration that when [a party's] conduct touches a certain point of disclosure, fairness requires that [the] privilege shall cease whether [the party] intended that result or not.  He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.  He may elect to withhold or to disclose, but after a certain point his election must remain final."  *Id.* (citing 8 Wigmore, Evidence § 2327 at 636 (McNaughton rev. 1961)).

Similarly, the work product privilege is "a qualified privilege subject to waiver."  *In re Martin Marietta Corp.*, 856 F.2d 619, 624 (4th Cir. 1988).  "The signal feature of the implied waiver . . . is the attempt to make testimonial use of work-product materials."  *Id.*  Indeed, "testimonial use of work-product implies a waiver."  *Id.*; *see also United States v. Nobles*, 422 U.S. 225, 240 (U.S. 1975) ("where counsel attempts to make a testimonial use of [work product] materials the normal rules of evidence come into play with respect to cross-examination and production of documents").  "The Fourth Circuit has not embraced the concept of limited waiver of the attorney-client privilege," and likewise revealing fact work product results in a subject matter waiver of all fact work product regarding the subject matter at issue.  *In re Martin Marietta Corp.*, 856 F. 2d at 623-25 ("subject matter waiver applies to non-opinion work-product when testimonial use of non-opinion work-product is made.")  In contrast, while "pure expressions of legal theory or mental impressions" may be specifically waived, these pure mental impressions or legal theories will not create a subject matter waiver.  *Id.* at 624-25.  Rather, the Fourth Circuit distinguishes "between non-opinion work product, which may nevertheless be

ordered produced if counsel has waived work product protection, and pure mental impressions

severable from the underlying data." *Id.* at 625; *see also Sanford v. Virginia*, 2009 WL 2421787,

at *3 (holding that various documents containing interview notes "contain factual information,

and not mental impressions, opinions, or thoughts.").

**D.      SunTrust's Partial Disclosure Clearly Waives Any Attorney-Client Privilege and Fact Work Product That Might Otherwise Attach to Communications Surrounding the Creation, Transmission, Investigation and Use of the Fraudulent Documents**

As a threshold matter SunTrust's motion for protective order makes no serious attempt to

meet its burden of demonstrating why the documents at issue are privileged.  Rather, it merely

conclusively asserts that "there should be no dispute that the substance of the documents is

privileged and protected from disclosure under both the attorney-client privilege and the work

product doctrine." SunTrust Priv. Mem. at 6.  Yet, even if SunTrust met its initial burden of

proving the existence of privilege, it unequivocally waived these privileges for the documents

that it seeks to shield from United Guaranty (and Pettitt).

Of its own accord, and for its own benefit, SunTrust disclosed several communications

that took place between Pettitt and SunTrust's in-house counsel and proffered several assertions

about what SunTrust's counsel did or did not know.  As noted above, in its "response" to United

Guaranty's Motion for Emergency Relief  SunTrust asserted that Pettitt provided the Fake

February 22, 2008 Email to in-house counsel as part of its effort to gather "documents relevant to

its ongoing dispute with United Guaranty over the coverage of the Combo 100 Loans at issue."

SunTrust Response p. 5.  In that same filing, SunTrust also admitted, for the first time, that it was

aware of at least two other altered emails produced by Pettitt, and that it had known about these

other emails for over a year.  *Id*. at 6.  SunTrust described that fact that Pettitt offered a

"plausible" explanation for the alterations in the other two emails, and that it accepted her

explanation because "there had never been any questions about her truthfulness and integrity

during her employment." *Id.*  Further, SunTrust asserted that, even though it was aware of two fraudulent emails created by Pettitt, "SunTrust did not detect that the [February 22, 2008] version furnished to Ms. Thurman by Ms. Pettitt in August 2008 differed from the 'sent' version." *Id.*  In addition, as set forth above, SunTrust's counsel affirmatively asserted to this Court that "there was no indication whatsoever to the attorney in-house who received it that there was anything amiss with regard to it, and it was sent to us in good faith as being a record of the company." Status Conf. Tr. at 11:25; 12:1-3 (emphasis added) (Ex. 1).

Yet now, after offering its story of the events surrounding the fraudulent emails, SunTrust seeks to prevent United Guaranty from testing the accuracy of this story by wrapping all documents and communications related to these emails in the cloak of the attorney-client and work product privileges.  Such tactics are not allowed.  A privilege holder may not "use[] an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion."  *In re Grand Jury Proceedings John Doe Co.*, 350 F.3d 299, 306 (2d Cir. 2003).

