**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| SUNTRUST MORTGAGE, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 3:09cv00529 |
| AIG UNITED GUARANTY CORPORATION a/k/a UNITED GUARANTY CORPORATION, et al., | |
| Defendants. | |

**REPLY IN SUPPORT OF
DEFENDANT UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF
NORTH CAROLINA'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS
IMPROPERLY WITHHELD AS PRIVILEGED AND THE DEPOSITIONS OF SUSAN
THURMAN AND JOANN CLACK**

Christyne K. Brennan (Va. Bar No. 48114)
John C. Millian (admitted pro hac vice)
Brian C. Baldrate (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
*telephone/fax/email on signature page*

Wyatt B. Durrette, Jr. (Va. Bar No. 04719)
DURRETTEBRADSHAW PLC
Bank of America Center
1111 East Main Street, 16th Floor
Richmond, VA  23219
*telephone/fax/email on signature page*

*Counsel of Record for Defendant United Guaranty
Residential Insurance Company of North Carolina*

Filed:  March 17, 2010

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ......................................................................................... 1

II.  PRELIMINARY STATEMENT ................................................................... 2

III. ARGUMENT ................................................................................................ 6

    A.   SunTrust's Selective Disclosure of Attorney-Client Communications
        and Work Product Waives Any Attorney-Client Privilege and Fact
        Work Product Claim by SunTrust Related to the Fake Emails ........................... 6

        1.   SunTrust has not "merely disclosed" the circumstances
              surrounding the discovery of altered emails, but has made
              affirmative representations regarding the contents of
              attorney-client communications and work product.................................... 7

        2.   SunTrust was not "required to provide such information by
              the Court's order or discovery rules"....................................................... 11

        3.   SunTrust cannot avoid a waiver finding by claiming that its
              assertions are meant to refute United Guaranty's claims of fraud........... 12

        4.   SunTrust cannot blame its selective waiver on outside counsel.............. 13

    B.   The Crime-Fraud Exception Applies to SunTrust's Claims of
        Attorney-Client and Work Product Privilege ....................................................... 15

        1.   SunTrust essentially concedes a *prima facie* case for
              crime-fraud with regard to the fake emails .............................................. 15

        2.   SunTrust cannot avoid disclosure of the information at issue
              by claiming "opinion" work product ....................................................... 17

    C.   No Privilege Exists With Respect to the Documents Presently
        Before the Court.................................................................................................... 18

    D.   SunTrust Failed to Produce, Failed to Provide to the Court for
        *In Camera* Review, and in Many Instances, Failed to Identify
        on a Privilege Log, Numerous Other Documents Relating to
        SunTrust's Fake Emails ....................................................................................... 19

IV.  CONCLUSION............................................................................................. 20

# I.      INTRODUCTION

United Guaranty Residential Insurance Company of North Carolina ("United Guaranty") respectfully submits this Reply in support of its motion to compel the production of documents improperly withheld as privileged and to compel deposition testimony from SunTrust witnesses, Susan Thurman and Joann Clack, who have refused to answer numerous questions regarding SunTrust's spoliation of evidence on purported privilege grounds (the "Motion to Compel").

United Guaranty's Opening Memorandum in support of this Motion establishes that:

(1)     SunTrust Mortgage, Inc.'s ("SunTrust's") selective disclosure of attorney-client communications and work product waives any attorney-client privilege and fact work product protection that might otherwise attach to communications and documents surrounding the creation, transmission, investigation and use of three documents that SunTrust's Senior Vice President Mary Pettitt ("Pettitt") altered (the "Fake Emails"); and

(2)     the crime-fraud exception applies to all attorney-client communications and fact work product related to the Fake Emails, as well as all opinion work product from the time that SunTrust's counsel knew of Pettitt's falsification of documents.

As discussed below, SunTrust's Opposition offers no basis for reaching any different conclusions.  Rather, the Opposition exhibits SunTrust's continued attempts to proffer representations regarding the purported content of certain attorney-client communications and work product to support its side of the story and then hide behind the privilege cloak; demonstrates SunTrust's inability to rebut well-settled law regarding the waiver of, and crime-fraud exception to, the attorney-client privilege and work product doctrine; highlights SunTrust's failure to provide all relevant documents to United Guaranty or the Court for *in camera* review or even to identify such documents on its privilege logs; and further substantiates that the Motion to Compel must be granted.  We address these points below.

## II.    PRELIMINARY STATEMENT

As an initial matter, SunTrust's Opposition contains, yet again, new representations related to the Fake Emails.  As set forth in our Opening Memorandum, while SunTrust has made numerous factual representations that go *directly* to the *content* of attorney-client communications and work product, SunTrust has withheld such material from production and blocked inquiry into these communications in depositions.  *See* Opening Memorandum at 10-17 and Appendix thereto.  Now, in its Opposition, SunTrust has made additional and more specific representations related to the substance of these same communications.

