**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| SUNTRUST MORTGAGE, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA, INC., <br><br> Defendant. | Civil Action No. 3:09cv00529-REP |

**SUNTRUST MORTGAGE, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE UNITED GUARANTY'S INTRODUCTION OF PAROL EVIDENCE FOR PURPOSES OF ALTERING THE MEANING OF THE PARTIES' UNAMBIGUOUS WRITTEN CONTRACTUAL AGREEMENTS**

SunTrust Mortgage, Inc. ("SunTrust"), by counsel, respectfully files this Memorandum in Support of its Motion *in Limine* to Preclude United Guaranty's ("UG") Introduction of Parol Evidence for Purposes of Altering the Meaning of the Parties' Unambiguous Written Contractual Agreements.

**INTRODUCTION**

Count I of SunTrust's Third Amended Complaint seeks judgment against UG for damages resulting from UG's wrongful denial of SunTrust's claims on defaulted IOF Combo 100 loans that UG insured under its Master Policy and the two subsequent written Flow Agreements that amended the Master Policy. UG's "central defense," indeed its only defense, to SunTrust's Count I breach of contract claim is that the governing underwriting guidelines applicable to these loans were not determined by the contract documents but rather by "a series of communications between SunTrust's Mary Pettitt and UG's Pam Gavin" regarding certain

Excel spreadsheets created by Ms. Gavin that UG refers to as "Guideline Matrices." (UG's Brief in Support of the Admission of the Testimony of Joshua Gold and Miles Dumville, Doc. 327, p. 1.) UG contends that this "series of communications" amounted to a contractual modification that overrode the express terms of the written agreements between the parties made both before and after the supposed Pettitt/Gavin parol agreement was reached. According to UG, this "series of communications" established a requirement, not found in SunTrust's underwriting guidelines, that the first mortgages in the IOF Combo 100 loans had to be underwritten using Fannie Mae's automated Desktop Underwriter (DU) program.

On October 4, 2010, UG moved for entry of summary judgment in its favor based on this "central defense." (Doc. 188.) SunTrust did not file a cross-motion for summary judgment regarding UG's affirmative defense. Instead, SunTrust moved for partial summary judgment on Count I because, by continuing to collect premiums for insuring the IOF Combo 100 loans after it knew or should have known such loans were not underwritten using DU, UG made a binding election to provide coverage for the loans and, therefore, could not deny SunTrust's claims.

The Court denied UG's summary judgment motion on the grounds that material facts were in dispute. 12/08/10 Motion for Summary Judgment Hearing Tr. pp. 262:22-263:2; 12/10/10 Order (Doc. 310).[1] The Court did not, however, identify the specific material facts that it felt are in dispute. Id.

While SunTrust and UG dispute many of the facts surrounding the genesis and purpose of the Gavin spreadsheets and whether Ms. Gavin and Ms. Pettitt ever reached an agreement regarding them, resolution of those disputes is not an issue for trial. Virginia's parol evidence rule bars the introduction of all evidence concerning the supposed parol agreement between Ms.

---

[1] The Court similarly denied SunTrust's Motion on the same grounds. See 12/10/10 Order.

Gavin and Ms. Pettitt. Consequently, SunTrust moves *in limine* for an order prohibiting UG from introducing or referring to such evidence during the trial of this case.

## RELEVANT FACTUAL BACKGROUND

UG insured second mortgages originated by SunTrust under a Master Policy issued prior to 2000. Section 7.12(a)(i) of the Master Policy provides that amendments to the Policy "shall be effective only after [UG] has given [SunTrust] written notice thereof by an endorsement to this Policy setting forth such amendment . . . ." See Third Amended Complaint, Ex. A at p. 15 of 15.

According to Christine Stumbo, who was employed by SunTrust from July 1998 to July 2007, and whose responsibilities included the negotiation of insurance coverage for SunTrust's Combo loans, UG provided coverage according to SunTrust's underwriting guidelines. Ex. 1 hereto (9/23/10 Stumbo Dep. at 28:21-24; 42:26-46:14). This understanding was confirmed in the First Flow Agreement, executed in June 2004 by Ms. Stumbo and UG's Vice President, Rick Hughes, which expressly stated:

> **Underwriting Guidelines:** These loans will conform to SunTrust Mortgage guidelines that are currently being used and have been mutually agreed upon.

Ex. 2 hereto (June 23, 2004 Flow Agreement, p. 1).

Four months later, Ms. Gavin, who had recently been employed by UG, became the "relationship manager" for SunTrust. Ms. Gavin's primary role in this position was to communicate with SunTrust regarding insurance coverage. She did not, however, have the authority to enter into binding agreements on behalf of UG. Ex. 3 hereto (Gavin Dep. at 40:20-41:12).

