

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SUNTRUST MORTGAGE, INC.,

    Plaintiff,

v.                          Civil Action No. 3:09cv529

AIG UNITED GUARANTY CORP.
a/k/a UNITED GUARANTY CORP.,
et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT UNITED GUARANTY'S MOTION FOR SANCTIONS (Docket No. 270). For the reasons set forth below, the Court will grant in part and deny in part United Guaranty's ("UG") motion. Under its inherent authority to issue sanctions, the Court will order Suntrust Mortgage, Inc. ("ST") to pay UG's attorney's fees and expenses necessarily and reasonably incurred in connection with UG's motion for sanctions as more specifically described herein.[1] To that extent, UG's motion will be granted. However, the Court will not order any of UG's other requested sanctions. To that extent, UG's motion will be granted.

---

[1] Because UG's motion for sanctions has resulted in other, related motions being filed with the Court, UG will be entitled to attorney's fees and expenses associated with filing and prosecuting these motions as well.

## PROCEDURAL HISTORY

On July 16, 2009, ST filed this action against UG. In its initial, state-court complaint, ST alleged breach of contract, actual fraud, and constructive fraud against UG. (NOTICE OF REMOVAL (Docket No. 1), Ex. A.) On October 27, 2009, the Court found that ST had failed to allege adequately the party against which it brought its breach of contract claims and that ST had failed to allege adequately two fraud claims, and, accordingly, dismissed ST's initial complaint with leave to amend. (Docket No. 36.) In consequence of the Court's dismissal order, on November 24, 2009, ST filed a FIRST AMENDED COMPLAINT ("FAC") (Docket No. 42).

Shortly thereafter, UG made a startling discovery—one which, it reasonably concluded, had the potential to call into question, perhaps invalidate, much of the evidentiary record in the case on a key issue. Specifically, UG discovered that an email cited in the FAC differed in substance from a version of the same email in UG's possession. After a forensic examination showed that the email cited in the FAC was an altered version of the one in UG's possession, UG moved, on December 29, 2009, for emergency relief (MOTION FOR EMERGENCY RELIEF PRESERVING EVIDENCE AND GRANTING EXPEDITED DISCOVERY REGARDING SPOLIATION OF EVIDENCE BY PLAINTIFF SUNTRUST MORTGAGE, INC. (Docket No.

2

52)), and the Court ordered additional discovery into the matter (Docket No. 59).

At ST's request, the Court also permitted ST to file a second amended complaint omitting reference to the suspect email. On February 18, 2010, ST filed a SECOND AMENDED COMPLAINT ("SAC") (Docket No. 88). That pleading re-alleged ST's substantive claims without citing the email, the integrity of which had been called into question. On May 10, 2010, the Court dismissed the fraud claims in the SAC without leave to amend and dismissed one of ST's breach of contract claims with leave to amend. On May 27, 2010, ST filed a THIRD AMENDED COMPLAINT ("TAC") (Docket No. 121)—its final complaint in this action—re-alleging its breach of contract claims without any accompanying fraud claims.

In the TAC, ST alleges two distinct claims against UG. Count One alleges a breach of a contract of insurance involving first, and second, lien mortgages with a combined loan to value ratio in excess of 90% referred to as "IOF Combo 100 Loans." Count Two alleges a breach of the same insurance contract involving other second-lien mortgages referred to simply as "Defaulted Loans." ST alleges that, between 2004 and 2009, it purchased insurance from UG pursuant to a "Mortgage Insurance Policy," which was subsequently modified by a series of documents, including "Flow Plans" that set forth underwriting

3

guidelines. ST alleges that, during the period in question, it paid UG insurance premiums pursuant to the Mortgage Insurance Policy, which UG accepted and deposited. Then, beginning in the spring of 2007, alleges ST, UG began to deny coverage of IOF Combo 100 Loans and other loans originated by ST. According to ST, UG has continued to deny coverage of such loans up until the present, not because of a legitimate basis in the Mortgage Insurance Policy or subsequent modifying documents, but rather because of financial difficulties brought on by the economic downturn of 2008, specifically, unanticipated increases in residential mortgage defaults.

On August 20, 2010, UG moved for sanctions against ST with its SEALED MOTION FOR SANCTIONS (Docket No. 147). On October 30, 2010, UG re-filed its motion for sanctions as DEFENDANT UNITED GUARANTY'S MOTION FOR SANCTIONS AGAINST PLAINTIFF SUNTRUST MORTGAGE, INC. (Docket. No. 270) when the Court ordered the parties to remove all motions and supporting memoranda from under seal and to file future documents on the public record in compliance with Local Civil Rule 5. (See Docket No. 259.) Following substantial discovery into the alteration of emails, the Court held a three day evidentiary hearing on UG's sanctions motion, receiving testimony from ST's senior management, its in-house counsel, and its outside counsel. The Court finds the

4

following facts from the hearing record by clear and convincing evidence.

## FINDINGS OF FACT

In early August 2008, ST and UG were engaged in a dispute over whether an insurance policy issued by UG covered losses that ST had sustained when many of the IOF Combo 100 Loans made by ST had gone into default. In dispute was whether ST was required to underwrite loans of that type using the Desktop Underwriter ("DU") method. In settlement negotiations held in August 2008, UG took the position that DU approval was a necessary condition to UG insuring ST's loans. (Sanctions Hearing Transcript ("Sanc. Hrg. Tr.") at 35:5-17.) In the negotiating session, UG produced documents called Guideline Matrices (alternatively, "Matrices"), and emails, which, according to UG, supported its position that its insurance obligation on IOF Combo 100 Loans was conditioned on ST having underwritten them using the DU method.

UG's position on DU approval blindsided ST's negotiators. In an effort to understand UG's unexpected stance and to determine whether it had any factual basis, ST officials convened an emergency meeting with Mary Pettitt, ST's principal liaison with UG on the loans at issue.

5

During the meeting, ST officials pointedly questioned Ms. Pettitt about whether, as UG had contended, she and a UG employee, Pam Gavin, had reached an understanding that DU approval was a condition of insurance coverage under the loan agreements.   Ms. Pettitt conveyed that there was no such agreement.   Also, Ms. Pettitt stated that the Guideline Matrices were used by Ms. Gavin merely to keep track of ST's insured loans.

Ms. Pettitt's statements, however, did not assuage the concerns of ST's management and negotiators.   They directed Ms. Pettitt to locate and deliver copies of all documentation that supported ST's position on loan agreements or that refuted the position announced by UG, or that otherwise bore on UG's position.   Of particular interest to ST's management were documents which referred to the Guideline Matrices—tables, which had been created by Ms. Gavin, which UG claimed, set mandatory conditions for coverage of ST's loans, one of them being DU approval of the loans.   (Id. at 36:4-21, 40:6-10.)

By mid-August 2008, ST's uneasiness about UG's stance, and ST's ability to defend against it, persisted.   By then, Ms. Pettitt had provided to ST's management and in-house counsel some documentation about the insurance on ST's loan agreements with UG (id. at 37:21-38:10.), but ST officials believed that there must be more because the documents she had produced did

6

not paint a comprehensive picture of the issue raised by UG respecting the IOF Combo 100 Loans.

On August 13, 2008, Joann Clack, a senior vice president for ST, sent Ms. Pettitt an email requesting further documentation. The email made clear that ST wanted all correspondence between Ms. Pettitt and UG's loan representative, Ms. Gavin, involving the insurance agreement and, in particular, the Guideline Matrices, whether or not the contents bolstered ST's position in the dispute. (Id. at 39:23-40:15.) The email also made clear that collecting that correspondence was of utmost importance. Indeed, Ms. Pettitt was told to focus all of her efforts on the task. (Id. at 94:12-16.)

On August 14, 2008, Ms. Pettitt provided additional emails as Ms. Clack had requested. (Id. at 45:16-18.) One email, dated June 20, 2005, was to Ms. Pettitt from Ms. Gavin, and it mentioned the Guideline Matrices. (See Ex. 27A.) Thereafter, but still in August 2008, Ms. Clack noticed that the version of the June 20, 2005, email that Ms. Pettitt had forwarded to her electronically (the "Pettitt version") differed substantively from the version of the same email that UG had provided to ST in the settlement negotiations (the "UG version"). (Sanc. Hrg. Tr. at 42:9-13.)

The sentence speaking to the Guideline Matrices in the UG version read: "The PM2nd Matrix and PDF document that are

operational - just want to confirm the data we have here, its exchange, and its accuracy." (Ex. 26A.) By contrast, what was supposed to be the same sentence in the Pettitt version read: "The PM2nd Matrix and PDF document are UG internal operational." (Ex. 27A.) The Pettitt version of the email thus did not contain the last half of the sentence in the UG version, beginning with "just . . . ," and it contained "UG internal" as additional words between "are" and "operational."

Ms. Clack had no doubt that the two versions of the email differed. She also could conceive no satisfactory explanation for the differences. She further appreciated that the UG version tended to support UG's position respecting the Matrices while the Pettitt version tended to support ST's position.

Ms. Clack immediately notified Susan Thurman, a senior in-house attorney at ST, of the troublesome discovery. (Sanc. Hrg. Tr. at 48:2-5.) Recognizing that one of the two emails must have been altered, Ms. Clack and Ms. Thurman enlisted the help of ST's IT department to determine which version was authentic. Before the end of August 2008, the IT department gave them the answer: the UG version, not Ms. Pettitt's version, was in unaltered form. (Id. at 49:12-16.)

It is rather obvious, then, that Ms. Clack and Ms. Thurman knew that there was a strong, if not overwhelming, likelihood that Ms. Pettitt had altered the email to provide documentary

8

support for her interpretation of the effect of the Guideline Matrices—an interpretation about which Ms. Pettitt had been questioned just days' earlier by ST's management and in-house counsel.    After all, the modifications in Ms. Pettitt's version of the email facially supported her earlier representations to ST management that the Guideline Matrices were a UG record-keeping device that was not binding on ST.  (Id. at 49:23-50:2.)

Not long thereafter, ST discovered that another email which had been provided by Ms. Pettitt in response to Ms. Clack's request for documentation had been altered.  That discovery was made when ST's IT department was checking into the authenticity of the June 20, 2005, email, and, in the process, the IT department took an image of the contents of Ms. Pettitt's computer hard drive.   In addition to revealing that Ms. Pettitt had failed to produce all emails in her possession concerning the Guideline Matrices (id. at 57:4-8), the imaging revealed the second altered email which was dated February 3, 2006.  A copy of that email also had been given to the ST negotiators by UG in the meeting held in early August.

And, like the first altered email, the second one also was from Ms. Gavin to Ms. Pettitt and its subject was the Guideline Matrices.   (Id. at 50:19-51:11.)   The sentence speaking to the Matrices in the UG version of the email read:   "Rick approved the request - I'll [Pam Gavin] add to the guideline sheets and

9

send them to you!" (Ex. 28A.) The same sentence in the Pettitt version, however, read, "Rick approved the request," with no mention of Ms. Gavin's intention to make amendments to the Guideline Matrices. (Ex. 29A.)

Ms. Clack discerned that the second email fit the mold of the first in that the alterations contained therein, on their face, supported Ms. Pettitt's claim that the Matrices were a UG-internal document with no binding effect on ST. Concerned once again, Ms. Clack notified Ms. Thurman of the existence of the second altered email. (Sanc. Hrg. Tr. at 56:3-13.) Ms. Clack also brought the discovery of the altered emails to the attention of the CEO of ST, Sterling Edmunds. (Id. at 56:23-25.)

