IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SUNTRUST MORTGAGE, INC.,

    Plaintiff,

v.                            Civil Action No. 3:09cv529

AIG UNITED GUARANTY CORP.
a/k/a UNITED GUARANTY CORP.,
<u>et al.</u>,

    Defendants.

### MEMORANDUM OPINION

This matter is before the Court on SUNTRUST MORTGAGE, INC.'S MOTION *IN LIMINE* TO PRECLUDE UNITED GUARANTY'S INTRODUCTION OF PAROL EVIDENCE FOR PURPOSES OF ALTERING THE MEANING OF THE PARTIES' UNAMBIGUOUS WRITTEN CONTRACTUAL AGREEMENTS (Docket No. 334). The Court heard oral argument on the motion on April 11, 2011, as part of the final pretrial conference in this action.[1] For the reasons set forth below, the motion will be granted.

The focus of this action is an insurance policy issued by United Guaranty Residential Insurance Company of North Carolina ("UG") which covers certain loans issued by SunTrust Mortgage,

---

[1] After hearing argument on all outstanding motions, the Court informed the parties that, in the interest of judicial economy, it would postpone attending to the JOINT PROPOSED PRETRIAL ORDER until after the resolution of such motions.

Inc. ("ST"). The policy provides coverage for ST if ST's borrowers default in repaying their loans. The parties concur that the policy consists of the "Master Policy" and the "Closed-End Purchase Money Seconds - Flow Business Risk Sharing Program" ("2004 Flow Plan"), dated June 23, 2004, and the "Closed-End Purchase Money Seconds - Flow Business Risk Sharing Experienced Rating Plan" ("2005 Flow Plan"), dated October 17, 2005 (Exs. A, C, and D, respectively, to the THIRD AMENDED COMPLAINT (Docket No. 121)).

## FACTUAL BACKGROUND

Count I of ST's THIRD AMENDED COMPLAINT (Docket No. 121) alleges that UG breached the insurance contract by denying claims on so-called IOF Combo 100 loans.[2] ST contends that UG agreed to insure the IOF Combo 100 loans on which it submitted claims and that UG denied coverage of the loans in contravention of the insurance policy's unambiguous terms. UG, on the other hand, contends that the defaulted IOF Combo 100 loans are excluded from coverage.

UG denied coverage because, according to it, the insurance policy clearly requires the defaulted IOF Combo 100 loans to have been underwritten using an automated underwriting method

---

[2] In late 2004, SunTrust developed a mortgage loan product consisting of second lien loans following first lien loans with combined loan-to-value ratios of up to one hundred percent. This loan product offered the option of an interest-only first mortgage—an "IOF."

referred to as "Desktop Underwriting" (sometimes referred to as "DU"), but they were not so underwritten. UG argues that, because the IOF Combo 100 loans were traditionally underwritten (as opposed to DU underwritten), they are excluded from coverage under the terms of the insurance policy. It is undisputed that the loans at issue were not underwritten by use of the DU method.

ST filed this motion because UG has indicated that it will attempt to introduce parol evidence at trial to contradict what, ST argues, is an unambiguous provision of the insurance policy. A brief explanation of the insurance policy and the anticipated parol evidence is necessary to resolution of the motion.

ST's business is to make mortgage loans. In or around 1998, ST and UG entered into a Master Policy that insured ST against payment defaults of its borrowers on certain of its loan products. The Master Policy did not cover IOF Combo 100 loans because ST had not yet begun to offer that loan product when the policy was issued. In June 2004 and October 2005, the parties signed addenda to the Master Policy. These addenda are respectively the 2004 Flow Plan and the 2005 Flow Plan (collectively, the "Flow Plans"). The Flow Plans served as the parties' premium or risk sharing plan, and, importantly for this case, they specified guidelines that were to be used by ST in underwriting its loans. It is undisputed that UG authored all

the provisions in the Master Policy and nearly all the provisions in the Flow Plans, including the provision on which the motion centers. ST negotiated the premium rates in the Flow Plans, but UG drafted and structured the Flow Plans.

The Master Policy established the initial terms of insurance coverage. Section 4 of the Master Policy is entitled "Exclusions from Coverage." It sets the boundaries of insurance coverage under the policy. Section 4 begins: "The Company [UG] shall not be liable for, and this Policy shall not apply to, extend to or cover the following . . . ." Subsections in Section 4 then list specific exclusions from coverage. One such subsection is Section 4.14, entitled "Failure to Conform to Reporting Program Guidelines." UG relied on Section 4.14 to deny coverage to thousands of Combo 100 loans, totaling tens of millions of dollars. Section 4.14 provides: "Any Claim [is excluded from coverage] if the Loan did not meet the Reporting Program Guidelines . . . ." (emphasis added). The term "Reporting Program Guidelines" is defined in Section 1.36 of the Master Policy: "Reporting Program Guidelines mean the guidelines designated as such in the Reporting Program Manual." "Reporting Program Manual," in turn, is defined in Section 1.37 of the Master Policy which states:

> Reporting Program Manual means the document designated as such by the Company [UG] in effect as of the date of this Policy [Master

4

> Policy], as it may be amended and restated by the Company from time to time, which contains the Reporting Program Guidelines and which sets forth the terms and conditions under which the Insured is to report or apply for coverage under this Policy.

THIRD AMENDED COMPLAINT (Docket No. 121) at Ex. A § 1.37.

