IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SUNTRUST MORTGAGE, INC.,

    Plaintiff,

v.                            Civil Action No. 3:09cv529

AIG UNITED GUARANTY CORP.
a/k/a UNITED GUARANTY CORP.,
et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on SUNTRUST MORTGAGE, INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS ON COUNTERCLAIM COUNT IV OR, IN THE ALTERNATIVE, RENEWED REQUEST FOR ENTRY OF SUMMARY JUDGMENT (Docket Nos. 352 and 354) and DEFENDANT UNITED GUARANTY RESIDENTIAL COMPANY OF NORTH CAROLINA'S RENEWED MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM COUNT IV (Docket No. 371). The Court heard oral argument on the motion on April 11, 2011, as part of the final pretrial conference in this action.[1]

## INTRODUCTION

For the reasons set forth below, DEFENDANT UNITED GUARANTY RESIDENTIAL COMPANY OF NORTH CAROLINA'S RENEWED MOTION FOR

---

[1] After hearing argument on all outstanding motions, the Court informed the parties that, in the interest of judicial economy, it would postpone attending to the JOINT PROPOSED PRETRIAL ORDER until after the resolution of such motions.

SUMMARY JUDGMENT ON COUNTERCLAIM COUNT IV (Docket No. 371) will be granted and SUNTRUST MORTGAGE, INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS ON COUNTERCLAIM COUNT IV OR, IN THE ALTERNATIVE, RENEWED REQUEST FOR ENTRY OF SUMMARY JUDGMENT (Docket Nos. 352 and 354) will be denied. The insurance policy clearly and unambiguously requires SunTrust ("ST") to pay annual premiums to United Guaranty ("UG") for the life of the insured loans, notwithstanding that UG's Maximum Cumulative Liability ("MCL") for loss on those loans has been reached. The Court will issue a declaration requiring ST to pay such premiums in accordance with the insurance policy's terms, as construed by the Court in this opinion.

## DISCUSSION

## I. Procedural History

After ST filed this action alleging breach of contract, UG filed a Counterclaim,[2] Count IV of which alleged that, under Section 3.4 of the Master Policy, the mortgage insurance policy at issue in this action, ST was obligated to continue paying annual "Renewal Premiums" even after UG had paid the MCL on a given loan pool. UG sought a declaration to that effect.[3] The

---

[2] DEFENDANT UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA, INC.'S ANSWER TO PLAINTIFF'S AMENDED COMPLAINT AND COUNTERCLAIM (Docket No. 47).

[3] When this action was filed, the MCL had not been reached as to any pool. However, the parties were in a dispute on the issue.

2

Court originally addressed the issue of summary judgment on UG's Count IV Counterclaim in ruling on DEFENDANT UNITED GUARANTY'S MOTION FOR SUMMARY JUDGMENT ON COUNT IV COUNTERCLAIM AGAINST PLAINTIFF SUNTRUST MORTGAGE (Docket No. 186). ST did not then move for summary judgment on Count IV of UG's Counterclaim. After hearing oral argument, the Court denied UG's motion for summary judgment, finding "genuine disputes of material fact." ORDER dated Dec. 10, 2010 (Docket No. 310). On March 4, 2011, ST filed SUNTRUST MORTGAGE, INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS ON COUNTERCLAIM COUNT IV OR, IN THE ALTERNATIVE, RENEWED REQUEST FOR ENTRY OF SUMMARY JUDGMENT (Docket Nos. 352 and 354). Believing upon further reflection that the Court might have erred in finding genuine disputes of material fact as to Count IV of the Counterclaim, the Court gave notice to the parties during a telephone conference on the record that it intended to revisit the summary judgment issue, and to hear oral argument thereon at the final pretrial conference scheduled for April 11, 2011.

---

Recently, the MCL has been reached as to one pool.

Originally, UG pressed the point that, if it prevailed in its interpretation of the so-called renewal premium issue, it also was entitled to accelerate ST's obligations to pay premiums. At oral argument, UG abandoned that position, and wisely so for it has no merit.

