**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

---

SUNTRUST MORTGAGE, INC.,

               Plaintiff,

   v.

UNITED GUARANTY RESIDENTIAL
INSURANCE COMPANY OF NORTH
CAROLINA,

               Defendant.

Civil Action No. 3:09cv00529

---

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT UNITED GUARANTY'S MOTION FOR**
**AN AWARD OF ATTORNEYS FEES AND EXPENSES**
**INCURRED IN CONNECTION WITH ITS MOTION**
**FOR SANCTIONS AND RELATED MATTERS**

Wyatt B. Durrette, Jr.
Virginia Bar Number 04719
DURRETTECRUMP PLC
Richmond, VA  23219

William E. Wegner (admitted pro hac vice)
John C. Millian (admitted pro hac vice)
Christopher Dusseault (admitted pro hac vice)
Brian C. Baldrate (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
Washington, D.C.  20036

*Attorneys for Defendant United Guaranty*
*Residential Insurance Company of North Carolina*

Filed:  May 17, 2011

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 2

II. STATEMENT OF FACTS........................................................................................... 4

    A.   Discovery of the Fraudulent February 22 Email and the Filing of United
          Guaranty's Motion for Emergency Relief (Dec. 11-29, 2009) ........................................ 4

    B.   Initial Communications Regarding Discovery; SunTrust's Misleading
          Statements to the Court "Hiding the Ball" Regarding Its Misconduct (Dec. 30,
          2009-Feb. 3, 2010) ........................................................................................................ 6

    C.   Initial Depositions; Filing and Granting of United Guaranty's Motion to
          Compel Production of Documents Withheld on Privilege Grounds  (Feb. 4,
          2010-Mar. 29, 2010) ...................................................................................................... 7

    D.   Document Production and Depositions; Preparation and Filing of UG's
          Sanctions Motion (Mar. 30, 2010-Aug. 20, 2010)........................................................ 8

    E.   Completion of Pre-Hearing Briefing on Sanctions Motion; Additional
          Discovery; Evidentiary Hearing (Aug. 21, 2010-Nov. 3, 2010)................................... 10

    F.   Post-Hearing Briefs and Further Oral Argument on the Sanctions Motion (Nov.
          4, 2010-Jan. 31, 2011)................................................................................................. 11

III. ARGUMENT ............................................................................................................ 12

    A.   Legal Standards for an Award of Attorneys' Fees........................................................ 12

    B.   UG Seeks Payment Only For "Hours Reasonably Expended" and Related
          Expenses With Regard to Sanctions Work .................................................................. 13

    C.   The Hourly Rates Charged By United Guaranty's Counsel Are Reasonable For
          the Relevant Market.................................................................................................... 15

    D.   Consideration of the Amount in Controversy and the Results Obtained, As Well
          as the Circumstances Surrounding SunTrust's Fraud on the Court and Abuse of
          the Litigation Process, Further Supports United Guaranty's Fee Request ................... 19

IV. CONCLUSION........................................................................................................... 21

Defendant United Guaranty Residential Insurance Company of North Carolina ("United Guaranty" or "UG") respectfully submits this Memorandum in Support of Its Motion for an Award of Attorneys' Fees and Expenses in Connection with its Motion for Sanctions and Related Matters (the "Fee Motion").

## I.  INTRODUCTION

In its Memorandum Opinion (the "Sanctions Opinion") [docket #403] and accompanying Order (the "Sanctions Order") [docket #404] dated March 29, 2011, granting in part and denying in part United Guaranty's Motion for Sanctions (the "Sanctions Motion"), this Court held that plaintiff SunTrust Mortgage, Inc. ("SunTrust" or "ST") engaged in both a fraud on the Court and an abuse of the judicial process stemming from (a) the creation of fraudulent documents by SunTrust Senior Vice President Mary Pettitt to support SunTrust's position in this litigation, and (b) the response of other SunTrust personnel, including SunTrust in-house counsel, to the discovery of those fraudulent documents.  As a sanction for this egregious misconduct by SunTrust the Court held that SunTrust must pay "the reasonable attorney's fees and expenses [incurred by UG] associated with [the Sanctions Motion] and related motions, discovery proceedings, evidentiary hearings, and briefing, spanning the period of time in which the altered nature of the February 22, 2008 email became known to United Guaranty's counsel to the date of this [Sanctions Order]."  Sanctions Order at 1.  Time expended by United Guaranty's legal team on the matters identified in the Sanctions Order, in some cases together with related expenses, is referred to herein as "Sanctions Work."  The present Fee Motion requests that the Court fix the amount of these reasonable attorneys' fees and expenses at $3,946,482.08.

