IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SUNTRUST MORTGAGE, INC.,

    Plaintiff,

v.                              Civil Action No. 3:09cv529

AIG UNITED GUARANTY CORP.
a/k/a UNITED GUARANTY CORP.,
et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on SUNTRUST MORTGAGE, INC.'S MOTION FOR SUMMARY JUDGMENT ON COUNT I (Docket No. 457).[1]

For the reasons set forth below, SunTrust ("ST") has met its burden to show that the IOF Combo 100 loans (alternatively, "loans") at issue in Count I of the THIRD AMENDED COMPLAINT (Docket No. 121) ("TAC") were covered under the insurance policy. For the reasons set forth below and in the MEMORANDUM OPINION (Docket NO. 448) granting SUNTRUST MORTGAGE, INC.'S MOTION *IN LIMINE* TO PRECLUDE UNITED GUARANTY'S INTRODUCTION OF PAROL EVIDENCE FOR PURPOSES OF ALTERING THE MEANING OF THE PARTIES' UNAMBIGUOUS WRITTEN CONTRACTUAL AGREEMENTS (Docket No.

---

[1] This Memorandum Opinion is the "forthcoming Memorandum Opinion" referred to in the ORDER dated May 13, 2011 (Docket No. 476), granting SUNTRUST MORTGAGE, INC.'S MOTION FOR SUMMARY JUDGMENT ON COUNT I (Docket No. 457).

334) ("motion to exclude parol evidence"), United Guaranty ("UG") has failed to meet its burden of showing that a clear and unambiguous provision in the insurance policy excludes the loans from coverage. Additionally, the material misrepresentation/ fraud affirmative defense (alternatively, "fraud defense") (pled in DEFENDANT UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA, INC.'S ANSWER TO PLAINTIFF'S THIRD AMENDED COMPLAINT (Docket No. 124) ("Answer")) fails as a matter of law. ST, therefore, is entitled to have partial summary judgment entered in its favor on the issue of liability on Count I of the TAC.[2] SUNTRUST MORTGAGE, INC.'S MOTION FOR SUMMARY JUDGMENT ON COUNT I (Docket No. 457) will be granted.

## DISCUSSION

### I.  Procedural History[3]

Count I of the TAC alleges that UG breached the insurance policy executed between the parties by denying claims on IOF

---

[2] Though it is not so termed, ST's motion is in fact a motion for partial summary judgment on the discrete issue of liability. As ST itself states in the motion, the "quantum of damages" on Count I must be "determined in subsequent proceedings." SUNTRUST MORTGAGE, INC.'S MOTION FOR SUMMARY JUDGMENT ON COUNT I (Docket No. 457) at 1. A bench trial on that issue is set for July 18, 2011.

[3] This section provides only basic background for ST's motion. More detail about the parties' businesses, their relationships, and the insurance policy executed between them is set forth in the earlier MEMORANDUM OPINION (Docket No. 448) at 2-10, which is incorporated by reference here.

Combo 100 loans that UG had agreed to insure.[4]  It is undisputed that the insurance policy consists of a "Master Policy," executed circa 1998, and a "Closed-End Purchase Money Seconds – Flow Business Risk Sharing Program," dated June 23, 2004, and a "Closed-End Purchase Money Seconds - Flow Business Risk Sharing Experienced Rating Plan," dated October 17, 2005 ("2005 Flow Plan").[5]

From the time it began issuing the denials of insurance coverage that prompted the filing of this action, and throughout this litigation, UG maintained that it was entitled to deny claims on ST's loans and rescind coverage based on exclusionary language in the insurance policy.[6]  Specifically, UG's position has been that Section 4.14 of the Master Policy excludes from

---

[4] In late 2004, SunTrust developed a mortgage loan product, first offered in 2005, consisting of second lien loans following first lien loans with combined loan-to-value ratios of up to one hundred percent.  The loan product offered the option of an interest-only first mortgage—an "IOF" loan.

[5] TAC at Exs. A, C, D, respectively.

[6] This was UG's position in December 2009 in DEFENDANT UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA, INC.'S ANSWER TO PLAINTIFFS' [sic] AMENDED COMPLAINT AND COUNTERCLAIM (Docket No. 47) ("Counterclaim"), in June 2010 in UG's Answer, in October 2010 in DEFENDANT UNITED GUARANTY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON COUNT I OF SUNTRUST MORTGAGE'S THIRD AMENDED COMPLAINT (Docket No. 189), and in March 2011 in UNITED GUARANTY'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE DEFENDANT'S INTRODUCTION OF PAROL EVIDENCE FOR PURPOSES OF ALTERING THE MEANING OF THE PARTIES' UNAMBIGUOUS WRITTEN CONTRACTUAL AGREEMENTS (Docket No. 350).

coverage "[a]ny claim if the [related] Loan did not meet the Reporting Program Guidelines," where the Reporting Program Guidelines are defined in Section 1.36 of the Master Policy as "the guidelines designated as such in the Reporting Program Manual." The Master Policy's Section 1.37, in turn, defines "Reporting Program Manual" as "the document designated as such by the Company [UG] . . . which contains the Reporting Program Guidelines."

From the commencement of this action, UG unflaggingly has argued that spreadsheets prepared in February 2005 by one of its clerical loan liaisons and attached to a series of emails that were exchanged with ST (the so-called "Guideline Matrices") set forth the underwriting guidelines for the IOF Combo 100 loans at issue in Count I of the TAC. Building upon that contention, UG argued that the underwriting guidelines contained in the Guideline Matrices required a method of underwriting known as "Desktop Underwriting" ("DU"). To support its denial of the insurance claims here at issue, UG endeavored to link the Guideline Matrices to the exclusionary provisions of the insurance policy by arguing that the Guideline Matrices amended the Reporting Program Guidelines referred to in Section 1.37 of the Master Policy so that the Guideline Matrices' terms, including the DU requirement for IOF Combo 100 allegedly set forth therein, became part of the policy. Because ST conceded

4

that the IOF Combo 100 loans on which it had submitted insurance claims were not underwritten using DU, UG asserted that the policy exclusion in Section 4.14 of the Master Policy (entitled "Failure to Conform to Reporting Program Guidelines") permitted UG to exclude ST's loans from coverage, and, in consequence, to deny coverage for ST's claims.

Because UG's exclusion argument depended on the introduction of parol evidence in the form of the Guideline Matrices (and oral and documentary evidence related thereto), ST filed its motion to exclude parol evidence. In that motion, ST argued that, under Virginia law, the Guideline Matrices (and related oral and documentary evidence) were inadmissible to modify what, according to ST, was an unambiguous insurance policy.[7] The Court rejected ST's argument that there was an unambiguous policy provision, but granted ST's motion for other reasons. See generally MEMORANDUM OPINION (Docket No. 448); ORDER (Docket No. 449). Specifically, the Court found a facial inconsistency, and hence a patent ambiguity, on the face of the policy: "The Master Policy . . . designates underwriting guidelines that are set forth and amended by UG—i.e., that are UG in origin. Meanwhile, the 2005 Flow [Plan] . . . designates

---

[7] SUNTRUST MORTGAGE, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE UNITED GUARANTY'S INTRODUCTION OF PAROL EVIDENCE FOR PURPOSES OF ALTERING THE MEANING OF THE PARTIES' UNAMBIGUOUS WRITTEN CONTRACTUAL AGREEMENTS (Docket No. 334) at 7.

underwriting guidelines that are ST in origin." MEMORANDUM OPINION (Docket No. 448) at 19. Accordingly, the Court held that UG's proffered parol evidence of and about the Guideline Matrices was inadmissible "'to supply the understanding that the parties could have reasonably been expected to reach where the language of the instrument reflects no such understanding.'" Id. at 22 (quoting Zehler v. E.L. Bruce Co., 160 S.E.2d 786, 789 (Va. 1968)). Alternatively, the MEMORANDUM OPINION (Docket No. 448) held that, even if the policy's language were read liberally in favor of UG, thereby permitting UG to introduce its proffered parol evidence, a latent ambiguity would persist, id. at 23-24; and that, under Virginia insurance law and federal decisions applying Virginia law, "ST's interpretation, as the one which provides, rather than withholds, coverage . . . would be the interpretation that must prevail . . . as a matter of law," id. at 25.