There is a long line of cases finding an implied waiver of the attorney-client privilege and fact work product protection in circumstances similar to those here.  As far back as 1914, the Virginia Supreme Court recognized that when a party "entered upon a line of defense which involved what transpired between herself and [her counsel] and respecting which she testified, she waived her right to object to his giving his own account of the matter."  *Grant v. Harris ET UX*, 82 S.E. 718, 720 (Va. 1914); *see also Grasso v. O'Connor*, 41 Va. Cir. 193, 193 (Va. Cir. Ct. 1996) (implied waiver of attorney-client privilege where party "complained that [counsel] abandoned her case"); *Commonwealth v. Miller*, 66 Va. Cir. 470, 470 (Va. Cir. Ct. 2001) (implied waiver where party stated to police officer that her lawyer informed her that she was not

22

required to take a course of action); *United States v. Bollin*, 264 F.3d 391, 412 (4th Cir. 2001)

(waiver where defendant testified about transactions and communications to grand jury, even

though the testimony was pursuant to a subpoena).

The Fourth Circuit's decision in *Hawkins v. Stables* is particularly instructive.  In

*Hawkins*, a husband sued his ex-wife for allegedly placing a wire tap on his phone and

improperly recording conversations.  During a deposition the wife denied that she ever had any

discussion with her divorce attorney about removing a wire-tap from her husband's phone.

*Hawkins*, 148 F.3d at 380.  At trial, the husband called his ex-wife's divorce attorney to testify

and asked him whether his wife's deposition testimony was true when she denied ever having a

conversation with him regarding the wiretap.  Her divorce attorney refused to answer on the

grounds that the attorney-client information protected the information from disclosure.  *Id.* at

381-82.  The trial court agreed that the attorney-client privilege attached and the privilege had

not been waived.  *Id.* at 382. In reversing this decision, the Fourth Circuit held:

> Although the question asked during the deposition clearly elicited information
> regarding confidential communications [the wife] may have had with [her
> attorney], and was objectionable on its face on the ground of attorney-client
> privilege, neither [the wife] nor her attorney asserted an objection. In response to
> the question, [the wife] simply stated that she never had a discussion of the matter
> with her attorney. By answering the question as she did, [the wife] both waived
> her privilege and provided probative evidence that she had had no conversation
> with her attorney on the subject of a phone tap.

*Id.* at 384.

Having found a waiver, the Fourth Circuit explained that "such a disclosure not only

waives the privilege as to the specific information revealed, but also waives the privilege as to

the subject matter of the disclosure."  *Id.*  As such, "[the wife] waived the privilege as to the

subject matter of the phone tap."  *Id.; see also Edwards*, 235 Va. at 509-10 ("When a client

communicates information to his attorney with the understanding that the information will be

revealed to others, the disclosure to others effectively waives the privilege "not only to the transmitted data but also as to the details underlying that information").

SunTrust's disclosure of privileged communications here is far more extensive than in *Hawkins*. SunTrust's affirmative representation that "there was no indication whatsoever to the attorney in-house who received it that there was anything amiss with regard to it" and that the email was "sent to us in good faith" following "an inquiry" for SunTrust to provide "more detail" is an unequivocal revelation of *some* of its attorney-client communications and work product, which as in *Hawkins* must result in a subject matter waiver related to what SunTrust's counsel did and did not know with regard to Pettitt's creation of fake evidence to support SunTrust's case. Similarly, SunTrust's representation at the status conference that Pettitt's hard drive was imaged in January 2009 just "relating to the lawsuit" and Thurman's contrary explanation at her deposition that it was imaged as "part of the investigation into the discrepancies in the emails" are additional affirmative representations by SunTrust of attorney-client communications and work product, which likewise constitute a subject matter waiver related to SunTrust's actions regarding the investigation of Pettitt's fake emails. SunTrust's assertions about Pettitt's alteration of the February 2008 email in its response to United Guaranty's interrogatory, and its assertion that Pettitt provided a "plausible explanation" for the other altered emails, clearly waives SunTrust privilege as to all of the altered documents. *See e.g.*, *Galaxy Computer Servs., Inc. v. Bake*, 325 B.R. 544, 559 (E.D.Va. 2005) (quoting *United States v. Workman*, 138 F.3d 1261, 1264 (8th Cir.1998)) ("The attorney client privilege cannot be used as both a shield and a sword, and [a party] cannot claim in his defense that he relied on [his attorney's] advice without permitting the prosecution to explore the substance of that advice."). Similarly, because SunTrust selectively and tactically waived attorney-client privilege and the work product

24

doctrine in proffering its explanation to the Court and United Guaranty, SunTrust has waived any

privilege with respect to the altered documents that have been—and continue to be—discovered.