SunTrust represents in its Opposition that there was "nothing in Ms. Pettitt's communication or in the language of the e-mail itself [from Pettitt to Thurman on August 12, 2008] that would have alerted Ms. Thurman [SunTrust's in-house counsel] to the fact that the February 2008 E-Mail may have been altered."  Opposition at 11.  This is plainly a representation as to the content of an attorney-client communication.  However, SunTrust has failed to produce this email communication to United Guaranty and has blocked deposition testimony regarding whether its representation concerning that email is true:

> Q:  Did the e-mail that Ms. Pettitt sent to you on August 12th of 2008 that transmitted Exhibit 5 [the Fake February 22, 2008 Email] and other e-mails include commentary from Ms. Pettitt on what she was sending you?
> A:  I think it did.
> Q:  Was that commentary in the text of the e-mail or was there a separate memo from her describing her discussing the documents she was sending –
> A:  I believe it was in the text of the e-mail.
> Q:  And what did the text say?
> MR. DUMVILLE:  Objection, attorney/client privilege, work product.  You're not to answer the question.
> BY MR. MILLIAN:
> Q:  Did the text of the e-mail represent to you, Ms. Thurman, that the documents being forwarded to you by Ms. Pettitt were genuine versions of e-mail communications between Ms. Pettitt and employees at United Guaranty?
> MR. DUMVILLE:  Objection to the form of the question, attorney/client privilege and work product.  You're not to answer what was represented.

Thurman Tr. at 37:16 – 38:13.

SunTrust also represents that Thurman "was unaware of the alteration [of the February 22, 2008 Email] until she received United Guaranty's 'emergency' motion." Opposition at 9. This is a representation as to what Thurman was and was not told regarding the Fake Emails in communications with Pettitt (and presumably others), also what Thurman did and did not learn from document review during her investigation prompted by the two Fake Emails she admits were known to have "discrepancies." However, SunTrust has failed to produce any documents related to its investigation into Pettitt's known alterations of emails, including Thurman's notes from her interview of Pettitt. SunTrust also specifically blocked Thurman from testifying about the steps she (or others) took to determine the veracity of the February 22, 2008 Email:

> Q:  Ms. Thurman, what steps were taken by you in August of 2008 to determine whether or not Exhibit 5, the purported e-mail of February 22, 2008, was genuine or, instead, had been doctored by Ms. Pettitt as other e-mails sent to you had been?
> MR. DUMVILLE:  Objection to the form of the question.  You can answer to the extent that your answer would not involve communicating as an attorney with others.
> THE WITNESS:  No.
> BY MR. MILLIAN:
> Q:  Why not?
> MR. DUMVILLE:  Objection to the form of the question, asks for her to reveal her mental impressions, opinions and strategy.  You're not to answer.
> BY MR. MILLIAN:
> Q:  Were any steps ever taken by SunTrust prior to December of 2009 to determine whether Exhibit 5 was a genuine document or had been doctored by Ms. Pettitt, as other e-mails had been doctored?
> MR. DUMVILLE:  You can answer to the extent you know of your own knowledge as opposed  to something you were told in your role as an attorney.
> THE WITNESS:  I can't answer that.
>                    *          *          *
> Q:  Did anyone else at SunTrust make any effort prior to December of 2009 to determine whether or not the e-mail of February 22, 2008, Exhibit 5, was genuine or not?

MR. DUMVILLE:  If you know of your own knowledge without revealing any communication from any other -- apart from any client or another attorney that was involved.
THE WITNESS:  I'd have to -- no, I can't answer that.

Thurman Tr. 38:15 – 39:15, 74:8-17.

Finally, SunTrust now also represents that it was "unable to conclude from its investigation between August, 2008 and the spring of 2009 that Ms. Pettitt had affirmatively altered the two e-mails."  Opposition at 4-5.  This is yet another representation as to what Pettitt stated to counsel and a specific assertion about what counsel learned in the investigation.  Again, however, SunTrust has failed to produce Thurman's notes of her interview of Pettitt, or to provide any other documents related to SunTrust's investigation.  SunTrust has also blocked inquiry into Pettitt's "explanation" for the Fake June 20, 2005 Email and Fake February 1, 2006 Email, which goes directly to what SunTrust was in fact "able to conclude":

Q:  What explanation did [Pettitt] provide to you [at any point in your interviews with her] for the differences in the language of the two e-mails that had been altered?
MR. DUMVILLE:  Objection on the grounds of attorney/client privilege, work product doctrine, instruct her not to answer the substance of her communication.
BY MR. MILLIAN:
Q:  Did the explanation she provided to you make sense to you?
MR. DUMVILLE:  Objection on the grounds that you're seeking an attorney's mental impressions and opinions.  Instruct you not to answer.
                              *        *        *
Q:  Did SunTrust accept Ms. Pettitt's explanation for the differences in the texts of the two e-mails that she was questioned about?
MR. DUMVILLE:  Objection to the form of the question.  I'm not sure how she can even answer that.
BY MR. MILLIAN:
Q:  Well, did you accept her explanation?
MR. DUMVILLE:  Objection to the question to the extent it seeks to discover her mental impressions and opinions.  And instruct you not to answer unless you can answer without divulging those.
THE WITNESS:  No, I can't answer it.

4

Thurman Tr. at 57:25 – 58:12; 61:17 – 62:5.  SunTrust should not be permitted to continue to make representations regarding privileged communications while blocking United Guaranty's attempts to determine the truth of SunTrust's representations.

In addition to offering yet more unverified representations, SunTrust now offers the following thesis – presumably a "sneak peek" at what it will argue in opposing sanctions:

> *an objective observer* with an average understanding of human nature would conclude that Ms. Pettitt, perhaps out of some concern that her handling of the relationship with United Guaranty might be criticized by her superiors, unilaterally submitted the altered e-mails to Ms. Thurman and others at SunTrust, probably hoping at the time that the dispute with United Guaranty would be resolved without her unauthorized actions being discovered.