Ms. Gavin first transmitted her spreadsheets to Ms. Stumbo and Ms. Pettitt via a February 14, 2005 email that stated:

- 3 -

> I've created the attached spreadsheets to keep track of the SunTrust product line. If you see guidelines that don't match up with yours, let me know. If I missed something, let me know - like the state bond programs where the 2nds are ok.
>
> I'll update the document as changes occur and send a revised copy to you. If you want to use it to request guideline changes, we're fine with that approach. Whatever works best for you....

Ex. 4 hereto (2/14/05 Gavin email).

Despite Ms. Gavin's statement that she had created the spreadsheets "to keep track of the SunTrust product line," UG now alleges that, through an undocumented agreement between Ms. Gavin and Ms. Pettitt, the spreadsheets became the governing underwriting guidelines. The Gavin/UG story about how these spreadsheets allegedly became the governing guidelines has, however, changed materially during the course of the litigation.

In its Counterclaim filed on December 14, 2009 (Doc. 46), UG alleged (based on information provided by Ms. Gavin) that Ms. Gavin first gave the spreadsheets to Ms. Stumbo and Ms. Pettitt during a February 2005 meeting in SunTrust's Richmond office and they agreed that the spreadsheets would be the governing guidelines. UG Counterclaim, ¶ 20. However, UG subsequently backtracked from this allegation and in an interrogatory response served on August 16, 2010, claimed that while Ms. Gavin did not remember her February 14, 2005 email, she did recall that sometime during the same time period she met with Ms. Stumbo and Ms. Pettitt and they "discussed that the Guideline Matrices would serve as the operative Guidelines between United Guaranty and SunTrust for insurance purposes going forward." Ex. 5 hereto (8/16/10 UG Response to Interrogatory # 17 of SunTrust's Second Set of Interrogatories, pp. 8-13).

It turned out, however, that the earliest documented meeting that Ms. Gavin had in Richmond with Ms. Stumbo and Ms. Pettitt was not until August 2005. Ex. 3 hereto (Gavin Dep. at 66:20-68:3). Faced with proof that there was no February 2005 meeting in Richmond

- 4 -

and recognizing that Ms. Stumbo would contradict Ms. Gavin's story about a three-way conversation during which an agreement regarding the spreadsheets was reached, Ms. Gavin changed her story again. Thus, in her August 26, 2010 deposition, Ms Gavin testified that on some unspecified date in February 2005, she "likely" had a phone conversation with Ms. Pettitt from which she gained an understanding that her spreadsheets would serve as the controlling underwriting guidelines for insurance purposes. Ex. 3 hereto (8/26/10 Gavin Dep. at 126:15-129:4).[2]

Eight months after this supposed phone conversation, however, Ms. Stumbo and Ms. Gavin's superior, Rick Hughes, executed the second Flow Agreement dated October 17, 2005.[3] <u>This Agreement makes no mention of Ms. Gavin's "Guideline Matrices" or anything remotely resembling them</u>. To the contrary, with regard to the applicable underwriting guidelines, the Agreement again stated:

> **Underwriting Guidelines:** These loans will conform to <u>SunTrust Mortgage guidelines</u> that are currently being used and have been mutually agreed upon.

Ex. 6 hereto (October 17, 2005 Flow Agreement, p. 1 (emphasis added)).

---

[2] Regarding the substance of this alleged phone conversation, Ms. Gavin testified that "my intent was to establish a baseline of guidelines under which we would insure SunTrust mortgage combos and asked that she [Pettitt] look and if she had any different opinion about what the guidelines were that she would communicate that to me, and that subsequently she could use this document as a way of requesting a guideline change if she chose to do that …." Ex. 3 hereto (8/26/10 Gavin Dep. at 127:15-21). Ms. Gavin further testified that Ms. Pettitt then asked for a copy of the spreadsheets, but subsequently never responded back to Ms. Gavin regarding Ms. Pettitt's views on the document. "Q. So there was just silence on her end of the exchange? A. Correct." <u>Id</u>. at 128:4-129:4. Ms. Gavin assumed, and UG contends, that Ms. Pettitt's silence indicated her agreement to what Ms. Gavin purportedly said.

[3] Neither Ms. Gavin nor Ms. Pettitt was authorized by her employer to change the terms of the insurance contract. <u>See</u> Ex. 3 (Gavin Dep. at 40:20-41:12); Sanctions Hearing Tr. (Clack), pp. 69:24-71:6. Both of the negotiated amendments to the insurance contract, known as the Flow Agreements, were executed by Ms. Stumbo and Mr. Hughes.