By this time (about the end of August 2008), Ms. Clack had grave concerns about the integrity of the documents that Ms. Pettitt had provided to support her contention that ST was not bound by the Guideline Matrices. Ms. Thurman, likewise, shared Ms. Clark's disquietude. The significance of whether the emails were genuine was obvious: if the emails were fraudulent, Ms. Pettitt's characterization of the effect of the Guideline Matrices also might be suspect. That, of course, could jeopardize ST's ability to refute UG's position that use of the DU method was a condition of insurance coverage, and could

10

ultimately jeopardize ST's ability to collect tens of millions
of dollars in insurance payouts from UG.

Notwithstanding the gravity of the developments respecting
the altered emails, neither ST's management nor its in-house
counsel confronted Mary Pettitt about the altered emails until
some seven months later, in March 2009. (Id. at 86:12-19.) Ms.
Thurman had planned to confront Ms. Pettitt about the
discrepancies as soon as October 10, 2008 (id. at 135:16-19.),
but her plan changed the night before that meeting when Sterling
Edmunds, ST's CEO, among others, advised Ms. Thurman to postpone
confronting Ms. Pettitt until she returned to the office from
medical leave. (Id. at 135:23-136:14.) With the October 10th
meeting scrapped, Ms. Thurman planned to confront Ms. Pettitt
ten days later, on October 20, 2008. (Id. at 136:15-16.) But,
no one in ST apprised Ms. Pettitt of the new meeting date.
October 2008 thus came to a close without ST officials meeting
with Ms. Pettitt. November and December 2008 also passed
without an interview. (Id. at 136:17-21.)

At the sanctions hearing, ST sought to explain the failure
to confront Ms. Pettitt about the altered emails by reciting
that she was out of the office in the latter months of 2008 for
personal reasons, consequently preventing ST's management from
meeting with her in person to discuss the altered emails.
(See, e.g., id. at 137:14-18, 150:20-151:9.) It is true that

11

Ms. Pettitt was out of the office from time to time in those months. But, it is also true that she did some work from home. And, there was no evidence that, if she had been told to come to ST's offices for a meeting, she would have been unable to comply with that instruction. The fact is that ST's explanation respecting the inability to interview Ms. Pettitt are not credible. If ST had desired to interview Ms. Pettitt about the two emails in her possession that it knew had been altered, it had ample opportunity to do so between August 2008 and December 2008. Simply put, the record reflects that ST did not want to interview Ms. Pettitt in 2008, and, in line with this preference, ST made a conscious decision not to interview her.

Instead of interviewing the employee who likely had all the answers, ST chose to conduct a records-based investigation that kept Ms. Pettitt in the dark about what ST knew. And, even ST's efforts in this regard were tepid at best. Although ST imaged the hard drive of Ms. Pettitt's work computer—presumably with the intention of rooting out additional altered emails, ST did not thoroughly prosecute that effort because, as the record shows, several other altered emails have since been identified. Nor did ST hire forensics experts or any other kind of outside help to assist in the collection and analysis of Ms. Pettitt's electronic files. (Id. at 120:21-23.) Not long after ST's IT department began the process of imaging Ms. Pettitt's computer,

technical difficulties arose that hindered thorough examination of her files.   This was of no moment for ST because, rather than investing additional resources in its own efforts or enlisting the support of outside investigative services to overcome the unanticipated difficulties, ST rested content with the information it then had, incomplete as it was.   (See id. at 140:15-24.)

Throughout the fall of 2008, ST continued settlement discussions with UG.   (Id. at 175:6-11.)   To its credit, ST did not use the altered emails in these discussions.   By September 2008, ST apprehended that it could soon be in litigation with UG over the insurance coverage.   Hence, it retained the law firm, Anderson Kill & Olick, P.C. ("Anderson Kill"), to represent it in the brewing dispute with UG.   Joshua Gold was the lawyer from that firm who took the lead in representing ST.

Ms. Pettitt remained on ST's backburner until mid-December 2008.   (Id. at 139:22-140:2, 144:2-3.)   On December 19, 2008, there was a meeting respecting how to proceed with Ms. Pettitt. The participants included prominent members of ST's legal department, including Ray Fortin, ST's general counsel, and Keith Reynolds, Debra Hovatter, and Susan Thurman.   (Id. at 371: 20-22, 363:15-364:21.)   Also on the call was Joshua Gold of Anderson Kill.

13

After that call, Mr. Gold made a memorandum to the file in
which he wrote:

> Ray Fortin instructed that he would like to
> avoid confronting or placing on leave/firing
> Mary Pettitt for fear it will adversely
> affect the insurance claim against AIG. I
> advised that SunTrust would have to consider
> the risk posed by not addressing this
> situation sooner rather than later as it
> potentially could risk leaving someone
> unsuitable in a position to cause harm in
> any manner that her employment and position
> at SunTrust might allow, including theft or
> liability.

(Ex. 42; Sanc. Hrg. Tr. at 318:12-18.)   Although while
testifying, Mr. Fortin took pains to refute the account of the
conference call that was expressed in Mr. Gold's memorandum
above (id. at 373:5-374:19), at some point during the call, Mr.
Fortin clearly instructed ST's in-house counsel not to confront
Ms. Pettitt about the altered emails (id. at 318:12-18).

Mr. Fortin expressed his belief that alerting Ms. Pettitt
to ST's knowledge of her wrongdoing might undermine ST's
insurance claim against UG (id. at 321:3-7), either by making a
hostile employee of Ms. Pettitt (id. at 320:8-13) or by bringing
her alterations to the attention of UG (id. at 320:14-19).   Mr.
Fortin's instructions marked an about-face from his previous
stance, articulated earlier in December 2008, that Ms. Pettitt
was to be interviewed "ASAP" about the email discrepancies.
(Ex. 42.)

14

Sometime in late December 2008 or early January 2009, after getting approval from Mr. Fortin, ST's in-house counsel decided to interview Ms. Pettitt in a "bifurcated" fashion:  there would be two separate interviews.  In the first interview, Ms. Pettitt was to be asked about her understanding of the insurance coverage dispute, without bringing up the altered emails.  In the second interview, ST was to confront Ms. Pettitt about the altered emails and require her to explain the alterations.

The first session of the bifurcated interview occurred on January 5, 2009, between Mr. Gold and Ms. Pettitt.  (Sanc. Hrg. Tr. at 327:24-328:2.)   Its purpose was to "pin down" Ms. Pettitt's story so she could not thereafter change it to damage ST's position in the loan dispute.  (Id. at 191:5-15, 329:3-10.) In line with this purpose, and, at the behest of Ms. Thurman and other ST officials, Mr. Gold drafted, and had Ms. Pettitt sign, an affidavit memorializing the substance of the January interview.   (Id. at 155:24-156:3, 328:6-329:1.)   The affidavit stated in part:

> 7.   My [Mary Pettitt's] knowledge regarding AIG's [UG's] confirmations for SunTrust's Combo 100 loan products also are derived from email exchanges between me and AIG. Specifically, in early January 2005, I requested, among other things, that AIG cover certain modifications to the Combo loan products which included covering second lien mortgages where the first lien was traditionally underwritten and the combined loan to value ratio was 100%.

. . .

> 11.   During the period 2005 to 2008, Pam
> Gavin  prepared  a  'matrix'  [Guideline
> Matrices] which she sent me periodically for
> review.   Pam indicated to me that the matrix
> she prepared was a mechanism she used to
> understand SunTrust mortgage loan products.

. . .

> 13.   Neither Ms. Gavin, nor anyone else ever
> communicated to me that the matrices sent
> were  intended  to  be  SunTrust  mortgage
> underwriting Guideline.

> 14.   Neither Ms. Gavin, nor anyone else,
> ever communicated to me that the matrices
> sent were intended to alter, override or
> restrict the insurance coverage that AIG
> previously agreed-to for Combo 100 mortgage
> products until after AIG first disputed its
> insurance coverage obligations for certain
> Combo 100 loan losses in 2008.

> 15.   My understanding of the references in
> the AIG matrices for "Interest Only" and
> "Yes, DU approved" were to indicate that
> should AUS underwriting be used to originate
> a SunTrust mortgage, the Fannie DU platform
> would be used because SunTrust did not use
> the Freddie LP platform to automatically
> underwrite these loan products.   I never
> interpreted the matrix to mean that AUS or
> DU  underwriting  was  a  requirement  of
> coverage, nor did anyone ever say that to me
> until after AIG began disputing its coverage
> obligations in 2008.

Ex. 51.   Ms. Pettitt executed the affidavit under oath.

The  second  session  of  the  bifurcated  interview  of  Ms.
Pettitt took place in mid-March 2009.   Ms.  Thurman and Ms.
Hovatter conducted the interview, with Mr. Gold absent.   In this
interview, Ms. Pettitt attributed the discrepancies in the June

16

20, 2005, and February 3, 2006, emails to her practice of sometimes appending parts of earlier emails to newer emails. (Id. at 257:6-17.) According to Ms. Pettitt, this practice facilitated understanding of certain emails, since relevant portions of earlier emails would be available for reference in a single document. That, of course, did not explain the actual alterations (textural deletions from, and additions to, the emails) that Ms. Pettitt made.

Both Ms. Thurman and Ms. Hovatter were unconvinced by Ms. Pettitt's explanation. At the hearing, Ms. Thurman testified that Ms. Pettitt had given a "possible," albeit not probable, explanation. (Id. at 162:20-23.) Ms. Hovatter testified that she "accepted" Ms. Pettitt's explanation, but, when pressed, she conceded that "[m]aybe 'accepted' is a little bit too broad." (Id. at 285:9-24.) Given what was then known about Ms. Pettitt's alterations and the evasive explanations that she offered in the interview, that testimony painfully minces words. The plain truth is that Ms. Pettitt, even if convincing in demeanor, simply did not offer a plausible substantive explanation for the email discrepancies in the March interview. Indeed, a conversation about the matter with Ms. Thurman led ST's CEO, Sterling Edmunds, to the understanding that "it looked like [Mary Pettitt] probably altered [the emails]" because "she

17

did not have a good explanation for [them]." (Ex. 62 at 21 (highlighted text).)

Even if one accepts that, before March 2009, it was possible (though neither probable nor plausible) that ST was uncertain who had altered the June 20, 2005, and February 3, 2006, emails, or for what purpose the emails had been altered, after March 2009 there could have been no doubt as to either question.

Even cursory examinations of the discrepancies in the January 20, 2005, and February 3, 2006, emails would have revealed that they did not result from parts of earlier emails being affixed to later emails. Rather, the discrepancies resulted from words being added to, and deleted from, singular emails. Those emails were clearly relevant to matters that ST had directed Ms. Pettitt to investigate. No reasonable person could have left the March 2009 interview with anything other than the belief that Ms. Pettitt deliberately had altered the emails to manufacture documentary support for her view that the Guideline Matrices were internal UG tracking documents, not binding on ST.

Not even that—by then irrefutable—knowledge spurred ST into action, however. Notably, in the months after March 2009, ST did not meet with Ms. Pettitt again to ask her whether she had altered other emails. And, it did not investigate—either

18

through internal or third-party means—whether Ms. Pettitt had altered other emails beyond the two then known to have been altered. Instead, ST proceeded as if circumstances justified a business as usual approach, thereby making it highly likely that, if Ms. Pettitt had altered other emails, their existence would never be known.