There is no dispute that, when the Master Policy was executed in 1998, there was a separate document with the name "Reporting Program Manual." However, it is also agreed that the document of that designation did not provide underwriting guidelines for the IOF Combo 100 loans implicated here, nor does it provide any such guidelines now.

ST alleges that, from the time the Master Policy was issued in 1998 until sometime in mid-2004, it submitted to UG various loan products under cover of facsimile or email communications, asking that those products be covered under the Master Policy and that, by return communication of like kind, UG approved those products for insurance. None of those loans, however, are the subject of this action.

On June 23, 2004, ST and UG entered into the 2004 Flow Plan modifying the terms of the Master Policy. The 2004 Flow Plan established a premium plan and a "risk share program" under which the parties agreed to pay losses under the Master Policy

in three, alternating layers.[3]    The 2004 Flow Plan also designated underwriting guidelines for ST's loans insured under the Master Policy in a section entitled "Underwriting Guidelines."  According to that section, and thus according to the terms of the policy, "These loans will conform to SunTrust Mortgage guidelines that are currently being used and have been mutually agreed upon."

ST alleges that, in late 2004, it decided to start making the IOF Combo 100 loans at issue here.  THIRD AMENDED COMPLAINT (Docket No. 121) ¶ 21.  According to ST, UG responded not later than January 7, 2005, that it had agreed to cover such loans, id. ¶ 22; see also id. at Ex. H, and thereafter UG routinely confirmed that ST's IOF Combo 100 loans were insured under the Master Policy by issuing unique certificate numbers for the loans.  Id. ¶ 24.  In January 2005, the guidelines being used for IOF Combo 100 loans were those set forth in a document entitled "Section 2.60 Combo Second Mortgage Loan Program,"[4]

---

[3] UG agreed to pay the first two percent of losses under each policy year.  ST agreed to pay the percentage of losses exceeding two percent of gross loan proceeds for an individual policy year but not exceeding five percent of gross loan proceeds under an individual policy year.  UG agreed to pay losses exceeding five percent under an individual policy year but not exceeding ten percent under an individual policy year.

[4] At least three versions of this document were produced, one for each of the three categories of mortgage issuers affiliated with ST.  The different versions accompany SUNTRUST MORTGAGE, INC.'S REBUTTAL MEMORANDUM IN SUPPORT OF ITS MOTION *IN LIMINE* TO

which, in pertinent part, states that IOF Combo 100 loans "MUST be traditionally underwritten."[5]

ST alleges that its January 2005 guidelines were provided to UG in January 2005. UG claims that there is no evidence showing that it received those guidelines. However, it is undisputed that contract underwriters employed by "United Guaranty Services," an affiliate of UG, used these guidelines for months (without objection from UG) to underwrite IOF Combo 100 loans using the traditional underwriting method. <u>See</u> SUNTRUST MORTGAGE, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I (Docket No. 204) at Ex. 3 ¶¶ 3-4. ST amended its January 2005 underwriting guidelines in July 2005, but the relevant provisions quoted above pertaining to the underwriting guidelines for IOF Combo 100 loans remained unchanged. Traditional underwriting remained the mandated method of underwriting IOF Combo 100 loans.

Both parties admit that before 2005 no one document contained the underwriting guidelines for IOF Combo 100 loans.

PRECLUDE UNITED GUARANTY'S INTRODUCTION OF PAROL EVIDENCE FOR PURPOSES OF ALTERING THE MEANING OF THE PARTIES' UNAMBIGUOUS WRITTEN CONTRACTUAL AGREEMENTS (Docket No. 366). All three versions are identical with respect to the underwriting requirements of IOF Combo 100 loans.

[5] SUNTRUST MORTGAGE, INC.'S REBUTTAL MEMORANDUM IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE UNITED GUARANTY'S INTRODUCTION OF PAROL EVIDENCE FOR PURPOSES OF ALTERING THE MEANING OF THE PARTIES' UNAMBIGUOUS WRITTEN CONTRACTUAL AGREEMENTS (Docket No. 366) at Att. 1, at 3 (emphasis in original).

UG maintains that, before 2005, ST and UG agreed to underwriting guidelines for IOF Combo 100 loans through ad hoc email exchanges between the parties. UG takes the view that the guidelines for underwriting the IOF Combo 100 loans are to be found in a document prepared in February 2005 by Pam Gavin, a UG employee who was UG's liaison to ST respecting all ST loans covered by UG. Gavin's document is a spreadsheet on which she set out in summary form her understanding of certain information about the insured loans, including the IOF Combo 100 loans. UG calls that document the "Guideline Matrix."[6] On it, under the heading IOF Combo 100 loans is the terse notation "Yes, if DU approved," which itself falls under a section of the tables headed "Eligible 1st Mortgage Programs" and the subheading "Interest Only."[7] It is this 2005 Guideline Matrix, and more particularly, the short-hand notation made by Gavin ("Yes, if DU approved") that UG contends specifies the underwriting requirements for the IOF Combo 100 loans.

The 2005 Flow Plan was executed on October 17, 2005. It modified the Master Policy and the 2004 Flow Plan. Like its

---

[6] There are multiple versions of Gavin's Guideline Matrix. Collectively, these documents have been referred to throughout these proceedings as the "Guidelines Matrices."