## II. Origin Of The Dispute - Section 3.4 Of The Master Policy

The parties are in agreement that the central issue in Count IV of UG's Counterclaim is the effect of Section 3.4 of the Master Policy. That section, which UG admits to drafting, is entitled "Renewal Premium," and part (a) of that section states:

> The insured's obligation for the payment of premium due, if any, after the payment of the appropriate initial premium shall continue for each Loan insured hereunder in accordance with the applicable premium plan elected by the Insured for each such Loan, notwithstanding the payment by the Company [UG] of Losses with respect to Loans insured hereunder during a Policy Year in an amount equal to the Maximum Cumulative Liability for such Policy Year, until . . . .

Ex. A § 3.4(a) to UG's Count IV Counterclaim (Docket No. 47). Four separate subsections specifying possible events in the lives of the insured loans follow the word "until" in Section 4.3(a). The occurrence of any of those events would terminate the obligation to pay premiums. The parties agree that none of those events have occurred. The second, and final, lettered part to Section 4.3 is part (b). It provides in relevant part: "Any such renewal premium must be paid within forty-five (45) days after the anniversary (monthly, yearly otherwise, as the case may be) of the Effective Date of the Certificate." The parties agree that previous renewal premiums for the loans at issue were paid on a yearly basis.

4

The parties agree that the "applicable premium plan" referred to in Section 3.4(a) of the Master Policy is set forth (for the vast majority of the loans here) in a document entitled "SunTrust Mortgage Agreement – Closed-End Purchase Money Seconds – Flow Business Risk Sharing Experienced Rating Plan" ("2005 Flow Plan"), dated October 17, 2005. In addition to setting forth the applicable premium plan, the 2005 Flow Plan, as well as its earlier incarnation, entitled "SunTrust Mortgage Agreement – Closed-End Purchase Money Seconds-Flow Business Risk Sharing Plan ("2004 Flow Plan")[4], dated June 23, 2004, states, "Term of Cover: The term shall be life of loan and coverage is provided in accordance with the terms and conditions of the Residential Loan Reporting Program Master Insurance Policy [the Master Policy]," and it further states, "Insurance coverage shall exist until loan is paid in full, or term of insurance expires." Exs. C and D to UG's Count IV Counterclaim (Docket No. 47).

While Section 3.4 speaks to any renewal premiums due for loans insured under the Master Policy, it is undisputed that Section 3.3 of the Master Policy obligates ST to pay an "Initial Premium" for such loans. ST admits that it paid an initial premium for all loans implicated by UG's Count IV Counterclaim

---

[4] The 2004 Flow Plan set governing terms for the premium plan before the 2005 Flow Plan came into effect.

in accordance with Section 3.3, and it does not here dispute having to do so.

### III. Position Of The Parties

ST argues that Section 3.4 is unambiguous on its face and that it does not require ST to continue to pay renewal premiums on loans in any pool on which the MCL has been met. First, ST contends that the ordinary meaning of the term "renewal premium"—the title of Section 3.4—bars UG from claiming that renewal premiums are due annually for the life of the covered loans, notwithstanding that UG's MCL has been reached for such loans. According to ST, the term "Renewal Premium," given its ordinary meaning, requires no premium to be paid if there is no insurance provided, and, of course, no insurance is provided once the MCL is reached. BRIEF IN SUPPORT OF SUNTRUST'S MOTION FOR JUDGMENT ON THE PLEADINGS ("ST Brief in Support") (Docket No. 353) at 10.

In support of its argument, ST relies upon the Oxford English Dictionary's definition of "premium": "The price for insurance protection for a specified period of exposure." ST also cites 5 Couch on Insurance § 69:1, defining premium as "the consideration paid an insurer for undertaking to indemnify the insured against a specified peril." ST harnesses Black's Law Dictionary, too, which defines "renewal" as "the act of renewing or reviving . . . The substitution of a new right or obligation

6

for another of the same nature." Noting that Virginia courts have turned to such venerated definitional authorities when construing similarly undefined words in a contract, ST argues that the plain meaning of "premium" and "renewal" counsels that Section 3.4's reference in its title to "Renewal Premium" refers to something other than what, according to UG, is a mandatory annual installment payment for the life of the insured loans.