The fees and expenses incurred by United Guaranty for Sanctions Work should come as no surprise to SunTrust.  "The record clearly requires the conclusion that UG justifiably incurred very significant additional legal fees and expenses to set the record straight and to assure that

tainted evidence would not be used at trial."  Sanctions Opinion at 71.  "[T]he efforts to uncover

the truth and to confirm, with reasonable certainty, the extent of Ms. Pettitt's handiwork have

been time-consuming and costly."  *Id.* at 40.  Further, "the toll on the judicial process of Ms.

Pettitt's spoliation and ST's deliberate failure to uncover the extent of it before allowing the

February 22nd email to be cited in the FAC [First Amended Complaint] has been staggering."

*Id.* at 41.

SunTrust's conduct is responsible not only for the ***fact*** that United Guaranty incurred

costs for Sanctions Work but also for the ***extent*** of those costs.  This is not a circumstance where

a party discovered spoliation of its own evidence and voluntarily brought this fact forward to the

Court in an effort to rectify the problem promptly, avoid prejudice and minimize costs to the

opposing party, and ensure the fair and efficient administration of justice by the Court.  It is the

complete opposite.  SunTrust's most senior personnel and its attorneys, after discovering

spoliation of critical evidence:

(a)  ***failed*** to advise either the opposing party or the Court that the spoliation had
     occurred;

(b)  ***deliberately*** engaged in an effort to avoid recognizing the full extent of the
     spoliation;

(c)  ***repeatedly misled*** the Court and UG concerning the truth regarding both the
     spoliation itself and ST's decision to avoid confronting the problem;

(d)  ***vigorously opposed*** legitimate discovery efforts designed to get at the truth;

(e)  ***refused*** to turn over key "smoking gun" documents (Thurman's notes) even
     after being ordered to do so by the Court, providing those documents only
     after the Court ordered their production a second time; and

(f)  ***continued to deny the truth*** even up to the very end of proceedings on
     United Guaranty's Sanctions Motion.

The Court, and United Guaranty, have thus been put through a process where the "toll" created

by SunTrust's misconduct has indeed been very high.  This toll undeniably includes the

enormous expense to United Guaranty, well exceeding the $3,946,482.08 amount requested in this Fee Petition, of identifying, exposing, and addressing SunTrust's misconduct over a period of well more than a year.

An award to United Guaranty of attorneys' fees and expenses incurred for its Sanctions Work "is especially appropriate on the facts of this case, where UG's additional fees and expenses preserved the integrity of the judicial record." Sanctions Opinion at 71. As we address below, an award of the requested amount is thus more than fully justified.

## II. STATEMENT OF FACTS

The Court is familiar with this case, and many of the key facts bearing on the present Fee Motion are ably described in the Court's Sanctions Opinion. A full recitation of *all* of the relevant facts would take many dozens of pages and require citation to a huge body of documentary and testimonial evidence. We make no attempt to cover this enormous record here, but instead focus on summarizing the legal work undertaken at United Guaranty's expense to identify and deal with SunTrust's misconduct, noting particular points at which SunTrust's actions have exacerbated the cost of uncovering and dealing with its fraud on the court and abuse of the judicial process.

### A. Discovery of the Fraudulent February 22 Email and the Filing of United Guaranty's Motion for Emergency Relief (Dec. 11-29, 2009)

As this Court has noted, the first inkling obtained by United Guaranty that SunTrust officer Mary Pettitt created fraudulent evidence to support SunTrust's position in this dispute came when United Guaranty's counsel requested and obtained from SunTrust's counsel a copy of the "February 22 email" referenced in SunTrust's First Amended Complaint ("FAC"). This document was obtained on December 11, 2009. Declaration of John C. Millian ("Millian Decl.") ¶ __ and Exhibit A thereto (the "Summary Chronology") at 1. "In examining the version of the

February 22d email that ST's counsel had provided, UG's counsel noticed discrepancies between it and the version of that email which UG had in its possession.  UG's counsel then retained KPMG to analyze the metadata associated with the UG version.  KPMG determined that UG's version was genuine, and that the version which ST's counsel had provided had [likely] been altered."  Sanctions Opinion at 21.

The February 22, 2008 email was a communication between Pettitt and Pam Gavin of United Guaranty, the key "point persons" on each side for the relationship between the parties.  Although the "discrepancy" in the February 22 email was identified immediately after it was received, UG and its counsel did not rush to judgment.  As the Court indicated, UG's counsel commissioned a forensic analysis in an effort to determine the cause of the discrepancy.  UG's counsel also reviewed related documents that might shed light on the discrepancy and interviewed Gavin regarding the different versions of the February 22 email—in sharp contrast to what UG and the Court later learned was SunTrust's decision to *avoid* confronting Pettitt about the same documents.