After oral argument on ST's motion to exclude parol evidence and before the Court had ruled on the motion, UG's counsel was asked to state the effect of granting ST's motion to exclude parol evidence. UG's counsel responded: "If the parol evidence motion brought by SunTrust is granted . . . , the

effect would be to render a summary judgment motion in favor of SunTrust on Count I."[8]  ST's counsel agreed.

Based on the positions of counsel, when the Court granted ST's motion to exclude parol evidence, it also issued an ORDER (Docket No. 450) announcing its intent to enter partial summary judgment in favor of ST and scheduling a conference call to discuss the future course of the litigation.  During that conference call, UG's counsel recanted the statement that granting ST's motion to exclude parol evidence was tantamount to entering partial summary judgment for ST.  Counsel for ST maintained the view that ST was entitled to partial summary judgment on Count I of the TAC.  Therefore, the Court instructed that, if ST considered that it was entitled to partial summary judgment on Count I of the TAC, it should file such a motion and explain why ST thought it was entitled to partial summary judgment.  That, in turn, would afford UG an opportunity, in a responsive brief, to explain why, after reflection, it believed partial summary judgment for ST was in fact not appropriate. The parties' positions are taken from the briefing that ensued.

---

[8] Hearing Transcript (Docket No. 440) 273:3-9.  From the briefing and argument, it is clear that the reference was to a partial summary judgment on the liability issue in Count I of the TAC and not a judgment also on damages.

## II.  Position of the Parties

### A.  ST's Position

ST requests partial summary judgment in its favor on the issue of liability on Count I.  It argues, first, that UG has failed to meet its burden of proving its proffered exclusion and, second, that it has met its *prima facie* burden of showing coverage under the insurance policy.  ST also argues that UG's material misrepresentation/fraud affirmative defense to Count I fails as a matter of law.

On the issue of coverage, ST argues: "The sole basis for United Guaranty's denials of SunTrust's claims and rescission of coverage on the Insured Loans is an assertion that the Policy contains an exclusion excluding from coverage any Insured Loan for which SunTrust failed to obtain DU approval during the underwriting process."[9]  According to ST, UG's asserted exclusion fails as a matter of law because the exclusion is premised exclusively on the Guideline Matrices (and oral and documentary evidence related thereto) and because the Court held in its MEMORANDUM OPINION (Docket No. 448) that UG may not introduce the Guideline Matrices (or documents or testimony related thereto) as evidence; and that, even if UG were permitted to do so, it could not unambiguously establish that the Guideline

---

[9] MEMORANDUM IN SUPPORT OF SUNTRUST'S MOTION FOR SUMMARY JUDGMENT ON COUNT I (Docket No. 458) at 3.

Matrices as the document setting forth the underwriting guidelines for ST's IOF Combo 100 loans. Pursuant to ST's interpretation of Virginia insurance law, the failure of UG's exclusion means that the only question left for decision on the issue of liability for Count I of the TAC is whether ST has met its burden of showing coverage under the policy. ST points to numerous aspects of the record as evidencing coverage of the loans before UG's denial of claims, including Section 1.2 of the Master Policy, testimony of UG executives, UG's denial letters, and UG's pleadings and briefs.[10]

ST contends that UG's fraud defense fails on two accounts. First, ST argues that there is nothing in the record to support UG's allegation that ST made affirmative misrepresentations to UG that the loans had been underwritten using DU.[11] According to ST, the record shows that it acknowledged all along, and never represented otherwise, that the loans had been traditionally underwritten. Second, ST argues that, even if the record supported UG's allegation that ST made affirmative misrepresentations to UG, UG could not show that it reasonably relied on such misrepresentations. ST notes that UG had the right to audit IOF Combo 100 loans at any time under the

---

[10] REPLY MEMORANDUM IN SUPPORT OF SUNTRUST'S MOTION FOR SUMMARY JUDGMENT ON COUNT I (Docket No. 462) at 2-8.

[11] Id. at 14.

insurance policy. ST further notes that UG exercised this right three times and each time found loans that were not underwritten using DU. ST highlights that one of the audits occurred as early as May 2006, more than two years before UG began to deny ST's claims en masse. Citing UG's audit right under the policy and its long-standing knowledge of loans that, in UG's view, failed to conform to the policy's underwriting guidelines, ST argues that, as a matter of law, UG cannot now be heard to claim that it reasonably relied to its detriment on misrepresentations made at the time the loans were submitted for coverage about the method employed to underwrite the loans.[12]

### B. UG's Position

UG advances two rebuttal arguments. UG's first argument is that ST cannot show coverage merely by pointing to the loan certificates it received from UG. According to UG, "[t]he exclusion of evidence that resulted from the Court's ruling on the Motion *in limine* concerning the UG spreadsheets [the Guideline Matrices and related communications] does not itself establish coverage, or provide any positive evidence to prove any of the elements of coverage . . . ."[13]    "[T]o prove

---

[12] Id. at 17.

[13] DEFENDANT UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA'S MOTION IN OPPOSITION TO SUNTRUST MORTGAGE INC.'S MOTION FOR SUMMARY JUDGMENT (Docket No. 460) at 12.

coverage," UG continues, "SunTrust must present evidence of (1) *what* SunTrust document contains Guidelines; (2) *whether* that document was agreed upon by UG; (3) *when* that document contained the Guidelines; (4) *what* the Guidelines actually said; and (5) *whether* the loans at issue met those [G]uidelines."[14] UG contends that an offer of proof on all of the above is necessary because "[t]he policy makes clear that although UG issues a certificate number when SunTrust submits a loan, *coverage* is contingent on a subsequent finding of whether the loan meets the agreed-upon guidelines as SunTrust represented it did." "In other words," posits UG, "the certificates did not speak to whether the loans at issue met the required coverage criteria, which is essential to deciding whether or not coverage exists."[15]

UG roots its interpretation, which ascribes scant weight to the certificates, in Section 3.1(a) of the Master Policy. That section reads in relevant part: "if a loan meets the Reporting Program Guidelines, the insured may submit that loan with a New Loan Reporting Summary Form. . . . Upon receipt of a properly completed New Loan Summary Form . . . , the Company [UG] shall issue a Certificate for such loan." According to UG, Section 3.1(a)'s "if . . ." clause establishes a condition to coverage.

---

[14] Id. at 10.

[15] Id. at 11.