**E.      The Crime-Fraud Exception Also Applies to the Communications and Documents
that SunTrust Seeks to Shield From Disclosure**

In addition to SunTrust's waiver of attorney client privilege and fact work product, the

crime-fraud exception also prevents SunTrust from hiding behind any assertions of privilege.

The attorney-client privilege and work product protection are designed "to assure that the 'seal of

secrecy,' between lawyer and client does not extend to communications 'made for the purpose of

getting advice for the commission of a fraud' or crime." *United States v. Zolin*, 491 U.S. 554,

563 (1989); *see also Seventh District Comm. of the Va. State Bar v. Gunter*, 183 S.E.2d 713, 719

(Va. 1971) ("[N]o privilege attaches to a communication and transaction between an attorney

and client with respect to transactions constituting the making of a false claim or the perpetration

of a fraud."). SunTrust has admitted that Pettitt altered not just the Fake February 22, 2008

Email but at least two others as well, all during a time of anticipated litigation. Such actions

vitiate any potential claim SunTrust has with regard to the attorney-client privilege and work

product doctrine.

**1.      Standard for Crime Fraud**

The party asserting the crime-fraud exception—here, United Guaranty—need not

definitively prove that a crime or fraud occurred in order for the crime-fraud exception to apply;

"a prima facie showing that the privileged communications fall within the exception" is

sufficient. *In re Grand Jury Proceedings #5 Empanelled*, 401 F.3d 247, 251 (4th Cir. 2005).

The prima facie showing requires evidence that "(1) the client was engaged in or planning a

criminal or fraudulent scheme when he sought the advice of counsel to further the scheme, and

(2) the documents containing the privileged materials bear a close relationship to the client's

existing or future scheme to commit a crime or fraud." *Id*.  The "proof must be such as to subject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted." *Id*.

The crime-fraud exception applies to a much broader array of wrongdoing than what is traditionally considered a "crime" or a "fraud," and spoliation of evidence squarely falls within the exception. *See Rambus, Inc. v. Infineon Techs. AG*, 220 F.R.D. 264, 282 (E.D. Va. 2004) ("[I]t is inconceivable that our Court of Appeals would find that a corporate client's interest in confidential communications respecting destruction of documents in anticipation of litigation would outweigh the societal need to assure the integrity of the process by which litigation is conducted which, of course, is the purpose of prohibiting spoliation of evidence.").  And because the attorney-client privilege is held by the client, the client's intentions are determinative—there is no requirement that an attorney have been aware of wrongdoing for the crime-fraud exception to destroy attorney-client privilege. *In re Grand Jury #5*, 401 F.3d at 251.  Fact work product protection is also abrogated upon a showing that the client engaged in a crime or scheme to defraud; only opinion work product requires a showing that the attorney was aware of or participated in the crime or scheme. *Id.* at 252-53.

>    **2.  The Crime Fraud Exception Applies to Attorney-client and All Fact Work Product By Virtue of Pettitt's Scheme**

SunTrust now admits that its Senior Vice President created multiple fake emails and provided them to in-house counsel for use by SunTrust in preparation for litigation.  SunTrust Priv. Mem. at 5.  Under similar circumstances to those here, the Virginia Supreme Court found that the crime-fraud exception vitiated any privilege that might have attached to attorney-client communications.  In *Seventh District Committee of the Va. State Bar v. Gunter*, a client altered the date of a relevant document, then gave his attorney a file containing the document to be used

as a part of a bar disciplinary proceeding.   *Gunter*, 183 S.E.2d at 716-17.  Even though the client claimed that he was unaware that the document would be used in the proceeding, the court found that the crime-fraud exception applied because by altering the date on the document "a material misrepresentation [was] made at a critical stage in the investigatory proceeding."   *Id*. at 718.  Similarly, this Court has held that the crime-fraud exception extinguished the attorney-client privilege and work product protection where a party committed spoliation by destroying relevant documents when it reasonably anticipated litigation, "even if [it] did not [do so] in bad faith." *Rambus*, 220 F.R.D. at 286.