Opposition at 11-12 (emphasis added).

Such conjecture is unsupported by Thurman's and Clack's deposition testimony or any other evidence.  To the contrary, the evidence establishes that in August 2008, SunTrust undertook to find written evidence "to show what documentation [SunTrust] relied upon to evidence approval by United Guaranty of our guidelines."  Clack Tr. at 46:15-17.  As both Pettitt and Clack understood, "this was an exercise in collecting documents that would be used in the dispute with United Guaranty to support SunTrust's position."  *Id.* at 46:18-25.  Further, as SunTrust has represented to the Court, "[o]ne of the specific purposes for which the documents were to be used was the drafting of a letter to United Guaranty."  SunTrust's Reply to United Guaranty's Response to SunTrust's Motion for Protective Order and Request for *In Camera* Review of Certain Documents [docket# 96] ("Priv. Reply") at 10.

Pettitt thus plainly created the Fake Emails in the course of her employment, and for purposes of bolstering SunTrust's case against United Guaranty.  Moreover, SunTrust's representation that SunTrust "accepted" a supposedly "plausible" explanation for the Fake Emails that Pettitt provided in March 2009, if true, shows that when SunTrust investigated the

incident *it* did not believe that Pettitt created the Fake Emails in an attempt to avoid criticism. SunTrust's Response to United Guaranty's Motion for Emergency Relief [docket # 74] ("ST Response") at 6.  SunTrust's attempts to rewrite the story and propose an alternative explanation for Pettitt's motives are thus simply unfounded.

Finally, much of SunTrust's Opposition is committed to arguing that there has been no fraud upon the Court.  Opposition at 7-12.  While this argument is more properly addressed in United Guaranty's forthcoming Motion for Sanctions, one item is particularly worth noting here. SunTrust now attempts to explain its representation to the Court on January 8, 2010, that "we are and SunTrust is looking very closely at all of Ms. Pettitt's e-mail traffic to make sure that there are no other issues out there," as simply referring to "the review then being conducted by an outside consulting firm [that] was more technically sophisticated than SunTrust's earlier internal review of Ms. Pettitt's emails."  Opposition at 10.  This "explanation" entirely ignores the point: regardless of what SunTrust's outside electronic vendor might then be doing, SunTrust ***already knew***, without a doubt, that there indeed were "other issues out there"—at least two more Fake Emails—and yet clearly suggested to the Court that it had no such knowledge at that time.

For the reasons set forth in United Guaranty's Opening Memorandum and as set forth below, SunTrust should not be allowed to continue to make selective and unsupported representations to this Court and United Guaranty, and then hide behind the privilege cloak to prevent its representations from being examined and challenged.  SunTrust's shenanigans must be stopped.

## III.    ARGUMENT

**A.    SunTrust's Selective Disclosure of Attorney-Client Communications and Work Product Waives Any Attorney-Client Privilege and Fact Work Product Claim by SunTrust Related to the Fake Emails**

United Guaranty's Opening Memorandum sets forth why SunTrust's selective disclosure

of the circumstances surrounding the Fake February 22, 2008 Email creates a *subject matter* waiver of SunTrust's knowledge and reliance on all fake documents and evidence. Opening Mem. at 21-25. Rather than refuting the law on subject matter waiver, SunTrust's Opposition simply denies that it committed any waiver of the attorney-client privilege and work product doctrine. SunTrust makes three half-hearted arguments in support of its position that no privilege waiver has occurred:

> (1)     SunTrust "merely disclosed, in the face of repeated assaults of those privileges by United Guaranty: (a) the circumstances surrounding the discovery of the altered e-mails; (b) the identity of individuals with knowledge of these matters; and (c) the timeframe during which these events occurred";

> (2)     SunTrust was "required to provide such information under this Court's December 29, 2009 Order and Rule 26(b)(5)(A)"; and

> (3)     "SunTrust was further entitled to provide such information to refute United Guaranty's claims of 'fraud' by SunTrust."

Opposition at 13. None of these claims withstand scrutiny, which may explain why SunTrust jettisons these arguments just two paragraphs later and argues that *even if* there was a waiver, that waiver was the fault of SunTrust's counsel, not SunTrust itself. *Id.* at 14. As explained below, however, this argument must also fail. We address each contention in turn.

> **1.     SunTrust has not "merely disclosed" the circumstances surrounding the discovery of altered emails, but has made affirmative representations regarding the contents of attorney-client communications and work product**

We have explained that controlling case law compels the conclusion that SunTrust has waived the attorney-client privilege with respect to the subject of the Fake Emails. *See* Opening Mem. at 22-23; *see e.g.*, *Hawkins v. Stables*, 148 F.3d 379, 383 (4th Cir. 1998) (finding a subject matter waiver because by denying a conversation with her attorney rather than asserting the privilege the defendant "both waived her privilege and provided probative evidence that she had had no conversation with her attorney…."). SunTrust, however, makes no attempt at all to

distinguish the controlling case law cited in United Guaranty's Opening Memorandum.  Instead, SunTrust cites only to one out-of-Circuit, unpublished case—*Nycomed U.S. Inc v. Glenmark Generics Ltd*., No. 08-5023, 2009 WL 3334365 (E.D.N.Y., Oct. 14, 2009)—to support its claim that "merely disclosing" the circumstances surrounding the discovery of altered emails does not create a waiver.  Even that case is inapposite to the facts at hand.