It is undisputed that SunTrust's guidelines never contained a requirement that the IOF Combo 100 loans at issue had to be underwritten using the Desktop Underwriter (DU) automated underwriting program. Instead, SunTrust's guidelines expressly stated that DU could <u>not</u> be used to underwrite the IOF Combo 100 loans because the DU program had not been updated to underwrite interest-only first mortgage loans where the combined loan-to-value ratio was between 95.1 and 100 percent. <u>See</u> Undisputed Material Facts cited in SunTrust Mortgage's Memorandum in Support of Its Motion for Partial Summary Judgment on Count I (Doc. # 204), ¶¶ 9, 11 and 21. Thus, the purported DU requirement that UG claims is contained in Gavin's Excel spreadsheets fails to meet the express definition of the applicable guidelines contained in the October 2005 Flow Agreement since this requirement was never in the "SunTrust Mortgage guidelines."

Beginning in March 2005, and for four years thereafter, UG insured thousands of IOF Combo 100 loans and collected premiums on them, even though UG knew they were not underwritten using DU. Nevertheless, in June 2008 when it found itself teetering on the edge of financial collapse due to the crash of the real estate market, UG told SunTrust's senior management that it was not going to pay any more claims on these loans because they had not been underwritten in accordance with the purported DU requirement in the Gavin spreadsheets.

Section 7.12 of the Master Policy, quoted in relevant part above, requires any amendment to the Policy to be by written endorsement issued by UG prior to the amendment taking effect. It is undisputed that UG never issued an endorsement making the Gavin spreadsheets the governing underwriting guidelines for purposes of determining loans that would be insured under the Policy. Because the Gavin spreadsheets are not a part of the insurance contract and there is no requirement in the contract documents that, in order to be insured, the IOF Combo 100 loans had to be underwritten using DU, SunTrust filed the present litigation seeking to recover

damages for UG's breach of the insurance contract and bad faith refusal to pay SunTrust's covered claims.

## ARGUMENT

It is undisputed that through UG's issuance of insurance certificate numbers and collection of premiums for the IOF Combo 100 loans submitted by SunTrust for coverage, those loans were covered under UG's insurance policy. Consequently, as recognized by both the Court, see 12/7/10 Motion for Summary Judgment Tr., p. 53:17-25, and UG, see UG's Memorandum in Support of Its Motion for Summary Judgment on Count I (Doc. 189), p. 12, UG has the burden to show that it is entitled to rescind coverage on these loans.

The sole basis on which UG claims the right to rescind coverage is its "central defense" that Ms. Gavin and Ms. Pettitt entered into a parol agreement that modified the terms of the Master Policy and the Flow Agreements. Nevertheless, Virginia law, which controls here, bars the admission of evidence of this alleged parol agreement at the trial of this matter.

"In Virginia, no general rule seems to be better settled than that, in controversies between two parties to a contract, parol evidence of prior or contemporaneous oral negotiations or stipulations is inadmissible to vary, contradict, add to, or explain the terms of complete, unambiguous, unconditional, written instruments." Walker & Laberge Co. v. First Nat. Bank of Boston, 206 Va. 683, 689, 146 S.E. 2d 239 (1966) (quoting Godwin v. Kerns, 178 Va. 447, 451, 17 S.E.2d 410 (1941)). This rule is not an evidentiary rule but rather a substantive rule of law. Pocahontas Mining, LLC v. CNX Gas Co., 276 Va. 346, 354, 666 S.E.2d 527, 532 (2008) (holding that the court does not resort to parol evidence merely because parties disagree about the meaning of the terms of their agreement); Noell Crane System GmbH v. Noell Crane and Service, Inc., 677 F. Supp.2d 852, 870-871 (E.D. Va. 2009).

Virginia also follows the merger doctrine which provides that prior agreements or understandings are merged into the parties' final written agreement. Brookland Park Plaza LLC v. Dresdner, 2009 WL 3297801 at *6 n.6 (Bankr. E.D.Va. October 13, 2009) ("A binding integrated agreement discharges inconsistent prior agreements, and evidence of a prior agreement is irrelevant to the rights of the parties when offered to contradict or expand the terms of the written agreement.") (citing Restatement (Second) of Contracts § 215).

UG asserts that on some unidentified date in February 2005, Ms. Gavin and Ms. Pettitt (neither of whom had authority to amend the insurance contract) made an oral agreement that Gavin's spreadsheets would be the underwriting guidelines that would determine what SunTrust loans would be insured. This alleged oral agreement supposedly became "operational" in June 2005 by virtue of an email sent on June 20, 2005, by Ms. Gavin to Ms. Pettitt and Ms. Stumbo. See UG's Memorandum in Support of Its Motion for Summary Judgment on Count I (Doc. 189), pp. 9-10.