ST fired Ms. Pettitt, but not until January 2010. (Id. at 172:9-12.) By then ten months had passed since the March 2009 interview, and UG already had brought the specter of Ms. Pettitt's forgeries to the Court's attention with its emergency motion. Moreover, Ms. Pettitt's firing came ten days before UG was scheduled to depose her. When questioned by UG, Ms. Pettitt invoked the Fifth Amendment in response to every question. (Id. at 172:18-173:1.)

Also, in the spring of 2009, ST was preparing to sue UG to secure the disputed insurance coverage. The action against UG was filed in state court on July 16, 2009. As previously explained, after UG removed the action to this Court, the complaint was dismissed with leave to amend and thus it was necessary for counsel to prepare the FAC.

In preparing the FAC, Messrs. Gold and Miles Dumville of the law firm Reed Smith LLP[2] relied on a memorandum provided by

---

[2]  Mr. Dumville was retained by ST in March 2009. (Id. at 394:15-17.)

19

Ms. Thurman that both espoused ST's position in the loan dispute and cited documents which, ST believed, supported its litigation position. (Sanc. Hrg. Tr. at 434:23-435:5.) One document cited in Ms. Thurman's memorandum was a February 22, 2008 email (the "February 22d email") from Ms. Gavin to Ms. Pettitt.[3] Unbeknownst to ST, this email, like the January 20, 2005, and February 3, 2006, emails, had been altered by Ms. Pettitt. (Id. at 437:9-11.)   Ms. Pettitt had inserted a sentence into the original, which, in the same vein as the other alterations, facially supported her view that the Guideline Matrices were not binding on ST. (Ex. 53.)   That altered, February 22d email was cited in ST's FAC that was filed with the Court on November 24, 2009.[4]

Mr. Dumville, his colleagues, and Mr. Gold did not know that the February 22d email was fraudulent. Although they had learned of the two other altered emails through conversations with ST's in-house counsel, (see Sanc. Hrg. Tr. at 435:24-436:2.), they did not question the genuineness of the February

---

[3] According to Mr. Dumville, Ms. Thurman also had provided Reed Smith with the original, un-summarized version of the email. (Id. at 435:18-23.)   The reference to the February 22nd email tracked the language that Ms. Thurman had provided in her memorandum to Reed Smith.

[4] The FAC was collaboratively drafted by Joshua Gold and Reed Smith attorneys, both of whom signed the pleading. (Id. at 342:18-21, 432:11-15.)

22d email. Nor did they question its inclusion in Ms. Thurman's memorandum because they had been told by Ms. Thurman that ST was satisfied that the suspicious emails were limited to the two emails already known to have been altered. (Id. at 422:18-23, 423:7-12, 438:4-21, 439:23-440:5.) Ms. Hovatter and Ms. Thurman both reviewed the FAC before it was filed by outside counsel. (Id. at 487:23-488:7.)

The fact that the February 22d email was altered was discovered through the investigative efforts of UG's counsel. In December 2009, UG's counsel requested a copy of the email referred to in the FAC as a "February 2008 email from Pam Gavin to Mary Pettitt." (FIRST AMENDED COMPLAINT (Docket No. 42) ¶ 19.) UG sought to determine to which "February 2008 email" the FAC was referring, and ST's counsel gave a copy of it to UG's counsel.

UG's seemingly innocuous request wrought unintended consequences. In examining the version of the February 22d email that ST's counsel had provided, UG's counsel noticed discrepancies between it and the version of that email which UG had in its possession. UG's counsel then retained KPMG to analyze the metadata associated with the UG version. KPMG determined that UG's version was genuine, and that the version which ST's counsel had provided had been altered. This revelation prompted UG's counsel to question the reliability of

ST's documentary support for its position on the Guideline Matrices.

UG raised the issue of the altered email with the Court on December 29, 2009, when it filed the emergency motion seeking preservation of evidence and expedited discovery regarding what, it perceived to be, ST's "spoliation of evidence." (MOTION TO EXPEDITE MOTION FOR EMERGENCY RELIEF PRESERVING EVIDENCE AND GRANTING EXPEDITED DISCOVERY REGARDING SPOLIATION OF EVIDENCE (Docket No. 52); Sanc. Hrg. Tr. at 441:20-21.) A status conference ensued on January 8, 2010. Thereafter, ST's outside counsel, Reed Smith, directed its document-retention service, Encore Discovery Solutions, to examine all of Ms. Pettitt's emails to look for additional, yet undiscovered, alterations. (Id. at 489:4-491:2.) Although Mr. Dumville could not testify with certainty at the sanctions hearing that Encore had examined all of Ms. Pettitt's emails, he indicated that Encore's subsequent audit identified "two or three" more altered emails.[5] (Id. at 492:18-22.)

---

[5] Even while preparing this opinion, the Court received notice from ST's outside counsel that another altered email had been uncovered. This email was dated July 19, 2004, and has a Bates label of "STM_002464893." By now, the known altered documents are not fewer than eleven in number. (See DEFENDANT UNITED GUARANTY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SANCTIONS (Docket No. 271) at 12-17 (listing and describing altered documents).)

22

Also, during the status conference on January 8, 2010, ST's outside counsel, Mr. Dumville chief among them, made certain representations to the Court in response to the Court's inquiries. Mr. Dumville stated, "I will affirmatively tell the Court that because of this revelation [referring to the discovery of the fraudulent nature of the February 22, 2008, email], we [Reed Smith] are and SunTrust is looking very closely at all of Ms. Pettitt's email traffic to make sure that there are no other issues out there." (Id. at 445:3-6 (emphasis added).) Mr. Dumville made this statement knowing that ST was aware of two other emails that Ms. Pettitt had altered. (Id. at 446:6-7.) He did not disclose that knowledge because, in his estimation, he did not know enough about the factual particulars (because he had not been retained by ST in 2008 when the altered emails were discovered), and he deemed ST's knowledge of the two forgeries (neither of which had been cited in any pleadings or briefs in this action) as confidential information, the divulgence of which was not permitted by his ethical obligations. (Id. at 447:19-448:7.)

Mr. Dumville also told the Court that the February 22d email, which UG had discovered to be a fraud, was sent to Reed Smith by ST's in-house counsel and that there was no reason to question the authenticity of that email. (Id. at 453:7-16.) Later in the status conference, Travis Sabalewski, another

23

attorney at Reed Smith, said the following about ST's imaging of Ms. Pettitt's hard drive: "[I]n anticipation of and relating to these issues, images were taken of a few different individuals of SunTrust's drives, including Ms. Pettitt's." (Id. at 454:8-12.)   The Court queried: "Relating to these issues?"   Mr. Dumville then interjected, "No, no, no, relating to the lawsuit, Your Honor," giving the clear implication that concern over altered emails had played no role in ST's decision to image Ms. Pettitt's hard drive.   (Id. at 454:13-15.)   Mr. Dumville made this last statement aware that ST had imaged Ms. Pettitt's computer, at least in part, because it had suspicions that Ms. Pettitt had altered emails.   (Id. at 457:10-19.)   However, Mr. Dumville had been told by ST that the primary reason for ST's imaging Ms. Pettitt's hard drive was to ensure that information contained therein was not lost for use in the litigation; he had also been told that Ms. Pettitt's hard drive was not the only employee hard drive that ST had imaged.   (Id. at 457:3-9.)

Mr. Dumville made all of the aforementioned statements to the Court under somewhat unusual circumstances.   UG had filed its emergency motion for relief on December 29, 2009 when Mr. Dumville and his family were vacationing outside Virginia.   (Id. at 446:9-12.)   Additionally, in the days before the January 8, 2010, status conference, Mr. Dumville's son had undergone knee surgery in Charlottesville, Virginia.   (Id. at 447:4-12.)   This

required Mr. Dumville to remain with his wife and son in Charlottesville until either the day before or the day of the status conference. (Id. at 447:13-18.) In consequence, Mr. Dumville did not communicate with his Reed Smith colleagues or ST about the particulars of UG's emergency motion. (See id. at 458:17-24.) Ms. Hovatter was present during the January 8 status conference. She neither corrected the statements made by Mr. Dumville nor told him to correct them.

Subsequently, the Court allowed full discovery into the facts respecting the alteration of emails. The trial on the merits was postponed. That discovery consumed several months. Briefing on the merits and of the sanctions issues was very extensive. The Court conducted several hearings on related discovery issues. And, there was a three-day evidentiary hearing.

## POSITIONS OF THE PARTIES

### 1. UG's Position

Originally, UG based its request for sanctions on the theory that ST committed a fraud on the Court and abused the litigation process "by asserting fraud claims against . . . UG that depended entirely on Mary Pettitt's unsupported representations and her concocted story that the Guideline Matrices, which exclude the loans at issue from coverage, were

25

not the governing Guideline." (MEMORANDUM RESPECTING SUNTRUST'S FRAUD ON THE COURT AND ABUSE OF THE JUDICIAL PROCESS THROUGH ITS ASSERTION OF ITS FRAUD CLAIMS (Docket No. 298) at 1.) Further, according to UG, ST "asserted these claims despite knowing that Pettitt's story was contradicted by documents exchanged between [ST] and [UG], that Pettitt altered documents to support her fictitious story, and that Pettitt's story was likely to change the moment she was confronted with her fraudulent actions." (Id.)

As briefing and argument proceeded, that rather broad theory became more focused in specifying the allegedly sanctionable conduct. UG now has identified those whose conduct, in its view, warrants the imposition of sanctions, namely: (1) ST's outside counsel; (2) ST's in-house counsel; and (3) ST, the corporation. See generally Summary Judgment Hearing Transcript at 165:15-199:23. And, it has identified, for each, the specific conduct thought to warrant sanctions.

### A.   Outside Counsel

UG alleges five instances of sanctionable conduct on the part of ST's outside counsel. First, UG claims that Mr. Gold's conduct in preparing the affidavit, which Ms. Pettitt was to sign under oath, amounted to subornation of perjury and obstruction of justice. According to UG, Mr. Gold's conduct is sanctionable because he knew that Ms. Pettitt had altered at

26

least two emails to support her story that the Guideline
Matrices were internal UG documents with no binding effect on
the parties, and therefore he knew that Ms. Pettitt likely would
perjure herself by signing an affidavit attesting to the
nonbinding nature of the Matrices. Second, UG accuses Mr. Gold
and Reed Smith of sanctionable misconduct for their inclusion of
the February 22d email of Ms. Pettitt in the FAC when they
already knew (from earlier communications with ST's in-house
counsel) that Ms. Pettitt had altered two other emails. Third,
UG claims that Mr. Gold and Reed Smith should be sanctioned for
basing the FAC on the contention that the Guideline Matrices
were merely non-binding, internal UG documents, rather than the
binding contract provisions which UG contends them to be, when
there existed compelling reasons (in the form of the altered
emails) to disbelieve that contention. Fourth, UG alleges that
Mr. Dumville intentionally misled the Court during the January
8, 2010, status conference. UG locates as sanctionable deceit
the statements that: (1) his learning of the altered nature of
the February 8, 2008, email was a "revelation"; (2) there was no
reason to think anything was "amiss" with regard to the email;
and (3) Ms. Pettitt's computer was scanned as part of the

altered emails.[6]  Fifth, and finally, UG faults Mr. Gold and Reed
Smith for failing to conduct a meaningful investigation into
whether there were other altered emails when both knew that Ms.
Pettitt had forged two emails.