[7] DEFENDANT UNITED GUARANTY'S MOTION FOR SUMMARY JUDGMENT ON COUNT I OF SUNTRUST MORTGAGE'S THIRD AMENDED COMPLAINT (Docket No. 188) at Ex. 24; see also DEFENDANT UNITED GUARANTY'S MOTION FOR SANCTIONS (Docket No. 270) at Ex. 65H.

2004 predecessor, the 2005 Flow Plan set forth a premium plan and risk share program.[8] The 2005 Flow Plan also provided: "Underwriting Guidelines: These loans [IOF Combo 100 loans] will conform to SunTrust Mortgage guidelines that are currently being used and have been mutually agreed upon." The 2005 Flow Plan did not make any reference to email correspondence between the parties, nor did it make any reference to the Guideline Matrix that Pam Gavin had prepared in or around February 2005 and reproduced with changes subsequently thereafter.

## POSITIONS OF THE PARTIES

ST argues that the email correspondence between Pam Gavin and Mary Pettitt (ST's loan liaison with UG), the Guideline Matrix (attached as an Excel spreadsheet to the Gavin-Pettitt email correspondence), and any oral testimony about those documents are inadmissible parol evidence which varies the terms of the written insurance policy—i.e., the Master Policy and the Flow Plans. According to ST, the written insurance policy unambiguously provides that the defaulted IOF Combo 100 loans

---

[8] The 2005 Flow Plan's premium plan and risk share program differed in certain respects from the premium plan and risk share program agreed to in the 2004 Flow Plan. For example, the 2005 Flow Plan's risk share program altered the layers of coverage such that UG would cover the first five percent of losses under each policy year. ST would provide a second layer of coverage in which it would pay losses exceeding five percent but not exceeding eight percent of gross loan proceeds under an individual policy year. Finally, UG would cover losses exceeding eight percent but not exceeding ten percent under each policy year.

would "conform to <u>SunTrust Mortgage guidelines</u> that are currently being used and have been mutually agreed upon" (emphasis added). In ST's view, the "SunTrust Mortgage guidelines" currently being used and mutually agreed upon in October 2005 were the guidelines for IOF Combo 100 loans that had been in use by ST officials and UG-affiliated underwriters since January 2005 (with immaterial amendments thereto in July 2005). ST argues that the 2005 Flow Plan was the final amendment to the insurance policy, and, as such, it set forth the controlling expression of the parties' intent respecting the underwriting guidelines.[9]

UG argues that the Gavin-Pettitt email communications and Guideline Matrix do not constitute a parol modification of the insurance policy. Instead, UG argues that the email communications and the Guideline Matrix <u>were</u> the underwriting guidelines because they amended and restated the Reporting Program Manual as provided in Section 1.37 of the Master Policy. Thus, absent the email exchanges and the Guideline Matrices, asserts UG, the insurance policy is incomplete. According to UG, "the doctrine of partial integration specifically

---

[9] <u>See</u> SUNTRUST MORTGAGE, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE UNITED GUARANTY'S INTRODUCTION OF PAROL EVIDENCE FOR PURPOSES OF ALTERING THE MEANING OF THE PARTIES' UNAMBIGUOUS WRITTEN CONTRACTUAL AGREEMENTS (Docket No. 335) at 9-10.

anticipates the introduction of extrinsic evidence in circumstance like this one . . . ."[10]

## VIRGINIA LAW REPSECTING PAROL EVIDENCE

The parties agree that Virginia law governs this contract dispute, which arises under the Court's diversity jurisdiction. The parol evidence rule "has nowhere been more strictly adhered to in its integrity than in Virginia." Erlich v. Hendrick Const. Co., Inc., 225 S.E.2d 665, 668 (Va. 1976). The rule provides: "[W]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." Globe Co. v. Bank of Boston, 140 S.E.2d 629, 633 (Va. 1965). In effect, the rule recognizes that "where parties have reduced their contract to a writing which imposes a legal obligation in clear and explicit terms the writing shall be the sole memorial of that contract, and it is conclusively concluded that the writing contains the whole contract, and is the sole evidence of the agreement." Pulaski Bank Ex'r v. Harrell, 123 S.E.2d 382, 387 (Va. 1962).

The predicate task for the Court in applying Virginia's parol evidence rule is to determine whether the insurance policy

---

[10] See UNITED GUARANTY'S OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* TO PRECLUDE DEFENDANT'S INTRODUCTION OF PAROL EVIDENCE FOR PURPOSES OF ALTERING THE MEANING OF THE PARTIES' UNAMBIGUOUS WRITTEN CONTRACTUAL AGREEMENTS (Docket No. 350) at 10.

is unambiguous.[11]  For if it is, that is the end of the matter; the four corners of the text control.  "[W]hen the language in an insurance policy is clear and unambiguous, courts do not employ rules of construction; rather, they give the language its plain and ordinary meaning and enforce the policy as written." Partnership Umbrella, Inc. v. Federal Ins. Co., 530 S.E.2d 154, 160 (Va. 2000); see also Bridgestone/Firestone, Inc. v. Prince William Square Assocs., 463 S.E.2d 661, 664 (Va. 1995); Wilson v. Holyfield, 313 S.E.2d 396, 398 (Va. 1984).  In so construing the text, the Court must give effect to all of the contract's language if its parts can be read together without conflict. Where possible, therefore, meaning must be given to every clause.  This is to say that the contract must be read as a single document.  Crucially, however inartfully the contract may have been drawn, courts are not free to make a new contract for the parties but must construe the contract's language as written.  Quesenberry v. Nichols and Erie, 159 S.E.2d 636 (Va.