Moving beyond dictionary definitions, ST argues that Section 3.4's operative language itself clearly shows that ST is not bound to pay renewal premiums for loans no longer eligible for future payouts from UG. ST bases this construction on the phrase "if any" because "[s]uch words indicate that SunTrust's obligation to pay an annual renewal premium after the initial premium is not absolute." ST Brief in Support (Docket No. 353) at 13. The remainder of the section beginning with "notwithstanding . . ." is superfluous, says ST, because one does not even reach that part of the provision if, as the preceding "if any" indicates, no renewal premium is due under the "applicable premium plan." Id. At oral argument, ST argued that it is clear that no renewal premium is due under ST's premium plan because the document setting forth the premium plan, the 2005 Flow Plan, nowhere mentions renewal premiums being due after the MCL is reached. In further reliance on the "if any" clause, ST argues that placement of that clause before

the "notwithstanding . . ." clause is significant because "[i]f no renewal premium is due for a loan, one does not reach [that clause]," and "no 'premium' is due to 'renew' coverage on the subject loans, because no insurance coverage is being renewed." Id. For these reasons, ST claims that Section 3.4 clearly does not require ST to continue to pay renewal premiums on loans after the MCL has been reached for such loans.

Alternatively, as a fallback position, ST argues that, even if Section 3.4 is not unambiguous in its favor, it is ambiguous as to the existence of an obligation to pay annual renewal premiums on loans for which the MCL has been met, and, according to the rule of contra proferentem, any such ambiguity should be construed against UG, the author of Section 3.4. Id. at 16-18.

Before turning to UG's position, it is worth noting that ST admits that Section 3.4 obligates it to pay renewal premiums for the life of the insured loans before the MCL for such loans has been reached. Thus, ST concedes that Section 3.4 does impose an obligation to pay renewal premiums in certain circumstances. However, ST objects to Section 3.4 being read in such a way as to require ST to pay renewal premiums on loans for which the MCL has been met.

UG's position is that Sections 3.3 and 3.4 of the Master Policy, in tandem, clearly set forth a payment structure obligating ST to pay an initial premium and mandatory annual

premiums for the life of the covered loans regardless of whether the MCL has been met for such loans. According to UG, Section 3.3, entitled "Initial Premium," obligates ST to pay an initial premium for the relevant loans. Then Section 3.4 requires ST to pay annual renewal premiums for the life of the loans (subject to certain occurrences not implicated here) even if the MCL has been reached. The obligation imposed by Section 3.4 is made clear, argues UG, by its concluding clause which provides that: "notwithstanding the payment by the Company [UG] of Losses with respect to Loans insured hereunder during a Policy Year in an amount equal to the Maximum Cumulative Liability for such Policy Year." UG contends that such language can have no meaning if ST's interpretation of Section 3.4 prevails and payment of renewal premiums may cease for certain loans upon the MCL being reached. UNITED GUARANTY'S MEMORANDUM IN SUPPORT OF ITS RENEWED MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM IV (Docket No. 372) at 16-17. Respecting the "if any" language in which ST vests so much importance, UG says that it refers to whether there is an obligation to pay renewal premiums based on the payment plan chosen by ST when the loans are submitted for coverage: either (1) pre-paid "lump sum" premiums or (2) "initial premium" plus "renewal premiums" thereafter. UG maintains that the "if any" language does not endow ST with the general freedom to renew, or not renew, coverage after the MCL has been reached, since, as UG

reiterates, such freedom would be directly inconsistent with the "notwithstanding . . ." phrase that ends Section 3.4(a). Id. at 16.