After completing this process and determining that it appeared highly likely that the version of the February 22 email cited in the FAC had been altered by Pettitt or someone else at SunTrust, United Guaranty filed its Emergency Motion.  *See* docket entries #52-#58.  This Court heard the Motion the day it was filed, and ordered SunTrust to take immediate steps to preserve the evidentiary record, provide expedited discovery to United Guaranty regarding the February 22 email, and advise Pettitt to retain her own counsel.  *See* 12/29/09 Transcript [dkt #58], Orders dated 12/29/09 [dkt #59] and 12/30/10 [dkt #61].

Further detail regarding the Sanctions Work during this time period is set forth in the Summary Chronology (Millian Decl. Ex. A), GDC Time Entries (Millian Decl. Ex. C); and DurretteCrump Time Entries (Millian Decl. Ex. F).

**B.    Initial Communications Regarding Discovery; SunTrust's Misleading Statements to the Court "Hiding the Ball" Regarding Its Misconduct (Dec. 30, 2009-Feb. 3, 2010)**

Following the hearing on United Guaranty's Motion for Emergency Relief, the parties took the first steps regarding preservation of evidence and discovery as to the February 22 email, and reported to the Court regarding these efforts at a Status Conference held on January 8, 2010. At the Status Conference SunTrust's lead counsel, as this Court has noted, made misleading statements that hid the fact that SunTrust was already aware that Pettitt had engaged in creation of fraudulent documents and indeed had imaged her computer twelve months earlier as part of its cursory "investigation" of her actions. *See* Sanctions Opinion at 23-24.

On February 3, 2010, SunTrust filed an after-the-fact, blatantly preemptive "Response" to United Guaranty's Emergency Motion (dkt #74]. In this filing SunTrust revealed what United Guaranty was just about to learn in any event in depositions: that the February 22, 2008 email was not the only fraudulent document created by Pettitt and that SunTrust had been aware of two others for approximately eighteen months. While making this revelation, however, SunTrust *once again* made affirmative misrepresentations hiding the truth, including the assertions that it had been "unable" to interview Pettitt regarding the known fraudulent documents for a number of months and that when Pettitt was finally interviewed regarding those documents she provided a "plausible explanation" for the "discrepancies." This Court has specifically held that SunTrust's explanation for its failure to interview Pettitt for months was "not credible," and that when interviewed Pettitt "simply did not offer a plausible substantive explanation for the email discrepancies." Sanctions Opinion at 12, 17. As the Court knows, an enormous amount of work,

6

including a motion to compel, extensive review of forensic and hard copy evidence, and several depositions, was required to expose these misstatements.  SunTrust's decision to ***affirmatively*** hide the facts significantly increased the ultimate costs associated with the Sanctions Motion.

Further detail regarding the Sanctions Work during this time period is set forth in the Summary Chronology (Millian Decl. Ex. A), GDC Time Entries (Millian Decl. Ex. C); and DurretteCrump Time Entries (Millian Decl. Ex. F).

### C.   Initial Depositions; Filing and Granting of United Guaranty's Motion to Compel Production of Documents Withheld on Privilege Grounds (Feb. 4, 2010-Mar. 29, 2010)

During the first half of February 2010 United Guaranty's legal team undertook factual and legal research relating to the three then-known fraudulent documents, and took the initial depositions of Mary Pettitt, Pettitt's boss Joanne Clack, and SunTrust in-house attorney Susan Thurman.  Pettitt took the Fifth Amendment and refused to answer virtually all questions.  Clack and Hovatter refused to answer numerous questions on privilege grounds, including questions directed at the truth of the representations made by SunTrust in its February 3, 2010 submission. Further, a privilege log provided by SunTrust indicated that a large number of relevant documents had also been withheld on privilege grounds.  Given these facts, United Guaranty suspended taking further depositions and sought the Court's help in getting access to the documents withheld by SunTrust.

The remainder of February 2010, together with most of March 2010, was largely consumed by extensive briefing on competing motions filed by each party on whether SunTrust could withhold on privilege grounds documents and testimony regarding the fraudulent emails. *See* docket entries #82, #83, #85, #87, #90-#94, #97, #104.  UG's legal team also conducted further factual research and analysis, as well as pertinent legal research.  SunTrust took an initial

deposition of Pam Gavin for purposes of preparing its response to United Guaranty's anticipated request for sanctions.

On March 26, 2010, the Court held a hearing on United Guaranty's motion to compel documents and testimony withheld on privilege grounds and on Suntrust's competing motion for a protective order.  The Court granted UG's motion, holding that the evidence in question was discoverable both because the crime-fraud exception applies and because ST had in any event waived the privilege due to its prior partial disclosures of privileged information in its attempt to "explain" the Pettitt saga.  *See* docket entry #107 (hearing transcript).