Thus, although UG issued certificates of insurance to ST after ST submitted IOF Combo 100 loans for coverage, the certificates themselves, now says UG, did not confer coverage. Rather, they conferred coverage only if the related loans complied with the Reporting Program Guidelines.[16] UG contends that this system—wherein coverage was conditional on compliance with the underwriting guidelines—was the essence of delegated underwriting effected by the insurance policy. The corollary of this system, UG further contends, is that ST has not met its burden of showing coverage by offering the loan certificates alone. Under UG's interpretation of the policy, ST must also offer proof that the loans conformed to the Reporting Program Guidelines.

UG acknowledges that the MEMORANDUM OPINION (Docket No. 448) granting ST's motion to exclude parol evidence precludes it from arguing that the "SunTrust Mortgage guidelines that are currently being used and have been mutually agreed upon" language[17] in the 2005 Flow Plan refers to the Guideline Matrices (which were UG in origin); but UG argues that the Court's ruling

---

[16] Id. at 4.

[17] In arguing against ST's motion to exclude parol evidence, UG had argued that this phrase in the 2005 Flow Plan referred back to the Reporting Program Guidelines referenced in the Master Policy.

does not absolve ST from having to point to a ST guidelines document to which UG agreed to meet its burden of showing coverage. Here, UG argues that genuine disputes of material fact persist in the wake of the Court's ruling because: (1) the only ST guidelines document to which UG ever agreed did not permit IOF Combo 100 loans as a loan product category; (2) UG never received or agreed to the January 2005 ST guidelines[18] that permitted IOF Combo 100 loans; and (3) even if the Court's parol evidence ruling held that the January 2005 ST guidelines document contained the governing underwriting guidelines, some of the loans at issue in Count I were issued before the execution of the 2005 Flow Plan, and therefore would not be covered under the policy.[19]

UG's second argument is that ST materially misrepresented the IOF Combo 100 loans as having been underwritten using DU when ST submitted the loans for coverage, and, as a result, UG

[18] In briefing its motion to exclude parol evidence, ST argued that the 2005 Flow Plan's reference to "SunTrust Mortgage guidelines" referred to a document entitled "Section 2.60 Combo Second Mortgage Loan Program." That document is Attachment 1 to SUNTRUST MORTGAGE, INC.'S REBUTTAL MEMORANDUM IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE UNITED GUARANTY'S INTRODUCTION OF PAROL EVIDENCE FOR PURPOSES OF ALTERING THE MEANING OF THE PARTIES' UNAMBIGUOUS WRITTEN CONTRACTUAL AGREEMENTS (Docket No. 366). It contains underwriting guidelines for ST's various loan products. It was created in or around January 2005 and employed by ST's underwriters to underwrite IOF Combo 100s loans.

[19] DEFENDANT UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA'S MOTION IN OPPOSITION TO SUNTRUST MORTGAGE INC.'S MOTION FOR SUMMARY JUDGMENT (Docket No. 460) at 14.

need not pay claims on them.[20] UG premises the defense on the joint operation of Sections 3.2(b) and 3.6 of the Master Policy. Section 3.2(b) provides: "The Insured represents to the Company [UG] that . . . each Loan . . . was underwritten by the Insured and complies with the Reporting Program Guidelines . . . ." Section 3.6 states: "The Company [UG] shall have the right, at its option and to the extent permitted by applicable law, to cancel coverage under any Certificate with respect to the related Loan if any of the Insured's representations made with respect to such Loan were materially inaccurate . . . ." UG argues that, pursuant to Section 3.2(b), ST represented that the loans complied with the Reporting Program Guidelines, and thus were underwritten using DU, simply by submitting the loans for coverage under the policy.[21] UG then argues that Section 3.6

---

[20] Although UG does not address the fraud defense in much detail in its brief, UG pleaded the affirmative defense in its Answer and Counterclaim, and it reserved its right to raise the defense in DEFENDANT UNITED GUARANTY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON COUNT I OF SUNTRUST MORTGAGE'S THIRD AMENDED COMPLAINT (Docket No. 189).

　　At oral argument, UG seemed to link its fraud defense to its argument that there are genuine disputes of material fact pertaining to the agreed-to guidelines document which, according to UG, ST must produce in order to meet its *prima facie* burden of showing coverage under the insurance policy. The Court will not address that argument in this section, since it rises or falls with UG's first argument.

[21] DEFENDANT UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA'S MOTION IN OPPOSITION TO SUNTRUST MORTGAGE INC.'S MOTION FOR SUMMARY JUDGMENT (Docket No. 460) at 6.

allows it to deny coverage of ST's loans because, in submitting non-complying loans for coverage, ST made materially false representations under Section 3.2(b).[22]

## III. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact in a case. Fed. R. Civ. P. 56(c). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986). A material fact in dispute appears when its existence or non-existence could lead a jury to different outcomes. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. <u>Id.</u>

Hence, summary judgment is only appropriate when, after discovery, the non-moving party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). When a motion for summary judgment is made, the

_____

[22] <u>Id.</u>

15

evidence presented must always be taken in the light most favorable to the non-moving party. <u>Smith v. Virginia Commonwealth Univ.</u>, 84 F.3d 672, 675 (4th Cir. 1996).

Nevertheless, a party cannot "create a genuine issue of material fact through mere speculation or the building of one inference upon another." <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985). Accordingly, the party who bears the burden of proof at trial cannot survive summary judgment without sufficient evidence to sustain his or her burden of proof on that point. <u>Celotex Corp.</u>, 477 U.S. at 327.

**IV. ST Is Entitled To Partial Summary Judgment On The Issue of Liability for Damages on Count I**

**A. Virginia Insurance Law**

Under Virginia insurance law, the insured bears an initial burden to establish a *prima facie* case that coverage should be triggered. <u>TRAVCO Ins. Co. v. Ward</u>, 715 F. Supp.2d 699, 706 (E.D. Va. 2010). In other words, the burden is on the policyholder at the outset "to bring himself within the terms of the policy." <u>Maryland Cas. Co. v. Cole</u>, 158 S.E. 873, 876 (Va. 1931) (citing <u>Gen. Accident, Fire & Life Assur. Corp. v. Murray</u>, 90 S.E. 620 (Va. 1916)). Once the policyholder makes out a *prima facie* case, the burden shifts to the insurance company to prove an affirmative defense. <u>RML Corp. v. Assurance Co. of America</u>, 60 Va. Cir. 269 (Va. Cir. Ct. 2002). <u>See generally</u> 17A

Couch on Ins. § 254:4 ("It has long been acknowledged that, as a general rule, the burden of establishing a given proposition or issue by the requisite quantum of evidence rests . . . on the party relying on that proposition or issue. . . . This principal is applicable to insurance coverage actions.").

Virginia law is clear that policy exclusions are an affirmative defense and, in consequence, "the burden is upon the insurer to prove that an exclusion applies." Allstate Ins. Co. v. Gauthier, 641 S.E.2d 101, 104 (Va. 2007) (quoting Transcon. Ins. Co. v. RBMW, Inc., 551 S.E.2d 313, 318 (Va. 2001)). Moreover, it is settled in Virginia that "[e]xclusionary language in an insurance policy will be construed most strongly against the insurer." American Reliance Ins. Co. v. Mitchell, 385 S.E.2d 583, 585 (Va. 1989). "Reasonable exclusions not in conflict with statute will be enforced, but it is incumbent upon the insurer to employ exclusionary language that is clear and unambiguous." State Farm Mutual Ins. Co. v. Gandy, 383 S.E.2d 717, 719 (Va. 1989).