SunTrust has admitted that Pettitt, at the time and until February 8, 2010 a  Senior Vice President of the company, altered at least one document central to this litigation.  *See*, *e.g.*, SunTrust Priv. Mem. at 15 ("SunTrust has already acknowledged that Ms. Pettitt likely altered the February 2008 E-Mail . . .")  SunTrust has also admitted, as it now must, that Pettitt altered these documents at a time SunTrust reasonably anticipated litigation with United Guaranty over the Combo 100 Loans.  *See, e.g*., SunTrust Response at 5 ("At the time Ms. Pettitt created the different versions of the February 22 Email, SunTrust was in the process of gathering documents relevant to its ongoing dispute with United Guaranty.")  Therefore, as this Court held in *Rambus*, there is uncontroverted evidence that "some destruction [of relevant evidence] occurred at a point in time when [the putative privilege holder] anticipated litigation and therefore had a duty to preserve the evidence."  *Rambus*, 220 F.R.D. at 284.  There are now three instances—that we know of—where SunTrust altered documents related to this case.  Yet despite this fact, and SunTrust's knowledge of certain instances of alteration, SunTrust continued to rely on Pettitt and Pettitt's emails in this litigation.   There can be absolutely no doubt that these instances of falsifying documents, which SunTrust has belatedly and begrudgingly admitted, along with

SunTrust's continued reliance on Pettitt's version of events,  fall squarely within the crime-fraud exception.  *See Gunter*, 183 S.E.2d at 719-20 ("The communications alleged to be privileged were made in the furtherance of the commission of an intended fraud on the [Bar] Committee.").

SunTrust cites only two cases in support of its contention that the crime-fraud exception does not apply to the communications and documents it seeks to withhold; neither support SunTrust's position.  *United States v. Lentz* actually held that the crime-fraud exception *applied*, though under circumstances dissimilar to those here.  419 F. Supp. 2d 820, 829-30 (E.D. Va. 2005).  And in *In re Grand Jury #5*, the Fourth Circuit held only that, where the district court had "no evidence of the contents of the[] documents," it should have examined the challenged documents *in camera* to determine whether the documents were closely related to the alleged crime.  401 F.3d at 255.  Indeed, SunTrust has all but conceded that the crime-fraud exception applies to Pettitt's communications with in-house counsel.  *See* SunTrust Priv. Mem. at 15 (asserting that "United Guaranty cannot show that communications by anyone *other than possibly those of Ms. Pettitt herself* were 'made for an unlawful purpose or an illegal scheme.'" (emphasis added)).

SunTrust filed suit in this case basing its Amended Complaint on communications between Pettitt and United Guaranty over a year after it knew that Pettitt had falsified documents related to this case.   Yet now, after being caught relying on fraudulent documents and a fraudulent narrative of events, SunTrust is making a belated attempt to disassociate itself from Pettitt and cabin the effects of the crime-fraud exception by arguing that the court should "limit such disclosures only to communications *by Ms. Pettitt* which relate to the February 2008 E-Mail."  SunTrust Priv. Mem. at 16.  SunTrust's opportunity to distance itself from Pettitt is long past; that opportunity took place in August 2008 when SunTrust's counsel and others first

learned that Pettitt had falsified evidence related to this case.  Instead, SunTrust chose the other

path.  As we are slowly learning, SunTrust's "fraudulent scheme" is not limited to the February

22, 2008 Email and not solely to Pettitt.  In contrast, it encompasses multiple doctored emails

that SunTrust, SunTrust's in-house counsel, and at least one outside counsel were well aware of.

Despite SunTrust's last minute attempts to disclaim reliance on altered emails, the facts make

clear that SunTrust chose to rely on Pettitt's altered documents long after it was aware that Pettitt

had altered evidence in this case.  "[T]he privilege cannot be used as a shield to preclude

disclosure of information concerning an ongoing or future crime or fraud collaterally learned by

a lawyer during the course of his representation." *X Corp. v. Doe*, 805 F. Supp. 1298, 1307

(E.D. Va. 1992).  As such, all communications related to Pettitt's alteration of evidence, and

SunTrust's reliance on that evidence are covered by the crime fraud exception and enjoy no

privilege.