In *Nycomed,* the defendant admitted during deposition testimony that its intellectual property department consulted with outside counsel in preparing its patent defenses.  Based on that admission, plaintiff alleged that defendant's "reference to defense strategies developed in consultation with counsel 'waived any attorney-client privilege (and work product immunity, if asserted) with regard to the subject matter of *any and all* defenses to the patent.'" *Id.*, 2009 WL3334365 at *3 (emphasis added).  In rejecting this plainly overbroad argument, the Court held that in light of defense counsel's objections to various deposition questions, and "absent disclosure of specific information from counsel, defendant cannot be deemed to . . . have impliedly waived the attorney-client privilege" to virtually *all* of the documents on defendant's privilege log.  *Id.*

United Guaranty is not seeking an overbroad waiver, as was the case in *Nycomed*.  To the contrary, United Guaranty seeks information solely related to SunTrust's creation, transmission, investigation and use of fraudulent evidence.  Of even greater significance, unlike the defendants in *Nycomed*, who merely stated that attorney-client communications had taken place, SunTrust has made affirmative disclosures concerning the ***contents*** of privileged communications related to SunTrust's purported awareness (or not) and use (or not) of the Fake Emails in order to suggest that no one other than Senior Vice President Pettitt—knew about or relied on fake evidence.

SunTrust began this process at the January 8, 2010 Status Conference, and has continued in subsequent filings.  In addition to SunTrust's recent representations discussed in Section II above, SunTrust affirmatively has represented, *inter alia*, that:

(1)    An in-house attorney at SunTrust (later identified as Susan Thurman) received "the suspect version" of the February 22, 2008 Email "from Ms. Pettitt in August of 2008"—***but*** in the communication of the Fake February 22, 2008 Email "there was no indication whatsoever to the attorney in-house who received it that there was anything amiss with regard to it."  Status Conf. Tr. at 11:20-12:2.  *SunTrust has thus made a representation regarding the contents of an attorney-client communication between Pettitt and Thurman and what Thurman learned from that communication.*

(2)    The "suspect version" of the February 22, 2008 Email "was forwarded to us [Reed Smith] by in-house counsel at SunTrust . . . and it was sent to us in good faith as being a record of the company."  *Id.* at 11:21-23, 12:2-3.  *SunTrust has thus made a representation regarding the contents of an attorney client/work product communication between SunTrust's in-house counsel and outside counsel Reed Smith and what in-house counsel knew and did not know from privileged communications.*

(3)    The February 22, 2008 Email was forwarded to Reed Smith because "an inquiry was made as to is there any more detail that you [SunTrust] can furnish us [Reed Smith]?"  *Id.* at 11:20-23; 12:2-3, 22-23.  *SunTrust has thus made a representation regarding the contents of an attorney client/work product communication between SunTrust's in-house counsel and outside counsel Reed Smith.*

(4)    "In January, 2009, Ms. Pettitt was questioned regarding the discrepancies in the United Guaranty versions and her versions of these two emails, and she provided what appeared to be a plausible explanation for the differences." ST Response at 6.  *SunTrust has thus made a representation as to what Pettitt said to counsel and what information counsel learned as the result of a privileged investigation concerning the Fake Emails.*

(5)    "Pettitt likely altered the original February 22, 2008 e-mail because she is the only one who had access to her work-assigned computer on which the alteration is made; Pettitt conveyed it to in house counsel without revealing it was altered; and as a consequence SunTrust's outside counsel subsequently relied on it in preparing the Amended Complaint." SunTrust's Motion for a Protective Order at 5-6 [docket # 83].  *SunTrust has thus made a representation regarding the contents of what was (and was not) contained in attorney client/ work product communication between in-house counsel and Pettitt, and other information gleaned in the investigation.*

(6)    SunTrust has "***never*** relied on the altered versions of either the February 2006 E-Mail or the June 2005 E-Mail."  Opposition at 6, n.5. *SunTrust has thus made a representation as to the contents of attorney client/work product communications between SunTrust's in-house counsel and outside counsel Reed Smith.*

9

SunTrust has thus deliberately chosen for its own tactical purposes to disclose and represent (a) what purportedly was (or was not) communicated between Pettitt and Thurman, (b) what was (or was not) communicated to outside counsel, (c) certain specifics of those communications, and (d) counsel's knowledge resulting from privileged communications and investigations regarding the *veracity* of the Fake Emails.  In so doing, SunTrust has committed a subject matter waiver related to SunTrust's knowledge and use of fraudulent documents.  *See In re Martin Marietta Corp.*, 856 F.2d 619, 623-25 (4th Cir. 1988) ("subject matter waiver applies to non-opinion work-product when testimonial use of non-opinion work-product is made").

It is now entirely clear that many people at SunTrust, including its CEO, knew that something was indeed very much "amiss" at the time Thurman forwarded Pettitt's email containing the Fake February 22, 2008 Email (and other unknown emails) to Reed Smith.  In fact, Thurman and others at SunTrust had every reason *at least to suspect* that the February 22, 2008 Email from Pettitt might be a fake, because they were already on notice that at least two other emails Pettitt sent to Thurman for purposes of this litigation were fakes.  Further, there is no legitimate, legal basis simply to take SunTrust's representations at face value, nor any other reason to do so.