Nevertheless, Ms. Stumbo and Ms. Gavin's superior, Rick Hughes, subsequently executed the Second Flow Agreement, which makes no mention whatsoever of Gavin's spreadsheets or anything similar, but rather states that the applicable underwriting guidelines will be "SunTrust Mortgage guidelines that are currently being used and have been mutually agreed upon."[4] Gavin's Excel spreadsheets do not purport to portray "SunTrust Mortgage guidelines that are currently being used and have been mutually agreed upon," but rather supposedly state UG's guidelines. Indeed, it is undisputed that SunTrust Mortgage's guidelines never contained a requirement that IOF Combo 100 loans had to be underwritten using DU and in fact prohibited

---

[4] UG cannot contend that Mr. Hughes was somehow unaware of the Gavin spreadsheets at the time he executed the second Flow Agreement, since Ms. Gavin testified that, prior to October 2005, she discussed the spreadsheets and their intended purpose with Mr. Hughes on multiple occasions. Ex. 3 hereto (8/26/10 Gavin Dep. at 114:4-21).

- 8 -

the use of DU for such loans, thus making it impossible for a DU requirement to be a SunTrust Mortgage guideline that was currently being used and had been mutually agreed upon.

Moreover, the language of this provision in the October 2005 Flow Agreement is exactly the same as the corresponding language of the prior June 2004 Flow Agreement. <u>Since Ms. Gavin's spreadsheets did not come into existence until February 2005, and in fact Ms. Gavin was not even involved in UG's dealings with SunTrust until some five months after the June 2004 Flow Agreement was executed, it is impossible for this language to refer to Gavin's spreadsheets</u>.

Under Virginia law, which controls here, evidence regarding a supposed contrary parol agreement made five months prior to execution of the Second Flow Agreement is inadmissible. If UG wanted Gavin's spreadsheets to be the controlling underwriting guidelines for purposes of providing insurance coverage, it clearly had the opportunity to do so in the Second Flow Agreement. Nevertheless, instead of specifying that the Gavin spreadsheets would be the controlling guidelines, as supposedly had been agreed to by Gavin and Pettitt five months earlier, the Second Flow Agreement stated exactly what the First Flow Agreement had said on the subject – that SunTrust's underwriting guidelines were the controlling guidelines. This was in accordance with the parties' practice even before the First Flow Agreement was executed. <u>See</u> Ex. 1 hereto (9/23/10 Stumbo Dep. at 141:15-142:21).

On point is the decision of the Supreme Court of Virginia in <u>Zehler v. E. L. Bruce Co.</u>, 208 Va. 796, 160 S.E.2d 786 (1968). <u>Zehler</u> involved a suit by the plaintiff, E. L. Bruce Co., to enforce a written guaranty executed by Zehler and two other directors and officers of a furniture company. The plaintiff contended that the defendants were liable for the entire debt of the furniture company, which was in excess of $18,000, but the defendants argued the language of the guaranty limited their liability to $2,000.

The Supreme Court of Virginia found that the language of the guaranty was not ambiguous and it was thus error to admit into evidence an earlier guaranty agreement and parol evidence of the parties' negotiations. The Court also found that because the guaranty agreement was unambiguous, it was error to admit a letter written after the guaranty was executed for purposes of explaining the meaning of the agreement. See also Bentley Funding Group, L.L.C. v. SK & R Group, L.L.C., 269 Va. 315, 332, 609 S.E.2d 49 (2005) (Where a contract is unambiguous, "the acts of the parties done under the contracts [*sic*] bear no weight as an indication of their intention." (citation and internal quotation marks omitted)). Moreover, as with Ms. Pettitt and Ms. Gavin in the present case, the Court noted as additional support for its holding that there was no evidence that the author of the letter had the authority to bind the other guarantors. Zehler, 208 Va. at 798, 160 S.E.2d at 788.

Based on years of consistent Virginia cases strictly applying the parol evidence rule, UG is precluded from introducing parol evidence of an alleged prior agreement between Ms. Gavin and Ms. Pettitt to contradict, vary or explain the terms of the second Flow Agreement, which is unambiguous. Likewise, under Zehler and Bentley Funding, UG cannot rely on "a series of communications" between Ms. Gavin and Ms. Pettitt to change the meaning of the unambiguous second Flow Agreement. Virginia law thus makes evidence supporting UG's "central defense" inadmissible.