### B.   ST In-House Counsel

UG has identified six kinds of sanctionable conduct on the
part of ST's in-house counsel.  First, UG claims that ST's in-
house attorneys, apparently Mr. Fortin, Ms. Hovatter and Ms.
Thurman, engaged in a cover-up by not confronting Ms. Pettitt
about the two altered emails they discovered in August 2008
until after she had been interviewed and had signed an affidavit
which they had good reason to believe was untrue.  Second, UG
asserts that ST's in-house counsel asked Ms. Pettitt to sign the
affidavit in an effort to keep her from changing her story when
she was confronted with altered emails.   Third, UG argues that
Ms. Thurman acted in a sanctionable way by forwarding to outside
counsel for use in the FAC the altered February 22d email when
she knew that Ms. Pettitt had altered two other emails on the
same topic without first verifying the authenticity of that
email.   Relatedly, UG proposes sanctions because Ms. Thurman

---

[6] UG concedes that Mr. Dumville had a duty of confidentiality to
his client, ST, but it says his duty did not permit him to
volunteer misleading information to the Court.

reviewed the FAC which cited that email and allowed it to be
filed without first checking its authenticity.    Fourth, UG
faults ST's in-house attorneys for using the version of the
facts that are recited in the altered emails as a basis of suit
when they had substantial reason to distrust that version of the
facts.    Fifth, UG argues that Ms. Hovatter played a role in
misleading the Court at the January 8, 2010, status conference
when she did not correct the representations made by Mr.
Dumville.    Also, it is said that Ms. Thurman reviewed ST's
response to UG's emergency motion and allowed misrepresentations
to be presented therein.    Sixth, UG posits that ST's in-house
counsel acted in a way to warrant sanctions by not conducting "a
serious    investigation    for    other    false    emails"    after
ascertaining, in August 2008, that Ms. Pettitt had altered two
emails.

### C.   ST:   The Corporation

UG has cited seven bases for the imposition of sanctions on
ST, qua corporation.    First, UG asserts that, because Ms.
Pettitt acted in the course of her employment with ST and as a
senior vice president thereof, ST is responsible for her
misconduct in spoliating evidence by altering the emails.
Second, ST should be sanctioned, says UG, for the intentional
suppression of Ms. Pettitt's conduct by ST management (Messrs.
Edmunds and Partlow) and in-house counsel.    Third, ST should be

sanctioned for the conduct of in-house counsel in having Ms. Pettitt execute the affidavit. Fourth, UG says that ST should be sanctioned because the FAC cites the altered February 22d email. Fifth, ST should be sanctioned because of its reliance on Ms. Pettitt's allegedly tainted story without conducting an adequate investigation. Sixth, ST should be sanctioned for in-house counsel's role in misleading the Court at the January 8, 2010, status conference and in the response to UG's emergency motion. Seventh and lastly, ST should be sanctioned for failing to conduct a meaningful investigation for other altered emails after discovering the first two Pettitt alterations.

The nature of UG's theories identify two candidates whose conduct warrant sanctions: (1) ST as a corporation (because of the conduct of its in-house counsel and its management); and (2) ST's outside counsel. Notwithstanding the somewhat overly detailed delineation of allegedly sanctionable conduct argued by UG, the conduct for which sanctions actually is being sought distills to the following:

(1) Spoliation of evidence by Ms. Pettitt in altering several emails, one of which (the February 22d email) is actually cited in the FAC;

(2) Covering up Ms. Pettitt's alteration of emails once it was discovered, including:

30

- Delay in confronting Ms. Pettitt about the alterations (ST's in-house counsel and management);

- Failure adequately to investigate the extent of Ms. Pettitt's alterations (ST's in-house counsel and outside counsel);

- Securing a false affidavit from Ms. Pettitt (Mr. Gold and ST's in-house counsel);

- Misrepresenting material information to the Court (ST's in-house counsel and outside counsel);

(3) Sending an altered email to outside counsel and allowing it to be cited in the FAC (ST's in-house counsel); and

(4) Using as a theory of the case a version of the facts that correlates to Ms. Pettitt's alterations of the UG emails (ST's in-house counsel and outside counsel).

As relief for all of the allegedly sanctionable conduct outlined above, UG requests dismissal of ST's action, either in whole or in part. UG also requests attorney's fees and costs associated with its sanctions motion. Furthermore, and short of dismissal, UG asks the Court to order Mr. Gold and Reed Smith to review their purported missteps and counsel new attorneys on why they happened and how they might be avoided in the future. Additionally, UG asks the Court for a series of jury

instructions to be given at trial: the first being an instruction that, if Mary Pettitt had testified (that is, not invoked the Fifth Amendment), any testimony she would have given would have been detrimental to ST's litigation position, and the second being that the jury must or may consider ST's response to the discovery of Ms. Pettitt's alterations as evidence of the weakness of ST's litigation position. UG also requests that it be allowed to call as trial witnesses Messrs. Gold and Dumville, notwithstanding any countervailing attorney-client privilege claims. Finally, UG requests that ST be prohibited from introducing evidence tending to show the non-binding nature of the Guideline Matrices.

## 2. The Position Of ST And Outside Counsel

ST's outside counsel and ST were separately represented at the evidentiary hearing because outside counsel were called by UG as witnesses. However, the positions of ST and its outside counsel are not adversarial on the sanctions issues and both oppose the imposition of any sanction on anyone for essentially the same reasons.

Both take the position that Ms. Pettitt's alteration of emails is not sanctionable conduct because none of the emails were used to support ST's case, except for the February 22d email which, ST represents, it will not use. In essence, ST and its outside counsel invoke the principle: "no harm, no foul."

They also contend that citation of the February 22d email in the FAC was done neither willfully nor with any intent to deceive. Both ST and its outside counsel oppose sanctions for the additional reason that none of the alleged misconduct—from the discovery of the first altered email in August 2008 onward—constitutes either fraud on the Court or an abuse of the litigation process.

## DISCUSSION

UG's motion seeks sanctions under the Court's inherent authority to issue sanctions. The parties agree that the inherent power is the only locus of sanction authority on which UG's motion is based. The decision in Chambers v. NASCO, Inc., 501 U.S. 32 (1991), defines the inherent power to sanction and establishes the principles that guide the exercise of that power. In Chambers, the Supreme Court cautioned that a district court's inherent powers "must be exercised with restraint and discretion." 501 U.S. at 45. However, while admonishing district courts to tread carefully, the Court, at the same time, outlined a rather broad array of implied powers that are available to sanction improper conduct during litigation, ranging from disciplining attorneys to assessing attorney's fees to even vacating judgments. Id. at 43-47.

In Chambers, the Court explained the origin and reach of the inherent power and approved use of the power to impose sanctions for practicing fraud on courts, defiling "the very temple of justice," or delaying or disrupting litigation in bad faith. Id. at 46. In United States v. Shaffer Equip. Co., 11 F.3d 450 (4th Cir. 1993), the United States Court of Appeals for the Fourth Circuit interpreted Chambers as authorizing use of the inherent power to impose sanctions "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the [judicial] process." Id. at 462. In Aoude v. Mobil Oil Corp., 892 F.2d 1115 (1st Cir. 1989), the First Circuit approved reliance on the inherent power to sanction "fraud on the court" and "abuse of the judicial process." Id. at 1119 (citing Eash v. Riggins Trucking, Inc., 757 F.2d 557, 567 (3rd Cir. 1985) (en banc)).

By now it is well-settled that fraud on the court or abuse of the judicial process warrants use of the inherent power to impose sanctions on the offending party or its counsel, or both. See Chambers, 501 U.S. at 46; see also Jones v. Winnepesaukee Realty, 990 F.2d 1 (1st Cir. 1993); United States v. Bertoli, 994 F.2d 1002 (3d Cir. 1993); Harlan v. Lewis, 982 F.2d 1255 (8th Cir. 1993); Sassower v. Field, 973 F.2d 75 (2d Cir. 1992); Lubrizol v. Exxon Corp., 957 F.2d 1302 (5th Cir. 1992); Marrocco

34

v. General Motors Corp., 966 F.2d 220 (7th Cir. 1992); Malautea
v. Suzuki Motor Co., 987 F.2d 1536 (11th Cir. 1993).

### 1.  Fraud On The Court

Fraud on the court is one of the grounds on which UG seeks
sanctions here.  In Aoude, the First Circuit defined fraud on
the court:

> A 'fraud on the court' occurs where it can
> be demonstrated, clearly and convincingly,
> that a party has sentiently set in motion
> some unconscionable scheme calculated to
> interfere with the judicial system's ability
> impartially to adjudicate a matter by
> improperly influencing the trier of the fact
> or unfairly hampering the presentation of
> the opposing party's claim or defense.

892 F.2d at 1118.  In Pfizer, Inc. v. International Rectifier
Corp., 538 F.2d 180 (8th Cir. 1976), the Eight Circuit defined
fraud on the court in similar fashion.  While recognizing the
concept's inherently amorphous quality, the court explained
that: "fraud on the court, though not easily defined, can be
characterized as a scheme to interfere with the judicial
machinery performing the task of impartial adjudication, as by
preventing the opposing party from fairly presenting his case or
defense."  538 F.2d at 195.  There appears to be no Fourth
Circuit definition of fraud on the court in this context, but
the Court of Appeals has found that sanctions are appropriately
imposed under the inherent power when a party's conduct

"involv[ed] deceit that, when not disclosed, undermine[d] the integrity of the [judicial] process." Shaffer, 11 F.3d at 459.

## 2. Abuse Of The Judicial Process

Abuse of the judicial process can take many forms, and the "inherent power extends to a full range of litigation abuses." Chambers, 501 U.S. at 46. For example, spoliation of evidence is an abuse of the judicial process that is sanctionable under the inherent power. Silvestri v. General Motors Corp., 271 F.2d 583, 590 (4th Cir. 2001). Chambers and Shaffer both teach that the commencement or continuation of litigation in bad faith is an abuse of the judicial process. Chambers also makes clear that it is an abuse of the judicial process to conduct litigation "in bad faith, vexatiously, wantonly or for oppressive reasons." There is no doubt that the inherent power can be used to sanction such abuses. See Chambers, 501 U.S. at 45-46; see also DLC Management Corp. v. Town of Hyde Park, 163 F.3d 124, 136 (2d Cir. 1998) (sanctions under court's inherent authority not abuse of discretion when defendant consciously disregards discovery obligations); Harlan v. Lewis, 982 F.2d 1255, 1259-60 (8th Cir. 1993) (monetary sanction under court's inherent authority not abuse of discretion when counsel improperly conducts *ex parte* communications with two witnesses); Pope v. Federal Express Corp., 974 F.2d 982, 984 (8th Cir. 1992) (sanction of dismissal under court's inherent authority not

36

abuse of discretion when plaintiff fabricates evidence); Thomas
v. Hoffman-La Roche, Inc., 126 F.R.D. 522, 525 (N.D. Miss. 1989)
(sanctions under court's inherent authority not abuse of
discretion when counsel needlessly prolongs depositions).

Against the factual background in this record and with the
foregoing precepts in mind, it is next necessary to determine
whether, as UG alleges, ST or its outside counsel has committed
either a fraud on the court or abuse of the litigation process.
To that analysis, this opinion now turns.

### 3. ST (Through Its In-House Counsel And Management)

The conduct of ST for which UG seeks sanctions, apart from
that of Ms. Pettitt, was largely that of its in-house counsel—
namely, Mr. Fortin, Ms. Hovatter, and Ms. Thurman—with the
involvement of its executives—namely, Ms. Clack, a senior vice
president of ST, and, to a much lesser extent, Mr. Edmunds, CEO
of ST, and Mr. Partlow, a senior vice president of ST. The
record establishes beyond question that Ms. Pettitt altered a
number of emails which addressed the DU approval question.[7] The
emails that were the subject of the alterations were potential
evidence in the anticipated litigation between ST and UG. Thus,

---

[7] There are at least eleven known altered documents, but whether
that is the extent of Ms. Pettitt's alterations is uncertain.
Indeed, during briefing on the sanctions issue another altered
email (in addition to the ten documents listed and described in
UG's initial sanctions memorandum) was identified by ST's
counsel. See note 5, supra.