---

[11] Whether the contract is "complete" is for all intents and purpose subsumed by the ambiguity issue.  If the contract is unambiguous on the issue of the applicable underwriting guidelines then it is necessarily complete as to that issue as well.  In essence, UG's argument reduces to a claim that the insurance policy unambiguously incorporates by reference the underwriting guidelines for IOF Combo 100 loans set forth in Gavin's Guideline Matrix and email correspondence, and that, accordingly, those two sets of documents should be admissible at trial.  UG's claim here can be dealt with by analyzing the issue of ambiguity.  Nevertheless, the Court will address UG's partial integration argument directly later in the opinion.

1968); see also Blue Cross & Blue Shield v. Keller, 450 S.E.2d 136 (Va. 1994).

Under Virginia law, an insurance policy is ambiguous when it can reasonably have more than one meaning given its context, Salzi v. Va. Farm Bureau Mut. Ins. Co., 556 S.E.2d 758, 760 (Va. 2002), or "[w]here two constructions are equally possible," or "reasonable [persons] . . . may reach reasonable, but opposite, conclusions" based on a policy's language, Spence-Parker v. Maryland Ins. Group, 937 F. Supp. 551, 556 (E.D. Va. 1996) (citing St. Paul Fire & Marine Ins. v. S.L. Nusbaum & Co., 316 S.E.2d 734, 736 (Va. 1984)). A conclusion that a contract is ambiguous does not in every instance justify the admission of parol evidence. Virginia courts have consistently distinguished between patent ambiguity—ambiguity apparent on the face of the instrument itself—and latent ambiguity—ambiguity that manifests only upon consideration of extrinsic evidence. See, e.g., Virginia Elec. & Power Co. v. Norfolk S. Ry. Co., 683 S.E.2d 517, 526 (Va. 2009) (defining and distinguishing between latent and patent ambiguity). "Parol evidence cannot be considered to explain patent ambiguity, that is, to supply the understanding that the parties could have reasonably been expected to reach where the language of an instrument reflects no understanding." Zehler v. E.L. Bruce Co., 160 S.E.2d 786, 789 (Va. 1968); see also Galloway Corp. v. S.B. Ballard Constr. Co., 464 S.E.2d 349

(Va. 1995) (citing Zehler favorably); City of Roanoke v. Blair, 60 S.E. 75 (Va. 1908); Gatewood v. Burrus, 7 Va. (3 Call) 194 (Va. 1802); Portsmouth Redevelopment & Housing Authority v. Ison, No. 03-1512, 2005 WL 126495 (Va. Cir. Ct. Jan. 18, 2005) (unpublished opinion); Vega Investments Corp. v. Gorge, No. 172906, 1999 WL 796651 (Va. Cir. Ct. July 16, 1999) (unpublished opinion); Mehlman v. American Prop. Services, Inc., No. 168503, 1999 WL 370380 (Va. Cir. Ct. May 5, 1999). On the other hand, parol evidence has been considered to explain a latent ambiguity. S. Ins. Co. of Virginia v. Williams, 561 S.E.2d 730, 733 (Va. 2002) ("It is well established that insurance contracts, like other contracts, generally are to be construed according to their terms and without reference to parol evidence. However, resort to parol evidence is proper where a latent ambiguity exists in a particular insurance contract."); see also Aetna Cas. & Sur. Co. v. Fireguard Corp., 455 S.E.2d 229, 232 (Va. 1995); American Ins. Co. v. Damascus Lumber Co., 124 S.E. 269, 270 (Va. 1924); Connecticut Fire Ins. Co. v. W.H. Roberts Lumber Co., 89 S.E. 945, 948 (Va. 1916); Home Ins. Co. v. Gwathmey, 1 S.E. 209, 211 (Va. 1887).

The Court realizes that not all Virginia decisions on the topic clearly distinguish between patent and latent ambiguity as they relate to the admission of parol evidence. More problematic is that not all Virginia decisions which have

admitted parol evidence have been clear about whether the ambiguity at issue was patent or latent. See, e.g., Nextel WIP Lease Corp. v. Saunders, 666 S.E.2d 317 (Va. 2008) (stating "where the writing on its face is ambiguous, . . . the court should receive extrinsic evidence to ascertain the intention of the parties." (internal quotation marks omitted)). This Court's task, however, as a federal court applying state law in diversity, is to predict, as best as possible, how the Supreme Court of Virginia would treat the parol evidence issue on the facts of this action[12] which, significantly, involve the construction of an insurance policy. Toward this end, the Court takes notice of the fact that there is a long line of cases, from Gwathmey (1887) to Williams (2002), that singles out latent ambiguity as the type of ambiguity that, if found, justifies consideration of parol evidence. And, that line of cases does so in the setting that we have here—the construction of an

---

[12] A respected treatise notes that, in many states, the distinction between patent and latent ambiguity, which dates for each into the common law, has been abandoned. See generally 11 Williston on Contracts § 33:40 (explaining that the admissibility of "parol or extrinsic evidence" hinged traditionally on classification of a contractual ambiguity as latent or patent and further explaining that many jurisdictions have abandoned the formalistic distinction in favor of admitting parol evidence to clarify the meaning of any contractual ambiguity, whether latent or patent). It is rather obvious, as explained herein, that Virginia still cleaves to the distinction in the insurance context.