According to UG, the Flow Plans and other provisions of the Master Policy merely confirm its interpretation of Section 3.4. UG highlights that the 2005 Flow Plan—which, the parties agree, sets forth the premium plan rate schedule and which is identical on the "term of cover" to the earlier 2004 Flow Plan—provides that "[i]nsurance coverage shall exist until the loan is paid in full, or term of insurance expires." Also significant for UG is that the document says, the term of coverage "shall be life of loan and coverage is provided in accordance with the terms and conditions of the Residential Loan Reporting Program Master Insurance Policy." Additionally, UG highlights Section 3.8, among other provisions in the Master Policy speaking to cancellation/cessation of coverage:

> Cancellation/Discontinuance by the Company [UG] – Either the Insured or the Company may cancel this Policy by providing thirty (30) days' written notice of cancellation of this policy, provided, however, that Exception Approvals, Commitments and/or Certificates issued prior to the cancellation of this Policy shall continue in force subject to the terms and conditions hereof (emphasis added).

The above highlighted portion of Section 3.8, says UG, evidences that ST could not cancel coverage on loans which it had agreed

to have insured on a whim from year to year; rather, prescribed in the policy were specific contingencies and events that had to be met and procedures that had to be followed before ST's obligation to pay renewal premiums ceased under the policy. Id. at 12-13.

## IV. Applicable Law And Analysis

### A. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact in a case. Fed. R. Civ. P. 56(c). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). A material fact in dispute appears when its existence or non-existence could lead a jury to different outcomes. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. Id.

Hence, summary judgment is only appropriate when, after discovery, the non-moving party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986). When a motion for summary judgment is made, the evidence presented must always be taken in the light most favorable to the non-moving party. Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996).

Nevertheless, a party cannot "create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Accordingly, the party who bears the burden of proof at trial cannot survive summary judgment without sufficient evidence to sustain his or her burden of proof on that point. Celotex Corp., 477 U.S. at 327.

The parties having been given ample notice before the April 11th's pretrial conference that the Court intended to revisit the issue of summary judgment on UG's Count IV Counterclaim, there is no procedural bar to deciding either party's summary judgment motion now. Indeed, even if the parties had not separately re-presented the issue of summary judgment, Fed. R. Civ. P. 56(f) provides that the Court, upon giving reasonable notice to the parties (which it has done), may grant summary judgment for a nonmoving party.

**B. Virginia Law on the Interpretation of Insurance Policies**

Under Virginia law, it is settled that insurance policies are to be construed in line with the written intent of the parties, as expressed by the terms the parties have used in

their agreement, provided that the policy does not transgress statutory requirements and is not antithetical to public policy interests. Nat'l Hous. Bldg. Corp. v. Acordia of Va. Ins. Agency, 591 S.E.2d 88, 90-91 (Va. 2004). If the terms used in the policy are clear and unambiguous and not otherwise defined therein, they are to be taken in their "plain, ordinary, and popular sense." Craig v. Dye, 526 S.E.2d 9, 11-12 (Va. 2000). That is, they are to receive a "reasonable interpretation." See Turley v. Insurance Co., 25 Wend. 374 (Va. 1841) (NELSON, C. J.). If a written contract or policy is unequivocal, courts are not at liberty to search for its meaning beyond the instrument itself. W.D. Nelson & Co. v. Taylor Heights Dev. Corp., 150 S.E.2d 142 (Va. 1966). This is so because the writing is the repository of the final agreement of the parties. Berry v. Klinger, 300 S.E.2d 792 (Va. 1983). Where a contract or policy is in writing and is unambiguous by its terms, it is the province of the court, not the jury, to construe the instrument and to determine the relation between the parties thereto. Winn v. Aleda Constr. Co., 315 S.E.2d 193 (Va. 1984).