SunTrust's refusal to produce key documents on purported privilege grounds significantly delayed the ultimate filing of the Sanctions Motion and substantially increased the Sanctions Work required to be undertaken by United Guaranty's legal team.  Of greater importance, absent the filing and granting of United Guaranty's motion to compel the truth regarding SunTrust's misconduct, including its misrepresentations to this Court, would almost certainly have remained hidden.

Further detail regarding the Sanctions Work during this time period is set forth in the Summary Chronology (Millian Decl. Ex. A), GDC Time Entries (Millian Decl. Ex. C); and DurretteCrump Time Entries (Millian Decl. Ex. F).

**D.      Document Production and Depositions; Preparation and Filing of UG's Sanctions Motion (Mar. 30, 2010-Aug. 20, 2010)**

In the weeks following the Court's granting of the motion to compel SunTrust undertook a "rolling" production of critical documents related to the fraudulent emails and SunTrust's attempted cover-up regarding those documents.  SunTrust, however, resisted disclosure of one of the key documents it had been ordered to produce by the Court:  Thurman's September 30, 2008 notes reflecting the recognition by SunTrust's counsel that if Pettitt "admits [she agreed to the

guidelines matrix], then we probably cannot file b/c [because] her agreement to the terms is binding on the company.  might consider closely what we ask." *See* Memo in Support of Sanctions Motion at 19 [dkt #271].  United Guaranty had to go back to the Court to force SunTrust to hand over this document.

With at least most of the relevant documents finally in hand, United Guaranty moved forward in June and July of 2010 with further depositions.  These included the continuation of the Pettitt, Clack and Thurman depositions, as well as depositions of Joshua Gold and Miles Dumville.

During the summer of 2008 United Guaranty also undertook substantial additional factual research and analysis.  A significant part of this factual work was required because, notwithstanding its promise to do so, SunTrust failed to identify and produce (with one exception) what turned out to be at least ***eight*** additional fraudulent documents created by Pettitt, including a doctored version of the guidelines matrix itself.  *See* Sanctions Opinion at 22 n.5. These additional documents were located only because United Guaranty did this job itself, a task that required extensive document review and forensic analysis.

The enormous task of preparing the Motion for Sanctions—which included, *inter alia*, a 48-page brief and well over 100 exhibits (including exhibits to declarations)—was undertaken by UG's legal team primarily during the summer of 2010.  The sanctions motion was filed, under seal, on August 20, 2010.

Further detail regarding the Sanctions Work during this time period is set forth in the Summary Chronology (Millian Decl. Ex. A), GDC Time Entries (Millian Decl. Ex. C); and DurretteCrump Time Entries (Millian Decl. Ex. F).

9

**E.      Completion of Pre-Hearing Briefing on Sanctions Motion; Additional
Discovery; Evidentiary Hearing (Aug. 21, 2010-Nov. 3, 2010)**

Before and after the filing of the Sanctions Motion the parties filed briefs addressing

whether that Motion should remain under seal.  As the Court is aware, SunTrust designated

virtually every document it produced in this litigation as "confidential" under the stipulated

protective order [dkt #43] and sought at virtually every turn to keep information regarding its

misconduct out of the public record.  As a result, many of the key submissions relevant here,

including UG's Emergency Motion, its subsequent Motion to Compel, and the Motion for

Sanctions itself, were required to be filed initially under seal.  The Court ultimately ruled,

however, that these materials should all be on the public record.  SunTrust's efforts to keep these

documents hidden from the public resulted in substantial additional expense to United Guaranty

due to (a) the need to prepare hard copy briefs and related materials (including exhibits) for filing

under seal; (b) the need to contest (ultimately successfully) SunTrust's efforts to keep these

submissions under seal; and (c) the need to refile certain submissions after the seal was lifted.

In September 2010 SunTrust filed its Opposition to the Sanctions Motion, and United

Guaranty filed its Reply papers.  At a status conference held on October 5, 2010, the Court

determined to hold an evidentiary hearing on the Sanctions Motion.  The remainder of the month

was devoted to preparation for that hearing, including certain additional discovery.  On

October 18, 2010, UG took the deposition of SunTrust Bank general counsel Ray Fortin, who

flatly denied making the statement on December 19, 2009 that he instructed ST's legal team not

to confront Pettitt, as recorded by Gold in a file memorandum that same day.  As a result of this

conflict, United Guaranty requested and obtained, over SunTrust's objection, leave to take the

deposition of Gold's partner Mark Garbowski and a further deposition of Thurman in order to

seek the recollections of other participants in the disputed conversation.  UG ultimately

established that Fortin had not provided accurate testimony.  *See* Sanctions Opinion at 13-14

("Mr. Fortin clearly instructed ST's in-house counsel not to confront Ms. Pettitt about the altered

emails.")