Like any contract, insurance policies are to be construed in line with the written intent of the parties, as expressed by the terms the parties have used. Nat'l Hous. Bldg. Corp. v. Acordia of Virginia Ins. Agency, 591 S.E.2d 88, 90-91 (Va. 2004). It is the duty of courts to construe the policy as a whole; and, in the performance of that duty, courts may not

17

treat as meaningless any word thereof, if any meaning, reasonably consistent with other parts of the contract, can be given. Smith v. Ramsey, 82 S.E. 189, 191 (Va. 1914). Thus, "[i]n the interpretation of written contracts, every part of the writing must be made, if possible, to take effect, and every word of it must be made to operate in some shape or other." Tate v. Tate's Ex'r, 75 Va. 522, *1 (Va. 1881) (also published at 1881 WL 6287). If the terms used in the policy are clear and unambiguous and not otherwise defined therein, they are to be taken in their "plain, ordinary, and popular sense." Craig v. Dye, 526 S.E.2d 9, 11-12 (Va. 2000).

### B. UG's Proffered Policy Exclusion Fails As A Matter Of Law[23]

In Virginia, when an insurer invokes an exclusion to deny a claim by the insured, the insurer must be able to point to a clear and unambiguous exclusion in the policy. UG denied claims on ST's loans by relying on a policy exclusion that, according to UG, included the policy's Reporting Program Guidelines. UG then argued that the Guideline Matrices amended the Reporting Program Guidelines such that the Guideline Matrices' notation allegedly requiring the DU method for IOF Combo 100 loans became

---

[23] The issues are addressed in the order that the parties presented them, and that order was based on the fact that there was the previous decision on the motion to exclude parol evidence. Obviously, the threshold issue is whether ST has met its burden to establish coverage. As explained in Section IV.C, ST has met that burden.

part of the policy. UG further argued that the 2005 Flow Plan's reference to "SunTrust Mortgage guidelines" referred back to the Reporting Program Guidelines, and hence to the Guideline Matrices. In short, the Guideline Matrices' purported DU requirement, as incorporated by the policy's reference to Reporting Program Guidelines and SunTrust Mortgage guidelines, constituted UG's proffered exclusion under the policy.

The MEMORANDUM OPINION (Docket No. 448) granting ST's motion to exclude parol evidence found ambiguous the language on which UG relied for its DU exclusion argument. Specifically, it found that the insurance policy's designation of separate underwriting guidelines evidenced a patent ambiguity, or, alternatively, a latent ambiguity that escaped resolution in UG's favor even upon consideration of UG's proffered parol evidence. Because it was limited to consideration of ST's motion to exclude parol evidence, the Court there merely held, based on the patent ambiguity found to be extant in the policy's designation of underwriting guidelines, that the Guideline Matrices (and related oral and documentary evidence) were inadmissible to furnish an interpretation of the policy that the language of the policy did not support. But, with ST now having moved for partial summary judgment on Count I of the TAC, the effect of the MEMORANDUM OPINION's (Docket No. 448) finding of ambiguity (both patent and latent) must be considered as to UG's

19

DU exclusion argument, which was pled as an affirmative defense to liability for damages on Count I of the TAC. Given Virginia law's mandate that the burden is on the insurer to prove an exclusion, and that the exclusion must be clear and unambiguous, another consequence of the previous finding of ambiguity in the policy is that UG's affirmative defense based on the exclusion fails as a matter of law. Thus, for the reasons set forth above and those stated in the MEMORANDUM OPINION (Docket No. 448) at 19-27, which are incorporated by reference here, UG has failed to show a clear and unambiguous exclusion in the policy. ST is entitled to summary judgment in its favor on UG's DU exclusion affirmative defense.

### C. ST Has Met Its Burden Of Showing Coverage Of IOF Combo 100 Loans Under The Policy

Virginia places the initial burden on the insured to bring itself within the insurance policy. At no point in this multi-year litigation did UG seriously contend that ST could not meet its initial burden of showing coverage under the policy. It is only in its latest brief, filed after the MEMORANDUM OPINION (Docket No. 448), that UG has taken the view that ST cannot show that its loans were covered under the policy. Specifically, UG now argues that ST's compliance with the applicable underwriting guidelines was relevant not only to UG's ability to exclude the loans from coverage under Section 4.14 of the Master Policy, but

20

also to ST's ability to establish coverage in the first place under the policy.

UG's change in position in the wake of the MEMORANDUM OPINION (Docket No. 448) granting ST's motion to exclude parol evidence must be viewed for what it is: an effort by UG to escape the necessary consequence of the rejection of the evidence on which UG's exclusion defense was based. The procedural impropriety of UG's move will be discussed in Section IV.D. The substantive inaccuracy of UG's argument is the subject of this section. The record clearly demonstrates that ST has met its burden of showing coverage.

### 1. The Insurance Policy

Insurance policies are to be construed according to the written intent of the parties, and the terms of the insurance policy here evidence that the loans were covered before UG's denial of ST's claims. It is undisputed that UG issued unique certificate numbers for each of the IOF Combo 100 loans shortly after ST submitted them for coverage. Also undisputed is that the certificate numbers served as substitutes for paper certificates.[24] Section 1.2 of the Master Policy leaves no doubt that the function of the certificates—and, by extension, the certificate numbers—was to extend coverage to the loans: "Certificate means the document extending the indicated coverage

---

[24] Counterclaim at 3, ¶ 16.

option to a specified Loan under this Policy" (emphasis added).
UG now claims that Section 3.1(a)—specifically, that section's
introductory clause "[i]f a loan meets the Reporting Program
Guidelines . . ."—makes compliance with underwriting guidelines
a condition to coverage. UG's argument suffers from at least
two textual infirmities, each of which necessitates its
rejection.

First, the text of Section 3.1(a) is inconsonant with the
function UG seeks to assign to that provision. Section 3.1(a)
provides: "[i]f a loan meets the Reporting Program Guidelines,
the Insured may submit that loan with a New Loan Summary
Form . . . ." It is not until the following sentence which is
unmodified by the "if . . ." clause that Section 3.1(a) says:
"Upon receipt of a properly completed New Loan Summary
Form . . . the Company [UG] shall issue a Certificate for each
such Loan." This latter sentence is the only part of Section
3.1(a) that speaks directly to the issue of coverage—the
issuance of a certificate. The "if . . ." clause that animates
UG's argument, therefore, cannot be considered to impose a
condition to coverage. If UG, the author of the policy,[25] wanted
to make compliance with the Reporting Program Guidelines a

---

[25] MEMORANDUM OPINION (Docket No. 448) 3-4 ("It is undisputed
that UG authored all the provisions in the Master
Policy . . . .").

condition to coverage, it could have made that explicit in the policy. That it did not is strong indication that coverage obtained upon issuance of a loan certificate.