> **3.     The Crime Fraud Exception Waives All Opinion Work Product From the Time that SunTrust's Counsel Knew of Pettitt's Falsification of Documents**

SunTrust rightly notes that in order "for the fraud exception to apply to opinion work

product (i.e. counsel's mental impressions, thoughts, strategies, etc.) the party asserting the

exception must show that counsel participated in or had knowledge of the fraudulent scheme."

SunTrust Priv. Mem. at 14.  Yet, SunTrust completely ignores the fact that the documents it is

withholding are not mental impressions, thoughts or strategies, but rather witness

communications and interview notes that constitute, at least in substantial part, fact work-

product. SunTrust also disingenuously asserts that United Guaranty can offer no evidence

whatsoever that counsel or anyone else at SunTrust "*knew of*, or participated in, the fraudulent

scheme." *Id. (*emphasis added).  Despite SunTrust's attempt to emphasize that no one (besides

Pettitt) allegedly knew that the Fake February 22, 2008 Email relied on in SunTrust's Amended

Complaint was altered, SunTrust completely ignores the stark fact that both SunTrust's in-house counsel and at least one outside counsel knew of Pettitt's fraudulent scheme with regard to the two other Fake Emails as far back as August 2008.  SunTrust's in-house counsel admitted that she first learned that Pettitt had doctored emails in August 2008. Thurman Tr. at 21:17-24 (Ex. 6).  Thurman in fact testified that she spoke with outside counsel [Gold] regarding the Fake Emails throughout the period of August 2008 through January 2009, that she sent the two known Fake Emails to Gold, and that Gold participated in the interview of Pettitt in January 2009. Thurman Tr. at 43:5-17; 44:13-24; 45:1-2; 55:23-25; 56:1-3 (Ex. 6).  Given these undisputed facts, United Guaranty has shown *at least* a prima facie case that SunTrust's counsel were aware of Pettitt's scheme to defraud.  Because all of the information United Guaranty seeks relates directly to this SunTrust scheme to defraud, the crime-fraud exception vitiates SunTrust's assertion of attorney-client privilege and the work product doctrine.

## IV.  CONCLUSION

The attorney-client privilege and fact work product protection has been implicitly waived; SunTrust has put the communications and work product related to the Fake Emails at issue by describing its version of events related to those emails.  It cannot now prevent United Guaranty from confirming the truth of its assertions by hiding behind the attorney-client privilege and work product doctrines.  In addition, the crime-fraud exception applies to the documents and communications United Guaranty seeks.  The Court should order SunTrust to produce to United Guaranty all documents related to any altered email of which it is aware, as well as documents related to SunTrust's handling of the altered emails once it became aware of their existence.

Dated: February 22, 2010                     Respectfully submitted,


      /s/
Christyne K. Brennan
Virginia Bar Number 48114
John C. Millian (admitted pro hac vice)
Brian C. Baldrate (admitted pro hac vice)
Attorneys for Defendant United Guaranty
Residential Insurance Company of North Carolina
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500 (main phone)
(202) 530-9627 (Brennan direct fax)
(202) 530-9566 (Millian direct fax)
(202) 530-9684 (Baldrate direct fax)
cbrennan@gibsondunn.com
jmillian@gibsondunn.com
bbaldrate@gibsondunn.com

Wyatt B. Durrette, Jr.
Virginia Bar Number 04719
Attorney for Defendant United Guaranty
Residential Insurance Company of North Carolina
DURRETTEBRADSHAW PLC
Bank of America Center
1111 East Main Street, 16th Floor
Richmond, VA  23219
(804) 775-6900 (phone)
(804) 775-6911 (fax)
wdurrette@durrettebradshaw.com

*Counsel of Record for Defendant United Guaranty*
*Residential Insurance Company of North Carolina*

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of February, 2010, I will electronically file the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification

of such filing (NEF) to the following:

S. Miles Dumville
Curtis G. Manchester
Travis Aaron Sabalewski
Reed Smith LLP
Riverfront Plaza – West Tower
901 East Byrd Street, Suite 1700
Richmond, VA  23219-4068

Joshua Gold
Anderson Kill & Olick
1251 Avenue of the Americas
New York, NY 10020

___/s/_____
Christyne K. Brennan
Virginia Bar Number 48114
Attorney for Defendants United Guaranty
Corporation and United Guaranty Residential
Insurance Company of North Carolina
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone: (202) 955-8685
Fax: (202) 530-9627
cbrennan@gibsondunn.com

32