As just one example, SunTrust's contrary assertion that it did not rely on either of the other two Fake Emails in preparing its First Amended Complaint ("FAC") is called directly into question by the fact that the FAC *does* cite a "February 1, 2006 email between Pam Gavin and Mary Pettitt," FAC ¶ 19, *which is one of the emails that Pettitt "altered" in an effort to support SunTrust's case.*  This supposed "coincidence" is way too much to swallow on faith.

The question of who knew what, and when, regarding the Fake Emails is thus of prime importance.  SunTrust's repeated representations about the contents of privileged

communications surrounding the Fake Emails, as well as its representations about what counsel knew and did not know as a result of these privileged communications and other aspects of the "investigation," are made for the obvious purpose of attempting to persuade the Court that SunTrust should not be sanctioned, and constitute a direct subject matter waiver of the attorney-client privilege and work product doctrine related to the Fake Emails.  *See Hawkins,* 148 F.3d at 381-82; *Martin Marietta Corp.*, 856 F.2d 610, 624 (4th Cir. 1988) ("The signal feature of the implied waiver . . . is the attempt to make testimonial use of work-product materials.").  "The attorney client privilege cannot be used as both a shield and a sword."  *Galaxy Computer Servs., Inc. v. Baker*, 325 B.R. 544, 559 (E.D.Va. 2005) (internal citations omitted).  Such gamesmanship is simply impermissible.

## 2.   SunTrust was not "required to provide such information by the Court's order or discovery rules"

Next, SunTrust suggests that it has not waived any privileges because SunTrust was "required to provide such information by the Court's Order and Rule 26(b)(5)(a)."  SunTrust claims that "any statements made by SunTrust or its counsel relating to this matter were very general and were ***necessary*** to disclose the context under which the e-mails at issue were discovered."  Opposition at 13-14.  Putting aside whether this is an accurate statement of the law, it does not even remotely comport with the reality of SunTrust's disclosures in this instance.  At the January 8, 2010 Status Conference, for example, the Court stated explicitly that it was "not requiring" SunTrust's counsel to provide an explanation of how the Fake February 22, 2008 Email came to Reed Smith.  Nonetheless, SunTrust chose to "tell the Court and Mr. Millian today how the document [the February 22, 2008 Email] came to us."  January 8, 2010 Status Conf. Tr. at 11:11-13.  The assertions subsequently made were not in any way "necessary to disclose the context under which the emails were discovered," but rather were calculated to

convince the Court that SunTrust was previously unaware that the Fake February 22, 2008 Email

had been altered and had no reason to suspect this had been done.

Indeed, if SunTrust was actually trying to disclose "the context under which the emails

were discovered," it is hard to imagine a more misleading way to do so than to inform the Court

that "there was ***no indication whatsoever to the attorney in-house who received it that there***

***was anything amiss*** with regard to it" and the email was sent "in good faith," ***without disclosing***

to the Court at that time that this ***same in-house counsel*** was aware of ***two other fake emails***

created by that ***same Senior SunTrust Vice President*** during precisely the same time period.

SunTrust simply offers no legal or factual basis that would permit this Court to conclude

that SunTrust's representations regarding the purported contents of attorney-client

communications and fact work product did not constitute a waiver because "the Court made me

do it."

### 3.    SunTrust cannot avoid a waiver finding by claiming that its assertions are meant to refute United Guaranty's claims of fraud

Finally, in one sentence SunTrust cites to *In re Grand Jury Proceedings*, 33 F.3d 342 (4th

Cir. 1994), for the supposed proposition that SunTrust was "entitled to provide such information

to refute United Guaranty's claims of fraud by SunTrust" without this constituting a waiver.

Opposition at 13.  This case provides no support whatsoever for this claim and does not even

mention the concept of waiver, but rather rejects "defendant's argument that failure to see the

government's *in camera*  submissions [related to the crime-fraud exception]. . . violated

defendant's due process claims."  *Id.* at 353.  SunTrust thus offers no basis for holding that a

waiver does not result from making selected representations regarding privileged

communications "in order to refute claims of fraud."  Such a result indeed would turn established

waiver law on its head; it is hard to imagine the result that a party is allowed to "refute a claim of

fraud" by picking and choosing what privileged communications to disclose (or merely represent) and then blocking inquiry into the veracity of that "evidence."  *See Martin Marietta Corp*., 856 F.2d 610, 625 (4th Cir. 1988).

> **4.      SunTrust cannot blame its selective waiver on outside counsel**

Perhaps recognizing the futility of claiming that SunTrust has not waived privilege, SunTrust retreats to the fall back position that "even if SunTrust's ***counsel*** somehow revealed information that could be considered privileged or work product, SunTrust the ***client***, cannot be deemed to have committed any waiver."  Opposition at 14.  SunTrust cites three cases in "support" of its argument, although only the first case— *Hanson v. United States Agency for Int'l Dev*., 372 F.3d 286 (4th Cir. Va. 2004)— even addresses waiver based on the actions of a party's lawyer.  None of these decisions help SunTrust.