## **CONCLUSION**

For the foregoing reasons, SunTrust requests that the Court rule that UG shall not be permitted to introduce into evidence or refer to at the trial of this matter any alleged parol agreement between Ms. Gavin and Ms. Pettitt regarding governing underwriting guidelines for purposes of insurance under the parties' insurance contract, including any evidence or reference to the Gavin spreadsheets.

                Respectfully submitted,

                SUNTRUST MORTGAGE, INC.

                By Counsel

/s/ S. Miles Dumville
S. Miles Dumville (VSB No. 15748)
Curtis G. Manchester (VSB No. 32696)
Travis A. Sabalewski (VSB No. 47368)
Alison Wickizer Toepp (VSB No. 75564)
Reed Smith LLP
Riverfront Plaza - West Tower
901 East Byrd Street, Suite 1700
Richmond, VA 23219-4068
Telephone: (804) 344-3400
Facsimile: (804) 344-3410
mdumville@reedsmith.com
cmanchester@reedsmith.com
tsabalewski@reedsmith.com
atoepp@reedsmith.com

Richard D. Holzheimer, Jr. (VSB No. 40803)
Matthew R. Sheldon (VSB No. 41892)
Reed Smith LLP
3110 Fairview Park Drive, Suite 1400
Falls Church, VA 22042
Telephone: (703) 641-4200
Facsimile: (703) 641-4340
msheldon@reedsmith.com
rholzheimer@reedsmith.com

Matthew J. Schlesinger, admitted pro hac vice
Elizabeth A. Reidy, admitted pro hac vice
Reed Smith LLP
1301 K. Street, N.W., Suite 1100
East Tower
Washington, D.C. 20005-3317
Telephone: (202) 414-9200
Facsimile: (202) 414-9299
mschlesinger@reedsmith.com
ereidy@reedsmith.com

        Counsel for SunTrust Mortgage, Inc.

Joshua Gold
Anderson, Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 278-1000
Facsimile: (212) 278-1733
jgold@andersonkill.com

Edward Joseph Stein
Anderson, Kill & Olick, P.C.
1055 Washington Boulevard, Suite 510
Stamford, CT 06091
Telephone: (203) 388-7945
Facsimile: (203) 388-0750
estein@andersonkill.com

        Of Counsel for SunTrust Mortgage, Inc.

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 11th day of February, 2011, a true and correct copy of the foregoing was served through CM/ECF, which will then send a notification of such filing to the following:


Wyatt B. Durrette, Jr., Esquire
DurretteBradshaw PLC
Bank of America Center
1111 East Main Street, 16th Floor
Richmond, VA 23219
wdurrette@durrettebradshaw.com

John C. Millian, Esquire
Christyne K. Brennan, Esquire
Brian C. Baldrate, Esquire
Jennifer V. Caughey, Esquire
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
cbrennan@gibsondunn.com
jmillian@gibsondunn.com
bbaldrate@gibsondunn.com
jcaughey@gibsondunn.com

Randy M. Mastro, Esquire
Gibson, Dunn & Crutcher, LLP
200 Park Avenue
New York, NY 10166-0193
rmastro@gibsondunn.com
cdusseault@gibsondunn.com
wwegner@gibsondunn.com
jzelenay@gibsondunn.com

Christopher D. Dusseault, Esquire
William E. Wegner, Esquire
James L. Zelenay, Jr., Esquire
Gibson, Dunn & Crutcher, LLP
333 S. Grand Avenue
46th Floor
Los Angeles, CA 90071
cdusseault@gibsondunn.com
wwegner@gibsondunn.com
jzelenay@gibsondunn.com
    Counsel for United Guaranty
    Residential Insurance Company of
    North Carolina

William J. Dinkin, Esquire
Stone, Cardwell & Dinkin, PLC
101 Shockoe Slip, Suite K
Richmond, VA 23219
bill.dinkin@gmail.com
    Counsel for Mary Pettitt

Cullen D. Seltzer, Esquire
SeltzerGreene, PLC
707 East Main Street, Suite 1025
Richmond, VA 23219
cseltzer@seltzergreene.com
    Counsel for Mary Pettitt

/s/ S. Miles Dumville
S. Miles Dumville (VSB No. 15748)
Curtis G. Manchester (VSB No. 32696)
Travis A. Sabalewski (VSB No. 47368)
Alison Wickizer Toepp (VSB No. 75564)
Reed Smith LLP
Riverfront Plaza – West Tower
901 East Byrd Street, Suite 1700
Richmond, VA 23219-4068
Telephone:  (804) 344-3400
Facsimile:  (804) 344-3410
mdumville@reedsmith.com
cmanchester@reedsmith.com
tsabalewski@reedsmith.com
atoepp@reedsmith.com