Ms. Pettitt spoliated that evidence by altering its text.   And, it has been shown that she altered other emails in like fashion.

By August 2008, Ms. Clack, Ms. Thurman, Mr. Edmunds, and Mr. Partlow knew that Ms. Pettitt had altered two of the emails (dated June 20, 2005, and February 3, 2006) that Ms. Pettitt had offered to document her position that the Guideline Matrices were merely for UG's internal use.   Yet, ST's management and in-house counsel made minimal and ineffectual efforts to determine the extent of Ms. Pettitt's alterations.

ST did not confront Ms. Pettitt for months about the two altered emails.   When finally confronted, Ms. Pettitt explained that the alterations were the result of appending the text of one email into another, a practice in which she sometimes engaged to facilitate clear communication of messages she forwarded to colleagues.   That explanation simply does not wash because the emails themselves clearly underwent an editing process that involved deleting some words and adding others, not broad-brush cutting and pasting of entire emails, or unedited parts thereof.

ST's in-house counsel and management knew that the emails on which Ms. Pettitt performed editorial surgery would likely be evidence in the forthcoming litigation because UG had relied in the settlement negotiations on emails on the very same topic and, indeed, on at least two of Ms. Gavin's emails which Ms.

Pettitt had altered.   And, to support its position UG had actually given the negotiators copies of the emails that Ms. Pettitt altered.

With all the background knowledge recited fully in the factual findings set out above, Ms. Thurman cited the February 22d email in a memorandum outlining ST's position and sent that memorandum and the February 22d email to outside counsel to use in framing the FAC.   Predictably, that email was cited in the FAC (albeit obliquely as a "February 2008" email).   That email, like the ones that Mr. Thurman knew Ms. Pettitt had altered (June 20, 2005, and February 3, 2006) addressed the Guideline Matrices.   And, it was from Ms. Gavin, as were the other two emails known to have been altered.   Ms. Thurman reviewed the FAC before it was filed and thus knew that it cited the February 22nd email.   Ms. Hovatter also reviewed the FAC before it was filed.

As UG correctly recites, the FAC reflects the same theory that appears in the altered emails: that the Guideline Matrices did not reflect an agreement respecting the underwriting criteria for insuring the IOF Combo 100 Loans and instead were for UG's internal use in keeping track of the loans that were insured.   Thus, the cited "February 2008" email from a UG employee was understandably of great interest to UG.

When UG's counsel obtained a copy of the "February 2008" email cited in the FAC, they observed that it was different than the email their client's employee, Ms. Gavin, actually had sent. They then confirmed that the cited email had been altered to change its substantive meaning.

That set in motion a series of events starting with the filing of UG's emergency motion, entry of an evidence preservation order, lengthy discovery, and forensic examination of computers and their contents.  That activity resulted in the filing of the pending motion for sanctions and an evidentiary hearing.

It is now undisputed that the February 22d email was altered by Ms. Pettitt, as were numerous other emails.  The record shows that the February 22d email is the only altered email cited by ST in the FAC or in any other pleading.  ST has pledged that it will not use in evidence any altered email.

However, the efforts to uncover the truth and to confirm, with reasonable certainty, the extent of Ms. Pettitt's handiwork have been time-consuming and costly.  The quantum of discovery time, briefing, exhibits, forensic examinations, and hearings bespeak the expenditure of hundreds of thousands of dollars (perhaps more) in legal fees and expenses.  The litigation activity, from the discovery of the altered email cited in the FAC until now, has consumed 15 months.  The trial of the merits

of the action had to be postponed until the facts respecting Ms. Pettitt's spoliation of evidence and its use were developed. It has been necessary for the Court to devote extensive time to resolve motions related to the many issues spawned by the discovery of the altered emails. Even more time will be required after this opinion is issued to decide related issues. In sum, the toll on the judicial process of Ms. Pettitt's spoliation and ST's deliberate failure to uncover the extent of it before allowing the February 22nd email to be cited in the FAC has been staggering.

But, for today's case, the first issue is whether the virtually undisputed conduct of Ms. Pettitt and ST is a fraud on the court or an abuse of the judicial process of the sort that warrants use of the inherent power to impose sanctions. That, in turn, necessitates a return to the principles outlined in Chambers, Shaffer, and Aoude.

## A.    Fraud On The Court

The record shows, clearly and convincingly, that Ms. Pettitt sentiently set in motion an unconscionable scheme to alter evidence to hamper the presentation of UG's defense to ST's claim that its IOF Combo 100 Loans were covered by UG's policy. Ms. Pettitt's purpose in altering the emails was to provide, supposedly out of the mouth of UG's point person (Ms. Gavin) on the loans at issue, documentary support for her view

41

that the Guideline Matrices did not, as UG contended, set the underwriting standards for the IOF Combo 100 Loans. In other words, Ms. Pettitt spoliated evidence to hamper UG in presenting its defense in the anticipated litigation between ST and UG. That meets the definition of a fraud on the court.

When Ms. Pettitt engaged in that conduct, she was acting as an employee of ST who had been asked by her superiors to provide evidence to support the position that the Guideline Matrices did not set the underwriting requirements for the loans at issue and, instead, that, as Ms. Pettitt had said, they were internal UG record-keeping documents.[8] Thus, her conduct was attributable to ST.

ST argues that it cannot be held accountable for Ms. Pettitt's tortious conduct, citing Virginia cases involving a principal's responsibility under the respondent superior doctrine for the torts of an agent. That argument fails here. First, spoliation is not a tort, so tort law principles do not apply to measure ST's accountability for Ms. Pettitt's conduct. And second, even if tort law principles were in play, they would not relieve ST of accountability for Ms. Pettitt's conduct. The Supreme Court of Virginia's decision in Davis v. Merrill, 112

---

[8] It is true that Ms. Clack told Ms. Pettitt also to provide "the good and the bad," but there is no doubt that what was wanted most was favorable documentation.

S.E. 628 (Va. 1922), provides the time-honored test in the
Commonwealth:

> the test of the liability of the master for
> the tortious act of the servant is not
> whether the tortious act itself is a
> transaction within the ordinary course of
> the business of the master, or within the
> ordinary scope of the servant's authority,
> but whether the service in which the
> tortious act was done was within the
> ordinary course of [the master's] business
> or within the scope of [the servant's]
> authority.

112 S.E. at 630-31. In Tri-State Coach Corp. v. Walsh, 49 S.E.
363 (Va. 1948), the Supreme Court of Virginia elaborated:

> The courts . . . have long since departed
> from the rule of non-liability of an
> employer for wilful or malicious acts of his
> employee. Under the modern view, the
> wilfulness or wrongful motive which moves an
> employee to commit an act which causes
> injury to a third person does not of itself
> excuse the employer's liability therefor.
> The test of liability is not the motive of
> the employee in committing the act
> complained of, but whether the act was
> within the scope of the duties of employment
> and in the execution of the service for
> which [the employee] was engaged.

49 S.E. at 366.

Recently, the Supreme Court of Virginia applied Tri-State,
among other cases, to hold that a trial court erred in granting
summary judgment in favor of an employer when an employee
accepted bribes in his role as a contract negotiator.

Commercial Business Systems, Inc. v. Bellsouth Services, Inc.,

453 S.E.2d 261 (Va. 1995).  In so holding, the Court wrote:

> In the present case, the facts presented by
> [the employer] and relied upon by the trial
> court do not conclusively establish that
> [the employee] was not acting within the
> scope of his employment when he committed
> the wrongful acts.  Unquestionably, [the
> employee's] conduct was outrageous and
> violative of his employer's rules.  And yet,
> [the employee's] willful and malicious acts
> were committed while [the employee] was
> performing his duties as [the employer's]
> contract negotiator and administrator and in
> the execution of the services for which he
> was employed.

Bellsouth, 453 S.E.2d at 266.  Bellsouth, as well as the Supreme

Court of Virginia's general pronouncements on the doctrine of

respondeat superior, counsel that ST would be subject to

liability for Ms. Pettitt's fraudulent alterations under

Virginia tort law principles.  There is no question that the

service in which Ms. Pettitt's fraudulent act was done was both

within the ordinary course of ST's business as a mortgage

provider and within the scope of Ms. Pettitt's authority as the

primary liaison with UG respecting ST's loans.

The record does not, however, permit a finding that, in

failing to uncover the extent of Ms. Pettitt's spoliation, that

ST's in-house counsel or ST's management joined Ms. Pettitt's

fraudulent scheme.  As will be discussed later, their conduct

allowed and encouraged the February 22d altered email to be

44

cited in the FAC, thereby causing great delay and expense.  But, inexcusable as it was, the conduct of ST's in-house counsel and management did not amount to fraud on the court because, unlike Ms. Pettitt's conduct, the conduct of management and in-house counsel was not accompanied by a sentient effort to hamper UG's case.

### B.    Abuse Of The Judicial/Litigation Process

The conduct at the core of the allegation that ST abused the judicial process is that of ST's in-house counsel and management: (1) in failing to uncover the extent of Ms. Pettitt's alterations once they were discovered in the first two altered emails and thus allowing the altered February 22d email to be cited in the FAC; and (2) in building a key part of ST's case around the theory reflected in the altered emails.

The record establishes, clearly and convincingly, that the way in which ST's in-house counsel and management proceeded after the discovery of Ms. Pettitt's alteration allowed the altered February 22d email to be featured in the FAC.  The topic of that email was the Guideline Matrices and, in substance, it was closely akin to the two altered emails of which ST's management and in-house counsel were intimately aware.  The February 22d email, in short, was of substantial substantive importance to ST's litigation position.

Ms. Thurman cited that email in her memorandum outlining ST's case and forwarded it (along with her memorandum) for use by outside counsel in framing the FAC. And, like Ms. Hovatter, she reviewed a draft of the FAC before it was filed, all the while being aware of the alterations and ST's inadequate efforts to determine the extent of the known spoliation.

The record shows that ST directed its IT department to review the first two emails and that effort confirmed that they had been altered. The record therefore shows that the IT department could have uncovered the other altered emails—if ST had been willing to invest the time and monetary resources to that end. The record, however, does not show that the IT department was asked to undertake that no doubt extensive task even after the imaging of Ms. Pettitt's hard drive disclosed a second alteration. Nor did ST retain an outside vendor to undertake the task when the IT department encountered unforeseen impediments in its abbreviated imaging process.

Remarkably, the record discloses no other efforts to verify the accuracy of emails from UG to Ms. Pettitt addressing the Guideline Matrices (i.e., those on the topic of the first two alterations) even after Ms. Pettitt's March 2009 interview when, in explaining the first two alterations (June 20, 2005, and February 3, 2006), she gave utterly incredible answers in explaining the alterations. Nor did ST seek to verify the

provenance of the February 22d email before citing it in the FAC. Given that the February 22d email, like the emails then known to have been altered, was from UG's Ms. Gavin and was of the same topical and substantive import, ST's complacency was inexcusable.

As has been explained, the consequences of ST's failure to face up to its responsibility (or of its decision to bury its corporate head in the sand) adversely and significantly affected and burdened this litigation and the judicial process. The handling of the matter by ST's in-house counsel and its management that led to citation of the February 22d email in the FAC and the aftermath thereof constituted an abuse of the litigation process.