insurance policy.[13]  Further, it is important that none of the

cases cited above for the distinction between patent and latent

---

[13] UG provided the Court with a number of insurance cases—both state (see, e.g., American Ins. Co. v. Damascus Lumber Co., 124 S.E. 269 (Va. 1924)) and federal (see, e.g., Commercial Union Ins. Co. v. Charleston Marine Leasing Co., 843 F. Supp. 124 (E.D. Va. 1994))—that do not distinguish between latent and patent ambiguity.  But, while those cases do involve courts' construction of insurance policies, the authorities to which those cases themselves cite respecting the parol evidence rule are not insurance cases.  The Court therefore finds such cases to be less persuasive than the numerous cases, spanning many decades, that have in fact distinguished between latent and patent ambiguity within the specific context of insurance. Additionally, some of the other cases that UG provided augur for, not against, the distinction that the Court finds in Virginia's caselaw.  For example, UG offers Southern Ins. Co. of Virginia v. Williams, 561 S.E.2d 730 (Va. 2002), for the proposition that Virginia courts consider parol evidence to elucidate ambiguities in an insurance policy.  Southern Ins. Co., however, involved a latent, not patent, ambiguity.  It thus supports the position that parol evidence is admissible to explain a latent ambiguity, but it does not support UG's more general proposition that parol evidence is admissible to explain both types of ambiguity in an insurance policy.

Of all the cases provided by UG, the case that most supports its position that parol evidence is admissible to explain any ambiguity in an insurance policy is Faulkner v. Property & Cas. Ins. Co. of Hartford, No. 7:10cv205, 2011 WL 772713 (W.D. Va. Feb. 28, 2011) (unpublished opinion), which cites State Farm Mut. Auto. Ins. Co. v. Justis, 190 S.E. 163 (Va. 1937), to say: "Virginia courts have consistently held that parties to an insurance contract may use parol evidence to resolve the meaning of any ambiguities."  Faulkner, 2011 WL 772713, at *2.  Faulkner's summary of Virginia law cannot be adopted here for at least two reasons.  First, it relies on a number of cases which, though sanctioning the use of extrinsic evidence to explain a latent ambiguity, do not sanction the use of extrinsic evidence to explain a patent one.  Second, it vests significant importance in Justis, a decision factually unique in that the Supreme Court of Virginia considered parol evidence (oral representations of the insurer to the insured during the execution of the insurance policy and collection of premiums) to prevent the insurer from "perpetrating a fraud" on the insured

ambiguity have been overruled by the Supreme Court of Virginia. To the contrary, those cases have been cited repeatedly, right up to the present day.

Finally, the distinction drawn out in the caselaw between patent and latent ambiguity comports with the rule of liberal construction that is a mainstay of insurance law in the Commonwealth. That rule—truly an age-old principle in Virginia—requires that ambiguity in an insurance policy be strictly construed against the insurer and in favor of coverage. S.F. v. W. Am. Ins. Co., 463 S.E.2d 450, 452 (Va. 1995) (citing S.L. Nusbaum & Co., 316 S.E.2d at 736); see generally 10A Michie's Jurisprudence § 25 (2011).[14] When one considers the Virginia insurance law's rule of liberal construction together with general Virginia contract law's parol evidence rule, it makes sense that Virginia courts would distinguish between patent and

party by "allow[ing] [the insurer's] agents to place one construction upon the contract when selling insurance and collecting premiums, and the [insurer] to place another and opposite construction upon the same language when called upon to assume liability for loss or damage." 190 S.E. at 167. In sum, UG offers no authority that justifies the Court ignoring the host of Virginia insurance cases that distinguish between patent and latent ambiguity in the context of the parol evidence rule.

[14] The rule of liberal construction is technically a subcategory of the more general rule of contra proferentem (translating roughly to "ambiguous terms will be construed against the party who imposed them"). Because the record is clear that UG, an insurer, drafted the operative language in the Master Policy and Flow Plans respecting the applicable guidelines, the rules of liberal construction and contra proferentem are equally applicable here.

latent ambiguities in insurance policies, for the presence of the former would warrant holding for the insured party as a matter of law given that, in Virginia, the onus is on the insurance company to draft a clear and unambiguous policy, especially as the policy relates to coverage exclusions. Meanwhile, it also is reasonable that courts would consider extrinsic evidence when there is a latent ambiguity in an insurance policy to the extent that consideration of such evidence might reveal that there is not an ambiguity at all, thus making application of the rule of liberal construction inappropriate.

## APPLICATION OF VIRGINIA LAW

Having taken a brief detour to explain the governing caselaw, it is appropriate now to return to the threshold question of whether the insurance policy in this action is unambiguous as a matter of law. Were it so, the Court would not need to consider the different categories of ambiguity. On this point, the Court recognizes that ST and UG both insist that the insurance policy is unambiguous in their respective favors. ST argues that the 2005 Flow Plan unambiguously refers to "SunTrust Mortgage guidelines" as setting forth the applicable underwriting guidelines for ST's IOF Combo 100 loans, and, building upon this conclusion and the fact that ST had it own guidelines in use for IOF Combo 100 loans by January 2005, ST

18

argues that parol evidence is inadmissible to vary the clear terms of the insurance contract. UG also argues that the insurance policy is unambiguous, although it maintains that it unambiguously establishes Gavin's Guideline Matrix and related email communications as setting forth the applicable underwriting guidelines. Here, UG's position is that those external documents are the very amendments to the "Reporting Program Manual," and thus the "Reporting Program Guidelines," specifically contemplated by Section 1.37 of the Master Policy. According to UG, the "SunTrust Mortgage guidelines" designation in the 2005 Flow Plan simply refers back to the "Reporting Program Guidelines" referenced in the Master Policy which, on its account, the Gavin documents amended.