Whether a policy is ambiguous is a question of law for the court to decide. Wilson v. Holyfield, 313 S.E.2d 396, 398 (Va. 1984). The mere fact that the parties do not agree to the construction of a policy does not render it ambiguous. Policy language may be ambiguous where it can reasonably have more than

one meaning given its context.  Salzi v. Va. Farm Bureau Mut. Ins. Co., 556 S.E.2d 758, 760 (Va. 2002).  Policy language may also be ambiguous "[w]here two constructions are equally possible," or where "reasonable [persons] . . . may reach reasonable, but opposite, conclusions" upon reading a policy's language.  Spence-Parker v. Maryland Ins. Group, 937 F. Supp. 551, 556 (E.D. Va. 1996) (citing St. Paul Fire & Marine Ins. v. S.L. Nusbaum & Co., 316 S.E.2d 734, 736 (Va. 1984)).  It is the duty of the courts to construe the policy as a whole; and, in the performance of that duty, courts may not treat as meaningless any word thereof, if any meaning, reasonably consistent with other parts of the contract, can be given.  Smith v. Ramsey, 82 S.E. 189, 191 (Va. 1914).  In other words, "[i]n the interpretation of written contracts, every part of the writing must be made, if possible, to take effect, and every word of it must be made to operate in some shape or other."  Tate v. Tate's Ex'r, 75 Va. 522, *1 (Va. 1881) (also published at 1881 WL 6287).

Because insurance contracts are "ordinarily selected by the insurers rather than by policyholders," Virginia courts have been consistent in construing "doubt as to their meaning[] in favor of that interpretation which grants coverage," and thus which generally favors the insured.  Government Employees Ins. Co. v. Moore, 580 S.E.2d 823, 827 (Va. 2003); see also S.L.

Nusbaum & Co., 316 S.E.2d at 736; Ayres v. Harleysville Mut. Cas. Co., 2 S.E.2d 303 (Va. 1939); Fid. & Cas. Co. v. Chambers, 24 S.E. 896 (Va. 1896); United States Mut. Accident Assn. v. Newman, 3 S.E. 805 (Va. 1887). The stance of Virginia courts in this regard is, at least in part, a reflection of a central tenet of contract law that any ambiguity or uncertainty pertaining to the language used in a contract should be construed against the party who drafted it. Am. Realty Trust v. Chase Manhattan Bank, 281 S.E.2d 825 (Va. 1981).

### C. Analysis

After having examined the insurance policy and the parties' briefs, and having heard oral argument on the issue of summary judgment on Count IV of UG's Counterclaim, the Court finds that Count IV can, and should, be resolved as a matter of law. Considering the record evidence in the manner most favorable to ST, it must be concluded that Section 3.4 of the Master Policy clearly and unambiguously obligates ST to pay annual renewal premiums for the life of the insured loans, notwithstanding that the MCL for such loans has been reached. Indeed, Section 3.4(a), on its face, plainly says as much, stating,

> The insured's [ST's] obligation for the payment of premium due, if any, after the payment of the appropriate initial premium shall continue for each Loan insured hereunder in accordance with the applicable premium plan elected by the Insured for each such Loan, notwithstanding the payment

15

> by the Company [UG] of Losses with respect
> to Loans insured hereunder during a Policy
> Year in an amount equal to the Maximum
> Cumulative Liability for such Policy
> Year . . . (emphasis added).

ST asks the Court to construe the contractual text in such a way as to read the highlighted "notwithstanding . . ." clause out of the policy. When asked at oral argument how ST's interpretation could be accepted while concomitantly giving meaning to the "notwithstanding . . ." clause, ST had no reasonable response, offering merely that the "notwithstanding . . ." clause did not bind ST on the facts here because the 2005 Flow Plan, which amended the Master Policy and sets forth the applicable premium plan, did not reiterate the "notwithstanding . . ." clause. ST's argument can be rephrased thusly: ST does not have to abide by a term in one part of the insurance policy (i.e., the Master Policy) because in another, later-in-time, but not contradictory, part of the insurance policy (i.e., the 2005 Flow Plan) the term is not repeated. In offering this argument, ST ignores two principles of Virginia contract law: (1) that a contract must be construed as a whole; and (2) that, when a contract—and, by extension, an insurance policy—is unambiguous on its face, the court is bound by the language used by the parties. Notably, courts must not ignore the language used by the parties and adopt an interpretation of a policy based on the language that they did not use. ST's

argument would have some merit if the parties, through the expressed terms of the 2005 Flow Plan, had evidenced intent to alter Section 3.4(a)'s requirement that annual renewal premiums for loans were due annually whether or not the MCL had been reached for such loans. But no such intent is discernible on the face of the 2005 Flow Plan, and nothing in the record otherwise supports such an intent.