On November 1-3, 2010, the Court held an evidentiary hearing on the Sanctions Motion.

United Guaranty called and elicited testimony from adverse witnesses Clack, Thurman, Hovatter,

Gold, Fortin and Dumville.  The Court also heard extensive argument.

Further detail regarding the Sanctions Work during this time period is set forth in the

Summary Chronology (Millian Decl. Ex. A), GDC Time Entries (Millian Decl. Ex. C); and

DurretteCrump Time Entries (Millian Decl. Ex. F).

**F.    Post-Hearing Briefs and Further Oral Argument on the Sanctions Motion
(Nov. 4, 2010-Jan. 31, 2011)**

The evidentiary hearing did not end the costs incurred by United Guaranty for Sanctions

Work.  Shortly after the hearing, the Court directed the parties to file additional briefs (four from

each side) addressing legal standards relevant to the Sanctions Motion and the implications for

the Sanctions Motion of SunTrust's assertion of fraud claims in its first three complaints filed in

the case.  Following this briefing the Court held a further day of argument on the Sanctions

Motion on December 8, 2010.  Thereafter, the Court directed the parties to file another round of

briefing, this time addressing whether the testimony of Gold and Dumville should be admitted at

trial.  United Guaranty filed two additional briefs on this topic as directed by the Court.  These

steps completed UG's Sanctions Work up to the issuance of the Court's Sanction Order and

Sanction Opinion.

Further detail regarding the Sanctions Work during this time period is set forth in the

Summary Chronology (Millian Decl. Ex. A), GDC Time Entries (Millian Decl. Ex. C); and

DurretteCrump Time Entries (Millian Decl. Ex. F).

### III. ARGUMENT

**A.     Legal Standards for an Award of Attorneys' Fees**

The party requesting fees bears the burden of demonstrating the reasonableness of what it seeks to recover. *Plyler v. Evatt,* 902 F.2d 273, 277 (4th Cir.1990); *Cook v. Andrews,* 7 F.Supp.2d 733, 736 (E.D.Va.1998). "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d 169, 174 (4th Cir.1994); *Schmidt v. Citibank (South Dakota) N.A.*, 2009 WL 975379 (E.D. Va. Apr. 10, 2009). The product of the reasonable fee and reasonable rate is referred to as the "lodestar amount." *See Daly v. Hill,* 790 F.2d 1071, 1076 n. 2 (4th Cir.1986). Use of the lodestar method "generates a presumptively reasonable fee." *Walker v. Dovetails, Inc.*, 2011 WL 761475 at *2 (E.D. Va. Feb. 24, 2011).

In determining "what constitutes a ' reasonable' number of hours and rate . . . a district court's discretion should be guided by the following twelve factors" adopted from *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir.1974):

> (1)     the time and labor expended;
>
> (2)     the novelty and difficulty of the questions raised;
>
> (3)     the skill required to properly perform the legal services rendered;
>
> (4)     the attorney's opportunity costs in pressing the instant litigation;
>
> (5)     the customary fee for like work;
>
> (6)     the attorney's expectations at the outset of the litigation;
>
> (7)     the time limitations imposed by the client or circumstances;
>
> (8)     the amount in controversy and the results obtained;
>
> (9)     the experience, reputation and ability of the attorney;

(10)   the undesirability of the case within the legal community in which the suit arose;

(11)   the nature and length of the professional relationship between attorney and client; and

(12)   attorneys' fee awards in similar cases.

*Robinson v. Equifax Info. Servs., LLC,* 560 F.3d 235, 243-44 (4th Cir.2009) (citing *Barber v. Kimbrell's Inc.,* 577 F.2d 216, 226 n. 28 (4th Cir.1978)); *see also, e.g., Rum Creek Coal Sales, Inc. v. Capterton*, 31 F.3d 169, 175 (4ᵗʰ Cir. 1994); *Walker*, 2011 WL 761475 at *2; .

The Court need not address all twelve factors independently because "such considerations are usually subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Freeman v. Potter,* No. 7:04cv276, 2006 WL 2631722, at *2 (W.D.Va.2006) (citing *Hensley,* 461 U.S. at 434 n. 9).  With this in mind, we address in Section III(B) below the "hours reasonably expended" in connection with Sanctions Work, which in this instance "subsumes" *Johnson* factors (1) and (2) and to some extent (4) and (7). We then address in Section III(C) the appropriate hourly rate for this work, which includes consideration of *Johnson* factors (3), (4), (5), (6), (8), (9), (11), and (12).  Finally, in section III(D) below we further address factor (8), the amount in controversy and the results obtained as a result of the Sanctions Work.  Taken together, consideration of the *Johnson* factors fully supports United Guaranty's Fee Motion.