Second, UG's interpretation of Section 3.1(a) is inconsistent with other provisions of the insurance policy. Section 4 of the Master Policy is entitled "Exclusions from Coverage." It lists, in separate subsections, sixteen "exclusions" to coverage. One such exclusion is addressed in Section 4.14—"Failure to Conform to Reporting Program Guidelines." Reading Section 4 and Section 4.14 in tandem[26] yields the following language: "The Company [UG] shall not be liable for, and this Policy shall not apply to, extend to or cover the following . . . [a]ny Claim if the Loan did not meet the Reporting Program Guidelines . . . ." Given the inclusion of such language under Section 4's heading "Exclusions from Coverage," it is beyond dispute that failure to comply with underwriting guidelines was intended to provide a basis for an exclusion from, not to constitute a condition to, coverage.[27]

_____

[26] Section 4 contains a phrase that functions as the operative introductory clause to each of Section 4's sixteen enumerated subsections which specify exclusions.

[27] The fact that Section 4.14 employs the phrase "extend to or cover" does not undercut this conclusion in any way. As stated, Section 4.14 is a subsection of Section 4 (one of just seven broad numerical sections in the Master Policy) which is entitled "Exclusions from Coverage." The entire structure of Section 4, and hence the Master Policy, depends on Section 4.14 functioning

Were the Court to accept UG's interpretation of Section 3.1(a), it would have to read Sections 4 and 4.14 out of the policy. That, of course, would contravene Virginia law, which requires the Court to interpret a policy as a whole and, where possible, give meaning and effect to every provision.

UG's position also runs afoul of Section 3.6, entitled "Cancellation of a Certificate by the Company [UG]." That section reads in part: "The Company [UG] shall have the right . . . to cancel coverage under any Certificate with respect to the related Loan . . . " (emphasis added).[28] The underscored language is telling. Far from indicating that coverage is conditional upon compliance with the Reporting Program Guidelines, it recognizes that coverage exists "under" a certificate, with no guidelines-related contingencies. That text in the policy discredits UG's assertion that the certificates alone did not confer coverage on the related loans, and it confirms Section 1.2's definition of certificates as the "document[s] extending the indicated coverage option to [the] specified Loan[s] under [the] policy."

If UG intended the insurance policy to make ST's compliance with underwriting guidelines a condition to coverage, it did not evince such intent in the policy's text. To the contrary, UG

---

as an exclusion.

[28] The underscored phrase is repeated throughout Section 3.6.

wrote Section 1.2 such the loan certificates extended coverage to the insured, and it wrote Section 4 and Section 4.14 such that non-compliance with underwriting guidelines constituted a basis for excluding from coverage loans that had already been extended coverage. Read as a whole, the text of the policy simply does not support UG's contention that compliance with the Reporting Program Guidelines was a condition to coverage.

The best that might be said is that the text on which UG bases its position is ambiguous. Were the Court to reach that conclusion, Virginia law would require that the ambiguity be resolved against UG and in favor of coverage. However, the policy read as a whole is not ambiguous. Instead, it is clear that the language of the insurance policy, standing alone, is a sufficient basis on which to conclude that ST has met its burden to show coverage. Other record evidence merely confirms that coverage was effective upon UG's issuance of loan certificates to ST.

### 2. Testimony of UG's Executives

The testimony of UG's executives substantiates Section 1.2's definition of the loan certificates as the documents extending coverage to the insured. When asked "[w]hat is a mortgage insurance certificate" at his sworn deposition, Alan Atkins, a former president of UG, testified: "a certificate of insurance [was the document] that bound coverage on that

individual loan under the master policy."[29]  Coming, as it does, from one of the UG officials who actually wrote the policy, that testimony provides persuasive evidence in support of the rather clear text: that issuance of the certificate established coverage.  Furthermore, when asked "why United Guaranty issue[d] a mortgage certificate," Jason Bohrer, a former executive at both UG and ST, testified: "[t]o indicate that the insured has insurance."[30]  That testimony confirms that the certificates extended coverage to ST's loans.

### 3.  UG's Denial Letters To ST

The letters that UG sent in the summer and fall of 2008 informing ST that it was denying claims on the IOF Combo 100 loans provide further evidence that the loans were covered.  UG articulated two justifications for the denial of ST's claims in the denial letters: (1) "coverage on this loan is being rescinded . . . ."[31] and (2) "[i]n accordance with the provisions of our Master Policy, AIG United Guaranty reserves all of its rights under the Policy with regard to this loan, including, but not limited to, rescission and exclusion from coverage."[32]

---

[29] REPLY MEMORANDUM IN SUPPORT OF SUNTRUST'S MOTION FOR SUMMARY JUDGMENT ON COUNT I (Docket No. 462) at Ex. 4, at 78:25, 79:3-5.

[30] Id. at Ex. 6, at 113:11-18.

[31] Id. at Ex. 3 (emphasis added).

[32] DEFENDANT UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA'S MOTION IN OPPOSITION TO SUNTRUST MORTGAGE

Neither of UG's articulated reasons for denial disputes that the loans were covered under the policy. Instead, commensurate with the terms of the insurance policy, UG treated non-compliance with the underwriting guidelines as the predicate for an "exclusion" from coverage. UG's use of the word "rescission" is revealing too. In invoking the concept of rescission in the denial letters, UG acknowledged that ST's loans were covered under the policy, coverage being a necessary predicate to rescission in the insurance context. In fact, what UG "rescinded" was, in its own words, "coverage."[33] UG currently asks the Court to defy all common sense and logic and hold that UG's denial letters announced "rescission" of coverage on loans that in fact were never covered under the policy.

UG's denial letters speak for themselves. They serve further to confirm that, contemporaneous with the earliest stages of the dispute between the parties, UG itself believed

INC.'S MOTION FOR SUMMARY JUDGMENT (Docket No. 460) at Ex. 2 (emphasis added). The fact that UG listed rescission and exclusion as non-exhaustive rights under the policy does not advance UG's position. Indeed, UG's isolation of those rights in particular as being expressly contemplated by the insurance policy lends further credence to the notion that the parties intended the policy to treat compliance with the underwriting guidelines as an exclusion from, rather than condition to, coverage.

[33] REPLY MEMORANDUM IN SUPPORT OF SUNTRUST'S MOTION FOR SUMMARY JUDGMENT ON COUNT I (Docket No. 462) at Ex. 3.

ST's loans were covered under the policy, and that the coverage was defeasible because of the application of a policy exclusion.

### 4. UG's Pleadings

Finally, UG's own pleadings acknowledge that the loans were covered before UG's denial of claims. For example, the "Prayer for Relief" in DEFENDANT UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA, INC.'S ANSWER TO PLAINTIFFS' [sic] AMENDED COMPLAINT AND COUNTERCLAIM (Docket No. 47) ("Counterclaim") requests a "declaratory judgment stating that United Guaranty is entitled to deny claims and to rescind coverage under the Master Policy . . . as to any IOF Combo 100 Loan for which SunTrust failed to obtain DU Approval."[34]  Also, the concluding sentence to the section of UG's Counterclaim termed "COUNT I: Declaratory Judgment Regarding IOF Combo Loans" states: "United Guaranty is entitled to deny claims and to rescind coverage with respect to Ineligible IOF Combo 100 Loans."[35]

UG's answers to ST's interrogatories reiterate the position stated in the Counterclaim. In response to "INTERROGATORY NO. 9," which asked UG to "describe the basis for the denial" of claims on ST's loans, UG wrote: "United Guaranty communicated

---

[34] Counterclaim at 30-31, ¶ 1.a (emphasis added).