As SunTrust correctly notes, "an attorney may not *unilaterally* waive the privilege that his client enjoys."  SunTrust Opposition at 14, *citing Hanson*, 372 F.3d at 294.  As *Hanson* itself makes clear, however, this "rule" applies only where an attorney is acting outside the proper scope of his representation of the client in revealing the privilege communication at issue.  Here, however, SunTrust cannot attempt to walk away from its numerous privilege waivers by asserting (which it has not done to date) that its own outside counsel was acting *ultra vires*.

In *Hanson*, the United States Agency for International Development ("USAID") was in project negotiations with another party. During those negotiations USAID hired a "third party" lawyer to draft a privileged report evaluating the negotiation process. *Hanson*, 372 F.3d at 289. When negotiations failed, the opposing party filed a Freedom of Information Act ("FOIA") request seeking a copy of the report.  USAID's outside attorney subsequently  voluntarily released a draft of his report to the opposing party during the course of the FOIA litigation over

13

that request—in which the attorney was *not representing* USAID.  *Id.* at 290. Under those facts,

the Fourth Circuit held that because USAID did not intend "to waive their attorney work product

exemption" and because "USAID had not authorized" the attorney "to disclose the third party's

report," this "unilateral disclosure" could not "waive USAID's right without USAID's consent."

*Id*. at 294.

      The facts in *Hanson* in no way resemble SunTrust's relationship with its counsel Reed

Smith.  Far from being a "third party," Reed Smith is counsel of record hired specifically to

represent SunTrust in its litigation with United Guaranty. Thus, it would be beyond surprising if

SunTrust were truly alleging that Reed Smith involuntarily disclosed privileged information

during its representation of SunTrust via its filings and appearances before the Court.  This

argument is particularly hard to fathom given that SunTrust's in-house counsel, Ms. Hovatter,

was sitting with counsel and identified on the record at the January 8, 2010 Status Conference

when SunTrust's counsel affirmatively represented that there was "no indication" of "anything

amiss" with the February 22, 2008 Email.  As Ms. Hovatter was one of the attorneys who

actually interviewed Pettitt concerning the Fake June 20, 2005 and February 1, 2006 Emails, her

presence at the hearing dispels any notion that SunTrust's outside counsel was somehow

speaking out of turn.  Further, this was not an isolated statement.  SunTrust has continued to

make representations regarding the content of attorney-client communications and work product

in its various court filings, as well as in Thurman's deposition testimony—all the while blocking

inquiry into the truth of those assertions.  The *Hanson* case is thus of no help to SunTrust.[1]

---

[1]   The other cases SunTrust cites are even less helpful to SunTrust's cause.  *Duplan Corp v.
Deering Miliken, Inc*., 540 F.2d 1215 (4th Cir. 1976), is completely unrelated to the issue of
client waiver and instead stands for the limited proposition that a waiver of *opinion* work

[Footnote continued on next page]

Here, SunTrust chose to selectively disclose information in order to gain a tactical advantage in this litigation and to characterize the conduct (or misconduct) by SunTrust and its counsel.  By selectively disclosing its version of the story through its representations about privileged communications, SunTrust has now waived any privilege related to SunTrust's knowledge, transmission, investigation and use of fake evidence.  As such, this Court and United Guaranty are entitled to know the full extent to which SunTrust knew of those Fake Emails and relied on them in this litigation.

**B.     The Crime-Fraud Exception Applies to SunTrust's Claims of Attorney-Client and Work Product Privilege**

**1.     SunTrust essentially concedes a *prima facie* case for crime-fraud with regard to the fake emails**

To establish crime-fraud, United Guaranty must make a *prima facie* case that SunTrust was "engaged in or planning a fraudulent scheme" and "the documents containing the privileged materials bear a close relationship to [SunTrust's] existing or future scheme to commit a crime or fraud."  *In re Grand Jury Proceedings #5 Empanelled*, 401 F.3d 247, 251 (4th Cir. 2005).  Although unable to muster the words, SunTrust essentially admits in its scant three-paragraph argument addressing the crime-fraud exception, as it must, that Pettitt's communications related to the Fake Emails are all covered by the crime-fraud exception.  SunTrust Opposition at 14 ("United Guaranty has failed to establish a *prima facie* case with regard to the crime-fraud

---

[Footnote continued from previous page]

product does not create a *subject matter* waiver, a point United Guaranty acknowledges in its Opening Memorandum.  *See* Opening Memorandum at 20.  The remaining case SunTrust cites, *Commonwealth v. Edwards*, 235 Va. 499, 509 (1988), generically discusses the requirements for implied client waiver, but contains facts wholly unrelated to the case at bar.  *See Edwards*, 235 Va. at 510-11, 14 (holding that the a client's decision to provide State regulators with a portion of a privileged accountant's report related to health care reimbursement did not entitle the State to the underlying attorney client consultations and the attorney's analysis of that data).

exception *except perhaps as to the actions of Ms. Pettitt.*") (emphasis added).  While SunTrust

implicitly acknowledges that Pettitt's actions meet the crime-fraud exception, it argues that the

exception is nonetheless inapplicable to SunTrust as an entity because there is no evidence that

anyone *else* at SunTrust knew about the fraud.