### C. Sanctionability Of The Fraud On The Court And The Abuse Of The Judicial Process Under The Inherent Power

The next issue is whether Ms. Pettitt's conduct that is attributable to ST and the conduct of ST's in-house counsel and management should be sanctioned under the Court's inherent power.

Clearly, the conduct at issue, as proved by the record and as described above, is of the kind that can warrant sanctions under the inherent power. As this issue is presented here, whether that conduct is sanctionable depends upon the culpability of the actors, as caselaw explains.

47

A review of Chambers, as well as authority in the Fourth
Circuit—namely, Shaffer and Silvestri—teaches that the inherent
power is reserved for quite serious misconduct.[9] As explained in
Sanford v. Commonwealth, 689 F. Supp.2d 802 (E.D. Va. 2010):

> The Court's inherent power to impose
> sanctions is in some respects broader and in
> other respects narrower, than its authority
> to impose sanctions pursuant to 28 U.S.C. §
> 1927.   It is broader, in that it covers
> every type of litigation misconduct, unlike
> rule-based and statutory authorities such as
> Rule 11, Rule 37, and § 1927, which concern
> themselves   with   specific   types   of
> misconduct.   But, the Court's inherent power
> is narrower in that the misconduct requires
> is almost always something more egregious
> than that required for other types of
> sanctions.

Id. at 813-24 (emphasis added).

That   conclusion   is   underscored   by   the   fact   that   the
authorities on which Shaffer relied all involved intentional and
quite serious wrongdoing of some sort.   See Aoude v. Mobil Oil
Corp., 892 F.2d 1115 (1st Cir. 1989); Hadaco Engineering Co. v.
Gostle, 843 F.2d 376 (9th Cir. 1988); United States v. National
Medical Enters., Inc., 792 F.2d 906 (9th Cir. 1987).

Other   federal   courts   have   mirrored   Sanford's   assessment
that   courts   should   impose   sanctions   under   their   implied

---

[9]   See also Glynn v. EDO Corp., No. 07-01669, 2010 WL 3294347 (D.
Md. 2010) (unpublished opinion) (A court's inherent authority to
impose sanctions "ought to be exercised with great caution, in
circumstances such as those involving the very temple of justice
being defiled" (internal quotation marks omitted)).

authority only to address conduct that is especially serious and knowing. Chief Judge Young of the Southern District of Indiana, in Lawson v. Sun Microsystems, No. 1:07-cv-196, 2010 WL 503054 (S.D. Ind. Feb. 8, 2010) (slip copy), reasoned that "wantonly," as that term is used in Chambers, "connotes malice (in the criminal sense)," which he later described as "reckless plus." 2010 WL 503054, at *3 (citing Rollin M. Perkins & Ronald N. Boyce, Criminal Law 879-80 (3d ed. 1982)). "Careless conduct," Chief Judge Young clarified, "does not equate to 'wanton' conduct." Id. In this vein, he echoed the sentiments of the Seventh Circuit, which earlier had held that a "district judge's finding of no willfulness . . . precludes any sanction against counsel under the inherent powers of the court." Maynard v. Nygren, 332 F.3d 462, 470 (7th Cir. 2003). Even the First Circuit decision on which UG principally relies, Aoude v. Mobil Oil Corp., defines a "fraud on the court" punishable under the inherent power as a case where "it can be demonstrated . . . that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability to impartially adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." 892 F.2d at 1118 (emphasis added).

The foregoing decisions confirm that Chambers and Shaffer are best construed to require, at least in most cases, that implied-authority sanctions be reserved for egregious misconduct that is engaged in knowingly.   The obvious exception, as Silvestri holds, is negligent conduct that results in such severe prejudice that a party is rendered unable fairly to prosecute its claim or to present its defense.

Before turning to the substantive analysis of the culpability issue presented here, it is necessary to resolve a dispute respecting the burden of proof.   UG argues that entitlement to sanctions under the inherent power need not be attended by clear and convincing evidence.   Citing, correctly so, Glynn v. EDO Corp., 2010 WL 3294347, at *2, for the proposition that the Fourth Circuit has not yet decided the precise burden of proof in sanctions cases, UG argues that the Court has discretion to apply the lower preponderance of the evidence standard here.   (See DEFENDANT UNITED GUARANTY'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SANCTIONS (Docket No. 174) at 4 n.2.)   ST argues that clear and convincing proof is required, citing, among other authorities, Samsung Elecs. Co., Ltd. V. Rambus, 440 F. Supp.2d 495 (E.D. Va. 2006), and Moore's Federal Practice – Civil, Spoliation – Destruction of Evidence § 37.A.55[1].   (See SUNTRUST MORTGAGE'S MEMORANDUM IN OPPOSITION

TO DEFENDANT UNITED GUARANTY'S MOTION FOR SANCTIONS (Docket No. 165) at 28-29.)

Fraud on the court, like all fraud, must be shown clearly and convincingly. That is established by Aoude, 892 F.2d at 1118. And, this Court has held that use of the inherent power to sanction spoliation, an abuse of the judicial process, requires clear and convincing evidence.[10]

Other courts have tended to require clear and convincing proof of misconduct (whether termed egregious, intentional, willful or in bad faith) before using the inherent power to impose sanctions for litigation abuse, at least where, as here, dismissal is the requested sanction. See, e.g., Nygren, 332 F.3d at 468 ("[C]onsidering the severe and punitive nature of dismissal as a discovery sanction, a court must have clear and convincing evidence of willfulness, bad faith or fault before dismissing a case."); Shepherd v. American Broadcasting Companies, Inc., 62 F.3d 1469, 1478 (D.C. Cir. 1995) ("[F]or those inherent power sanctions that are fundamentally penal-dismissals and default judgments, as well as contempt orders, awards of attorneys' fees, and the imposition of fines-the district court must find clear and convincing evidence of the predicate misconduct."). Those authorities teach that prudence

---

[10]   See Samsung Elecs. Co., Ltd. V. Rambus, Inc., 440 F. Supp.2d 495, 497 (E.D. Va. 2006).

and fairness dictate that, at least in cases such as this, where the fraud on the court and the abuse of the litigation process are so intimately connected, the clear and convincing standard should be used.

The next task is to ascertain whether UG has proved the requisite level of culpability on the part of ST. The "fraud on the court" attributable to ST by virtue of Ms. Pettitt's misconduct was engaged in sentiently (e.g., knowingly and deliberately) by Ms. Pettitt. But, only one of her altered emails actually made its way into use in the case. And, whether that use is attended by the requisite degree of culpability is intertwined with ST's failures that led to its citation in the FAC. Thus, the culpability analysis applicable to the fraud on the court is merged with the culpability analysis for the abuse of the judicial process.

The record here establishes that ST (through the conduct of both its employee Ms. Pettitt and its in-house counsel and management) is sufficiently culpable to warrant imposition of sanctions under the inherent power. The record shows clearly and convincingly that Ms. Pettitt's misconduct in altering the emails was willful. The record also demonstrates, by clear and convincing evidence, that ST's in-house counsel, as well as its senior management, were willfully blind to the truth of the February 22d email—and, in particular, its fraudulent nature—

when that email was forwarded by ST to its outside counsel for use in the FAC without either investigating the provenance of that email or alerting outside counsel to its highly questionable standing given the two other emails on similar topics known to have been altered by Ms. Pettitt.   Indeed, the conduct of ST's in-house counsel and management after discovery of the first two emails was the epitome of willful blindness.

Issuing sanctions upon a finding of willful blindness is squarely in line with the sanctions standards articulated by the Supreme Court in Chambers and the Fourth Circuit in Shaffer. One will recall that egregious, knowing misconduct is the locus of inherent-authority sanctions.   Chambers refers to it as "bad faith" conduct, while Shaffer refers to it as a "fraud on the court" and "abuse of the litigation process."   Here, the Court proceeds mindful that Chambers directed courts to exercise considerable discretion in issuing sanctions under its inherent authority.   Indeed, it is the Supreme Court's cautionary advice which motivated the assessment that, with but one exception, the ability to impose sanctions is cabined to instances involving egregious, knowing misconduct or conduct that is the equivalent of knowing.[11]   Issuing sanctions for willful blindness on these facts hews closely to Chambers in that it reserves inherent-

---

[11] As Silvestri holds, negligent spoliation accompanied by severe, unredressable prejudice also authorizes use of the inherent power.

authority sanctions for the most egregious of conduct engaged under circumstances that are tantamount to knowing.

Decisions in other jurisdictions also teach that willful blindness can act as a basis for inherent-authority sanctions. The Sixth Circuit, for example, has established as an element of "fraud on the court" that the conduct is "intentionally false," or that it is "willfully blind to the truth." Carter v. Anderson, 585 F.3d 1007, 1011 (6th Cir. 2009) (citing Demjanjuk v. Petrovsky, 10 F.3d 338, 348 (6th Cir. 1993)). Of course, the Sixth Circuit's fraud analysis came in the context of a party's Rule 60(b)(6) motion attacking the propriety of federal habeas proceedings, and not in the context of sanctions issued under a court's implied powers. Carter, 585 F.3d at 1011. Nevertheless, the court's recognition that fraud on the court, as a concept, encompasses willful blindness is instructive in the sanctions context here.

Additionally, the Ninth Circuit has suggested that willful blindness to the truth is indicative of bad faith. In Richie v. United States, No. 07-16753, 2009 WL 2562738 (9th Cir. Aug. 20, 2009) (unpublished opinion), the court rejected allegations that the government had acted improperly by filing answers that it knew to be false, but in doing so the court wrote, "deliberate ignorance can constitute knowledge." 2009 WL 2562738, at *1. The court further indicated that deliberate ignorance to the

54

truth of assertions made in pleadings, if adequately shown, was a basis for finding misconduct, all the while employing "deliberate ignorance" and "fraud on the court" as if the two terms were interchangeable. Cf. id. It merits noting, too, that several courts have treated willful blindness and bad faith as functional equivalents in trademark cases. See, e.g., Louis Vuitton S.A. v. Lee, 875 F.2d 584, 590 (7th Cir. 1989) ("Innocent infringer" status lost when a defendant "failed to inquire further [into the legitimacy of the mark] because he was afraid of what the inquiry would yield. Willful blindness is knowledge enough."); Chanel, Inc. v. Italian Activewear of Florida, Inc., 931 F.2d 1472, 1476 (11th Cir. 1991) ("We accept this dicta from the Seventh Circuit [in Louis Vuitton]: willful blindness could provide the requisite intent or bad faith."); Levi Strauss & Co. v. Diaz, 778 F. Supp. 1206, 1208 (S.D. Fla. 1991) (citing Louis Vuitton favorably); Montana Professional Sports, LLC v. Leisure Sports Management, Inc., 422 F. Supp.2d 1271, 1281 (M.D. Fla. 2006) ("At the very least, the Defendants were 'wilfully blind' to [the Plaintiff's] rights, which also supports a finding of bad faith.").

Of course, those decisions on willful blindness are not dispositive. But they are instructive because they confirm the common-sense notion—validated by willful blindness' standing in the criminal law as an alternate, co-equal, state of mind to

"actual knowledge"[12]—that deliberate disregard for the truth bespeaks bad faith by any meaning of that term and is tantamount to knowing or willful conduct.