### 1. Patent Ambiguity

Despite the parties' conviction as to the clarity of the insurance policy, the record supports neither party's argument. Instead, a patent ambiguity is present on the face of the policy. The Master Policy which, the parties agree, is the document that actually provides coverage for IOF Combo 100 loans designates underwriting guidelines that are set forth and amended by UG—i.e., that are UG in origin. Meanwhile, the 2005 Flow which, the parties agree, is a document that amends the Master Policy designates underwriting guidelines that are ST in origin. The insurance policy, in other words, is facially

inconsistent as to the documents that provide the governing underlining guidelines for IOF Combo 100 loans. Further explanation is necessary on this point.

The term "Reporting Program Guidelines" is defined in Section 1.36 of the Master Policy which states: "Reporting Program Guidelines mean the guidelines designated as such in the Reporting Program Manual." "Reporting Program Manual" is then defined in Section 1.37 of the Master Policy which states:

> Reporting Program Manual means the document designated as such by the Company [UG] in effect as of the date of this Policy [Master Policy], as it may be amended and restated by the Company from time to time, which contains the Reporting Program Guidelines and which sets forth the terms and conditions under which the Insured is to report or apply for coverage under this Policy.

THIRD AMENDED COMPLAINT (Docket No. 121) at Ex. A § 1.37 (emphasis added). The Master Policy thus provides that the Reporting Program Manual, and, by extension, the Reporting Program Guidelines housed therein, is a UG document—a document designated by UG, and UG alone, that sets forth underwriting guidelines that ST is to follow. The Master Policy further provides, also in Section 1.37, that the Reporting Program Guidelines may be amended by UG from time to time.

By contrast, the 2005 Flow Plan designates "SunTrust Mortgage guidelines that are currently being used and have been

mutually agreed upon" as the document setting forth the governing underwriting guidelines (emphasis added). The 2005 Flow Plan thus provides in plain terms that the operative guidelines are contained in a ST document which, contemporaneous with the execution of the 2005 Flow Plan, was in use and to which the parties had agreed.[15] Coupling these realities together, the Master Policy and the 2005 Flow Plan are inconsistent as to the document that contains the underwriting guidelines for IOF Combo 100 loans. Moreover, the inconsistency is apparent on the face of the insurance policy, and it was apparent from the moment the 2005 Flow Plan was executed as an amendment to the Master Policy.

UG attempts to introduce parol evidence in the form of Gavin's Guideline Matrix and emails to show that ST and UG intended the 2005 Flow Plan's phrase "SunTrust Mortgage guidelines" to mean just the opposite—"UG guidelines" that Gavin had prepared and to which ST later agreed. UG tries to couch

---

[15] UG makes much of the fact that the "g" in the 2005 Flow Plan's reference to "guidelines" is lowercase and the preceding "SunTrust Mortgage" modifier is not possessive (i.e., it is not "SunTrust Mortgage's guidelines"). According to UG, these grammatical features demonstrate that the phrase "SunTrust Mortgage guidelines" neither refers to a specific document nor a document originating from or of SunTrust. UG's argument here vests far too much significance in grammatical minutia. The plain meaning of the adjectival modifier "SunTrust Mortgage" before the word "guidelines" is guidelines emanating from ST. To hold anything otherwise is to deny the plain meaning of that phrase.

its request as something that is corroborative of, rather than contradictory to, the terms of the insurance policy by claiming that "SunTrust Mortgage guidelines" in the 2005 Flow Plan was meant to refer back to the "Reporting Program Guidelines" of UG mentioned in Section 1.37 of the Master Policy. Here, however, UG asks the Court to do precisely that which the Supreme Court of Virginia has said it cannot: consider parol evidence "to explain a patent ambiguity; that is, to supply the understanding that the parties could have reasonably been expected to reach where the language of an instrument reflects no such understanding." Zehler, 160 S.E.2d at 789. The 2005 Flow Plan was executed after the Master Policy, and it thus stands as the final, most persuasive expression of intent of the parties. That document clearly designates "SunTrust Mortgage guidelines" as setting forth the governing underwriting guidelines for IOF Combo 100 loans. The 2005 Flow Plan therefore, on its face, does not reflect an understanding that a UG document (and certainly not an impromptu set of email exchanges and summary of correspondence (i.e., the Guideline Matrix) reflecting in terse form the views of a single clerical UG employee) would provide the governing underwriting guidelines. Although the parties perhaps could have reasonably been expected to designate underwriting guidelines that were furnished by the insurer UG, and subsequently agreed to by the insured ST, the language of

22

the 2005 Flow Plan reflects no such understanding. In consequence, the Court is not at liberty to allow UG's offered parol evidence in support of UG's effort to prove otherwise.