ST does not salvage its position with its interpretation of the "if any" phrase in Section 3.4(a). First, ST's contention that the "if any" clause somehow absolves it from having to pay renewal premiums on loans where the MCL has been met simply because the 2005 Flow Plan does not speak to such an obligation is unavailing for the reason stated above—namely, that the absence of language in a subsequently executed, amendatory contract is not a basis for ignoring a clearly articulated duty in an earlier, still operative contract.[5] As UG correctly contends, ST's obligation to pay renewal premiums for loans notwithstanding the MCL having been met for such loans "is

_____

[5] Also, ST's claim that the 2005 Flow Plan is the only document speaking to the "applicable premium plan" is not supported by the record. For instance, the Master Policy, in Section 3.3, requires payment of an initial premium on covered loans. Under either the lump-sum payment method or the initial premium plus discretionary renewal premium method that ST argues this insurance policy provides for, an initial premium would be due. This feature of Section 3.3 means that the Master Policy would bear on the "applicable premium plan," and therefore, contrary to ST's claim, the 2005 Flow Plan would not be the only document relevant to the "applicable premium plan."

addressed in Section 3.4 [of the Master Policy]; therefore, it does not need to be addressed separately in the [2005 Flow Plan's] premium plan." Final Pretrial Conference Motions Hearing Transcript 166:8-9. Second, ST's argument that the "if any" clause takes into account that "no 'premium' is due to 'renew' coverage on the subject loans, because no insurance coverage is being renewed," on loans where the MCL has been reached is equally unconvincing because that construction, if adopted, would simply read the "notwithstanding . . ." clause out of the policy. After all, what function would the "notwithstanding . . ." clause have in Section 3.4(a) if the "if any" clause permitted ST not to renew coverage on loans on which no more insurance payouts could be had? The answer is none because, if ST had such freedom under the insurance policy, it would never rationally continue to pay premiums on loans that were not eligible for future insurance payouts.

The real reason for Section 3.4's prefatory "if any" clause is that, depending on the premium plan elected at the outset of the insurance coverage, ST may or may not have owed renewal premiums under the Master Policy. Id. at 168:7-9. ST had the option of paying a "single lump sum premium" to insure its loans, but ST chose to forego this option and pay premiums in annual installments. Id. at 167:25-168:2. Though the exact figures are disputed, ST now finds itself in a situation where

it will have to pay, by rough estimate, $200 million for what amounts to only $300 million in insurance coverage. While an agreement of that nature is difficult for the Court to understand, that is ST's predicament because, in addition to opting to pay for insurance by way of annual renewal premiums, ST negotiated a "risk sharing experience rating plan" with UG that made the amount of ST's renewal premiums a direct function of the number of defaults in ST's insured loan pools. Id. 169:2-7. With many of ST's loans now in default, ST "gambled and lost" in the words of UG's counsel. Id. 170:9-10. In consequence, ST now must not only pay high premiums (that it did not think it would be required to pay), but it must also pay high premiums after the MCL has been met for many loans (a reality brought on by the high number defaults on ST's loans).

To reiterate, it is the duty of the Court to construe a policy as a whole; and, in the performance of that duty, the Court must not treat as meaningless any word thereof, if any meaning, reasonably consistent with other parts of the contract, can be given. Smith v. Ramsey, 82 S.E. 189, 191 (Va. 1914). ST's interpretation of Section 3.4 fails for the singular reason that it reads Section 3.4's "notwithstanding . . ." clause out of the insurance policy. UG's interpretation of Section 3.4, by contrast, is the only interpretation that gives full effect to all the language in the policy, and, in consequence, it is the

only interpretation sanctioned by Virginia law.