**B.    UG Seeks Payment Only For "Hours Reasonably Expended" and Related Expenses With Regard to Sanctions Work**

This Court has already recognized in its Sanctions Opinion that an extraordinary level of work was required to uncover and address SunTrust's fraud on the Court and abuse of the judicial process.  As addressed in Section II above, UG's Sanctions Work extended over a period of more than a year and involved extensive discovery, document review and forensic analysis,

13

motions practice, the preparation of eight major briefs in support of the Sanctions Motion itself, and a three-day evidentiary hearing.

As established by time records submitted herewith, United Guaranty's legal team expended over 6,500 hours specifically on this Sanctions Work. *See* Millian Decl. ¶¶ 4, 7, and Exs. C and F thereto. Gibson Dunn's Sanctions Work, which accounted for the vast bulk of this time, comprised little more than one-third of all time billed by the firm during the relevant time period (Dec. 2009-Jan. 2011).

While 6,500+ hours is a great deal of time, it should not be a surprise given the work involved. Further, the matter has not been "over lawyered" by United Guaranty's counsel. No more than two timekeepers for United Guaranty appeared at any of the relevant depositions, for example, and in some cases one. SunTrust's legal team outnumbered United Guaranty's at multiple relevant hearings. Further, virtually all discovery related to sanctions issues, including extensive internal work, was performed by a core team of only four Gibson Dunn attorneys (Millian, Baldrate, Brennan and Caughey), with the assistance of support personnel including inexpensive "contract" attorneys hired from a temp agency. *See* Ex. C to Millian Decl.

Finally, any doubt as to the reasonableness of the time for which United Guaranty seeks a fee award should be resolved in United Guaranty's favor by consideration of the substantial time and expense associated with Sanctions Work that is ***not*** included in the Fee Motion. As an initial matter, in allocating time for the different tasks on this case Gibson Dunn has erred on the side of conservatism with respect to assigning time to Sanctions Work. Millian Decl. ¶ 4. Further, United Guaranty has incurred several millions of dollars in costs for temporary attorneys in this case, *id.* ¶ 8, as well as large additional sums for the work of its litigation support/forensic consultant, KPMG. Except for certain time specifically identified by KPMG, none of these costs

14

are included in the Fee Request notwithstanding that the temporary attorneys spent hundreds of hours on document review associated Sanctions Work, and KPMG spent substantial additional time on related document  searches and forensic analysis.

The time spent by United Guaranty's legal team on Sanctions Work is, of course, directly related to the second *Johnson* factor, the novelty and difficulty of the questions raised.  The Sanctions Work, as the Court is aware, has involved both highly complicated and difficult factual issues and similarly complicated and difficult legal questions.  This factor thus strong supports the requested fees.

*Johnson* factors (4) and (7), the attorney's opportunity costs and the time constraints imposed by the client or circumstances, also support the fee request.  To put it mildly, the Sanctions Work, coupled with other work on this case, consumed much (in some cases nearly all) of the time of the Gibson Dunn attorneys who worked on this matter during 2010, was exceedingly demanding at times, and thus precluded these attorneys from handling other work.  These factors thus also support the conclusion that the amount of time expended on Sanctions Work—the first component of the "lodestar" calculation—was eminently reasonable.

**C.    The Hourly Rates Charged By United Guaranty's Counsel Are Reasonable For the Relevant Market**

The hourly rates for which the prevailing party requests reimbursement must be reasonable.  Whether the requested hourly rates are reasonable is generally determined by the Court based upon prevailing rates for attorneys of similar skill and experience in the "relevant market."  "The relevant market for determining the prevailing rate is ordinarily the community in which the court where the action is prosecuted sits.  *See National Wildlife Federation v. Hanson,* 859 F.2d 313 (4th Cir.1988).  ***In circumstances where it is reasonable to retain attorneys from***

*other communities, however, the rates in those communities may also be considered.  Id.* at

317."  *Rum Creek Coal Sales*, 31 F.3d at 175 (emphasis added).

"The determination of the prevailing market rates in the relevant community is fact-

intensive and is best guided by what attorneys earn from paying clients for similar services in

similar circumstances." *Nahigian v. Juno-Loudoun, LLC*, 2101 WL 4623895 at *10 (E.D. Va.