[35] Id. at 28, ¶ 75 (emphasis added).

any denials of claims to SunTrust via written denial letters. These letters set forth the basis for the denial . . . ." The pertinent language in the denial letters is quoted in Section IV.C.3, so it need not be repeated here. Suffice it to say that, to the extent the letters state a specific basis for denying ST's claims, they take the view that existing coverage can be rescinded because of a policy exclusion. And, to reiterate, rescission is devoid of practical effect unless the loan on which it is sought is covered under the policy.[36] No doubt UG, a sophisticated insurance company, understood this elementary feature of insurance law and its policy when it employed the language that it did in its pleadings.

In sum, ST has met its burden of showing coverage under the insurance policy. The language of the policy, standing alone, evidences UG's intent to extend coverage to the loans from the

---

[36] The Court is aware of instances in UG's pleadings where UG ostensibly takes the position that DU approval was a condition to coverage. For example, UG states in its Counterclaim: "the applicable Guidelines for insurance coverage purposes . . . provide that IOF Combo Loan are covered under the Master Policy . . . only if SunTrust obtains DU Approval . . . ." Id. at 28, ¶ 72. Additionally, UG states in its Answer that it "issued certificate numbers for certain SunTrust loans that United Guaranty undertook to insure, subject to each loan's compliance with the terms and conditions of the applicable Insurance Policies, including the criteria set forth in guidelines spreadsheets." Answer ¶ 17. Simply put, UG has not meaningfully elaborated on or drawn upon such statements during this litigation. When UG has been specific about its reasons for denying claims on ST's loans, it has argued that it was "rescinding" coverage of such loans because they were excluded under Section 4.14 of the Master Policy.

moment the loans were issued unique certificate numbers. Moreover, UG's conduct leading up to and continuing through this litigation—namely, the testimony of its executives and its invocation of the concepts of rescission and exclusion as bases for denying ST's claims—substantiates ST's satisfaction of its initial burden. Lastly, UG's own pleadings confirm that ST's loans were covered. On this record ST has clearly met its burden of showing that the IOF Combo 100 loans at issue in Count I were within the insurance policy executed between the parties prior to UG's denials of claims on such loans.

### D. Procedural Impropriety Of UG's New Position

Even if the record did not show substantively that ST has satisfied its burden (and it does), UG would be procedurally barred from arguing, as it does now—months after the close of discovery, less than two weeks before trial, and on the Court's second pass at summary judgment on Count I—that compliance with the underwriting guidelines was a condition to coverage under the insurance policy.

The decision whether to hear legal arguments raised late in litigation is in the sound discretion of the district court. Foman v. Davis, 371 U.S. 178, 182 (1962). Generally, "surprising" arguments are discouraged. Crest Hill Land Dev., LLC v. City of Joliet, 396 F.3d 801, 804 (7th Cir. 2005) (citing Fort Howard Paper Co. v. Standard Havens, Inc., 901 F.2d 1373,

1380 (7th Cir. 1990)). Courts have granted parties leave to amend pleadings late in litigation when doing so would not cause unfair surprise or undue prejudice to the opposing party, and the newly raised argument was a "logical outgrowth of the evidence." See, e.g., Akrabawi v. Carnes Co., 152 F.3d 688, 693 (7th Cir. 1998). However, courts have denied parties leave to amend pleadings, and thus the ability to raise new legal arguments, when justice so required. See Crest Hill Land Dev., 396 F.3d at 804 (holding that the district court did not abuse its discretion when it denied defendant's motion for leave to amend answer five months after the original answer had been filed and one month after discovery had closed when defendant sought to change its position to pursue new legal arguments against plaintiff); Schwartz & Schwartz of Virginia, LLC v. Certain Underwriters at Lloyd's, London Who Subscribed to Policy No. NC959, 677 F. Supp.2d 890, 898 (W.D. Va. 2009) (holding untimely defendants' motion to amend counterclaim that had been filed eighteen months earlier when motion was filed after close of discovery, would require additional discovery, and would prejudice plaintiff); Commonwealth of Pennsylvania v. Local 542, Int'l Union of Operating Eng'rs, 569 F. Supp. 582, 589 (E.D. Pa. 1983) (stating "'at this very late stage, an interest in orderly litigation cautions against entertaining arguments not previously raised absent very compelling circumstances . . . .

It would be unfair to defendants, after [they] have prevailed on the . . . theories originally presented, to allow plaintiff to test yet another theory . . . .'" (quoting Feeney v. Commonwealth of Massachusetts, 475 F. Supp. 109, 111-12 (D. Mass. 1979) (citations omitted))); see also Johnson v. Trueblood, 629 F.2d 287, 294-95 (3d Cir. 1980); Oreck Corp. v. Whirlpool Corp., 639 F.2d 75, 81 (2d Cir. 1980); Troxel Mfg. Co. v. Schwinn Bicycle Co., 489 F.2d 968, 970-71 (6th Cir. 1973).

Far from a "logical outgrowth of the evidence," UG's belated argument is an attempt to escape the acknowledged consequence of the Court's earlier decision holding inadmissible the Guideline Matrices (and related parol evidence) on which UG's asserted exclusion hinged. UG's position from the nascent stages of this litigation (and, indeed, even before it, as UG's denial letter attest) was that it was rescinding coverage on ST's IOF Combo 100 loans based on a purported exclusion in the insurance policy—specifically, the requirement that the loans conform to the Reporting Program Guidelines which, according to UG, meant that the loans had to have been underwritten using DU. UG's Counterclaim, filed on December 14, 2009, espoused this position. And, UG's briefs addressing issues relevant to Count I articulated and developed this position. For instance, the first substantive heading in UG's October, 5, 2010, brief in support of summary judgment pronounces: "It is Undisputed That

the Policies Contain an <u>Exclusion</u> for Loans That Do Not Meet Applicable Guidelines."[37]   The text under the above-quoted heading goes on to cite Section 4.14 of the Master Policy which, UG claimed (at least at the time), "could not be clearer.  When a loan fails to meet applicable Guidelines, that loan falls under the <u>exclusion</u> to coverage."[38]   Later in the same brief, UG concedes:

> [Count I] turns on whether the Guideline Matrices were the governing Guidelines.  Put differently, the question of whether UG had a contractual obligation to pay SunTrust's claims on IOF Combo 100 Loans, or whether these claims were <u>excluded</u> under the Policies, depends solely on whether the Guidelines Matrices—with their DU approval requirement—constituted the governing Guidelines.[39]

In fairness to UG, its brief in support of summary judgment on Count I at least twice mentions underwriting guidelines being "conditions under which coverage would exist."[40]   But such characterizations of the underwriting guidelines appear only in the brief's preliminary facts section and, even there, only in passing.  They are not mentioned at all in the brief's section

---

[37] DEFENDANT UNITED GUARANTY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON COUNT I OF SUNTRUST MORTGAGE'S THIRD AMENDED COMPLAINT (Docket No. 189) at 12 (emphasis added).

[38] <u>Id.</u> (emphasis added).

[39] <u>Id.</u> at 13 (emphasis added).