As a threshold matter, SunTrust cites to no law or authority suggesting that when "only

one" Senior Vice President of a company attempts to perpetrate a fraud the company is not liable

for that employee's actions, and this is not the law.  To the contrary, as corporations act only

through their employees, any distinction between "SunTrust's" fraud and "Pettitt's" fraud is

artificial.  *See e.g. Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 157 (4th Cir. 1995) ("district

court acted within its discretion in permitting the jury to draw an adverse inference if it found

that [plaintiff] or her agents caused destruction or loss of relevant evidence"); *Trigon Ins. Co. v.

United States*, 204 F.R.D. 277, 289 (E.D. Va. 2001) (holding a principal responsible where its

agent destroyed evidence).  Indeed, what is clear is that (1) Pettitt, acting as SunTrust's agent,

attempted to perpetrate a fraud against United Guaranty; and (2) the documents and other

evidence United Guaranty seeks relate directly to this scheme to commit that fraud.

Pettitt's actions in doctoring emails while SunTrust was gathering evidence in pursuit of

litigation thus extinguishes all attorney-client and fact work product privileges related to

SunTrust's knowledge, transmission, investigation and use of the Fake Emails.  *See Rambus, Inc.

v. Infineon Techs. AG*, 220 F.R.D. 264, 284 (E.D. Va. 2004) (holding the crime-fraud exception

abrogated privileges because "some destruction [of relevant evidence] occurred at a point in time

when [the putative privilege holder] anticipated litigation and therefore had a duty to preserve the

evidence.").  Because the crime-fraud exception clearly applies, the information sought by

United Guaranty must be disclosed.

2.     **SunTrust cannot avoid disclosure of the information at issue by claiming "opinion" work product**

While Pettitt's fraud creates a subject matter waiver of all attorney-client and fact work product claims, disclosure of pure "opinion work product" containing counsel's mental impressions, theories and strategies requires that United Guaranty make a *prima facie* showing that an attorney "either knew or participated in the scheme." *In re Grand Jury Proceedings #5*, 401 F.3d.at 252-53. This requirement, however, does not justify withholding any of the documents or testimony sought in this motion, for two reasons.

First, SunTrust has simply failed to establish that any of the information sought by United Guaranty constitutes "opinion work product." *See* Appendix A hereto. This is not surprising given the nature of what United Guaranty seeks—not legal analysis, but *facts* regarding SunTrust's creation, transmission, investigation and use of the Fake Emails. Second, SunTrust's assertion that United Guaranty cannot "make a *prima facie* showing that any one at SunTrust, other than Ms. Pettitt ***knew about***, or was involved in an attempted fraud…," Opposition at 15, is incorrect. Thurman admittedly learned in August 2008 of the "discrepancies" created by Pettitt, and indeed she took the issue to SunTrust's CEO and outside counsel and ultimately chose not to send the letter relying on Pettitt's emails at that time. Thurman Tr. at 21:17-24, 42:24-43:17; 44:13-24; 45:1-2; 55:23-25; 56:1-3; Opposition at 15 ("SunTrust had made a decision early on that as a precaution it would not rely upon any of [Pettitt's] email" with discrepancies.). Thus, there is least strong evidence (and enough to make out a *prima facie* case) that SunTrust's counsel indeed ***knew of*** the scheme at the time she provided Pettitt's documents to outside counsel. Thurman Tr. at 75:15-77:11. Nonetheless, SunTrust's FAC was replete with references to Pettitt's version of events and Pettitt's documents, including the indisputably Fake February

17

22, 2008 Email.[2]  Given these facts, this Court should not only require SunTrust to produce

documents previously protected by attorney-client and fact work product privileges, but – to the

extent they exist -  opinion work product as well.

**C.      No Privilege Exists With Respect to the Documents Presently Before the Court**

On February 11, 2010, this Court ordered SunTrust to produce to the Court "any

requested documents that SunTrust asserts are privileged."  February 11, 2010 Order [docket #

81].  While SunTrust apparently provided certain purportedly privileged documents to the Court

for *in camera* review on February 16, 2010, SunTrust failed to contemporaneously identify such

documents for United Guaranty.  Indeed, it was not until *after* United Guaranty filed its Opening

Memorandum and the Court instructed SunTrust to identify the documents, that it became clear

(1) what documents SunTrust submitted to the Court, and (2) that SunTrust excluded numerous

documents from the Court's review that are directly related to the creation, transmission,

investigation and use of the Fake Emails.

In any event, every document at Tabs A-S that SunTrust submitted for *in camera* review

must be produced to United Guaranty, because any privilege that might attach has been waived

---

[2]  A central part of Pettitt's fictitious story, as told through the Fake Emails and otherwise, is
that the Spreadsheet Guidelines prepared by Pam Gavin at United Guaranty were merely
"internal" to United Guaranty and not the "operative" guidelines for insurance purposes. *See*
Fake June 20, 2005 Email (changing statement that the Guideline Spreadsheets "are
operational" to state "are UG internal operational.") Opening Mem., Exhibit 4.  The FAC
repeatedly includes this fiction as well.  Tellingly, SunTrust's SAC does not merely
"withdraw" reference to the Fake February 22, 208 Email—it also withdraws repeated
references to the Spreadsheet Guidelines as "UGRIC's internal criteria" and "its internal
guidelines."  *Compare* FAC ¶ 19 *with* SAC ¶ 20; FAC ¶ 20 *with* SAC ¶ 22; FAC ¶ 20 with
SAC ¶ 23; FAC ¶ 22 with SAC ¶ 25.

or is vitiated by the crime-fraud exception.  As did SunTrust in its brief, we address the

individual documents in an attached Appendix.  *See* Appendix A.