Under the criminal law, willful blindness is the functional equivalent of knowledge. See United States v. Schnabel, 939 F.2d 197, 203 (4th Cir. 1991). It is appropriate to give a willful blindness instruction to a jury when a criminal defendant "claims lack of guilty knowledge in the face of evidence supporting an inference of deliberate ignorance." United States v. Lightly, 616 F.3d 321, 377-78 (4th Cir. 2010) (citing United States v. Abbas, 74 F.3d 506, 513 (4th Cir. 1996)). In this case, the record is clear and convincing that ST officials were willfully blind to the truth in deliberately not determining the extent of Ms. Pettitt's alterations and in deliberately submitting the February 22d email to outside counsel for use in the FAC, knowing that email to be on the same topic, not to mention supposedly authored by the same UG official, as the two emails which the ST officials knew Ms. Pettitt had altered. On the record set forth in the findings of

---

[12] See United States v. Perez-Melendez, 599 F.3d 31, 41 (1st Cir. 2010) ("Willful blindness serves as an alternate theory on which the government may prove knowledge"); cf. United States v. McIver, 470 F.3d 550, 564 (4th Cir. 2006). Refer also to the discussion of willful blindness directly following this footnote in the main text.

facts made previously, UG has proved willful blindness by clear and convincing evidence.

A contrary conclusion would permit, and thereby encourage, parties to cite documents, the integrity of which is highly doubtful, in court filings with impunity. That cannot be tolerated where, as here, the party offering the evidence deliberately chooses not to examine the integrity of evidence when it possesses knowledge that calls into serious question the integrity of that evidence. If parties choose to rely on and/or cite documents which they have strong, if not overwhelming, reason to believe are fraudulent without taking meaningful steps to dispel such suspicion, they do so at their own peril.

### D. ST's Outside Counsel

UG also contends that the conduct of ST's outside counsel is sanctionable as fraud on the court and an abuse of the judicial process. The charges are levied at Mr. Gold of Anderson Kill and Mr. Dumville of Reed Smith. Mr. Gold was retained by ST in September 2008. Mr. Dumville was retained in March 2009.

UG first claims that Mr. Gold's preparation of the Pettitt affidavit amounted to subornation of perjury and obstruction of justice. UG faults Mr. Gold and Mr. Dumville and Reed Smith for citing the altered February 22nd email in the FAC and decries Mr. Dumville's allegedly misleading statements to the Court at

the January 8, 2010, status conference respecting UG's emergency motion.   Finally, UG chastises Mr. Gold and Reed Smith for failing to conduct a meaningful investigation into Ms. Pettitt's alterations before UG brought its emergency motion.

The record shows that neither Mr. Gold nor Reed Smith handled the Pettitt situation with an exceptional level of diligence, care, or skill.   However, the record also shows that neither Mr. Gold nor Reed Smith intentionally sought to deceive the Court.   Thus, neither committed a fraud on the court.

The determination that Mr. Gold did not intentionally seek to mislead the Court is borne out by examination of UG's claims that, in preparing the Pettitt affidavit, he suborned perjury and obstructed justice.   Subornation of perjury:

> 'consists in procuring or instigating another to commit the crime of perjury.
> It is essential to subornation of perjury that the suborner should have known or believed or have had good reasons to believe that the testimony given would be false; that he should have known or believed that the witness would testify willfully and corruptly, and with knowledge of the falsity; and that he should have knowingly and willfully induced or procured the witness to give such false testimony.'

Petite v. United States, 262 F.2d 788, 794 (4th Cir. 1959) (quoting 70 C.J.S. 1951 Perjury § 79), vacated on other grounds, 361 U.S. 529 (1960).

When Mr. Gold prepared the Pettitt affidavit in January
2009, he knew that Ms. Pettitt had provided two altered emails
to her superiors.   He had sufficient knowledge to have
understood that she likely had altered those emails.   But, even
considering what Mr. Gold actually knew when Ms. Pettitt signed
the affidavit, there is no record evidence that he believed that
everything Ms. Pettitt would say advancing her interpretation of
the loan agreements and the Guideline Matrices was a lie.   The
affidavit that Mr. Gold prepared laid out Ms. Pettitt's story
without relying on any of the suspicious emails.   (See generally
Ex. 51.)   Furthermore, it did not make claims that, in his view,
could not be corroborated by other evidence, the integrity of
which was not in question.   Mr. Gold walked a fine line because
reasonable minds could dispute whether the altered emails
constituted "good reason" to reject as a lie anything Ms.
Pettitt might say about ST's insurance agreement and because, in
paragraph 7 of the Pettitt affidavit, he mentioned the
unquestionably dubious topic of email exchanges.   The Court
would like to think that a lawyer would err on the side of
caution when he or she has any doubts at all about the veracity
of an affiant's statements.   But, apart from what the most
desirable course of conduct may have been, Mr. Gold did not
engage in willful deception.   He did not cite the altered emails
and he kept the language in the affidavit sufficiently general

to permit Ms. Pettitt means of supporting her story without having to rely on the tainted emails.

Mr. Gold did not obstruct justice, either. Obstruction of justice requires: (1) a pending judicial proceeding; (2) knowledge or notice of the pending judicial proceeding; and (3) corrupt conduct aimed at influencing, obstructing, or impeding that proceeding in the due administration of justice. United States v. Grubb, 11 F.3d 426, 436 (4th Cir. 1993) (citing United States v. Williams, 874 F.2d 968 (5th Cir. 1989)). When the affidavit was prepared, there was no pending judicial proceeding. Thus, neither the first nor the second element of obstruction of justice has been met. Nor has UG shown that, in fashioning the affidavit and having Ms. Pettitt execute it, Mr. Gold acted corruptly to influence a pending judicial proceeding.

Nor does the record establish that Mr. Dumville's statements to the Court at the January 8, 2010, status conference were a fraud on the court. The substance of Mr. Dumville's statements were misleading. His referring to the altered nature of the February 22d email as a "revelation" left the Court with the impression that Reed Smith and ST officials had not been aware of other altered emails from Ms. Pettitt. The statement that ST's in-house counsel had given Mr. Dumville no reason to believe that anything was "amiss" with the February 22d email worked to similar effect. The statement that Ms.

Pettitt's email had been imaged in the ordinary course of the litigation process, if not altogether inaccurate, was at least partially incorrect.

But, the dispositive question with regard to sanctions is not whether Mr. Dumville's statements at the January 8 status conference were misleading. Rather, the dispositive question is whether Mr. Dumville made those statements with intent to deceive the Court. The record shows that Mr. Dumville did not intend to deceive the Court.

As Mr. Dumville himself admitted, he was not of his best wits on the morning of the status conference. His son had recently undergone knee surgery, and, owing to this stressful event, Mr. Dumville had to rush to Richmond on either the day of or the day before the status conference.[13] Moreover, his familiarity with UG's emergency motion, while not bare, was not as nuanced as it ordinarily would have been. This was due in part to his son's operation and in part to his being out of town when UG's emergency motion was filed.

Further, Mr. Dumville was confronted with the need to guard client confidences. Virginia ethics rules distinguish between not divulging client confidences to correct a misapprehension

---

[13] Mr. Dumville's memory was less than perfect on this point. Nevertheless, the Court finds credible his testimony that he had to travel to Richmond shortly before the status conference because of personal matters at home.

61

and making affirmative misrepresentations. A lawyer is only obliged to divulge information when failure to do so would assist a criminal or fraudulent act. Va. Model Rule § 3.3(a)(2). By contrast, a lawyer may never knowingly volunteer a false statement of fact to a court. Id. § 3.3(a)(1). UG argues that Mr. Dumville's conduct violates the latter tenet, since, rather than remaining silent on Ms. Pettitt's alterations, he made affirmative misrepresentations.

That distinction is not controlling here, though, because Mr. Dumville did not make his misleading statements with intent to deceive. His words were inartful, and probably were better left unsaid, but they were not an attempt to mislead or defraud the Court. Shaffer, in opining on counsel's duty of candor to a tribunal, warned of "clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end." 11 F.3d at 458. It did not set ill-advised, impromptu misstatements in the crosshairs of justice. Mr. Dumville's statements at the January 8 status conference did not constitute a fraud on the Court.[14]

Like Mr. Gold's involvement with the Pettitt affidavit and Mr. Dumville's statements at the status conference, the other

---

[14] Also, one of ST's in-house counsel, Ms. Hovatter, was present at the status conference. She did not correct Mr. Dumville's statements on the record or tell him, *sotto voce*, that he was wrong.

conduct of ST's outside counsel was unfortunate without rising to the level of abuse of the litigation process. Mr. Gold and Reed Smith collaboratively drafted the FAC. In it they cited a February 22d email. When Mr. Gold and Reed Smith cited that email they knew, based on earlier communications with ST, that Ms. Pettitt had altered at least two other emails. Having such knowledge, Mr. Gold and Reed Smith should not have allowed an email whose provenance traced to Ms. Pettitt to have been cited in the FAC, particularly when they had not verified the integrity of that email.

Neither Mr. Gold nor Reed Smith exercised the proper degree of diligence and care in citing the February 22d email in the FAC. Instead, they relied on the representations of their client, ST, that ST's claims against UG and the documents to be cited in the FAC could be taken at face value. Given what they knew (that similar emails had been altered by Ms. Pettitt), it was, to say the least, unwise to accept the client's representations at face value.

The inquiry for the Court, however, is whether Mr. Gold and Reed Smith's shortcomings constituted willful abuse of the judicial process. That question must be answered in the negative. Though privy to the fact that Ms. Pettitt had altered two similar emails, Mr. Gold and Reed Smith did not have nearly the same depth of knowledge that ST's management and in-house

counsel had about the nature and context of the alterations. For example, ST's outside counsel had not been present at the March 2009 interview with Ms. Pettitt, where she offered a bogus rationale for the two altered emails. Consequently, ST's outside counsel had to rely on second-hand interpretations of the March 2009 interview from ST officials. And, as the testimony at the sanctions hearing revealed, ST told its outside counsel that Ms. Pettitt's explanation was plausible.[15] It also is significant that outside counsel referred a draft of the FAC to Ms. Thurman and Ms. Hovatter for review before it was filed, and neither of them raised any concerns about the February 22d email.

Additionally, just as ST officials had alerted Reed Smith to Ms. Pettitt's altered emails, they also had conveyed that ST had scanned her computer, which left ST's outside counsel with the impression (incorrect as it was) that ST had taken meaningful steps to locate other altered emails. Nor does the record show that outside counsel knew of the slip-shod efforts ST had made to ascertain the extent of Ms. Pettitt's alterations.

---

[15] In fact, Mr. Dumville could not recall ever being told by ST officials that Mary Pettitt had given anything less than a plausible explanation for the email alterations. (Sanc. Hrg. Tr. at 421:17-21.)

Thus, the record here confirms that, insofar as ST's outside counsel was concerned, the February 22d email found its way into the FAC by neglect and error, not through willful conduct or willful blindness.   ST's outside counsel's citation to the February 22d email does not constitute an abuse of the litigation process.

Finally, Mr. Gold and Reed Smith's decision not to investigate the integrity of Ms. Pettitt's email record before the emergency motion was filed does not justify sanctions. While outside counsel knew of the altered emails, they had been led to believe by their client that the problem was not pervasive.   Knowing what they knew, good practice would have counseled that outside counsel would have independently investigated the provenance of any emails similar to the altered ones (i.e., from the same author on the same topic) before citing them in a pleading.   However, it is the office of sanctions imposed under the inherent power to punish willful, egregious litigation abuses.   The failure to live up to best practices and the exercise of poor judgment, under the circumstances shown by this record, cannot be placed in that category.