## 2. Latent Ambiguity

UG supports its argument largely by relying on decisions that involve latent ambiguity. The language of the insurance policy here does not support application of those cases because, as already stated, the plain construction of "SunTrust Mortgage guidelines" is guidelines put forth by ST, not UG. But, even if the Court were to construe this phrase liberally in favor of UG, thus entertaining the notion that "SunTust Mortgage guidelines" could reasonably refer to UG-promulgated guidelines that UG used for ST, in distinction to guidelines that UG used for its other corporate customers, UG would not reach the result that it desires. In that scenario, the Court would consider all the parol evidence offered by the parties to explain the 2005 Flow Plan's reference to "SunTrust Mortgage guidelines." The Court would consider the Gavin emails and the Guideline Matrix (as well as subsequent iterations), and the Court would also consider the January 2005 guidelines of ST. The Court would note that, leading up to ST's offering IOF Combo 100 loans in late 2004, ST fronted the possibility of UG insuring the loans in emails to Pam Gavin. Moreover, the Court would consider that Gavin synthesized a host of prior informal communications with

UG into a single document, the Guideline Matrix, which she sent to ST and which in a terse notation reflected her opinion that DU underwriting was required for IOF Combo 100 loans. Also, the Court would consider that, in January 2005 and right up to the execution of the 2005 Flow Plan, ST had its own set of guidelines that it, along with UG-affiliated underwriters, were using and that this document explicitly mandated traditional underwriting for IOF Combo 100 loans.[16] Finally to be considered would be the undisputed fact that neither Gavin nor Pettitt, the ST employee to whom Gavin sent the emails, had authority to amend the policy or the Reporting Program Guidelines. Weighing all this evidence, the Court would have to determine whether the latent ambiguity—the fact that "SunTrust Mortgage guidelines" might reasonably refer to Gavin's Guideline Matrix or ST's January 2005 guidelines—was resolved. Even if the record were such that this was the proper course for the Court (and it is not), the latent ambiguity would still remain. Reading all the evidence in a fashion most favorable to UG, the Court could not conclude that UG's interpretation of "SunTrust Mortgage guidelines" was any more reasonable than ST's interpretation.

---

[16] There also is evidence that Mary Pettitt altered emails (see MEMORANDUM OPINION (Docket No. 403)) which UG would say would have to be considered. That is the subject of another motion as to which there is doubt respecting whether the evidence of Pettitt's alterations is admissible at all; however, that motion need not be decided because, for purposes of this analysis, the Pettitt alterations would be considered.

With the latent ambiguity unresolved by the parol evidence, ST's interpretation, as the one which provides, rather than withholds, coverage under the insurance policy would be the interpretation that must prevail under Virginia law as a matter of law.[17]  Here, the Court is guided by the Fourth Circuit's account of Virginia insurance law in Highway Express, Inc. v. Fed. Ins. Co., Nos. 93-1715, 93-1889, 1994 WL 95956 (4th Cir. Mar. 24, 1994) (unpublished table opinion):

> [A]ll exclusions in an insurance policy must be clearly and unambiguously articulated by the insurer to be effective.  Further, ambiguities are _always_ interpreted strongly against the insurer and must be construed to effectuate coverage. . . .
>
> . . . .
>
> <u>[C]ases applying Virginia . . . law have construed ambiguous terms in an exclusion to effectuate coverage on summary judgment, with neither a jury trial nor a bench trial.</u>

1994 WL 95956, at *6-7 (citations omitted and emphasis added).

Highway Express is especially insightful because it explicitly

---

[17] The Court is aware that the Supreme Court of Virginia has not always granted summary judgment for the insured party where it recognized that parol evidence may be consulted to explain a latent ambiguity in an insurance policy.  In some cases, the court has granted judgment for the insurance company upon finding the insurance policy's language unambiguous in the insurer's favor.  See, e.g., Gwathmey, 1 S.E. 209.  The insurance policy here does not permit such a favorable outcome for UG because there is no scenario in which "SunTrust Mortgage guidelines," as articulated in the 2005 Flow Plan, could unambiguously refer to UG's proffered parol evidence to the absolute exclusion of ST's January 2005 guidelines.

states our Circuit's view that Virginia law leaves no room for a jury trial when exclusionary language in an insurance policy is ambiguous. The Fourth Circuit expressly considered the insurance company's argument that the trial court should have submitted the ambiguous phrase in the insurance policy to the jury, and it rejected that argument with reference to Virginia's universal adherence to the rule of liberal construction/*contra proferentem*. See id. Also instructive for the Court is Atkinson Dredging Co. v. St. Paul Fire & Marine Ins. Co., 836 F. Supp. 341 (E.D. Va. 1993). There, a district court explicitly recognized summary judgment as the necessary consequence in Virginia of policy language held to be ambiguous: when a policy "yields two equally fair interpretations," the court wrote, "the one which is fairer to [the insured] is to be adopted. That result would eliminate the need for a trial because the interpretation required by law will resolve the controversy and leave no issue for actual determination." 836 F. Supp. at 344 (emphasis added). Other federal and state cases applying Virginia insurance law, although not expressly stating that ambiguities in an insurance policy necessitate summary judgment for the insured (thereby foreclosing submission of parol evidence to a jury), further confirm the approach taken in Highway Express in granting summary judgment for the insured after finding the language in the insurance policy ambiguous.