Although the language in Section 3.4 of the Master Policy is alone dispositive of the parties' dispute respecting the obligation to pay future renewal premiums, language in the 2005 Flow Plan and language in other provisions of the Master Policy merely confirm that UG's interpretation is the only viable one. For example, the 2005 Flow Plan's statement (also present in the 2004 Flow Plan) that "Insurance coverage shall exist until the loan is paid in full, or term of insurance expires," with the "term of cover[age]" being the "life of the loan," clearly demonstrates that ST and UG intended insurance coverage to persist on more than a year-to-year basis depending on whether the MCL had been reached. Moreover, Section 3.5 of the Master Policy, which says, "[t]he Insured shall not be entitled to cancel coverage under a Certificate except for full prepayment of the Loan," shows that the parties contemplated certain events—limited to those specified in the policy—which would trigger the discontinuance of coverage. UG is correct, too, that Section 3.8's circumscribing ST's and UG's ability to cancel coverage—by, among other things, requiring 30 days' written notice and stating that "Certificates issued prior to the cancellation of this Policy shall continue in force subject to the term and conditions thereof"—evidences the parties' intent to create an insurance structure where both the insured

20

and insurer could cancel insurance only in enumerated circumstances and only with prospective effect. Finally, Section 6.3 of the Master Policy explicitly recognizes the exact scenario that ST claims is expressly precluded by the terms of the insurance policy:

> On and after the date on which the aggregate Losses paid by the Company [UG] for a Policy Year equal to the Maximum Cumulative Liability for such Policy Year, the Company shall have no further obligation with respect to Loans insured hereunder during such Policy Year notwithstanding the potential for additional premium to be due hereunder with respect to such Loans (emphasis added).

The record shows that UG offered to insure ST's loans for the life of such loans or until they were paid in full, and ST agreed to pay an initial premium and renewal premiums annually thereafter on its loans (according to the premium plan it elected at the outset of coverage), notwithstanding that UG already had covered ST's losses on such loans up to the MCL. ST's argument that this arrangement was invalid on public policy grounds lacks merits because it is clear that UG incurred risk in agreeing to insure ST's loans. ST, in fact, opted for this arrangement—wherein it would pay an initial premium and subsequent renewal premiums as set forth in the 2005 Flow Plan's variable rate structure—in an effort to save money. It just so happened that the economy went into an unprecedented decline

during the period of ST's insurance coverage, and, as a result, ST is now obligated to pay substantial premiums going forward without the benefit of future insurance payouts due to the large number of loan defaults. Although this outcome was likely unanticipated by ST, and likely UG too, it is an outcome recognized as a possibility by the clear terms of the insurance policy. Moreover, even if ST were correct in positing that the common definitions and connotations of "renewal" and "premium" are not in accord with how the synthesis of these two terms—"renewal premium"—is employed in Section 3.4 of the Master Policy, the undeniable reality is that the clear directive in Section 3.4(a), not to mention the accompanying text in the Master Policy and 2005 Flow Plan, proves that "renewal premium" meant something else in this particular insurance policy. Also, even when the MCL is met for ST's loans, and therefore UG is not obligated to cover further losses on such loans, ST is still paying "premiums" on such loans. Specifically, it is paying the premiums in installments that it agreed to pay in accordance with the rate structure in the 2005 Flow Plan.

In summation, ST's position distorts the terms of the insurance policy, and thereby offends fundamental precepts of Virginia contract law, in narrowly focusing on Section 3.4's title, "Renewal Premium," at the expense of not only that section's operative language but also the related and relevant

provisions in the insurance policy.

CONCLUSION

For the reasons set forth above, DEFENDANT UNITED GUARANTY RESIDENTIAL COMPANY OF NORTH CAROLINA'S RENEWED MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM COUNT IV (Docket No. 371) will be granted and SUNTRUST MORTGAGE, INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS ON COUNTERCLAIM COUNT IV OR, IN THE ALTERNATIVE, RENEWED REQUEST FOR ENTRY OF SUMMARY JUDGMENT (Docket Nos. 352 and 354) will be denied.

It is so ORDERED.

/s/ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: April 26, 2011