Nov. 5, 2010), citing *Rum Creek Coal Sales*, 31 F.3d at 75, and *Blum v. Stenson*, 465 U.S. 886,

895 n.11, 104 S.Ct. 1541, 1547 n.11 (1984).  While evidence of fees paid to attorneys of

comparable skill in similar circumstances is relevant, so too is the rate actually charged by the

petitioning attorneys when it is shown that they have collected those rates in the past from the

client." *Rum Creek Coal Sales*, 31 F.3d at 175.   "[A] fully compensatory fee will include

compensation for all hours reasonably expended at market rates in the relevant community, and

market rates may be proved by the rate which clients normally pay their attorneys." *Id.* at 175.

United Guaranty recognizes that numerous decisions by this Court focus upon customary

hourly rates charged in the geographic area where this Court is located as the appropriate rates to

be awarded in the cases under consideration.  This case, however, provides an example of the

situation described by the Fourth Circuit in *Rum Creek Coal* "where it is reasonable to retain

attorneys from other communities," in which case "the rates in those communities may also be

considered."  The Fourth Circuit has articulated a two-pronged test for when it is permissible to

award home-market rates to extrajurisdictional attorneys.   ""First, tribunals should ask if

extrajurisdictional counsel rendered services that were truly available in the visited market.

Second, tribunals should ask if the party that hired extrajurisdictional attorney chose reasonably,

or whether they chose an unnecessarily expensive attorney." *Newport News Shipbuilding & Dry

Dock Co. v. Holiday*, 591 F.3d 219, 229 (4th Cir. 2009).  In cases where the issues are highly

complex and require particular expertise, the Fourth Circuit has upheld the award of home-market rates.  *National Wildlife Foundation*, 859 F.2d at 318.  This is in fact a case where the "relevant market" is the market for what are recognized as the best law firms and litigation teams in the nation, and United Guaranty reasonably chose to retain extrajurisdictional counsel.  This conclusion is supported by several factors.

First and foremost, the issues in this lawsuit are highly complex and the amounts at stake very large.  Further, United Guaranty's Counterclaim Count IV, seeking a declaratory judgment regarding SunTrust's obligation to continue making premium payments after policy limits has been reached, involves (according to UG's actuarial projections) approximately $100 million.  It is common for parties to retain national law firms to handle such high-stakes cases.

Second, SunTrust's own actions demonstrate this fact.  At the outset of this dispute SunTrust sought as its counsel not its "regular" counsel or other attorneys from a Richmond firm, but rather a New York/California/Washington, D.C. law firm, Anderson Kill & Olick.  Anderson Kill was SunTrust's sole counsel with regard to this dispute for a number of months, prepared SunTrust's case including drafting the original Complaint, and (as the Court is aware) had a role in the "investigation" of the fraudulent emails.  SunTrust's other firm, Reed Smith, which originally served as "local" counsel in this action, is a major regional firm, as is McGuire Woods, retained by SunTrust in connection with defense of the Sanctions Motion.  SunTrust is thus also represented by counsel whose rates are likely above those typically addressed in fee petitions before this Court.

Third, the hourly rates requested for Gibson Dunn attorneys in this Fee Motion reflect negotiated, lower than standard rates (including a prompt pay discount) agreed to between United Guaranty and Gibson Dunn for work on this case given its overall large scope.  Millian

Decl. ¶ 12.  United Guaranty has paid these rates for all work on the case by Gibson Dunn during the time period relevant here (2010, with certain time in Dec. 2009 and Jan. 2011 charged at higher rates not sought here), of which the Sanctions Work is but a part, and United Guaranty's parent company, AIG, is currently paying the same rates on another significant matter.  *Id.* These hourly rates are thus "reasonable" under a key measure of "market rates":  the rate at which Gibson Dunn's clients, including United Guaranty, normally pay their attorneys.  *See, e.g., Karo v. Wachovia Bank, N.A.*, 2010 WL 3074393 at *3 (E.D. Va. Aug. 5, 2010) ("the rates charged to paying clients by the petitioning attorneys can assist a court in determining the prevailing market rate"), citing *Rum Creek Coal Sales*, 31 F.3d at 176).

The hourly rates charged by Gibson Dunn are also consistent with rates in the "relevant market," *i.e.*, the market for major national law firms.  Submitted herewith is extensive survey data, drawn from court filings and other sources, addressing hourly fees charged by major national law firms, including data broken down by firms located in the cities from which the Gibson Dunn sanctions litigation team is drawn (New York, Washington and Los Angeles).

This evidence demonstrates that the rates charged in this matter by Gibson Dunn are well in line with rates charged by other major national law firms.  Mr. Mastro's rate in this matter ($941/hour),[1] for example, is well within the range of fees charged by the most experienced attorneys in New York.  *See* Exs. K and L to Millian Decl.  The billing rates for Messrs. Wegner ($801/hour) and Millian ($774/hour), who each have over 25 years' experience, similarly is well within the range of billing rates for attorneys from national law firms in Los Angeles and

---

[1]   The indicated billing rates have been rounded here to the nearest dollar for simplicity.   Exact rates are set forth in exhibits.