[40] <u>Id.</u> at 8.

dedicated to legal argument; instead, that section—for not less than twelve pages—bases UG's denial of ST's claims on an alleged DU exclusion.[41]   Tellingly, the argument section concludes with the following summation of the "Guidelines": "United Guaranty Is Entitled to Summary Judgment [on Count I] Because the Plain Language of the Policy Excludes Coverage for These Loans that Fail to Meet the Applicable Guidelines."[42]

UG relied on its DU exclusion argument in subsequent briefing as well.  On October 15, 2010, in its opposition brief to ST's motion for summary judgment on Count I, in response to ST's argument that UG had waived the DU requirement through the parties' course of dealings, UG contended that ST was "tr[ying] to avoid the fact that the Matrices are the guidelines and that IOF Combo loans are excluded without DU."[43]  Additionally, in its opposition brief to ST's motion to exclude parol evidence filed on March 1, 2011, UG described the operative effect of the

_____

[41] Id. at 11-22.

[42] Id. at 20 (emphasis added).

[43] DEFENDANT UNITED GUARANTY'S OPPOSITION TO SUNTRUST MORTGAGE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I (Docket No. 217) at 20 (emphasis added).  Although in the same brief UG uses language that arguably animates its recent claim that DU approval was a condition to, rather than exclusion from, coverage (e.g., "If the loan *did not in fact* meet the Guidelines, however, *it was not in fact* insured," id. at 11), it is clear from the Master Policy provision which UG cites amid such language, and indeed throughout the brief—Section 4.14—that such language actually was part of UG's DU exclusion argument.

underwriting guidelines as constituting an exclusion from coverage. Specifically, UG cited Section 4.14 for the proposition that "the Master Policy excludes from coverage all loans that fail to meet those guidelines."[44] Although it is true that at one point UG's brief describes the delegated underwriting process implemented by the Master Policy as one where "UG . . . agree[d] [to insure a submitted ST product] subject to whatever conditions UG decided to impose,"[45] the brief neither explains this statement nor refers to Section 3.1(a) of the Master Policy, the provision on which UG bases its belated contention that the guidelines impose a condition to coverage. Finally, UG's "Contentions Regarding Triable Issues," as stated in the proposed final pretrial order tendered by the parties in

---

[44] UNITED GUARANTY'S OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* TO PRECLUDE DEFENDANT'S INTRODUCTION OF PAROL EVIDENCE FOR PURPOSES OF ALTERING THE MEANING OF THE PARTIES' UNAMBIGUOUS WRITTEN CONTRACTUAL AGREEMENTS (Docket No. 350) at 4 (emphasis added).

[45] Id. Alan Atkins made a similar statement in his testimony explaining the effect of the certificates. See REPLY MEMORANDUM IN SUPPORT OF SUNTRUST'S MOTION FOR SUMMARY JUDGMENT ON COUNT I (Docket No. 462) at Ex. 4, at 79:1-3 (stating, in submitting a certificate, "[t]he lender has . . . represented and warranted that they have met the materials and conditions that [the parties] agreed upon"). However, Mr. Atkins' statement, like the statement in UG's brief quoted above, does little to advance UG's argument when it was never meaningfully explained during the litigation. And, in any event, Mr. Atkins clarified his statement by saying that the "issu[ance] of a certificate of insurance . . . bound coverage on that individual loan under the master policy." Id. at Ex. 4, at 79:3-5. Notably, he did not say that coverage was conditional.

April 2011, nowhere mention DU approval as being a condition to coverage under the policy.[46]

Given UG's consistent position throughout this litigation—from its early pleadings to the parties' proposed final pretrial order—that non-compliance with DU was a basis for invoking an exclusion under the policy, not a basis for claiming that ST's loans were never covered in the first place, there can be no doubt that permitting UG to raise its DU-as-a-condition-to-coverage argument now would impose undue prejudice on ST. The evidentiary record in this case has been developed and discovery has closed. If UG truly believed that its newly minted argument had merit, it had ample opportunity to advance that argument in its pleadings and elaborate on it in its briefs in the one year and nine months since UG filed its first responsive pleading.[47] Doing so would have allowed ST to tailor its discovery and litigation strategy toward fleshing out, and ultimately

---

[46] Proposed Final Pretrial Order at 339. The proposed final pretrial order was not entered by the Court owing to developments in the litigation, including, but not limited to, the Court's ruling on ST's motion to exclude parol evidence, which mooted a substantial portion of the proposed order. Nevertheless, to the extent that the proposed order gave ST and the Court notice—or, more precisely, failed to give both notice—of UG's DU-as-a-condition-to-coverage argument, it is relevant in assessing the fairness of permitting UG to advance that argument now.

[47] DEFENDANT UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA'S ANSWER TO COUNT I (Docket No. 8) was filed on August 31, 2009.

combating, UG's position. But, because UG raises the argument for the first time in any meaningful sense at this extremely late juncture, less than two weeks before trial, ST has had no such opportunity. It would work an injustice upon ST to permit UG to proceed as it desires.

To allow the new theory also would affront basic notions of judicial economy. The Court has ruled—after careful deliberation, research, and exegesis of the insurance policy—on the issues as they have been presented by the parties. While it is axiomatic that civil defendants have considerable freedom to assert and develop defenses to the claims leveled against them, their freedom is not absolute.

One of the reasons why courts have discretion not to hear arguments raised late in the process is to safeguard the finality of decisions. Civil litigation, particularly in the federal system, is already a long, drawn-out process that imposes substantial costs on parties, the judiciary, and ultimately the taxpayer. Were courts not equipped with the discretion to reject surprise arguments raised in the wake of, and as a means around, adverse rulings, courts would be powerless to shepherd cases to a final outcome that respects citizens' rights to have their claims tried judiciously in a court of law. UG attempts to steer the Court, and ST too, down a circular path. In re-characterizing DU approval as a

condition to coverage, UG effectively asks the Court to vacate the MEMORANDUM OPINION (Docket No. 448) and ORDER (Docket No. 449) granting ST's motion to exclude parol evidence. To the extent UG objects to the Court's ruling, the proper course is to appeal the decision to the Fourth Circuit; it is not to attack the decision through arguments that, on the eve of trial, it has neither pleaded nor briefed with specificity.

UG's conduct is similar to that rejected by the Tenth Circuit in Elephant Butte Irrigation District of Mexico v. U.S. Department of the Interior, 538 F.3d 1299 (10th Cir. 2008). In Elephant Butte, the plaintiffs attempted to raise a breach of contract theory for the first time on a motion for reconsideration of the district court's summary judgment ruling. The district court refused to hear the plaintiffs' contract argument. It noted that, while the plaintiffs had made oblique references in their summary judgment papers and final pretrial order to issues that arguably supported a breach of contract claim, it concluded that the plaintiffs had waived such a claim by failing to raise it with sufficient specificity to put the Court and the opposing parties on notice. Elephant Butte, 538 F.3d at 1302-03. Also important was that "the [plaintiffs] did not explicitly raise their contract theory in a timely manner, but instead belatedly sought to 'bootstrap' their new argument on a broader theory of statutory interpretation." Id. at 1303.

Here, UG likewise endeavors to raise an argument that, if made at all, was made in such vague terms that neither ST nor the Court was put on notice of its being made. Moreover, like the plaintiffs in Elephant Butte, UG attempts to resurrect a previously rejected argument by recasting it in different terms. As Elephant Butte confirms, the Court has discretion to nip such mischief at the bud.