**D.**   **SunTrust Failed to Produce, Failed to Provide to the Court for *In Camera* Review, and in Many Instances, Failed to Identify on a Privilege Log, Numerous Other Documents Relating to SunTrust's Fake Emails**

SunTrust's lament that United Guaranty's Motion to Compel lacks "specificity"

regarding the documents it is demanding cannot be viewed seriously in light of SunTrust's

repeated delays in producing responsive documents, including documents of Thurman, Clack

and Pettitt.  One of the many ironies in this litigation is that United Guaranty completed its

production of documents prior to SunTrust filing its Second Amended Complaint, yet SunTrust

has still failed to complete its own production of documents and continues to request numerous

extensions of time to produce documents.  SunTrust's continued delay has directly prevented

United Guaranty from receiving key documents related to SunTrust's spoliation of evidence and

has made it impossible to identify all of the documents related to SunTrust's knowledge and use

of fake evidence.

For example, with regard to Susan Thurman—a central player in this saga—SunTrust

still has not produced *any* of the "non-privileged" documents for which she is the custodian, and

seeks an extension up to March 24, 2010 in order to do so.  Further, SunTrust has not identified

or submitted any Thurman custodian documents to the Court for *in camera* review, such as her

notes of a January 2009 interview of Pettitt and her transmittals of the Fake February 22, 2008

Email and other documents (possibly including other Fake Emails) to Reed Smith.  *See* Thurman

Tr. 78:21-79:21; 89:14-21 (these documents exist).  Finally, none of SunTrust's privilege logs

(currently containing in excess of 25,000 entries) produced to date contains any Thurman

custodian documents.

Similarly, SunTrust seeks even more time—up to April 2, 2010—to produce documents in the custody of Debra Lee Hovatter (the other SunTrust in-house counsel that interviewed Pettitt) and David Hay (Thurman's boss who was aware of Pettitt's alteration of documents)—other key players in the spoliation story currently before the Court.  Thus, while United Guaranty is doing everything within its power to specify exactly which documents it wishes to challenge, it simply cannot challenge what SunTrust has failed to identify.  In any event, it should not be United Guaranty's burden to identify the relevant SunTrust documents, given that SunTrust's waiver and the crime-fraud exception warrant SunTrust's complete production of *all* documents related to the Fake Emails.

That said, the documents and communications that clearly should be produced to United Guaranty are identified at Appendix B.  Further, Thurman and Clack should be produced for another round of deposition questions on the topic of the Fake Emails, this time with instructions to *answer* questions regarding all communications and other information regarding those emails.

The time has come for the Court to end SunTrust's delay tactics and require SunTrust to give a complete accounting of  the extent of SunTrust's knowledge and use of the Fake Emails and a full explanation of what it did upon learning of its Senior Vice President's deliberate spoliation of evidence.

## IV.    CONCLUSION

For the foregoing reasons, together with those set forth in United Guaranty's Opening Memorandum, this Court should grant the present motion, ordering the relief requested in the proposed Order and Section III.D. above.

Dated: March 17, 2010                      Respectfully submitted,


                                     /s/
                        Christyne K. Brennan
                        Virginia Bar Number 48114
                        John C. Millian (admitted pro hac vice)
                        Brian C. Baldrate (admitted pro hac vice)
                        Attorneys for Defendant United Guaranty
                        Residential Insurance Company of North Carolina
                        GIBSON, DUNN & CRUTCHER LLP
                        1050 Connecticut Avenue, N.W.
                        Washington, D.C.  20036
                        (202) 955-8500 (main phone)
                        (202) 530-9627 (Brennan direct fax)
                        (202) 530-9566 (Millian direct fax)
                        (202) 530-9684 (Baldrate direct fax)
                        cbrennan@gibsondunn.com
                        jmillian@gibsondunn.com
                        bbaldrate@gibsondunn.com

                        Wyatt B. Durrette, Jr.
                        Virginia Bar Number 04719
                        Attorney for Defendant United Guaranty
                        Residential Insurance Company of North Carolina
                        DURRETTEBRADSHAW PLC
                        Bank of America Center
                        1111 East Main Street, 16th Floor
                        Richmond, VA  23219
                        (804) 775-6900 (phone)
                        (804) 775-6911 (fax)
                        wdurrette@durrettebradshaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of March, 2010, I will electronically file the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification

of such filing (NEF) to the following:

> S. Miles Dumville
> Curtis G. Manchester
> Travis Aaron Sabalewski
> Reed Smith LLP
> Riverfront Plaza – West Tower
> 901 East Byrd Street, Suite 1700
> Richmond, VA  23219-4068
>
> Joshua Gold
> Anderson Kill & Olick
> 1251 Avenue of the Americas
> New York, NY 10020

> _____/s/_____
> Christyne K. Brennan
> Virginia Bar Number 48114
> Attorney for Defendants United Guaranty
> Corporation and United Guaranty Residential
> Insurance Company of North Carolina
> GIBSON, DUNN & CRUTCHER LLP
> 1050 Connecticut Avenue, N.W.
> Washington, D.C.  20036
> Phone: (202) 955-8685
> Fax: (202) 530-9627
> cbrennan@gibsondunn.com

100833591_2.DOC