### E.   The Appropriate Sanction For ST's Conduct

UG seeks the sanction of dismissal.   Its briefs also suggest a variety of other sanctions, including (1) prohibiting

ST from presenting evidence at trial that the Guideline Matrices was a UG internal document, non-binding on ST; (2) instructing the jury that Ms. Pettitt's testimony would have been harmful to ST's litigation position and further instructing the jury that it must or may consider ST's conduct after discovering Ms. Pettitt's alterations as indicative of the weakness of ST's litigation position; (3) permitting UG to call as trial witnesses ST's outside counsel; and (4) awarding attorney's fees and costs.[16]

The Fourth Circuit's decision in Shaffer, leaves no doubt that the Court may order dismissal as one of its inherent powers.[17] Shaffer, 11 F.3d at 462. According to Shaffer, a court may do this "when a party deceives a court or abuses the [judicial] process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process." Id. But, in recognizing this "most

---

[16] For the first time at the summary judgment hearing, UG also proposed ordering ST's outside counsel to review their firms' handling of the Pettitt situation and to report those findings to their firms' junior attorneys for educational purposes. (Summary Judgment Hearing Transcript at 186:24-187:6.) This sanction will not be considered as it was not briefed by the parties, and, in any event, UG cites no caselaw for the Court's authority to impose such a novel sanction.

[17] Shaffer states this explicitly, and it also cites an earlier, unpublished opinion of the Fourth Circuit, Liva v. County of Lexington, No. 91-2337, 1992 WL 187299 (4th Cir. Aug. 6, 1992), wherein the court dismissed a personal injury suit for the plaintiff's presentation of false evidence.

extreme" power, Shaffer was careful to remind district courts of
the circuit's "strong policy that cases be decided on the
merits." Id. Shaffer thus enumerated six factors that a court
must consider before dismissing an action under its implied
authority: (1) the degree of the wrongdoer's culpability; (2)
the extent of the client's blameworthiness if the wrongful
conduct is committed by an attorney, recognizing that actions
are rarely dismissed against blameless clients; (3) the
prejudice to the judicial process and the administration of
justice; (4) the prejudice to the victim; (5) the availability
of other sanctions to rectify the wrong by punishing culpable
persons, compensating harmed persons, and deterring similar
conduct in the future; and (6) the public interest. Id. at 462-
63.

Shaffer's holding is illustrative of how courts should
apply these six factors. In Shaffer, the Fourth Circuit
reviewed a district court's determination that two government
attorneys had breached their duty of candor to the court. Id.
at 452. The record showed that one of the government attorneys
had known that an expert witness did not have a college degree
and that opposing counsel was relying on a résumé that
represented otherwise. Rather than being forthright, and
informing his adversary of the material misrepresentation by the
expert witness, the attorney had obstructed opposing counsel's

attempt to uncover the falsity. The attorney also had failed to inform the court that there was substantial reason to doubt the expert witness' credentials, notwithstanding the fact that he knew the expert was under criminal investigation for lying. Id. at 456. The second government attorney, the first attorney's supervisor, likewise had known of the expert witness' misrepresentations and the criminal investigation into them. However, the second attorney had chosen not to inform opposing counsel of the expert witness' lies, and he even had instructed the first attorney not to disclose the fraud to the court. Id. On account of the two attorneys' conduct, and the fact that the expert witness' testimony had "played a significant role in the preparation of the documents contained in the . . . record," id. at 455, the district court dismissed the government's action under its inherent authority, id. at 456.

In reviewing the case on appeal, the Fourth Circuit readily conceded the wrongful nature of the attorneys' conduct. Id. at 463 ("We are in full agreement with the district court's expressed concern, and we repeat that the adversary system depends on jealous safeguarding of truth and candor."). But obfuscatory and flagrant as the attorneys' conduct was, the Court of Appeals vacated the district court's dismissal order and remanded the action for a lesser sanction because the district court had not duly considered the government's proposed

68

sanctions short of dismissal, and, in consequence, had "not adequately address[ed] the broad policies of deciding cases on the merits where the orderly administration of justice and the integrity of the process [was] not permanently frustrated, and of exercising the necessary restraint when dismissal [was] based on the inherent power." Id.

The holding illustrates the importance of the fifth Shaffer factor. A court should give considerable weight to "the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future." Indeed, it would be a fair reading of Shaffer to say that, generally speaking, fraud on the court or litigation abuse should be accompanied by something akin to severe prejudice to either the court or a party before the sanction of dismissal is appropriate.

The six-factor test in Shaffer does not support the dismissal of ST's case, even though UG's request is not altogether unreasonable. That ST's own officials, not its outside lawyers, were the principally culpable parties augurs in favor of dismissal. The impact that ST's conduct has had on the Court also favors dismissal. The Court has had to spend a great deal more time on this action than it otherwise would have, which, of course, diverted the Court's attention from other matters on its criminal and civil dockets, including this case.

A reasonably thorough checking of the extent of Ms. Pettitt's fraud and verification of emails like the ones known to have been altered could have avoided several months' worth of hardship on a judiciary whose resources are already stretched thin.  And, the Court cannot deny that the public interest could derive some benefit if ST were forced to forfeit its claims, however meritorious, as a consequence of deliberately ignoring the truth.  Ultimately, however, the prejudice to UG owing to ST's transgressions is insufficient to justify dismissal under Shaffer.

The record does not support UG's claim that ST's entire case has been infected by Ms. Pettitt's story.  First, there is insufficient record evidence to show that ST's other employees were influenced by Ms. Pettitt's altered emails, whether consciously or subconsciously.  Second, the record does not establish as false Ms. Pettitt's interpretation of ST's loan agreements or the role of the Guideline Matrices in the processing by UG.[18]  The record shows that some of the documents on which Ms. Pettitt relied for her story were fraudulent, but

---

[18]    Indeed, it is passing strange that a set of informally created documents in tabular form might alter a formal insurance contract, or that two employees, neither of whom appear to have had contracting authority to define the terms of insurance, could amend a contract.  While those are questions for another day, they serve to illustrate how Messrs. Gold and Dumville could credit ST's position even when aware that Ms. Pettitt had altered two emails on the topic.

70

it does not show that her story itself is a false one that cannot be independently proved by untainted means.

The record clearly requires the conclusion that UG justifiably incurred very significant additional legal fees and expenses to set the record straight and to assure that tainted evidence would not be used at trial. That is UG's demonstrated prejudice. Therefore, UG will be awarded the attorney's fees and expenses that it reasonably incurred to achieve those ends. Chambers and Shaffer counsel that an award of attorney's fees and expenses are appropriate sanctions to be awarded in the exercise of the inherent power. That remedy is especially appropriate on the facts of this case, where UG's additional fees and expenses preserved the integrity of the judicial record.

As an alternative to dismissal, and in addition to the sanction of attorney's fees and costs, UG requests several other sanctions. UG, for example, asks the Court to instruct the jury at trial that it may assume that anything Ms. Pettitt would have said at trial would have been harmful to ST's litigation position. UG bases it requests on what it claims to be material prejudice resulting from the loss of the testimony of Ms. Pettitt, who has claimed Fifth Amendment protection and who is not expected to testify at trial. That argument, while correctly assuming that Ms. Pettitt likely will not testify at

71

trial, overstates the harm, if any, that Ms. Pettitt's unavailability has wrought. First, what record evidence there is that bears on Ms. Pettitt's would-be testimony (the affidavit which Mr. Gold prepared and which Ms. Pettitt signed and what she said in the initial meeting with the ST negotiators) suggests that Ms. Pettitt probably would have given testimony adverse to—or at least not in support of—UG's litigation position. Of course, UG has lost the impact of showing, in impeachment, that Ms. Pettitt altered evidence. But, if she does not testify at all, the ability to impeach her is not a particularly serious loss. Second, and respecting UG's argument on summary judgment that no one else from ST will be able to address the Guideline Matrices, Ms. Pettitt's unavailability will only mean that UG's evidence on the effect of the Guideline Matrices will stand un-rebutted by someone in ST who had first-hand knowledge of them. In sum, the record does not establish, either in type or degree, the prejudice UG claims on account of Ms. Pettitt's unavailability as a trial witness.

UG also requests the Court to instruct the jury that, in assessing the validity of ST's breach of contract claims, it must or may draw an adverse inference from ST's conduct after Ms. Pettitt's alterations were discovered. The record does not justify this sanction because ST's conduct, while certainly egregious for the reasons outlined earlier in this opinion, has

not meaningfully hindered UG's ability to rebut ST's breach of contract claims (beyond, as already stated, forcing UG to incur additional legal expenses, which the sanction of attorney's rectifies).   Furthermore, and as a broader evidentiary matter, it is not appropriate to air the topic of Ms. Pettitt's alterations before the jury in any form—either with an instruction or witness testimony—because that topic would be a substantial distraction to the fair resolution of the substantive issue on which this action turns:[19] whether there is insurance coverage under the policy.   As explained previously, that issue can be fairly and fully tried by both ST and UG without evidence of the alterations (if, of course, Ms. Pettitt does not testify), just as it could have been if the alterations had not occurred at all.

The same analysis explains why it is not an appropriate sanction for the Court to require ST's outside counsel—namely, Mr. Gold and Mr. Dumville—to testify at trial.   With UG's injury from Ms. Pettitt's conduct cabined to additional attorney's fees and costs, requiring ST's outside counsel to testify is both unresponsive to and inconsonant with the actual prejudice UG has suffered.   And, the issues to which ST's outside counsel would

---

[19]   In the words of Federal Rule of Evidence 403, the "probative value [of that evidence] is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. . . ."

testify (i.e., the alterations and ST's response thereto) would divert the trial from the issues most directly relevant to ST's breach of contract claims.[20]

Finally, UG requests the Court to preclude ST from introducing evidence speaking to the non-binding nature of the Guideline Matrices. This proposed sanction, which it classifies as "issue preclusion," is also inappropriate on the record before the Court. The record does not fully discount the validity of Ms. Pettitt's version of the effect of the Guideline Matrices, even if it discredits some of the documents that she provided ST's management to support it. It would be unduly pernicious to prohibit ST from advancing the non-binding nature of the Matrices at trial—a position which, it must be noted, has the potential of operating to dispositive effect on ST's breach of contract claims—when the record does not show ST's characterization of the Guideline Matrices to be without merit. Indeed, considering the very nature of the matrices and given that neither Ms. Gavin nor Ms. Pettitt appears to have had authority to amend the insurance contract, there is considerable reason not to foreclose ST's proofs on this issue.

---

[20] The Court having found it inappropriate to require ST's outside counsel to testify at trial as a sanction for ST's conduct, ST's MOTION IN LIMINE TO PRECLUDE INTRODUCTION OF EVIDENCE OF OR REFERENCE TO MATTERS INVOLVING SUNTRUST'S OUTSIDE COUNSEL (Docket No. 324) will be denied as moot.

74

## CONCLUSION

For the reasons set forth above, DEFENDANT UNITED GUARANTY'S MOTION FOR SANCTIONS (Docket No. 270) will be granted in part and denied in part. Under its inherent authority to issue sanctions, the Court will order ST to pay UG's attorney's fees and costs associated with UG's sanctions motion on account of the willful spoliation of evidence by an ST employee and the ensuing willful blindness to the truth of ST's in-house counsel and senior management that allowed the spoliated, February 22d email to be cited in the FAC. The Court will not order any other sanction in this action.

It is so ORDERED.

_____/s/_____ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: March 29, 2011

75