See Joseph P. Bornstein, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 828 F.2d 242, 245 (4th Cir. 1987) (granting summary judgment for the insured and writing, "[b]ecause the policy language fairly can be interpreted in [two ways], we are bound, under Virginia law, to adopt the construction that will afford coverage to [the insured]"); Lincoln Nat'l Life Ins. Co. v. Commonwealth Corrugated Container Corp., 327 S.E.2d 98, 101 (Va. 1985) (granting summary judgment for the insured and stating, "because the policy language is ambiguous, it will be strictly construed against the insurer"); S.L. Nusbaum & Co., 316 S.E.2d at 736 (Va. 1984) (affirming summary judgment for the insured and stating "[w]here two constructions [of an insurance policy] are equally possible the most favorable to the insured will be adopted"); Clark v. Nationwide Mutual Fire Ins. Co., No. 161702, 1999 WL 370407 (Va. Cir. Ct. Apr. 14, 1999) (granting summary judgment for the insured and stating "[w]hen more than one interpretation is reasonable, an ambiguity exists and the contract must be construed most favorably toward the insured").

In sum, even if there is a latent ambiguity (and there is not), Virginia law dictates a result that forecloses presentation of parol evidence.

### 3. Partial Integration Doctrine

Obviously mindful of the foregoing consequences, UG endeavors to bypass the issue of ambiguity altogether by arguing

that the Gavin-related parol evidence is admissible under Virginia's partial integration doctrine. According to the Fourth Circuit in Swengler v. ITT Corp., 993 F.2d 1063 (4th Cir. 1993), on which UG itself relies, the doctrine of partial integration,

> [u]nder Virginia law . . . allows parties to a contract to supplement the terms of the writing with extrinsic evidence only if: (1) the parties did not reduce their entire agreement to writing; (2) the extrinsic evidence does not contradict or vary the written terms; and (3) the extrinsic evidence involves items on which the parties agreed contemporaneously with the writing.

993 F.2d at 1969 (citing High Knob, Inc. v. Allen, 138 S.E.2d 49, 52 (Va. 1964)); see also Farmers Mfg. Co. v. Woodworth, 64 S.E. 986, 987-88 (Va. 1909) ("The legal proposition is not controverted that a contract in writing, complete on its face, cannot be altered or contravened by parol evidence of inconsistent agreements and undertakings previously or contemporaneously made."). Even a cursory review of UG's argument evidences that UG fails on at least two of the three prongs quoted above, all of which must be satisfied for the Court to consider parol evidence on the basis of Virginia's partial integration doctrine.

First, the record is clear that the parties did in fact reduce their entire agreement to writing. The 2005 Flow Plan is far from silent on the issue of the governing underwriting guidelines. Those guidelines, the 2005 Flow Plan explicitly provides, are set forth in "SunTrust Mortgage guidelines that are currently being used and have been mutually agreed upon." The partial integration doctrine obtains in situations where, wholly unlike this one, the written instrument is silent on a material issue and consequently fails to impart a "complete legal obligation." Cf. Adams v. Seymour, 61 S.E.2d 23 (1950).

Second, UG impermissibly attempts to introduce parol evidence to contradict and vary the terms of the written insurance policy. As explained, UG offers the Gavin emails and Guideline Matrix to show that "SunTrust Mortgage guidelines" in fact meant UG guidelines that Gavin had prepared. UG characterizes its move as merely confirming the language of the insurance policy by stressing that Section 1.37 of the Master Policy refers to "Reporting Program Guidelines" contained in the "Reporting Program Manual" which, according to Section 1.37, could be restated and amended by UG. Respecting the 2005 Flow Plan, UG asserts that "SunTrust Mortgage guidelines" referred back to the "Reporting Program Guidelines" designated by the Master Policy, with Gavin's Guideline Matrix constituting amendments to the "Reporting Program Guidelines." However, even if it were true that the Gavin parol evidence was consistent with the Master Policy's use of the term "Reporting Program

Guidelines,"[18] it is undeniable that the Gavin parol evidence is inconsistent with the plain construction of "SunTrust Mortgage guidelines" in the 2005 Flow Plan. In sum, whereas the partial integration doctrine is meant to supplement terms respecting a material issue that the parties left out of a written contract, UG attempts to wield it to contradict the terms—in the 2005 Flow Plan—respecting a material issue—the governing underwriting guidelines—that is explicitly and conclusively spoken to in the insurance policy. The parol evidence that UG offers is not admissible under Virginia's partial integration doctrine.

## CONCLUSION

For the reasons set forth above, the Court will grant SUNTRUST MORTGAGE, INC.'S MOTION *IN LIMINE* TO PRECLUDE UNITED GUARANTY'S INTRODUCTION OF PAROL EVIDENCE FOR PURPOSES OF ALTERING THE MEANING OF THE PARTIES' UNAMBIGUOUS WRITTEN CONTRACTUAL AGREEMENTS (Docket No. 334).

It is so ORDERED.

_____/s/_____  *REP*
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: April 26, 2011

---

[18] And it is not because the Master Policy, in Section 7.12, sets forth specific criteria for amending the insurance policy. Although Section 7.12 does not clearly prohibit amending the "Reporting Program Guidelines" in the manner advanced by UG through its parol evidence, the presence of this provision in the Master Policy suggests that the parties contemplated something more than the lone, ad hoc conduct of Pam Gavin—someone whom the parties agree did not have authority to bind UG—to effectuate a formal amendment to the "Reporting Program Guidelines," and thus the insurance policy.