Washington with similar experience. *Id.*. The same is true for the other attorneys who have worked on this matter. *Id.*

In short, there is simply no reason for this Court to "cut" the hourly rates sought in the Fee Motion, reflecting the actual "arms-length" rates paid by United Guaranty in this matter. The hourly rates charged are reasonable and should be awarded.

**D.     Consideration of the Amount in Controversy and the Results Obtained, As Well as the Circumstances Surrounding SunTrust's Fraud on the Court and Abuse of the Litigation Process, Further Supports United Guaranty's Fee Request**

SunTrust will, no doubt, attempt both to nitpick the amounts of time that should be deemed "reasonable" with respect to Sanctions Work, and argue that the hourly rates actually charged by United Guaranty's attorneys in this matter should not be used as the basis for a fee award either because they are not in line with Richmond-area rates or for some other reason. In other words, SunTrust will ask this Court to excuse SunTrust from paying a significant portion of the costs ***actually incurred*** by United Guaranty as a result of SunTrust's fraud on the court and abuse of the litigation process. The Court should decline to rule that United Guaranty rather than SunTrust should bear these costs.

We have already addressed above the fact that this case involves many tens of millions of dollars. While conduct such as that engaged in by SunTrust is reprehensible regardless of the amount at stake, such conduct is particularly troubling given the stakes in this dispute. Further, there can be little doubt that SunTrust's misconduct was driven by these stakes, or that SunTrust wished to hide the truth in the hope that doing so would help it recover tens of millions of dollars from United Guaranty. SunTrust's attorneys even discussed, as described above and in the Court's Sanctions Opinion, their concern that confronting Pettitt and obtaining her "confession" that the guidelines matrices reflected the mutually agreed-upon guidelines would indeed

19

foreclose SunTrust's claim entirely.  Fortin's instruction not to confront Pettitt, SunTrust's decision to engage in "willful blindness" including having Pettitt sign a highly suspect (and in fact perjurious) affidavit, and SunTrust's repeated misstatements to this Court regarding the facts and its own misconduct, make clear that SunTrust was fully prepared to obtain tens of millions of dollars from United Guaranty by improper means.

Under these circumstances it is entirely appropriate for the Court to reimburse United Guaranty for its ***actual*** costs for Sanctions Work, and indeed anything less than this cannot be deemed either adequate recompense to United Guaranty or an appropriate penalty for SunTrust. This is not a situation where the Court is simply ruling on a statutory attorneys' fee claim submitted by a prevailing party, is accordingly constrained by the particular standards applicable to that specific claim.  Rather, it is an award of sanctions for clearly reprehensible conduct that goes to the very ability of the judicial process to function in a just manner.

The Court is granted significant discretion in determining what sanctions to impose for SunTrust's misconduct, *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993), and is free to consider the larger question of what sanction or sanctions is appropriate given the misconduct involved and to take into account  considerations that include both compensation to United Guaranty and appropriate punishment of SunTrust.  In such circumstances, there is no reason for the Court not to conduct its "reasonableness" inquiry in light of the actual realities of the situation, including the fact that United Guaranty reasonably and appropriately retained experienced national law firm counsel to handle this matter, and to reimburse United Guaranty for its actual costs incurred as a result of SunTrust's actions.  Particularly in light of these central considerations, the Court should grant United Guaranty the full amount requested for fees and expenses.

## IV.  CONCLUSION

For the foregoing reasons, the Court should grant United Guaranty's Motion for an

Award of Attorneys' Fees and Expenses, and award fees and expenses to United Guaranty in the

sum of 3,946,482.08.


Dated:  May 17, 2011

Respectfully submitted,

_____/s/_____
Wyatt B. Durrette, Jr.
Virginia Bar Number 04719
DURRETTECRUMP PLC
Bank of America Center
1111 East Main Street, 16th Floor
Richmond, VA  23219
(804) 775-6900 (phone)
(804) 775-6911 (fax)
wdurrette@durrettecrump.com

William E. Wegner (admitted pro hac vice)
John C. Millian (admitted pro hac vice)
Christopher Dusseault (admitted pro hac vice)
Brian C. Baldrate (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500 (main phone)
(202) 530-9566 (Millian direct fax)
(202) 530-9684 (Baldrate direct fax)
jmillian@gibsondunn.com
bbaldrate@gibsondunn.com

*Attorneys for Defendant United Guaranty*
*Residential Insurance Company of North Carolina*

101078476.1