### F. UG's Other Arguments Fail As A Matter Of Law

The Court need not address UG's other arguments respecting ST's ability to show coverage under the policy because they all rest on the erroneous assumption that, in order to meet its burden of showing coverage, ST must point to a ST document containing the operative guidelines. The insurance policy makes clear that when UG issued unique certificate numbers for ST's IOF Combo 100 loans it was extending coverage to the loans. This is not to say that UG's issuance of certificate numbers thereafter precluded UG from denying claims on loans by invoking an operative exclusion in the policy;[48] but it is to say that UG's issuance of certificate numbers thereafter precluded UG from denying that the loans were ever covered at all. The loans' compliance or non-compliance with the underwriting guidelines—whatever those guidelines said and wherever they were

---

[48] But, as explained above in Section IV.B, under settled principle of Virginia law, UG's effort to rely on the exclusion on which it relied to deny coverage fails as a matter of law.

to be found—simply has no bearing on ST's ability to bring itself within the policy on this record. Accordingly, UG's arguments that ST cannot show that it complied with guidelines that (1) permitted IOF Combo 100 loans, (2) UG received and agreed to, or (3) aligned temporally with all of the loans at issue in Count I are without merit.

## V.   UG's Material Misrepresentation/Fraud Affirmative Defense

### A.   Virginia Insurance Law

For an insurance company to deny a claim on the basis of an alleged misrepresentation by the insured, it must prove three elements by "clear proof": (1) that the statement on the application was false; (2) that the company's reliance on the false statement was material to its decision to incur the risk and issue the policy; and (3) that the company reasonably relied upon the false representations of the insured. See Commercial Underwriters Ins. Co. v. Hunt & Calderone, P.C., 540 S.E.2d 491, 493 (Va. 2001). In ruling on summary judgment, "the judge views the evidence presented through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). The Supreme Court of Virginia has held that "clear proof" is a lower evidentiary burden than "clear, cogent, and convincing evidence," the burden of proof that obtains in

fraud claims outside the insurance context.[49]  Old Republic Life
Ins. Co. v. Bales, 195 S.E.2d 854, 856 (Va. 1973).  Although it
appears that the Supreme Court of Virginia has not yet defined
"clear proof," the Court takes the phrase, at minimum, to set a
higher evidentiary standard than mere preponderance of the
evidence.[50]

### B.   UG's Fraud Defense Fails As A Matter Of Law Because The Record Does Not Evidence A False Statement By ST

The first flaw with UG's argument is that no evidence in
the record shows that ST made a false statement to UG when the
former submitted its IOF Combo 100 loans for coverage under the
policy.  UG's defense as much acknowledges this reality when it
pins ST's allegedly fraudulent conduct wholly on ST's supposed
failure to conform to the terms of the insurance policy.  ST's
"INTERROGATORY NO. 11," which asks UG to explain its affirmative
defense, prompted the following answer from UG:  "[t]he Master
Policy, Section 3.2, . . . required SunTrust to represent to
United Guaranty, inter alia, that SunTrust underwrote each loan,
followed prudent underwriting procedures, and that each loan

---

[49] Fraud claims in insurance cases are governed by Va. Code 38.2-309 which says in part: "No statement in an insurance application . . . shall bar a recovery upon a policy of insurance unless it is clearly proved that such answer or statement . . . was untrue."

[50] The governing burden of proof, or its precise contours, is of no consequence here.  UG's affirmative defense fails as a matter of law no matter what evidentiary burden is applied.

complied with the Reporting Program Guidelines and the Reporting Program." According to UG, its "review of SunTrust's claims as well as [its] periodic audits of SunTrust's loans demonstrate that SunTrust failed to live up these representations . . . ."

UG cannot prove a misrepresentation, much less a material one, by showing that a party failed to "live up" to a contractual provision. See Richmond Metro. Auth. v. McDevitt Street Bovis, Inc., 507 S.E.2d 344, 559 (Va. 1998) (stating "[plaintiff] may have breached each one of these contractual duties, but its actions do not give rise to a cause of action for actual fraud . . . . [Plaintiff] has alleged only [defendant's] breach of contractual obligations 'because no duty apart from the contract to do what is complained of exists'" (quoting Oleyar v. Kerr, 225 S.E.2d 398, 399 (Va. 1976))); see also Strum v. Exxon Co., 15 F.3d 327, 331 (4th Cir. 1994) (stating "[t]he mere failure to carry out a promise in contract . . . does not support a tort action for fraud"). The law differentiates between a breach of contract claim and a fraud claim for good reason; to prove one is not to prove the other. If anything, UG's answer to Interrogatory No. 11 outlines a breach of contract claim. It does not prove a misrepresentation.

To succeed on a fraud claim, a party must show, by clear proof, that the opposing party made a false statement. Nothing

in the record supports the conclusion that ST made a false statement to UG in the performance (or, for that matter, non-performance) of the insurance policy.

## C. UG's Fraud Defense Fails As A Matter Of Law Because UG Cannot Show Reasonable Reliance

Even if the record clearly evinced a false statement by ST (and it does not), UG's argument would suffer from a second flaw: UG, on this record, cannot show reasonable reliance on what it contends to be ST's false statement. Pursuant to Section 7.6 of the Master Policy, UG had the right to audit loans insured under the policy. The record establishes that UG audited ST's loans as early as May 2006 and found nine loans not to have been underwritten using DU.[51] The record also establishes that UG audited ST's loans in December 2006 and February 2008 and, respectively, found five and fifteen loans that had not been underwritten using DU.[52] Although UG rescinded coverage and refunded past premiums on the loans that, by its determination, were not in compliance with the policy's underwriting guidelines, UG did not thereafter conduct comprehensive audits of other IOF Combo 100 loans or otherwise investigate the prevalence of non-DU IOF Combo 100 loans in the policy's loan pools. Instead, UG continued to collect premiums

---

[51] REPLY MEMORANDUM IN SUPPORT OF SUNTRUST'S MOTION FOR SUMMARY JUDGMENT ON COUNT I (Docket No. 462) at Ex. 7.

[52] Id. at Ex. 8.

on the IOF Combo 100 loans. Having been complacent as early as May 2006 and two times subsequently in the face of evidence that significant numbers of ST's loans had not been underwritten using DU, and thus were not in compliance with UG's conception of the underwriting guidelines, UG cannot presently argue, years after it was first put on notice of the potential of a significant allotment of nonconforming loans, that it reasonably relied to its detriment on some contrary representations (even if there were any) effectuated by ST's submission of loans for coverage. Armed with a sweeping right to audit ST's loans and being in possession of information that would have alerted a reasonable insurer (especially a sophisticated insurer like UG) to the prospect of material, wide-scale misrepresentations by ST years before UG raised its fraud defense, UG cannot now claim that it was duped by ST into covering the loans. The law does not afford a remedy under those circumstances. The Fourth Circuit's decision in Foremost Guaranty Corp. v. Meritor Savings Bank, 910 F.2d 118 (4th Cir. 1990), illustrates this feature of the law on facts similar to these. 910 F.2d at 125 (holding that insurer was not reasonable to rely on oral representations of the insured that were inconsistent with papers and records in the insurer's possession).

UG's fraud defense fails as a matter of law. As a result, ST is entitled to summary judgment in its favor on the fraud defense.

## CONCLUSION

For the reasons set forth above, SUNTRUST MORTGAGE, INC.'S MOTION FOR SUMMARY JUDGMENT ON COUNT I (Docket No. 457) will be granted.

It is so ORDERED.

_____/s/_____ REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: June 30 , 2011

45