IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


SUNTRUST MORTGAGE, INC.,

    Plaintiff,

v.                            Civil Action No. 3:09cv529

UNITED GUARANTY RESIDENTIAL
INSURANCE COMPANY OF NORTH
CAROLINA,

    Defendant.


### MEMORANDUM OPINION

This matter is before the Court, following a bench trial, on SunTrust Mortgage, Inc.'s ("ST") affirmative defense to Count IV of DEFENDANT UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA, INC.'S ANSWER TO PLAINTIFFS' [sic] AMENDED COMPLAINT AND COUNTERCLAIM (Docket No. 47) ("Counterclaim").[1]

For the reasons set forth below, ST has met its burden on the affirmative defense (alternatively, "first material breach defense"). Judgment therefore will be entered for ST on Count IV of UG's Counterclaim.

---

[1] ST pled the affirmative defense in SUNTRUST MORTGAGE, INC.'S ANSWER TO UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA, INC.'S COUNTERCLAIM (Docket No. 63) at 16 in alleging: "United Guaranty materially breached the subject contract(s) first, thus precluding it from obtaining any relief or recovery thereunder."

## PROCEDURAL HISTORY

Count IV of UG's Counterclaim seeks a "declaratory judgment stating that SunTrust is obligated under [the insurance policy] to continue making annual renewal premium payments on all loans in each of the Loan Pools, notwithstanding that the Maximum Cumulative Liability amount has been reached with respect to a particular Loan Pool."[2]   On April 26, 2011, the Court entered summary judgment for UG on Count IV of the Counterclaim.[3] Specifically, it held: "[t]he insurance policy clearly and unambiguously requires SunTrust . . . to pay annual premiums to United Guaranty . . . for the life of the insured loans, notwithstanding that UG's Maximum Cumulative Liability . . . for loss on those loans has been reached."[4]   However, in so holding, the Court failed to address ST's first material breach defense, which was pled by ST as an affirmative defense to Count IV of the Counterclaim[5] and which had been briefed, albeit in a skimpy

---

[2]   Counterclaim at 32, ¶ 4.a.

[3]   See generally ORDER (Docket No. 452); MEMORANDUM OPINION (Docket No. 451).   The procedural history predating the Court's entry of summary judgment in favor of UG on Count IV of the Counterclaim is set forth in the MEMORANDUM OPINION (Docket No. 451) at 2-3.

[4]   MEMORANDUM OPINION (Docket No. 451) at 2.   The basis for the Court's holding is set forth more fully in the MEMORANDUM OPINION (Docket No. 451) at 15-23.

[5]   Counterclaim at 32, ¶ 4.a.

fashion, in opposing UG's motion for summary judgment on Count IV.[6]

ST's first material breach defense was that UG materially breached the insurance policy by "(a) continuing to collect and failing to refund premiums on [performing] IOF Combo 100 Loans[7] when United Guaranty knew it would not pay claims on those loans; and (b) relying on a legally unsupportable basis for

---

[6] See SUNTRUST MORTGAGE, INC.'S BRIEF IN OPPOSITION TO DEFENDANT UNITED GUARANTY'S MOTION FOR SUMMARY JUDGMENT ON COUNT IV OF ITS COUNTERCLAIM (Docket No. 216) at 22-24. There in fact were two rounds of summary judgment briefing on Count IV of the Counterclaim. The first round followed DEFENDANT UNITED GUARANTY'S MOTION FOR SUMMARY JUDGMENT ON COUNT IV OF ITS COUNTERCLAIM AGAINST PLAINTIFF SUNTRUST MORTGAGE (Docket No. 186), which was filed on October 4, 2010. Finding genuine disputes of material fact on the record then before it, the Court denied that motion on December 10, 2010. ORDER (Docket No. 310). The second round followed ST's MOTION FOR JUDGMENT ON THE PLEADINGS ON COUNTERCLAIM COUNT IV OR, IN THE ALTERNATIVE, RENEWED REQUEST FOR ENTRY OF SUMMARY JUDGMENT (Docket No. 354), which was filed on March 4, 2011, and which prompted UG to file DEFENDANT UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA'S RENEWED MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM COUNT IV. Those motions culminated in the ORDER (Docket No. 452) and MEMORANDUM OPINION (Docket No. 451) entering summary judgment for UG on Count IV of the Counterclaim. The Court overlooked ST's affirmative defense in the MEMORANDUM OPINION (Docket No. 451) because, while that issue was clearly briefed in the first round of summary judgment briefing, it was but briefly raised in the second.

[7] "IOF Combo 100 Loans" are the type of loans at issue in Count I of the THIRD AMENDED COMPLAINT (Docket No. 121). They consist of a second-lien loan made behind an interest-only first-lien loan with a combined loan-to-value ratio of up to 100%. Trial Transcript of Evidentiary Hearing of May 25-26, 2011:65:12-66:3, 66:22-69:4.

denying SunTrust's claims [on defaulted IOF Combo 100 Loans]."[8]
The consequence of those alleged breaches, said ST, was that UG
may not "enforc[e] any contractual obligation of SunTrust to
continue paying renewal premiums under the Policy."[9]

The Court realized its failure to consider ST's first
material breach defense in a conference call with the parties on
May 3, 2011. To allow ST to be heard on its affirmative
defense, the Court vacated the order entering summary judgment
for UG on Count IV of the Counterclaim.[10] A briefing schedule
was set for ST's first material breach defense and the issue was
set for oral argument on May 23, 2011, with an evidentiary
hearing to follow, if necessary, on May 25, 2011.[11] The Court
heard oral argument on ST's first material breach defense, and,
finding genuine disputes of material fact, received evidence on
the affirmative defense on May 25-26, 2011. That, in effect,
was a denial of SUNTRUST MORTGAGE, INC.'S MOTION FOR SUMMARY
JUDGMENT ON COUNT IV OF UNITED GUARANTY'S COUNTERCLAIM (Docket
No. 468), which ST filed on May 9, 2011, pursuant to the

---

[8] MEMORANDUM IN SUPPORT OF SUNTRUST'S MOTION FOR SUMMARY JUDGMENT
ON COUNT IV OF UNITED GUARANTY'S COUNTERCLAIM (Docket No. 469)
at 15.

[9] Id. at 3.

[10] ORDER (Docket No. 459).

[11] Id.

briefing schedule set by the Court. Following the bench trial, the Court ordered the parties to file post-trial findings of fact and conclusions of law.[12] The Court informed the parties that consideration of ST's first material breach defense would be limited to evidence adduced at the bench trial.[13] Accordingly, the Court's findings of fact are based exclusively on evidence received at trial.

Of course, Count IV of UG's Counterclaim is just one part of this litigation, it having developed out of the events which gave rise to ST's breach of contract claim, as presented in Count I of the THIRD AMENDED COMPLAINT (Docket No. 121) ("TAC"). In brief, Count I of the TAC alleges that UG breached the insurance policy when, from the spring of 2007 through 2009, it denied ST's claims on IOF Combo 100 Loans.[14] Count I of the TAC thus overlaps the second of the two alleged breaches in ST's first material breach defense: that UG breached the insurance policy by denying claims on IOF Combo 100 Loans.

---

[12] ORDER (Docket No. 492).

[13] See id. ("The [post-trial] briefs shall cite to the record by page and line number and shall not cite to, or otherwise rely on, evidence that was not admitted at the bench trial on the merits of SunTrust's affirmative defense to Count IV of [the Counterclaim].").

[14] The Court has set forth the allegations in Count I of the TAC in detail in prior opinions. See MEMORANDUM OPINION (Docket No. 403) at 3-4; MEMORANDUM OPINION (Docket No. 448) at 2-3.

ST was awarded summary judgment on Count I of the TAC on May 13, 2011. The Court held that UG's denial of claims on IOF Combo 100 Loans breached the insurance policy.[15] It therefore is not necessary to decide in this opinion whether UG's denial of claims on IOF Combo 100 constituted a breach of the insurance policy. It did.

The questions that must be answered now are whether the improper collection of premiums alleged in ST's first material breach defense was in fact a breach of the insurance policy, and, if so, whether that breach, and the breach already found by the Court, were material in view of the policy. Some preliminary procedural questions must be answered as well, but the substantive questions are limited to those outlined above.

## FINDINGS OF FACTS

ST is a corporation based in Virginia. It is a subsidiary of SunTrust Bank.[16] ST's business is the origination of mortgage loans on residential real property. It sold some loans, retained others in its portfolio, and serviced those that it retained as well as some that it sold. See Trial Transcript of

---

[15] The reasons for the Court's holding are set forth in the MEMORANDUM OPINION (Docket No. 448) and the MEMORANDUM OPINION (Docket No. 518), which are incorporated by reference here.

[16] UG is a North Carolina corporation with its principal place of business in Greensboro, North Carolina. Jurisdiction lies under 28 U.S.C. § 1332, there being diversity of citizenship and the amount in controversy exceeding $75,000.00.

Evidentiary Hearing of May 25-26, 2011 ("Trial Tr.") 53:15-17;
see also id. at 55:1-6.

UG provided ST with mortgage insurance to cover losses on
second-lien loans in the event of borrower default.   Id. at
258:20-24.  A written insurance policy effectuated the coverage.
The policy consisted of a "Master Policy" issued circa 1998, as
modified by a "SunTrust Mortgage Agreement Closed-End Purchase
Money Seconds-Flow Business Risk Sharing Program - June 23,
2004" ("2004 Flow Plan") and a "SunTrust Mortgage Agreement
Closed-End Purchase Money Seconds-Flow Business Risk Sharing
Experienced Rating Plan - October 17, 2005" ("2005 Flow Plan").[17]

Under the insurance policy, the insured party, ST,
underwrote the loans and submitted them for coverage on a
monthly basis.  The insurer, UG, in turn extended coverage to
the loans that ST had submitted by issuing them unique
certificate numbers.  See ST Ex. 3 §§ 1.2, 3.1(a); Trial Tr.
271:12-13.  In addition to evidencing coverage under the policy,
the certificate numbers assisted UG in tracking the loans,
verifying that premiums had been paid on them, and, among other
things, qualifying and processing claims on them.   Trial Tr.
271:14-18.

UG did not endeavor to determine whether a submitted loan
in fact conformed to the underwriting parameters unless and

---

[17] These documents are ST Exs. 3, 4, and 5, respectively.

until ST made a claim on the loan.   If, after a claim was made on a loan, UG determined that the loan did not in fact meet the agreed-to parameters, UG rescinded coverage on the loan and returned any premiums that it had collected on the loan.

All the loan products covered under the policy fell under an umbrella of products referred to as "Combo Loans."   Id. at 69:21-25, 70:6-10.   ST began offering Combo Loans around 2000 and continued to offer them when it filed this action in July 2009.   Combo Loans were second-lien mortgage loans that had been originated with a first-lien mortgage loan on the same parcel of real estate.   Id. at 54:6-55:19.   ST generally sold the first-lien mortgage loan on the secondary market and retained the second-lien loan for its loan portfolio and had it insured.   Id. at 55:1-6.

ST offered at least eight general types of Combo Loans between 2000 and 2009.   Id. at 264:3-13.   See generally UG Ex. 48.   One such type of Combo Loan permitted borrowers to obtain loans with a maximum loan-to-value ratio of up to 90%; another type permitted borrowers to obtain loans with a maximum loan-to-value ratio of up to 95%; and a third type permitted borrowers to obtain loans with a maximum loan-to-value ratio of up to 100%.   All of the loan products were further characterized by customizing features that the borrowers selected—for instance, first- and/or second-lien loans that required interest-only

payments for a specified period of time, first- and/or second-lien loans that required principal and interest payments for a specified period of time, or some combination thereof. See, e.g., ST Ex. 34 at 24-99. The loans at issue here are second-lien loans made behind an interest-only first-lien loans with a combined loan-to-value ratio of up to 100%. See n.7, supra.

The second-lien loans were the riskier of the two loans on a real estate parcel. This fact was not lost on ST. It understood that, in the event of foreclosure, the amount owed on the second-lien loans would be satisfied only after the amount owed on the first-liens had been satisfied. Trial Tr. 55:5-11, 56:23-58:24. It also understood that the risk associated with the second-lien loans would increase in a declining residential real estate market. See id. at 57:16-58:24. ST understood, too, that the residential real estate market historically was prone to fluctuation. See id. at 60:15-61:17. Being aware of such risks, particularized and systemic, ST paid UG for mortgage insurance on the second-lien loans in its portfolio. Id. at 55:4-11, 60:11-13. ST "borrow[ed] on [its] earnings in the good times[] to protect [itself] in the bad times." Id. at 61:9-17.

From the insurance policy's inception, all the insured loans were grouped into loan pools. Each loan pool corresponded to a "Policy Year," which Section 1.33 of the Master Policy defined as the "annual period from the Effective Date of this

Policy until 12:01 a.m. (Eastern Time) of the same day of the following year and each subsequent time period similarly calculated." ST Ex. 3 § 1.33. The effect of Section 1.33 was that all loans issued in a twelve-month interval, the beginning of which was marked by the "effective date of [the] Policy," were placed in the same pool. Trial Tr. 70:17-21; see also ST Ex. 71 ¶ 11. The individual characteristics of the loans therefore had no bearing on their placement in the pools; the singular determinant was their date of origination. This method of placing the loans in pools resulted in the pools each containing different types and quantities of Combo Loans. Trial Tr. 71:16-20.

In the policy's nomenclature, the "maximum cumulative liability" referred to UG's coverage obligation under the policy. Pursuant to Section 1.26 of the Master Policy, the maximum cumulative liability was based on a percentage of the aggregate total of the loan amounts insured in each pool. Specifically, the maximum cumulative liability was "an amount to be determined for each Policy Year" that was equal to ten percent of the aggregate total of the insured loan amount in a pool,[18] less ten percent of the aggregate total of the loan

---

[18] The 2004 Flow Plan and 2005 Flow Plan modified UG's ten percent coverage obligation under the Master Policy by instituting a "risk share program" under which the parties agreed to pay loan losses in three, alternating layers. Under

amount in a pool for which coverage had ceased for certain enumerated reasons, including rescission of a loan ("cancell[ation] by [UG] in accordance with Section 3.6") and exclusion of a loan from coverage ("exclu[sion] under Section 4"). ST Ex. 3 § 1.26.

Two realities followed from the maximum cumulative liability being so determined. First, each pool imposed its own coverage obligation on UG. This meant that UG's coverage obligation for a particular loan extended only so far as its coverage obligation for the pool containing the loan. Second, each pool imposed a coverage obligation on UG that, in being dependent on the total amount insured in the pool (which, of course, changed as new loans were insured, loan amounts were paid down, and coverage of existing loans was cancelled), was variable in nature.

Although a pool corresponded to a "Policy Year," the amount in the most current pool (i.e., the one to which newly originated loans were added) was updated on a monthly basis. At

---

the 2004 Flow Plan, UG agreed to pay the first two percent of losses; ST agreed to pay losses exceeding two percent but not exceeding five percent of a pool's gross loan proceeds; and UG agreed to pay losses exceeding five percent but not exceeding ten percent of a pool's gross loan proceeds. ST Ex. 4. Under the 2005 Flow Plan, UG agreed to pay the first five percent of losses; ST agreed to pay losses exceeding five percent but not exceeding eight percent of a pool's gross loan proceeds; and UG agreed to pay losses exceeding eight percent but not exceeding ten percent of a pool's gross loan proceeds. ST Ex. 5.

the end of each month, ST bundled the Combo Loans that it had issued during the month and submitted the loans for coverage. Trial Tr. 73:14-21, 74:5-11. When the twelve-month period allotted for a loan pool expired, the loan pool was closed, meaning that no other Combo Loans would be added to it, and another loan pool was commenced. Loans were then added to the newly created pool on a recurring monthly basis for the next twelve months. The insurance policy called for this process to be repeated ad infinitum. See ST Ex. 3 § 1.33.

The Master Policy established the basic framework for the payment of premiums. Section 3.3 of the Master Policy provided for the payment of an "Initial Premium" for each newly insured loan under the policy. Id. § 3.3. Section 3.4 of the Master Policy provided for the payment of "Renewal Premiums" on the loans for which an initial premium already has been paid: "[t]he insured's obligation for the payment of [renewal] premium due . . . shall continue for each Loan insured [under the policy] . . . notwithstanding the payment by [UG] of Losses . . . during a Policy Year in an amount equal to the Maximum Cumulative Liability for such Policy Year . . . ." Id. § 3.4. Although Sections 3.3 and 3.4 stated that an initial premium and renewal premium, respectively, were to be paid for each loan insured under the policy, they did not specify how those premiums were to be calculated.

12

Before the 2005 Flow Plan, UG calculated the premiums without reference to language in the insurance policy. UG's actuaries analyzed data of every loan with all lenders, not just ST, that UG had insured dating back twenty years. Then, based on the analysis of that data, the actuaries established rate factors for each general category of ST loan that was insured under the policy, with each rate factor corresponding to the predicted risk of the loan category to which it was to be applied. The premium for each loan was calculated by applying the rate factor matching that loan's category to the outstanding balance of the loan. See Trial Tr. 285:20-287:3.

The 2005 Flow Plan changed the method of calculating the premiums and, for the first time, linked the calculation of the premium to language in the insurance policy. In the mid-2000s, in response to ST's requests for lower premiums, UG offered ST the opportunity to have the performance of its entire loan portfolio "earn" lower premiums. Id. at 275:3-10. UG did this because it valued ST's business and because ST's portfolio had outperformed the majority of its other lenders' portfolios. See id. at 274:20-275:15. The 2005 Flow Plan accordingly established an "Experience Rating Plan": "a special lender pay program that features potential changes in the rate for new and existing business based on the cumulative loss ratio of the insured business." ST Ex. 5. Notwithstanding that the Combo

Loans insured under the policy had different risk characteristics (as evidenced by the fact that they had been assigned different rate factors before the 2005 Flow Plan according to the general loan category), the 2005 Flow Plan called for the "cumulative loss ratio" to be calculated by taking the cumulative losses paid out by UG on all the loans insured under the policy and dividing that figure by the cumulative premiums collected by UG on all the loans insured under the policy. Id.; Trial Tr. 276:19-277:14. Also according to the 2005 Flow Plan, the cumulative loss ratio was to be calculated each calendar year (after the 2005 Flow Plan went into effect) using the loss and premium data for the most recent seven-year experience of all the loans insured under the policy.[19] ST Ex. 5.

UG was to apply a rate factor to the outstanding balances of all the loans insured under the policy according to a table in the 2005 Flow Plan listing eleven different rate factors for eleven different cumulative loss ratio ranges. The rate factors increased as the values in the cumulative loss ratio ranges increased as set forth below:

---

[19] This seven-year look-back was not to go past the execution of the 2005 Flow Plan. Thus, for the first six years under 2005 Flow Plan, UG was to use data encompassing a period of time that in fact was shorter than seven years. See Trial Tr. 283:18-23.

| Paid Loss Ratio | Annual Rate |
|:---:|:---:|
| 0-15 | 0.35% |
| 15-25 | 0.40% |
| 25-35 | 0.50% |
| 35-45 | 0.60% |
| 45-55 | 0.70% |
| 55-65 | 0.80% |
| 65-75 | 0.95% |
| 75-85 | 1.00% |
| 85-90 | 1.05% |
| 90-100 | 1.15% |
| 100+ | 1.35% |

Id.

The premiums for the first two years under the 2005 Flow Plan, however, did not make use of the cumulative loss ratio. Pursuant to the 2005 Flow Plan, UG set the "initial rate . . . based on the most recent experience[20] with the lender [ST] as well as the quality of business expected in the future." Id. The initial rate was in effect for two years, with UG applying

---

[20] The testimony at trial was that UG considered the past seven or eights years' performance of all ST loans insured by UG. Id. at 338:14-23.

that rate to the outstanding balances of the insured loans to calculate the premiums for each loan.[21]

Use of the cumulative loss ratio (as set forth in the preceding table) to calculate premiums began in the third year of the 2005 Flow Plan and continued each year thereafter. Trial Tr. 338:25-339:2. UG calculated the cumulative loss ratio based on the seven-year experience of all of ST's loans covered by the policy; it then matched the calculated cumulative loss ratio with the ranges listed on the table in the 2005 Flow Plan to determine the applicable rate factor; and, finally, it applied the applicable rate factor to the outstanding balance of all the loans insured under the policy to calculate the premiums for all the loans.

UG issued a bill to ST each month stating a gross premium for all the loans insured under the policy. Attached to the monthly bills was a detailed statement stating the portion of the gross amount applicable to each loan. Id. at 181:3-19.

The initial dispute in this action arose in the spring of 2007 when UG began denying claims on IOF Combo 100 Loans that had not been underwritten using Fannie Mae's automated underwriting system, "Desktop Underwriting" ("DU"). This

---

[21] The testimony did not indicate what precisely the rate factor was, but it established that, owing to the exemplary record of ST's loan portfolio, it was a "lower rate" than what UG typically offered to its other lenders. Id. at 336:17-22.

dispute is the subject of Count I of the TAC.  UG took the position that IOF Combo 100 Loans that had not been underwritten using DU were excluded from coverage under the terms of the insurance policy.  ST disagreed.

The IOF Combo 100 Loans that are at issue in Count I of the TAC are housed in six loan pools.  ST Ex. 71 ¶ 151; see also id. at Ex. C (listing the loan pools).  ST began originating loans of this kind in late 2004 after the execution of the 2004 Flow Plan, see id. at Ex. C; see also Trial Tr. 190:23-25, but ST originated the majority of the loans between 2005 and 2007 after the execution of the 2005 Flow Plan, see ST Ex. 71 at Ex. C.  ST originated and submitted IOF Combo 100 Loans for coverage under the policy for more than three years before the coverage dispute in Count I of the TAC arose.  By January 2008, UG was categorically denying claims on IOF Combo 100 Loans that had not been underwritten using DU.

In early 2008, word that UG had begun systematically to deny claims of loans for non-use of the DU method reached Robert Partlow, a Senior Vice President of ST.  Trial Tr. 86:21:24. Mr. Partlow initiated communications with UG in an effort to resolve the dispute.  During these communications, Mr. Partlow corresponded with John Gaines, a Senior Vice President of UG. Id. at 87:11-14.  In June 2008, Mr. Partlow received a letter from Mr. Gaines indicating that UG had denied claims on IOF

Combo 100 Loans that had not been underwritten using DU.  ST Ex. 10.  The letter also indicated that "[t]here are undoubtedly a large percentage of loans remaining in force that will similarly be denied should they default," and that "without [ST's] help, [UG is] unable to identify those loans with interest only first mortgages that are lacking the required DU approval."  The letter from Gaines also stated: "[i]t is not appropriate for us [UG] to continue to accept premium on loans that are not eligible for claim payment."  Id.

In the months after receiving the letter, Mr. Partlow engaged in additional discussions with Mr. Gaines to resolve the dispute.  Trial Tr. 88:7-11.  But, the dispute persisted. Accordingly, on October 28, 2008, the parties entered into an agreement (the "Tolling Agreement") recognizing "the intent of the Parties to preserve the *status quo* as of September 30, 2008 with respect to claims or potential claims between the Parties in connection with [UG's denial of claims on IOF Combo 100 Loans that had not been underwritten using DU]."  ST Ex. 56.  The Tolling Agreement was to remain in force until November 17, 2008.  Id.  It was extended not less than seven times while the parties continued negotiations, carrying its effective expiration date through July 31, 2009.  See ST Exs. 57-63; Trial Tr. 88:24-89:2, 89:14-20.

In response to the statement in the Gaines letter that "without [ST's] help, [UG is] unable to identify those loans with interest only first mortgages that are lacking the required DU approval," ST sent UG a list of all IOF Combo 100 Loans insured under the policy that, it believed, had not been underwritten using DU.[22]   ST Ex. 6.   The list of loans was

---

[22] A ST employee, Daniel Green, prepared the list of loans.   In preparing the list, Mr. Green used ST's electronic origination system to isolate the second-lien loans insured under the policy that were coupled with an interest-only first-lien loan that had an underwriting designation of "traditional."   Id. at 201:16-25. In doing this, Mr. Green was using IOF Combo 100 loans that had been underwritten traditionally as a proxy for IOF Combo 100 Loans that had not been underwritten using DU.   Mr. Green's method showed 11,981 loans to have been traditionally—and, thus, presumably, not DU—underwritten.

Because Mr. Green used a proxy method, he did not review the individual loan files of the IOF Combo 100 Loans included on the list, which were in ST's, not UG's, possession.   Given the information available on ST's electronic records system, review of the loan files would have been the only way to determine—with absolute certainty—whether a loan had been underwritten using DU.

Mr. Green subsequently verified the list of 11,981 loans with an alternate method.   Instead of isolating the IOF Combo Loans that had been traditionally underwritten, as he had previously done, he isolated the IOF Combo Loans that ST's records indicated as having been processed through the DU software.   Mr. Green learned that IOF Combo 100 Loans that had been so processed would have a first-lien loan with a "DU decision" (also referred to throughout the record as a "DU finding") designation.   A "DU decision" refers to a report generated by the DU software after loan data had been put into, and processed by, the software.   Id. at 212:16-20.   Mr. Green understood that, just because ST's records indicated a "DU decision" for a loan, it did not follow that the loan had actually been underwritten using DU.   Id. at 213:12-214:4, 215:23-216:7.   The presence of a "DU decision" notation merely meant that the loan had been run through the DU software.   Mr. Green found that about 14,000 loans had a "DU decision."

attached to an email dated February 6, 2009, from Mr. Partlow to Mr. Gaines. Id. It was compiled at Mr. Partlow's direction, Trial Tr. 90:14-16, and Mr. Partlow believed its contents to be accurate, id. at 90:23-24. The number of loans on the list totaled 11,981. Id. 217:24-218:4. By way of an email dated February 14, 2009, UG informed ST that it had "match[ed] all of the loans [on the list]" with its own loan records. ST Ex. 9; see also Trial Tr. 91:17-22.

Of the 11,981 loans on the list, 1,069 (approximately 9%) had in fact been denied coverage before ST sent UG the list on February 6, 2009. ST Ex. 70 ¶¶ 6, 8. Therefore, not all the loans on the list were performing loans—i.e., loans that had not defaulted and on which ST had not submitted claims. Of course, the vast majority of the loans on the list were performing loans. For those loans, UG submitted to ST bills for millions

---

Mr. Green had cause to believe that his initial proxy method was accurate based on the 14,000 figure. DeeDee Hadalski, a ST employee to whom Mr. Green often turned when he needed large data pools pertaining to ST's loans, id. at 206:5-11, had given him a spreadsheet indicating that a total of 26,172 IOF Combo 100 Loans were insured under the policy, UG Ex. 68. With the earlier proxy method indicating that about 12,000 IOF Combo 100 Loans had been underwritten traditionally, Mr. Green would have expected to find that about 14,000 IOF Combo 100 Loans had a "DU decision" designation when that field was acting as a proxy for loans that had been underwritten using DU, since the sum of 12,000 traditionally underwritten loans and 14,000 DU-underwritten loans equaled 26,000 loans, thus accounting for substantially all of the IOF Combo 100 Loans that Ms. Hadalski's spreadsheet showed to be insured under the policy.

of dollars in premiums, which ST has paid. Before UG received the Partlow list, from May 1, 2007, through February 28, 2009, UG billed premiums of, and ST paid premiums in, an amount not less than $10,977,351 for the performing loans on the list. Id. at Ex. A. And, after receiving the list, from March 1, 2009, through March 31, 2011, UG demanded premiums of, and ST paid premiums in, an amount not less than $12,027,250 for the performing loans on the list. Id. For all such performing loans on the list for which ST has not submitted claims and are otherwise performing, UG has continued to bill and collect premiums. Id. ¶ 15.

In early July 2009, the parties had reached what appeared to be a final resolution of the dispute and had prepared a settlement agreement. However, UG abruptly and without explanation refused to execute the agreement and declined to further discuss settlement. Trial Tr. 92:24-93:4. By that time, the negotiations had been ongoing for months. As of June 30, 2009, UG had denied not less than $63,894,849 in claims on IOF Combo 100 Loans, ST Ex. 71 ¶ 18, Ex. E; see also Trial Tr. 196:19-25, which, at that time, equated to more than 25% of the total coverage liability of UG for the six loan pools at issue in Count I of the TAC, ST Ex. 71 at Ex. E; Trial Tr. 197:1-5.

Within two weeks of the unexpected end of settlement talks to UG, ST filed the present action.[23]   ST continued paying premiums during the pendency of the action because it feared that UG could use its failure to do so to invoke Section 3.6 of the Master Policy to cancel coverage on all loans for which premiums had not been paid.  Trial Tr. 178:22-179:12.

After receiving the list of loans from Mr. Partlow in February 2009, and even after UG broke off settlement discussions in July 2009, UG has not exercised its contractual right to audit the loans on the list.  Id. at 252:22-23.  ST Ex. 3 § 7.6; see also Trial Tr. 252:18-21.   Thus, UG has not ever determined whether those loans are in fact eligible for coverage under its interpretation of the insurance policy—an interpretation on which it has denied tens of millions of dollars in claims made by ST on IOF Combo 100 Loans that have defaulted.   And, at no time between receiving the list of loans from Mr. Partlow in February 2009 and responding to ST's first material breach defense in May 2011, did UG dispute the accuracy of the loan list.   Trial Tr. 94:25-95:19.   It was only during the course of this litigation, and quite far into the process, that UG raised the specter of the list being unreliable.

---

[23] See DEFENDANT'S NOTICE OF REMOVAL (Docket No. 1) (noting filing date of "July 16, 2009").

The foregoing findings of fact provide a basic factual context for discussion of the procedural and substantive legal issues relevant to ST's first material breach defense. Further findings of fact are made as appropriate in the ensuing legal discussion and conclusions.

### CONCLUSIONS OF LAW

Each of the procedural and substantive legal issues relevant to ST's first material breach defense are decided in turn below.

## I. ST Did Not Waive Its Right To Assert Its First Material Breach Defense

### A. Position Of The Parties

UG argues that the doctrine of waiver prevents ST from asserting its first material breach defense. Central to UG's argument is 13 <u>Williston on Contracts</u> § 39:31 (4th ed.), which provides: "when a contract not fully performed on either side is continued in spite of a known excuse, the right to rely upon the known excuse is waived [and] in turn, *the defense based on the excuse is lost*."[24] UG contends that ST lost its right to rely upon UG's improper denial of claims on the IOF Combo 100 Loans as a predicate for its first material breach defense to Count IV

---

[24] UNITED GUARANTY'S MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO COUNT IV OF ITS COUNTERCLAIM AND IN OPPOSITION TO SUNTRUST'S MOTION FOR SUMMARY JUDGMENT (Docket No. 478) at 8.

of UG's counterclaim, because ST allegedly knew in June 2008, after receiving the Gaines letter, that UG had denied claims on the loans and that UG would continue to deny claims on them, yet it continued to pay premiums under the policy and continued to accept millions of dollars in insurance payouts.  In other words, UG maintains that, having been informed of UG's breach in June 2008, and having subsequently performed under and having nonetheless accepted the benefits of the policy, ST cannot now cite that breach as a reason to be released from further performance under the policy.

ST counters that it did not waive its right to rely upon UG's denial of claims on the loans as a predicate for its first material breach defense, because, "by its words and deeds, [it] consistently and repeatedly asserted its position that United Guaranty's refusal to pay claims [on the loans] was contrary to United Guaranty's obligations under the insurance policy."[25] And, in any event, says ST, UG did not carry its burden to prove waiver.

### B.   Analysis

In Virginia, "[a] party claiming waiver has the burden of showing two essential elements of waiver, namely 'knowledge of

---

[25] SUNTRUST'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE TRIAL OF SUNTRUST'S AFFIRMATIVE DEFENSE TO COUNT IV OF UNITED GUARANTY'S COUNTERCLAIM (Docket No. 503) ("ST's Proposed Facts and Law") at 25.

the facts basic to the exercise of the right [waived] and *the intent to relinquish that right.'*   These elements must be shown by 'clear, precise and unequivocal evidence.'"   Stuart's Draft Shopping Ctr. v. S-D Assocs., 468 S.E.2d 885, 889-90 (Va. 1996) (quoting Stanley's Cafeteria v. Abramson, 306 S.E.2d 870, 873 (Va. 1983)) (emphasis and brackets in original).   The requisite elements of waiver do not conflict with the general principle articulated in 13 Williston on Contracts § 39:31 (4th ed.), and they control its application under Virginia law.

The record shows that UG has failed to carry its burden on its waiver argument.   Contrary to evidencing an intent to relinquish its rights, ST's actions in the wake of its receipt of the June 2008 letter from UG demonstrate that it intended to preserve those rights.

When ST received the Gaines letter, it did not accept the position announced by UG that IOF Combo 100 Loans that had not been underwritten using DU were not eligible for coverage under the policy.   Rather, ST immediately stated its disagreement and then set out to resolve the dispute through negotiations with UG.   When negotiations had not resolved the dispute by October 2008, ST and UG entered into the Tolling Agreement, which, as a result of multiple extensions executed in the midst of continued negotiations, remained in effect through July 2009.   In addition to tolling the limitations period for claims related to the

25

coverage dispute, the Tolling Agreement provided in clear terms that "SunTrust wishes to preserve and protect its right to prosecute any and all claims SunTrust may have against UG related to the Dispute, the Policies, [and] insurance coverage obligations under the Policy for certain SunTrust insurance claims stemming from SunTrust mortgage products." ST Ex. 56. ST's conduct after receiving the Gaines letter and the terms of the Tolling Agreement foreclose a finding that, by continuing to pay premiums, it intended to relinquish its known right to assert against UG any rights it had respecting its insurance coverage.

And, not more than two weeks after UG informed ST in July 2009 that it was no longer amenable to resolving the dispute through negotiations, ST sued UG, alleging, among other things, a breach of the insurance policy on account of UG's denials of claims on IOF Combo 100 Loans that had not been underwritten using DU. Then, when UG filed its Counterclaim, Count IV of which sought a declaratory judgment to enforce provisions of the insurance policy providing for continued payment of renewal premiums after the exhaustion of UG's coverage obligation, ST timely pled its first material breach defense as an affirmative defense to the relief sought by UG.

ST continued to pay the premiums because UG led ST to believe that the dispute could be settled, and ST did not want

26

UG to cancel the coverage for non-payment of premiums under Section 3.6 of the Master Policy while the parties were working to compromise the dispute. Nothing in the record demonstrates that ST continued to pay premiums on the loans because it agreed with UG's stated position in the Gaines letter, or because it had excused UG's denial of claims on the loans. Accordingly, UG has failed to show by clear, precise, and unequivocal evidence that ST intended to relinquish its right to raise ST's denial of claims on IOF Combo 100 Loans as a basis for its first material breach defense.

UG's reliance on American Chlorophyll, Inc. v. Schertz, 11 S.E.2d 625 (Va. 1940), and federal cases citing to it, for its waiver argument is without merit.[26] First, American Chlorophyll is factually inapposite. In American Chlorophyll, "the parties *specifically contracted* that no breach should be grounds for terminating the contract unless two notices were given, the first stating that a breach had occurred, and the second that the thirty-day 'period of grace' had expired and that the contract was henceforth at an end." 11 S.E.2d at 628 (emphasis in original). Because the plaintiff failed to terminate the contract in the prescribed manner after the defendant had

---

[26] UNITED GUARANTY'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING COUNT IV OF UNITED GUARANTY'S COUNTERCLAIM (Docket No. 506) ("UG's Proposed Facts and Law") at 31.

breached, the court found that the plaintiff had waived his right to assert the defendant's prior breach as a bar to the defendant's counterclaim for damages. Id. The facts at issue here are not at all like those in American Chlorophyll. The insurance policy does not limit the ability of a party to cancel the policy based on the breach of another party. And, ST and UG executed the Tolling Agreement explicitly preserving then-extant and potential claims related to the dispute, and they extended it many times. The Tolling Agreement establishes that, from the nascent stages of the dispute, ST intended to preserve its rights related to the dispute (and, moreover, gave notice of its intention to do so to UG). On facts such as these, which were not before the American Chlorophyll court (or any court which since has cited that decision), it cannot be said that ST waived its right to rely on UG's denial of claims as a predicate for its first material breach defense.

Second, even if American Chlorophyll were factually applicable (and it is not), this district recently held that American Chlorophyll is no longer good law for the waiver principle for which UG cites it. See Tandberg, Inc. v. Advanced Media Design, Inc., No.1:09cv863, at 9-11 (E.D. Va. Dec. 11, 2009) (Order) (finding "plainly meritless" the proposition that "American Chlorophyll and its progeny remain good law in Virginia" based on the "weight of authority supporting

application of *Countryside* and *Horton*" and at least twenty other decisions in Virginia state and federal courts permitting operation of the first material breach doctrine to prevent enforcement of a contract by the breaching party even when both parties continued to perform the contract).   The decision in Tandberg is well-documented, and independent assessment of the underlying authorities counsels that it is correct.   Hence, the Court adopts Tandberg here.

## II.   ST May Sue For Contract Damages And Raise As An Affirmative Defense Its First Material Breach Defense

### A.   Position of the Parties

UG argues that, "awarding expectation damages *and* excusing [ST's] own obligations are overlapping and duplicative remedies that would result in a double recovery and an unjustified windfall."[27]   "Thus," UG argues, "the doctrine known as the election of remedies holds that '[w]hen a material breach of contract has occurred, a party has two recourses: rescind the contract and recover the value of any performance made by it or affirm the contract and recover damages for the breach.'"[28] According to UG, "a party cannot do both."[29]

---

[27] Id. at 29.

[28] Id. (quoting Siemark Corp. v. Ningbo Haitian Mach. Co., No. 147502, 1997 WL 1070617, at *1 (Va. Cir. Ct. June 11, 1997)).

[29] Id. at 30.

ST meets that argument by pointing out that it is not seeking a double recovery. "The only remedy sought by SunTrust in this case," argues ST, "is damages for UG's breach."[30] ST clarifies that "[t]he material breach affirmative defense is not a remedy. Rather, it is the interposition of a legal reason why United Guaranty is not entitled to the remedy it seeks, i.e., a declaratory judgment that it can continue to collect premiums after the coverage under its policy is exhausted."[31] It follows, according to ST, that it may seek damages as a remedy for its breach of contract claim in Count I of the TAC and plead its first material breach defense as an affirmative defense to UG's requested relief in Count IV of the Counterclaim.

**B. Analysis**

UG's election of remedies argument must be rejected. It conflates two distinct concepts in the civil litigation process: a remedy sought under a cause of action and an affirmative defense raised as a bar to a cause of action. In this action, ST seeks but one remedy: damages for UG's breach of contract. ST seeks that remedy in Count I of the TAC, which ST filed in its capacity as a plaintiff before UG filed its Counterclaim.

---

[30] SUNTRUST'S REPLY TO UNITED GUARANTY'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING COUNT IV OF UNITED GUARANTY'S COUNTERCLAIM (Docket No. 508) ("ST's Reply to UG's Proposed Facts and Law") at 22.

[31] Id.

ST's first material breach defense, on the other hand, is an affirmative defense, not a remedy.  An affirmative defense is a "response to a plaintiff's claim which attacks the plaintiff's *legal* right to bring an action."  BLACK'S LAW DICTIONARY 60 (6th ed. 1990).  ST's first material breach defense, which ST raised in its capacity as a defendant, thus is a response to UG's request for declaratory relief that attacks UG's legal right to the declaratory judgment that is sought in Count IV of the Counterclaim.  With ST's first material breach defense properly conceived as the affirmative defense that it is, the election of remedies doctrine simply has nothing to say about ST's ability to plead it in this action.[32]

It appears that Virginia courts have never squarely addressed, in the election of remedies context, the ability of a party to seek damages for breach of contract and absolution from further performance under the same contract as a result of the other party's material breach.  However, they have, commensurate with the inherent distinction between remedies and affirmative

---

[32]  The inapplicability of the election of remedies doctrine renders inapplicable Robb v. Vos, 155 U.S. 13 (1894), and similar cases cited in UG's Proposed Facts and Law at 30-31, the rationales of which rely on the election of remedies doctrine. The inapplicability of these cases was foretold, in any event, by the fact that they all involve a situation unlike the one here, where a plaintiff sought the inconsistent remedies of damages under a contract and rescission of the same contract.

defenses, permitted the award of contract damages in conjunction with the operation of the first material breach doctrine.

The decision in Shen Valley Masonry, Inc. v. S.P. Cahill and Associates, No. 00-75, 2001 WL 34038625 (Va. Cir. Ct. Dec. 11, 2001), is illustrative.  There, the court both awarded a plaintiff subcontractor $332,033 in "completed but unpaid labor" and $4,585 in "clean up and equipment removal costs" stemming from a defendant general contractor's breach of a subcontract and denied the defendant general contractor's prayer for liquidated damages based on the latter's "initial material breach" of the subcontract.  Shen Valley Masonry, 2001 WL 34038625, at *8-9.  The court articulated the first material breach doctrine as follows: "[t]he party who commits the first breach of a contract is not entitled to enforce the contract." Id. at *6 (citing, among other cases, Countryside Orthopedics v. Peyton, 541 S.E.2d 279 (Va. 2001); Horton v. Horton, 487 S.E.2d 200 (Va. 1997)).  Significantly, the court said nothing about the first material breach doctrine's precluding a plaintiff (even one who benefits from the doctrine's operation) from suing for damages on the contract.  The court's silence in this regard is not surprising, because, as explained above, the first material breach doctrine operates not as a remedy requested by a

party in its capacity as a plaintiff, but as an affirmative defense pled by a party in its capacity as a defendant.[33]

The Supreme Court of Virginia's decision in ADC Fairways Corp. v. Johnmark Construction, Inc., 343 S.E.2d 90 (Va. 1986), further undermines UG's assertion that contract damages and the first material breach doctrine are mutually exclusive "remedies." In ADC Fairways, the court permitted a plaintiff contractor to recover damages for delays in performance that the trial court had held were a breach of the defendant real estate developer's obligations under the contract. When the defendant argued that it was entitled to an offset against the damages awarded to the plaintiff, the Supreme Court responded that the defendant "could only recover an offset if it had not breached." ADC Fairways, 343 S.E.2d at 93. It explained: "[b]ecause the trial court ruled that [the defendant] breached the contract and because we have upheld that ruling, it follows that the trial court did not err in denying [the defendant's] claim of offset."[34] Id. The allowance of the plaintiff's recovery of

---

[33] Conceptually, the concept could be asserted by a declaratory judgment plaintiff, but that need not be addressed here.

[34] The Court is aware that, in ADC Fairways, the Court reversed the trial court's lost profits award of $47,781.13 on account of the award being based on evidence that the court found too speculative. The reversal of the lost profits portion of the damages award, however, does not diminish the persuasive effect of ADC Fairways in relation to UG's election of remedies argument, because the Court still permitted the remaining

contract damages and concurrent denial of the defendant's right to a damages offset based on the latter's material breach of the contract in ADC Fairways is inconsistent with UG's argument that a plaintiff's request for damages under a contract and invocation of the first material breach doctrine to excuse further performance under the same contract is an either-or proposition.

In sum, the distinct nature of a remedy and an affirmative defense and the distinct functions they serve in the litigation process, as confirmed by Virginia decisions, counsel that a litigant may seek the remedy of damages under a cause of action for breach of contract and, in response to his adversary's countervailing breach of contract claim, may also invoke the first material breach doctrine, all without running afoul of the election of remedies doctrine.[35]

---

$75,630.87 in damages to be awarded to the plaintiff while also holding that the defendant's claim for a damages offset was barred on account of the first material breach doctrine. Clearly, in ADC Fairways, the Court had an opportunity either to vacate the entire damages award on account of the operation of the first material breach doctrine or to preempt the operation of the first material breach doctrine on account of the plaintiff's seeking damages under the contract if it deemed a suit for damages on a contract and the operation of the first material breach doctrine as being irreconcilable under the law. Tellingly, the Court did neither.

[35] As explained below in the main text of the opinion, where there is no state decision directly on point, a federal court sitting in diversity must attempt to predict how the state court would apply its law to the facts of the federal case. The

III. **UG Breached The Insurance Policy Both In Denying Claims On ST's IOF Combo 100 Loans And In Continuing To Demand And Collect Premiums On Performing IOF Combo 100 Loans For Which It Knew Claims Would Be Denied**

A. **Position of the Parties**

ST argues that UG breached the insurance policy in two ways. First, it argues that UG breached the insurance policy "by failing to pay SunTrust's claims on the loans at issue in Count I of the Third Amended Complaint."[36] Second, ST argues that "United Guaranty's billing for and collecting premiums on [performing] loans on which it [knew] it [would] not pay claims constitutes a . . . breach of the policy."[37] ST contends that "[t]he undisputed facts show that United Guaranty made the corporate decision in the second quarter of 2008 that it would not pay a claim on any IOF Combo 100 loan that was not underwritten using Fannie Mae's Desktop Underwriter . . . automated program," yet it continued to bill for, and collect, premiums on performing IOF Combo 100 Loans that had not been underwritten using DU."[38] ST argues that, pursuant to Section

---

decisions in ADC Fairway, Countryside Orthopedics, and Horton instruct that the election of remedies doctrine does not foreclose, under Virginia law, a reliance on the same breach of a contract affirmatively as the basis for a claim and defensively as the predicate for an affirmative defense.

[36] ST's Reply to UG's Proposed Facts and Law at 9.

[37] Id. at 6.

[38] Id.

3.6 of the Master Policy,[39] UG had two options when it decided that the policy did not require it to pay claims on IOF Combo 100 Loans that had not been underwritten using DU: to cancel coverage and return the premiums paid on the loans or not cancel coverage, continue to collect premiums, and pay ST's claims on such loans despite the fact that it believed the policy did not obligate it to do so. According to ST, UG instead opted for a course forbidden by the policy: "continuing to collect premiums but providing no coverage."[40]

UG concedes, as it must, based on the Court's earlier entry of summary judgment for ST on Count I of the TAC, that, for purposes of applying the first material breach doctrine, it must be considered to have breached the insurance policy when it denied claims on IOF Combo 100 Loans that had not been underwritten using DU.[41] However, UG argues that its acceptance of premiums on performing IOF Combo 100 Loans was not a breach of policy. First, it contends that "no provision in the Master

---

[39] Section 3.6 of the Master Policy provides in pertinent part: "[UG] shall have the right, at its option and to the extent permitted by applicable law, to cancel coverage under any Certificate with respect to the related Loan [and] [UG's] liability shall be limited to the return of premium . . . ." ST Ex. 3 § 3.6.

[40] ST's Reply to UG's Proposed Facts and Law at 7.

[41] UG's Proposed Facts and Law at 2.

Policy, the 2004 Flow Plan, and the 2005 Flow Plan . . . requires UG to reject premiums sent by SunTrust on in-force loans."[42] Second, UG refutes ST's claim that it accepted premiums on "specific loans knowing that it would never pay a claim on that loan." UG argues that ST was slow to respond to Mr. Gaines' June 2008 request for ST's assistance in identifying IOF Combo 100 Loans that had not been underwritten using DU, noting that ST did not send UG the list of loans that, in ST's estimation, had not been underwritten using DU until February 2009. UG also argues that the list itself was inaccurate. It notes that claims have been made on about 4,400 of the loans on the list and, further, that 341 of these claims were paid by UG.[43] According to UG, the fact that it found those 341 claims to be valid proves that, contrary to ST's representations, not all the loans on the list were non-DU loans. Finally, UG argues that it received the list of loans at a time when settlement discussions were ongoing with ST. UG contends that, if it had stopped demanding and collecting premiums on the performing IOF Combo 100 Loans, it would have jeopardized the efficacy of those

---

[42] Id. at 5.

[43] Id. at 6.

discussions and breached the Tolling Agreement by disturbing the "status quo" relationship of the parties.[44]

## B. Analysis

ST rests its breach argument respecting UG's continued collection of premiums principally on Section 3.6 of the Master Policy. ST also repeatedly argues that UG acted improperly in continuing to collect premiums on performing IOF Combo 100 Loans when it knew that it would never pay a claim on those loans.[45] In considering the record and the parties' post-trial briefs, the Court construed these arguments to be that UG's continued collection of premiums breached its duty to deal in good faith with its insured on a matter of the insurance contract. The Court ordered the parties to state their respective positions on UG's continued collection of premiums in respect to the duty of

---

[44] Id.

[45] For example, ST's Proposed Facts and Law at 22 states: "[p]resent and former members of United Guaranty's senior management, including former President, [sic] Alan Atkins, [sic] testified that it was improper for United Guaranty to collect and retain premiums on IOF Combo 100 Loans where the first lien loan was not underwritten using DU because United Guaranty knew it would never pay a claim on such loans." ST's Reply to UG's Proposed Facts and Law at 1 states that United Guaranty "collected millions of dollars in premiums for coverage it had no intention of providing." ST's Reply to UG's Proposed Facts and Law at 6 further quoted UG's witnesses to argue that UG's continued collection of premiums was "not appropriate" and "would not be right." And, ST's Reply to UG's Proposed Facts and Law at 2 describes UG's alleged breach of the policy as "intentional."

good faith and fair dealing after the close of trial,[46] and ST confirmed the Court's construction of its arguments as alleging that, in continuing to collect premiums on performing IOF Combo 100 Loans, UG "fail[ed] to deal fairly and in good faith" with ST.[47]

---

[46] See ORDER (Docket No. 539) (ordering two rounds of "simultaneous briefs on the duty of good faith and fair dealing as it relates to first-party insurance relationships in Virginia and United Guaranty's continued collection of premiums on the loans in question"). ST filed the following briefs in accordance with the order on August 8 and 11, 2011, respectively: SUNTRUST MORTGAGE, INC.'S OPENING BRIEF ON THE DUTY OF GOOD FAITH AND FAIR DEALING (Docket No. 540) and SUNTRUST MORTGAGE, INC.'S REPLY BRIEF ON THE DUTY OF GOOD FAITH AND FAIR DEALING (Docket No. 542). And UG filed the following briefs on August 8 and 11, 2011, respectively: DEFENDANT UNITED GUARANTY'S POST TRIAL BRIEF REGARDING THE COVENANT OF GOOD FAITH AND FAIR DEALING (Docket No. 541) and DEFENDANT UNITED GUARANTY'S REPLY REGARDING GOOD FAITH AND FAIR DEALING (Docket No. 543).

[47] See SUNTRUST MORTGAGE, INC.'S REPLY BRIEF ON THE DUTY OF GOOD FAITH AND FAIR DEALING (Docket No. 542) at 7.

In DEFENDANT UNITED GUARANTY'S REPLY REGARDING GOOD FAITH AND FAIR DEALING (Docket No. 543) at 14, UG argues that ST has waived its right to argue that "UG breached the implied covenant of good faith and fair dealing . . . [g]iven [ST's] consistent position throughout this litigation from its early pleadings that UG breached the express terms of the parties' contract, and ST's failure to even mention the possibility that UG breached an implied covenant of good faith and fair dealing" (internal quotation marks omitted and brackets in original). UG is not correct in its conclusion.

First, as ST's statements quoted in note 45, supra, evince, UG had notice that ST's position was that UG's continued collection of premiums on performing IOF Combo 100 Loans was improper. Although ST did not employ the precise phrase "breach of an implied covenant of good faith and fair dealing," it was clear from ST's statements in its briefs before and after trial, as well as its questioning of witnesses and presentation of evidence during trial, that it was alleging that UG's continued

As explained below, ST's agreement based on Section 3.6 of the Master Policy is not well taken.  But, ST is correct that, in billing for, and accepting premiums on loans which it knew it would not cover, UG breached the duty of good faith and fair dealing it owed to ST.

---

collection of premiums was a reason (among others) to hold that UG had materially breached the insurance policy.

Second, the evidence adduced at trial, irrespective of the clarity of ST's position on UG's collection of premiums, clearly supports a finding that UG breached an implied covenant of good faith and fair dealing by continuing to collect premiums on performing IOF Combo 100 Loans.  That will be addressed later in the main text of the opinion.  Suffice it to say here that it would contravene the Court's role as the finder of fact (the trial on ST's first material breach doctrine being one without a jury) not to make a finding that the evidence clearly supports.

Third, and flowing from the first two points, UG has not shown that it was prejudiced by ST's arguing after trial, for the first time explicitly, that UG breached an implied covenant of good faith and fair dealing in continuing to collect premiums on performing IOF Combo 100 Loans.  Because ST made clear its position before, during, and after trial that UG's continued collection of premiums was an affront to basic notions of fair business practices, much of the oral and documentary evidence offered at trial (by both UG and ST, the latter of which UG had fair opportunity to rebut) addressed the issue of why UG continued (and has continued) to collect premiums on the loans in question.  Indeed, UG even offered evidence at trial on why ST wanted to continue to pay premiums on the loans.  Given the parties', and thus the record's, attention at trial to the fact of UG's continued collection of premiums (not to mention the multiple rounds of briefing, as ordered by the Court, on the discrete issue of the duty of good faith as its pertains to UG's continued collection of premiums), it cannot be said that UG has been denied an opportunity to respond to ST's claim (or, for that matter, the Court's understanding of it) that UG breached an implied covenant of good faith and fair dealing in continuing to collect premiums on the performing IOF Combo 100 Loans.

### 1.   Section 3.6 of the Master Policy

Section 3.6 of the Master Policy, the provision on which ST relies, does not forbid the conduct in which UG engaged respecting the performing loans on the list.  The most that can be said about that provision is that it provided UG with a "right," exercisable at "its option," to cancel coverage on a loan for certain prescribed reasons.  See ST. Ex. 3 § 3.6.  It does not follow that UG was precluded by that provision from continuing to collect premiums on IOF Combo 100 Loans—or any loans, for that matter—that it had decided were not eligible for coverage.  That is because Section 3.6 simply does not speak to UG's ability under the policy to collect, or to continue to collect, premiums.

### 2.   Implied Duty of Good Faith and Fair Dealing

However, UG's conduct in billing for and collecting premiums knowing that it would not pay claims was a breach of the insurance policy because it was a breach of the duty of good faith and fair dealing owed to ST.  Although it appears that the Supreme Court of Virginia has never expressly adopted Section 205 of the Restatement (Second) of Contracts ("Restatement"), which states that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement," the Court holds that it would do so here.

The task of a district court exercising diversity

41

jurisdiction over an action the substance of which concerns state law is to interpret and apply the relevant state law to the controversy at issue. Where the highest court of a state has yet to address a legal issue that must be decided during the course of the federal litigation, the task of a district court sitting in diversity is to predict, as best as possible, how the state's highest court would decide the issue. See Nature Conservancy v. Machipongo Club, Inc., 579 F.2d 873, 874-75 (4th Cir. 1978). In carrying out this task, the Court should consider all of the authority on the undecided issue—of course, giving the most weight to applicable decisions of the state's highest court.

The weight of authority counsels that, in Virginia, parties to an insurance contract are bound by an implied duty of good faith and fair dealing.[48] It follows that UG owed ST a duty of good faith and fair dealing in its performance of the insurance policy, including the collection of premiums.

Two courts have found that an implied duty of good faith and fair dealing obtains in first-party insurance relationships in Virginia, and that a breach of the duty gives rise to a

---

[48] Both parties agree that Virginia has taken the view that a duty of good faith and fair dealing in contract exists in Virginia. See DEFENDANT UNITED GUARANTY'S POST TRIAL BRIEF REGARDING THE COVENANT OF GOOD FAITH AND FAIR DEALING (Docket No. 541) at 1, 3-5; SUNTRUST MORTGAGE, INC.'S OPENING BRIEF ON THE DUTY OF GOOD FAITH AND FAIR DEALING (Docket No. 540) at 6-7.

contract claim.   It seems that only one Virginia court has had
occasion to decide whether Virginia law imposes an implied duty
of   good   faith   and   fair   dealing   in   first-party   insurance
relationships; and that court found that it did.   See Harris v.
USAA Cas. Ins. Co., 37 Va. Cir. 553, 568 (1994) (stating "this
case . . . involves the application of Virginia law in a first-
party insurance context.   It is the opinion of this court, after
careful consideration of what authority exists in Virginia and
nationwide, that the Virginia Supreme Court would imply a duty
of good faith in a first-party insurance context [and] would
find the breach of same to give rise to a claim for breach of
contract . . . .").[49]   The Fourth Circuit has likewise held that

---

[49] The Court notes that another Virginia court raised, without
deciding, the issue of whether there was an implied duty of good
faith and fair dealing in first-party insurance relationships in
Coker v. State Farm Fire & Cas. Co., No. 161002, 1998 WL 972219
(Va. Cir. Ct. June 4, 1998).   The court noted that the Supreme
Court of Virginia had yet to decide the issue, but that it had
"recognized the potential liability of an insurer for an excess
judgment   obtained   against   the   insured,   arising   from   the
insurer's refusal to settle a claim within the policy limits" in
Aetna v. Price, 146 S.E.2d 220 (Va. 1966).   The court took this
as   an   indication   that   the   Supreme   Court   of   Virginia   had
recognized an implied duty of good faith and fair dealing in
third-party insurance contexts, but not first-party insurance
contexts.   Coker, 1998 WL 972219, at *6 n.6.
       The Court's own review of Virginia caselaw confirms the
continued vitality of Price.   See Erie Ins. Group v. Hughes, 393
S.E.2d 210 (Va. 1990) (citing Price for the proposition that an
insurer has a "duty to exercise good faith in dealing with the
offer of compromise" made by a third-party tort claimant that is
within the insurance policy's coverage limits); Reisen v. Aetna
Life & Cas. Co., 302 S.E.2d 529 (Va. 1983) (same); see also
Levine v. Selective Ins. Co. of America, 462 S.E.2d 81 (Va.

an implied duty of good faith and fair dealing governs first-party insurance relationships in Virginia. In A & E Supply Co. v. Nationwide Mutual Fire Ins. Co., 798 F.2d 669 (4th Cir. 1986), the Fourth Circuit explained that, pursuant to Section 205 of the Restatement, "[a]ll contracting parties owe to each other a duty of good faith in the performance of the agreement." 798 F.2d at 666. And, citing Carpenter v. Virginia-Carolina Chemical Co., 35 S.E. 358 (Va. 1900), the Court of Appeals concluded that "the Virginia Supreme Court has long enforced . . . bonds [of good faith] in contract despite an absence of an express promise among the parties." A & E Supply, 798 F.2d at 666-67. Moved in part by such authorities, the Fourth Circuit held that, "in a first-party Virginia insurance relationship, liability for bad faith conduct is a matter of contract," with the contract itself and general contract law "govern[ing] the measure of recovery."[50]   Id.; see also Florists'

_____

1995). Although the Supreme Court of Virginia's recognition of an implied duty of good faith and fair dealing in third-party insurance relationships is by no means dispositive in the direction of finding an identical duty in first-party insurance relationships, it is reasonable to conclude that such recognition makes it at least more likely that the Supreme Court of Virginia would recognize an implied duty in a first-party relationships too.

[50] In addition to defining the duties that an insurer owes to an insured, one of which, the Court of Appeals found, was a duty to act in good faith in the performance of the policy, A & E Supply held that an insurer's breach of the duty of good faith gave rise to an action in contract, not tort, and thus punitive

Mutual Ins. Co. v. Tatterson, 802 F. Supp. 1426, 1436 (E.D. Va. 1992) (citing A & E Supply for the proposition that "[i]n first-party Virginia relationships, liability for bad faith conduct can only arise from the contract and extends only to situations connected with the policy"). And, one decision in this district, when addressing allegations of an insurer's bad-faith refusal to pay benefits under a policy, has stated that, "[u]nder Virginia law, every contract contains an implied covenant of good faith and fair dealing in the performance of the agreement." Penn. Life Ins. Co. v. Bunbrey, 665 F. Supp. 1190, 1195 (E.D. Va. 1987).

Outside the context of insurance, numerous Virginia state and federal courts in Virginia have acknowledged that an implied duty of good faith and fair dealing obtains in contractual relationships under Virginia law. Many of those courts have done so in cases involving contracts governed by the Uniform Commercial Code, which, pursuant to Va. Code § 8.1A-304, there is no question "impose[] an obligation of good faith in [their] performance and enforcement." See, e.g., Charles E. Brauer Co.,

---

damages would not be available stemming from the breach. 798 F.2d at 666-68. In A & E, the Fourth Circuit directed most of it analysis toward answering the question of the proper area of the law—contract or tort—in which a claim for bad-faith practices in a first-party insurance relationship sounded. Notwithstanding that focus, the Court of Appeals clearly recognized that an insurer owes a duty of good faith to the insured in first-party insurance contexts.

Inc. v. Nationsbank of Virginia, 466 S.E.2d 382, 385 (Va. 1996)
(stating "[t]he breach of an implied duty under the U.C.C. gives
rise . . . to a cause of action for breach of contract").   Many
of those decisions, however, have acknowledged an implied duty
of good faith and fair dealing in cases involving contracts not
governed by the Uniform Commercial Code, and therefore outside
Va. Code § 8.1A-304's ambit.[51]   See, e.g., Stepp v. Outdoor World
Corp., 18 Va. Cir. 106, 111 (1989) (recognizing an "implied
covenant of good faith and fair dealing by all parties in the
performance" of a contract for the sale of real estate);
Virginia Vermiculite, LTD. v. W.R. Grace & Co., 156 F.3d 535,
542 (4th Cir. 1998) (announcing, during its construction of a
contract for the sale of land and conveyance of mining rights,
that "it is a basic principle of contract law in Virginia, as
elsewhere, that although the duty of good faith does not prevent
a party from exercising its explicit contract rights, a party

---

[51] The Court is aware that Virginia courts have not always found
an implied duty of good faith and fair dealing outside the
purview of the Uniform Commercial Code.   They have refused to
locate the duty in at-will employment contracts.   See, e.g.,
Spiller v. James River Corp., 32 Va. Cir. 300 (1993); Burton v.
Central Fidelity Bank, 14 Va. Cir. 159 (1988).   These decisions,
however, are not applicable to the insurance context.   The at-
will employment relationship is a unique creature of the law,
which rests on the presumption that an employer can fire an
employee for virtually any reason it desires, without
explanation.   An implied duty of good faith and fair dealing in
such contracts would run contrary to their very purpose and
substance.   The same is not true of insurance contracts, as the
cases that have dealt with those types of contracts confirm.

may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party" (emphasis in original)); Enomoto v. Space Adventures, LTD., 624 F. Supp.2d 443, 450 (E.D. Va. 2009) (stating "[i]n Virginia, every contract contains an implied covenant of good faith and fair dealing," and, in so stating, rejecting the argument that an implied covenant of good faith could not exist under Virginia law when there was an express contract setting forth the parties' duties); Johnson v. D & D Home Loans Corp., No. 2:07cv204, 2007 WL 4355278, at *3 (E.D. Va. Dec. 6, 2007) (noting, in response to defendants' argument that Virginia law did not recognize an implied duty of good faith and fair dealing respecting a contract for the deed of real property, that "[u]nder Virginia law, every contract contains an implied covenant of good faith and fair dealing").

The decisions that have recognized an implied duty of good faith and fair dealing in non-Uniform Commercial Code contracts have done so in line with the position adopted by the majority of jurisdictions: that a duty of good faith and fair dealing governs all contracts at common law. See generally Steven J. Burton, Breach of Contract and the Common Law Duty To Perform In Good Faith, 94 Harv. L. Rev. 369, 369 (1980) (explaining "[a] majority of American jurisdictions . . . recognize the duty to perform a contract in good faith as a general principle of

contract law"); id. at 404 (appendix) (providing an extensive list of state and federal cases "explicitly recogniz[ing] a general obligation of good faith performance in every contract at common law"). Of course, this is the position taken by Section 205 of the Restatement, the origins of which, notably, trace to the Uniform Commercial Code provision that served as a genesis for Va. Code § 8.1A-304.[52] See Restatement (Second) of Contracts § 205 cmt. a (1981) (explaining the concept of "good faith" by referencing Uniform Commercial Code §§ 1-201(19) and 2-103(1)(b)).

Some who have argued against finding an implied duty of good faith and fair dealing under Virginia law have relied on Ward's Equipment, Inc. v. New Holland North America, 493 S.E.2d 516 (Va. 1997). There, the Supreme Court of Virginia wrote: "in Virginia, when parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights. This is so under either the common law or the Uniform Commercial Code . . . ." Ward's Equipment, 493 S.E.2d at 520.

---

[52] Echoing the Restatement, Michie's Jurisprudence speaks to a broadly applicable duty of good faith and fair dealing: "The law implies a covenant of good faith and fair dealing in every contract for the purpose of evaluating a party's performance of that contract." 4A M.J. Contracts § 58 (citing, among another case, A & E Supply, 798 F.2d 669).

Taken in isolation, it has been maintained that the statement in Ward's Equipment counsels against finding an implied duty of good faith and fair dealing under Virginia law. But, the statement was not made in isolation, and therefore it should not be so construed. In the sentence directly following the passage quoted above, the Supreme Court of Virginia wrote: "[g]enerally such a covenant cannot be the vehicle for rewriting an unambiguous contract in order to create duties that do not otherwise exist." Id. (citations omitted). From this latter statement it is clear that the Court was not saying in Ward's Equipment that an implied duty of good faith and fair dealing did not exist at all under Virginia law. Rather, the Court was saying that an implied duty of good faith and fair dealing must yield to the express terms of the contract when the latter might be conceived as inconsistent with the former. See Enomoto, 624 F. Supp.2d at 450 (concluding "Ward's . . . addressed only conduct that Defendant was explicitly authorized to undertake by the contract"). And, in any event, it cannot be maintained that Ward's Equipment rejected categorically an implied duty of good faith and fair dealing in Virginia since the Court, after all, cited Va. Code § 8.1-203, the predecessor to Va. Code § 8.1A-304. Like Va. Code § 8.1A-304, Va. Code § 8.1-203 imposed a duty of good faith and fair dealing in every contract under the Uniform Commercial Code. Thus, to read Ward's Equipment as

49

rejecting an implied duty of good faith and fair dealing as a matter of course is to make the rather untenable conclusion that the Supreme Court of Virginia either was unaware of or ignored a statutory provision which it itself cited.

In summary, the weight of state and federal authority, inside and outside the insurance context, counsels that, commensurate with Section 205 of the Restatement, an implied duty of good faith and fair dealing obtained in the insurance policy executed between ST and UG. Analytically, there is no reason to differentiate between contracts falling under the Uniform Commercial Code and contracts that do not insofar as an implied duty of good faith and fair dealing is concerned. A legal regime that recognized the duty in contracts for the sale of goods but did not recognize the duty in contracts for the sale of land, or, as is relevant here, the provisioning of insurance, would be arbitrary in the extreme. This Court therefore joins the numerous courts that have concluded that Virginia law recognizes no such distinction.

### 3. UG's Breach of the Implied Duty of Good Faith and Fair Dealing

Having found that an implied duty of good faith and fair dealing governed the insurance policy, it must be determined whether UG breached the duty. As the state and federal caselaw

instructs, if UG breached the duty, it breached the policy under Virginia law.

### a. The Duty Of Good Faith And Fair Dealing In The Context Of The Insurance Policy

The duty of "good faith" defies a fast and true definition. But, at minimum, it includes "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party [to a contract]." Restatement (Second) of Contracts § 205 cmt. a (1981); see also RW Powers Partners, L.P. v. Virginia Elec. & Power Co., 899 F. Supp. 1490, 1498 (E.D. Va. 1995) (citing, among other authorities, the commentary of Section 205 of the Restatement for a definition of "good faith").

It is beyond dispute that a "justified expectation" of the party who contracts for insurance with an insurance company is that the payment of premiums to the company secures from the company a promise to provide insurance. More specifically, the payment of premiums by the insured, and acceptance thereof by the insurer, secures a promise from the insurer to pay claims on the property for which the premium has been paid.[53]  Naturally,

---

[53] So elementary is this principle that it stands on its own. It bears mentioning, however, that the axiom finds support in Virginia insurance cases that, though addressing facts and legal issues different from the ones here, provide basic insight into the relationship between the insured and insurer under Virginia law. See Autumn Ridge, L.P. v. Acordia of Va. Ins. Agency, Inc., 613 S.E.2d 435, 438 (Va. 2005) ("The risk undertaken by

there will be some instances where, based on the terms of the insurance policy and the conduct of the insured, the payment of a claim is neither required nor appropriate after the insurance company has collected premiums.   But, it strains credulity to accept as correct UG's position that an insurance company is free to demand and retain premiums on items for which, prior to and contemporaneous with the demand and collection of premiums, the company actually knows it will not insure simply because the insurance policy does not expressly prohibit such conduct on the part of the company.   That is especially true where, as here,

---

the insurer is an essential element of a contract of insurance, and no premium is due from the insured unless the risk attaches."); Ingrams v. Mut. Assur. Soc., 40 Va. 661, 668 (Va. 1843) ("For the premium paid by the insured, and the risk which the insurer takes upon himself, are considerations each for the other; they are correlatives, whose mutual operation constitutes the essence of the insurance contract."); see also Foremost Guar. Corp. v. Meritor Sav. Bank, 910 F.2d 118 (4th Cir. 1990) (holding an insurance company waived the right to rescind coverage when it continued to accept premiums with knowledge of grounds for rescission).

Not surprisingly, the axiom also finds support in insurance treatises.   See, e.g., 5 Couch on Ins. § 79:6 ("As a general rule, an insurer is entitled only to such premium as the risk carried reasonably warrants.   It follows that where . . . a premium has been paid for which there has been no corresponding risk, the unearned premium should be returned to the insured.").

Finally, UG itself acknowledged the inherent impropriety in collecting premiums on property—in this case, loans—that were not eligible for coverage.   For example, the Gaines letter stated that "[i]t is not appropriate for [UG] to continue to accept premium on loans that are not eligible for claim payment."   ST Ex. 10; see also Trial Tr. 125:18-23.   And, Mr. Gaines acknowledged the same at trial: "[UG's] not going to keep somebody's premium if the loan did not qualify [for coverage]. That would not be right."   Trial Tr. 302:16-17.

the insurer actually has said that retention of premiums is improper. The demand and retention of premiums under such circumstances is so antithetical to the purpose of a contract for insurance that an express prohibition of the kind that UG indicates is absent from the insurance policy will hardly, if ever, be found.

The record clearly shows that the common purpose that underlay the ST/UG insurance contract was to provide ST a measure of relief from the default of somewhat risky loans. Indeed, ST obtained insurance from UG on second-lien mortgage loans in part because the loans were riskier than their first-lien counterparts and because ST appreciated the historical volatility of the national real estate market. ST's justified expectation was that, if it paid premiums, it would have the coverage for which it paid those premiums. According to ST's records, UG insured about 26,000 second-lien loans affiliated with the IOF Combo 100 Loan product. Not later than June 2008, as evidenced by the Gaines letter, UG decided that it would not pay claims on IOF Combo 100 Loans that had not been underwritten using DU. In Gaines' letter, UG requested ST's assistance in identifying IOF Combo 100 Loans that, according to UG's interpretation of the policy, would not be eligible for claim payments because they had not been underwritten using DU. ST expressed disagreement with UG's interpretation of the policy,

but, nonetheless, in February 2009, ST provided UG with a list of some 12,000 IOF Combo Loans that it believed were not subject to coverage under UG's interpretation of the policy. UG confirmed that the loans on the list comported with its records. In the months after receiving the list of loans (March 1, 2009, through March 31, 2011), UG demanded and collected not less than $12,027,250 in premiums from ST for the loans on the list.

> **b.   UG's Argument Respecting Parties' Settlement Of ST's Count I Fees And Costs**

UG argues that the "Settlement, Stay, and Tolling Agreement" ("Settlement Agreement") executed between the parties bars ST from advancing the argument, in support of its first material breach defense, that UG breached its duty of good faith and fair dealing in continuing to collect premiums on performing IOF Combo 100 Loans. That position is not well-taken because the limited scope of the Settlement Agreement is evidenced by its clear terms: "Subject to the terms below, UG stipulates to a monetary amount for the fees and costs associated with ST's claim, and ST agrees to accept that monetary amount in lieu of pursuing its fees and costs under Virginia Code § 38.2-209 <u>with respect to Count I</u>" (emphasis added).[54] The Settlement Agreement thus effected a settlement on ST's claim for attorney's fees and

---

[54] This language is taken from the Settlement Agreement that counsel for UG provided to the Court and represented as being the version that the parties executed.

costs pursuant to Va. Code § 38.2-209 due on account of UG's refusal to pay the insurance on the loans at issue in Count I of the TAC.   It did not effect a settlement on ST's assertion that UG acted improperly in continuing to collect premiums on performing IOF Combo 100 Loans as that claim might relate to ST's first material breach defense, which ST pled as an affirmative defense to Count IV of UG's Counterclaim.   In proffering the Settlement Agreement as a bar to the Court's consideration of ST's claim that UG acted improperly in continuing to collect premiums,[55] UG conflates a claim brought by the insured in its capacity as a plaintiff that the insurer denied claims in bad faith with an affirmative defense brought by the insured in its capacity as a defendant that, by failing to perform the policy consonant with the duty of good faith and fair dealing, the insurer has materially breached the policy and therefore may not pursue its own claim (in this instance for declaratory relief) under the policy.

### c.  UG's Justifications Offered At Trial For Its Continued Collection Of Premiums

UG offered three reasons at trial to justify its continued demand for, and collection of, premiums after its decision in June 2008 to deny claims on IOF Combo 100 Loans that had not been underwritten using DU and after its receipt in February

---

[55] See DEFENDANT UNITED GUARANTY'S REPLY REGARDING GOOD FAITH AND FAIR DEALING (Docket No. 543) at 15-17.

2009 of the list of IOF Combo 100 Loans that, according to ST, had not been underwritten using DU.   First, UG recites (and accurately so) that the policy is silent as to UG's ability to continue to demand and collect premiums.   Second, UG says that the list of loans furnished by ST was inaccurate.   Third, UG explains that it did not want to impede the settlement negotiations or breach the Tolling Agreement.

UG's first justification is unavailing for the reason explained above that, under Virginia law, UG had a duty to perform the contract in good faith, even if the contract was silent as to that duty.   UG's second justification is likewise unpersuasive.   The record shows that UG never raised the inaccuracy of the list of loans as a reason why it could continue to demand and collect premiums on the loans.   The first time that notion appeared was in response to ST's first material breach defense and even then it appeared late in the litigation.

And, even if the list of loans had been inaccurate to the point of being unreliable (which it was not), UG had a right to audit the loans on the list, as it did with all the loans insured under the policy.   Had UG audited the loans, it could have dispelled any legitimate concern about the integrity of the list.[56]   For sure, owing to the large number of loans on the

---

[56] The fact that, as UG claims, some 300 of the approximately 12,000 loans on the list had in fact been run through DU, UG's

list, any meaningful effort to investigate the list's accuracy likely would have required a more than trivial investment of resources on the part of UG.   But, as the insurer, UG had an obligation to determine which loans were in fact not eligible for claim payouts under its interpretation of the policy and to stop collecting premiums on those loans.   And, UG certainly had this obligation once ST provided it with a list of loans confirming UG's stated belief that a large portion of the loans for which ST believed it was paying premiums (about 12,000 of the approximate 100,000 total loans then insured under the policy) were likely ineligible for coverage, at least, in view of UG's interpretation of the policy.   UG's disregard for its obligation is demonstrated by the fact that it set out to determine which loans were not eligible for coverage under its stated interpretation of the policy and then, after ascertaining from the insured that there were almost 12,000 loans meeting that description, UG continued to accept the very premiums which its executives say it could not properly accept.

UG's third justification for its continued demand and collection of premiums is equally unconvincing.   The Tolling Agreement entered into in October 2008, and its subsequent extensions, simply preserved the rights of the parties "with

Proposed Facts and Law at 17, is thus irrelevant to the appropriateness of UG's continued demand and collection of premiums on the loans on the list.

respect to <u>claims or potential claims</u> between the parties"
(emphasis added). In essence, it foreclosed any waiver of a
claim or defense and tolled statutes of limitations. It did not
by its terms prohibit either ST or UG from changing its position
vis-à-vis the coverage dispute or its course of conduct therein.
Thus, a decision by UG to stop billing ST or to stop accepting
premium payments would not have breached the Tolling Agreement.

It likely is true, however, that a decision to stop
accepting premiums would have disrupted, perhaps even ended, the
settlement discussions. But, even if UG was animated by such a
motive to avoid that result, it certainly did not have that
reason after it refused to execute the settlement agreement and
declined thereafter even to discuss settlement further.[57]

The bottom line is that, from March 2009 through March
2011, UG continued to bill for, and collect, premiums on IOF
Combo 100 Loans that, by February 2009, at the latest, ST had
clearly identified as not being eligible for coverage under UG's
expressed interpretation of the insurance policy. Because UG

---

[57] UG argues that ST wanted to continue to perform under the
policy by continuing to pay premiums on the loans on the list
because ST had determined by September 2008 that it was to its
benefit to do so. <u>Id.</u> at 11-12. But, even if ST wanted to
continue to pay premiums on the loans in order to maximize its
coverage under the policy, UG had a duty (notwithstanding ST's
motivations) arising from the basic purpose of the policy and
reasonable expectation of ST not to demand and collect premiums
on loans that, according to its interpretation of the policy,
were not covered.

persisted in subscribing to that interpretation of the policy in March 2009, and at all times thereafter, it had an obligation to stop demanding and collecting premiums on the loans. This obligation stemmed not from any express language in the policy, but from the duty of good faith and fair dealing that UG owed to ST based on the common purpose of the insurance contract—to insure ST's loans in return for the payment of premiums on such loans—and the justified expectation of ST—not to pay premiums on loans as to which UG knew that it would not provide the coverage for which ST was paying.

Moreover, the record clearly shows that UG wanted to continue to collect premiums on the performing IOF Combo 100 Loans because it understood that the maximum cumulative liability for the pools would likely be reached in any event, and thus it was to UG's benefit to continue collecting renewal premiums on these loans in the future since, whether they did or did not default, UG would still be paying out the same amount in insurance claims to ST (capped at the combined maximum cumulative liability of the applicable pools).

> **d. UG's Arguments Offered After Trial In Response To ST's Assertion That UG Breached The Duty Of Good Faith And Fair Dealing**

The foregoing are the three arguments UG offered at trial in defense of its continued collection of premiums on performing IOF Combo 100 Loans. In DEFENDANT UNITED GUARANTY'S REPLY

REGARDING GOOD FAITH AND FAIR DEALING (Docket No. 543) at 1-3, UG recently posited three additional reasons why, in its view, it cannot be held to be in breach of the duty of good faith and fair dealing. Specifically, UG argues: first, ST has failed to prove by the requisite clear and convincing evidence standard that UG acted in bad faith; second, UG's continued collection of premiums "[did] not prevent ST from enjoying the benefit of the insurance contract," and thus, under <u>Florist Mutual</u>, 802 F. Supp. at 1436 (stating "for there to be a bad faith claim, there must be some bad faith that in some way impaired the ability of the insured to receive the benefits of the insurance contract causing the plaintiff damages"), cannot act as the basis for a finding of bad faith; and, third, "given ST's position (accepted by this Court) that IOF Combo 100 loans were covered under the insurance contract and eligible for claim payments, UG presumably would have breached the *express* terms of the contract had it done exactly what ST now urges: return premiums and rescind coverage on the entire body of disputed loans." None of these new rationales for avoiding a finding that UG breached its duty of good faith and fair dealing are persuasive.

First, even if, as UG argues, <u>State Farm Mutual Automobile Insurance Co. v. Floyd</u>, 366 S.E.2d 93 (Va. 1988), controls on the issue of the evidentiary burden, thus imposing a clear and

convincing evidentiary standard here (and the decision arguably
does not control, since it involved allegations, unlike those
here, that the insurer acted in bad faith in failing to settle a
claim within the policy limits and said: "we hold that bad faith
must be proved by clear and convincing evidence in cases of this
kind," 366 S.E.2d at 98 (emphasis added)), the records shows,
clearly and convincingly, that UG's continued collection of
premiums on loans the claims for which it knew it would deny was
a breach of its duty to perform the insurance policy in good
faith.

     Second, Florist Mutual, 802 F. Supp. 1426, does not bar a
finding that UG breached the duty of good faith and fair dealing
here because the record clearly establishes that UG's continued
collection of premiums impaired the ability of ST to receive the
benefits of the insurance contract.  As explained in note 53,
supra, the payment of premiums in return for insurance coverage
is the "essence" of a contract for insurance.  ST has paid
millions of dollars in premiums (thus being deprived of the
benefit of the use of that money) on IOF Combo 100 Loans that UG
knew it would not cover.  Although those loans have not
defaulted, and hence have not been denied coverage by UG, it
cannot be reasonably maintained that UG's conduct has not
impaired ST's ability to receive the benefit of the policy.  UG
knowingly billed for and collected premiums on loans for which

it knew there was to be no insurance coverage. It is difficult to imagine a more substantial impairment of an insured's benefits under a policy. The mere happenstance that ST has not had need to submit claims on the loans owing to the loans' continued performance does not alter the fact that ST has paid millions of dollars in premiums—at UG's demand—for what UG knew would amount to nothing in the way of insurance coverage.

Third, a finding that UG breached its duty of good faith and fair dealing in continuing to collect premiums on performing IOF Combo 100 Loans is separate and distinct from the Court's earlier finding that UG breached the insurance policy by denying claims on IOF Combo 100 Loans based on such loans' not having been DU-underwritten. Relevant to the former is what UG knew at the time it decided to bill for and collect premiums on the performing IOF Combo 100 Loans, not what UG knows now—only after being told by the Court—that its denial of claims on the Count I loans was a breach of the policy. The record clearly shows that, when UG received the Partlow loan list, it believed IOF Combo 100 Loans that had not been underwritten using DU were not covered by the policy and that, despite being of this conviction, UG continued to bill for and collect premiums on loans that ST represented as being IOF Combo 100 Loans that had not been underwritten using DU. This is the temporal context in which the propriety of UG's conduct must be assessed; and it

shows UG's conduct to have been improper.

## IV.  UG's Breaches Of The Insurance Policy Were Material

### A.  Position of the Parties

ST argues, and the Court has found, that UG breached the insurance policy, first, in denying claims on IOF Combo 100 Loans that are the subject of Count I of the TAC and, second, in continuing to demand and collect premiums on performing IOF Combo 100 Loans on the Partlow list the claims for which it had decided it would deny.  ST further argues that, under Virginia law, both breaches were material in view of the insurance policy.  In support of its argument that UG's denial of claims was material, ST notes that, pursuant to Section 6.3 of the Master Policy, UG had an obligation to pay claims within sixty days.  According to ST, the fact that the policy imposed a specific timeframe for the payment of claims made the timely payment of claims critical under the policy.  Also relevant for ST is that, as of June 30, 2009, around when ST filed suit, UG had denied claims in an amount totaling approximately $63 million.  The magnitude of this amount, argues ST, was significant to the point of being material.[58]  In support of its argument that UG's continued collection of premiums on performing IOF Combo 100 Loans on the Partlow list was a

---

[58] ST's Proposed Facts and Law at 20-21.

material breach, ST argues that UG's conduct flouted the "fundamental function" of the policy: UG's insuring loans in exchange for ST's payment of premiums. Additionally, ST argues that the amount of premiums that ST demanded and collected on the loans on the list from May 2007 to March 2011—approximately $23 million—was significant to the point of being material.[59]

UG offers one argument in response to the alleged materiality of both breaches. According to UG, its denial of claims on the IOF Combo 100 Loans at issue in Count I of the TAC will only result in losses to ST of approximately 2% to 3% of the "total consideration" that "ST could have expected under the contract [of] approximately $287 million [in insurance coverage]."[60] UG explains that, based on the operation of the maximum cumulative liability under the 2005 Flow Plan, "[r]escinding coverage on the approximately $88 million in loans at issue in Count I reduced UG's [coverage] liability by approximately $7 million" from $287 million to $280 million.[61] That $7 million is paltry, contends UG, in comparison to the $287 million in coverage to which ST argues it was entitled. And, says UG, ST will receive substantially all of the $287

---

[59] Id. at 21-22.

[60] UG's Proposed Facts and Law at 26-27.

[61] Id. at 27.

million in coverage that ST claims it bargained for since the maximum cumulative liability for the loan pools either has been or is expected to be reached for all six pools containing IOF Combo 100 Loans.[62]

## B. Analysis

Virginia law defines a "material breach" as "a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." Horton, 487 S.E.2d at 204. It includes a "failure of consideration of such a degree that the remaining consideration may be deemed to be no substantial consideration." Neely v. White, 14 S.E.2d 337, 341 (Va. 1941). "Proof of a specific amount of monetary damages is not required when the evidence establishes that the breach was so central to the parties' agreement that it defeated an essential purpose of the contract." Horton, 487 S.E.2d at 204 (citations omitted).

In assessing the materiality of a breach, this district has considered the permissive factors set forth in Section 241 of the Restatement. See, e.g., RW Powers, 899 F. Supp. at 1496-97 (quoting and applying the Restatement factors).[63] Those factors are:

---

[62] Id. at 9.

[63] Although the Supreme Court of Virginia has not formally adopted Section 241 of the Restatement, it has cited its

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Assessment of these factors and the Virginia caselaw on materiality demonstrates that UG's breaches, considered in combination,[64] constituted a material breach of the insurance policy.

---

commentary in expounding on the type of evidence required to establish a material breach.  Horton, 487 S.E.2d at 204. Moreover, other Virginia courts have relied extensively on Section 241 of the Restatement in assessing the materiality of a breach.  See, e.g., South Auburn L.P. v. Old Auburn Mills, L.P., No. 24210, 2005 WL 1995433, at *5 (Va. Cir. Ct. Aug. 18, 2005).

[64] Precedent shows that, in assessing the materiality of multiple breaches, as the Court must do here, it is appropriate to consider the combined—or "cumulative"—effect of the breaches. See, e.g., Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 187 (2d Cir. 2007) (stating "if [the plaintiff] breached one or more warranties and the cumulative effect of such breaches was material, [the plaintiff] did not substantially perform its side of the deal"); Coleco Indus., Inc. v. Berman, 423 F. Supp. 275, 313 (E.D. Pa. 1976) (considering the defendants' breaches singly and in combination

The record clearly shows that UG's breaches substantially denied ST the benefit it reasonably expected under the insurance policy. UG's argument, reduced to its core, is that, in the end, ST will get nearly all of what it bargained for in insurance coverage as a consequence of the interaction between the capped nature of UG's coverage obligation and the number and amount of claims that ST has made, and likely will make, for its other loans insured under the policy. What UG's argument ignores is that ST did not pay premiums on the IOF Combo 100 Loans on which UG denied claims to get insurance coverage on other loans for which it was already paying premiums.

And, even if UG had eventually paid the claims on these loans (which it has not), what UG's argument further ignores is that ST did not pay premiums on the IOF Combo Loans in return for a promise by UG to insure those loans at a time when UG saw fit to do so. Pursuant to Section 6.3 of the Master Policy, ST paid premiums in exchange for UG's promise to pay claims within sixty days of their being made. ST Ex. 3 § 6.3; see also Trial Tr. 410:1-16, 421:12-22. The timeliness of UG's payment of

---

in determining their materiality); Prima Classe USA, Ltd. v. The Gitano Group, Inc., No. 91cv1765, 1992 WL 51546, at *2-3 (S.D.N.Y. Mar. 9, 1992) (same); Talley v. Talley, 566 N.W.2d 846, 851 (S.D. 1997) (rejecting the defendant's argument that the "trial court's cumulative application of the breaches of each individual agreement to support a finding of material breaches of all the agreements was in error").

claims was critical not just because the policy indicated it was, but also because ST had purchased insurance from UG to protect itself in precisely the type of situation in which it found itself in and around 2007, 2008, and 2009, when its claims were being denied. During those years, ST, like most banks, was under severe stress from the national collapse of the stock and residential real estate markets. Trial Tr. 95:24-96:23. It is hollow for UG to claim that substantially delayed receipt of the insurance coverage is tantamount to receiving the insurance proceeds within the time specified by the policy and that ST needed, and had contemplated needing, in those years. Cf. Tandberg, Inc. v. Advanced Media Design, Inc., No. 1:09cv863, 2009 WL 4067717, at *4 (E.D. Va. Nov. 23, 2009) (stating "under Virginia law, it is well-settled that failure to make timely payment constitutes a material breach" (citing, among other cases, Horton, 487 S.E.2d at 204)).

It must be said, too, that the magnitude of UG's denial of claims forced substantial hardship on ST. In June 2009, shortly before ST filed suit, the claims outstanding for IOF Combo 100 loans was approximately $63 million. ST Ex. 74; Trial Tr. 410:1-16. This outstanding balance equated to more than 25% of UG's total coverage obligation at that time for the six pools containing IOF Combo 100 Loans. UG's refusal to pay such a

significant    portion    of    its    total    coverage    obligation    was

certainly a material breach of the policy.[65]

---

[65] It is appropriate to measure the effect of UG's denial of
claims on the IOF Combo Loans at issue in Count I of the TAC in
June 2009 and not now, or sometime in the future, as UG
contends.    Farnsworth on Contracts § 8.16 ("The time for
determining materiality is the time of the breach . . . .").

UG places much emphasis on Neely v. White, 14 S.E.2d 337
(Va. 1941).    There, the Supreme Court of Virginia held that a
defendant could not use a non-party corporation's breach of a
contract, ninety-three percent of which, the Court noted, had
been performed, as a basis for barring the plaintiff from suing
the    defendant    for    damages    on    a    separate    contract,    the
obligations of which the defendant had assumed from the non-
party corporation in another transaction.    Neely, 14 S.E.2d at
340.    Citing Neely, UG argues that, because it allegedly has
provided (in the months after June 2009) or will provide in the
future ninety-seven to ninety-eight percent of the insurance
coverage ST expected to obtain under the policy, it has not
materially breached the policy.

UG's reliance on Neely is misplaced.    First, Neely is a
novel case factually, where the defendant was citing the breach
of a non-party as a basis for preempting the contract claim by
the plaintiff.    The interest of the Neely court in allowing the
plaintiff's claim to proceed, despite the non-performance of the
non-party    corporation,    was    thus    far    different    from    any
corresponding interest here.    Second, and even assuming, for
argument's sake, that Neely's applicability was not limited by
its peculiar facts, Neely does not stand for the proposition
that a court must look beyond the moment in time in which the
breach occurred—in this instance, to a point months, and,
indeed,    years,    after    the    obligation    was    due—to    afford    the
breaching party an opportunity to "cure" its prior breach.    In
contrast to the ninety-three percent performance referenced in
Neely, which had taken place by the time of the alleged breach,
the ninety-seven to ninety-eight percent performance on which UG
hopes to rely can only be said to have taken place (if it took
place or will take place at all) at a time significantly after
(as judged by Section 6.3 of the Master Policy) the breach found
by the Court.    Simply put, it is a misapprehension of Neely to
argue, as UG does, that the decision requires the Court to
ignore the policy's sixty-day limit for the payment of claims
and ST's reasons for procuring insurance from UG on the loans at
issue in assessing the materiality of UG's breach.

Timely payment of its claims was an integral feature of both the policy and ST's decision to purchase insurance from UG. Moreover, UG's continued demand and collection of premiums on performing IOF Combo 100 Loans for which it knew claims would be denied resulted in ST paying millions of dollars in premiums during a two-year period in which ST was under significant economic pressure.

Where, as here, ST has incurred substantial harm as a result of UG's breaches, it cannot be said that relieving ST of its obligation to pay further premiums on all the loans insured under the policy will result in a forfeiture to UG. UG argues that, "in the two years since SunTrust filed suit on Count I, it has collected over $130 million in additional claims payments and now has less than $6 million in claims payments remaining [as a function of the maximum cumulative liability of the pools] despite owing United Guaranty over $90 million in continued premiums."[66] To terminate ST's obligation to continue paying renewal premiums at this juncture, contends UG, would give a windfall to ST at UG's expense.

Although UG's argument has some superficial appeal, upon closer examination, it is must be rejected. First, UG's argument wholly neglects the fact that UG's obligations under the terms of the insurance policy extended not only to paying

---

[66] UG's Proposed Facts and Law at 36.

ST's claims, but also to paying ST's claims in a timely manner
(i.e., sixty days).  Thus, while UG may have paid "$130 million
in additional claims" since this action has been pending, it
scarcely can be maintained that UG substantially performed the
policy when it did not timely pay—and, in fact, did not pay at
all—approximately $63 million in claims on IOF Combo 100 Loans
that were outstanding as of June 2009.  Second, of the $130
million that UG says it has paid ST during the pendency of this
litigation, it must be remembered that $63 million of it—that
is, almost half of it—was due ST before the litigation commenced
and would have counted against UG's maximum liability under the
policy (which UG itself concedes has been or likely will be
reached for all six of the pools containing Count I loans).
Thus, in reality, the "additional" performance that UG has
rendered is at most only about $67 million.  Third, while the
consequence of applying the first material breach doctrine here
is  financially  significant,  it  cannot  be  considered  to
effectuate a forfeiture on UG, or to confer a windfall for ST,
when one takes into account the effects of the breach on UG's
insured.

The remaining two factors of Section 241 of the Restatement
augur that UG's breaches were material.  There is nothing in the

record suggesting that UG has attempted to cure its breaches.[67]
In fact, quite to the contrary, UG has persistently insisted
that it did not breach the policy.  And, as found respecting
UG's continued billing for, and collection of, premiums on the
performing IOF Combo 100 Loans on the Partlow list, UG failed to
conform its conduct to standards of good faith and fair dealing.

On this record, ST has carried its burden to prove that
UG's failures to perform its obligations, respecting both the
payment of claims and the collection of premiums, defeated an
essential purpose of the contract of insurance.

## V.   The Insurance Contract Is Not Severable

Having determined that UG breached the insurance policy in
two distinct ways, and having now further determined that those
breaches were material under Virginia law in view of the
language and purpose of the insurance policy, it follows that UG
may not sue for further performance on the contract under the
first material breach doctrine.   See 4A M.J. Contracts § 77
("The party who commits the first material breach of a contract
is not entitled to enforce it or to maintain an action thereon
against the other party for his or her subsequent failure to
perform.").   This is so unless the policy is severable.   See 2

---

[67] The most that UG has done in this direction is to return the
premiums collected on the IOF Combo 100 Loans at issue in Count
I of the TAC.   But, obviously, the return of premiums did
nothing to cure the breach as to those loans, which was the
denial of claims on those loans.

Couch on Ins. § 23:1 ("Whether a contract of insurance is considered entire or whether its parts are severable is of great importance in determining the effect of a breach of part of the contract. If the contract is entire, all of the [party's] protection will be lost upon a breach as to any part of the risk, but if the contract is severable, only the part of the policy directly affected by or connected with the breach will be avoided."); see also 15 Williston on Contracts § 45:17 (4th ed.) ("[A] recovery may be had for part performance of a divisible contract, and is not barred by a subsequent breach by the party seeking recovery. By contrast, in an indivisible contract, the entire fulfillment of the promise by either party, in the absence of any agreement to the contrary or waiver, is a condition precedent to the fulfillment of any part of the promise by the other party.").

## A. Position of the Parties

UG argues that the insurance policy is severable on a "loan-by-loan basis." The corollary of this, contends UG, is that, because UG's breach only related to the IOF Combo 100 Loans that were denied coverage and the performing IOF Combo 100 Loans on the Partlow list, ST's first material breach defense does not bar a judgment, as it seeks in Count IV of the Counterclaim, obligating ST to pay future premiums on the other loans insured under the policy, notwithstanding the maximum

cumulative liability having been reached for the pools in which those loans are housed.[68]    In support of its severability argument, UG cites East Augusta Mutual Fire Insurance Co. of Virginia v. Hite, 250 S.E.2d 348, 352 (Va. 1979) (holding "the better rule . . . on the question of the divisibility of a contract of insurance for a gross premium on several items of property separately valued[] is that it depends upon the nature and entirety of the risk.    Thus, where the property is so situated that the risk of one item affects the risk on the other, the contract is entire and not divisible").    UG argues that, because each loan insured under the policy had "unique risk characteristics and every borrower ha[d] a unique risk profile," with the ultimate effect being that "the risk of default of one loan [did] not impact the risk of default on any

---

[68] Actually, UG argues in UG's Proposed Facts and Law at 24 that ST's first material breach defense does not bar it from a judgment obligating ST to pay future premiums on all performing loans insured under the policy, including the performing IOF Combo 100 loans on the Partlow list.    However, UG's argument assumes (incorrectly) that it was not a breach of the insurance policy for it to continue demanding and collecting premiums on the performing IOF Combo 100 Loans on the list.    The Court having found that UG did in fact breach the policy in continuing to demand and collect premiums on those loans, the strongest form of UG's argument that remains viable in light of the Court's ruling is that ST's first material breach defense does not bar it from seeking a declaratory judgment obligating ST to continue to pay renewal premiums on all performing loans insured under the policy that were not on the Partlow loan list.    That point is addressed here.

other loans," East Augusta counsels that the policy is severable on an individual loan basis.[69]

UG further argues that the operation of the maximum cumulative liability evidences the severable nature of the policy.   UG spotlights that the cancellation or denial of coverage as to one loan in a pool did not set at naught the contractual relationship between the parties; rather, as UG indicates, it merely resulted in the maximum cumulative liability for a pool being adjusted downward to reflect the loss of the removed loan's value.[70]

Additionally, UG maintains that the sheer scope of the policy augurs for severability.   UG notes that the policy insures "over a hundred thousand loans presenting different types of risks," and that, "in this context, it cannot reasonably be inferred that the parties intended to let a single, isolated breach (or even the breach of several loans with the same characteristic) unravel the entire contract."[71]

UG acknowledges that a single rate factor was applied to each loan insured under the policy in calculating premiums, but it argues that the significant feature of the premiums' calculations, insofar as the issue of severability is concerned,

---

[69] Id. at 20.

[70] Id.

[71] Id. at 21.

is that "the rate factor was applied to individual loans and a separate premium was apportioned to each loan."[72]   Finally, UG asserts that the language employed in provisions of the policy demonstrates the policy's severable nature.

Among the provisions significant for UG are: first, Section 3.1 of the Master Policy, providing that "if a loan meets the Reporting Program Guidelines, the insured may submit *that* loan with a New Loan Summary Form"; second, Section 1.2 of the Master Policy, defining "Certificate" as "the document extending the indicated coverage option to a specified Loan under this Policy"; and, third, Section 3.6 of the Master Policy, authorizing UG to

> cancel coverage under any Certificate *with respect to the related Loan* if any of the Insured's representations made *with respect to such Loan* were materially inaccurate . . . or if the Insured has otherwise materially breached any of its obligations . . . in connection *with such Loan or related Certificate.*[73]

The repeated references to individual loans insured under the policy, according to UG, evidences the parties' intent to enter into an insurance contract making "each loan . . . severable from the others."[74]

---

[72] Id. at 24.

[73] Id. at 21-22.

[74] Id. at 22.

ST argues that the insurance policy is not severable based on "the express language of the . . . insurance contract, the manner in which [the] contract was implemented, and the testimony of United Guaranty's own witnesses."[75]  First, ST cites Section 1.32 of the Master Policy, which defines "Policy" as "this contract of insurance and all the applications, attachments, Exception Approvals, Commitments, Certificates, amendments, endorsements, and schedules related hereto, which are incorporated herein a made part hereof with respect to the Loans to which they relate."[76]  Important to ST is that Section 1.32 defines the policy as a singular contract "deal[ing] with a mass of loans."[77]  According to ST, Section 1.32's definition of "Policy" as one document with global effect is to be expected given that "for both financial and administrative reasons, the parties agreed that there would be a single Master Policy whose terms would govern all loans insured by United Guaranty."[78]

Second, ST argues that UG did not perform a "loan-by-loan risk assessment" in deciding whether to accept loans for coverage under the policy.  On this point, ST notes that UG's

---

[75] ST's Reply to UG's Proposed Facts and Law at 21.

[76] Id. at 12 (emphasis added).

[77] See id. at 13.

[78] Id. at 12.

former president, Alan Atkins, testified that UG formulated and approved "broad guidelines," "parameters," and "criteria" for the types of loan products that it would insure under the policy, and that, rather than assessing the particular risk for each loan as it was submitted for coverage, UG insured each loan so long as it comported with the broad criteria approved by UG in advance of the loan's submission.[79]

Third, ST argues that the method of calculating premiums under both the 2004 Flow Plan and the 2005 Flow Plan establishes the non-severable nature of the policy. Respecting the calculation of premiums under the 2004 Flow Plan, ST takes the view that the initial premiums were based on the twenty-year performance of all the loans UG had insured with all of its lenders, and that UG's actuarial department calculated a rate factor for each loan product that, in turn, was applied to the outstanding balances of loans within a product category.[80] "The 2005 Flow Plan changed the manner in which premiums were calculated," says ST, "but again premiums were not based on any loan-by-loan risk assessment, but rather on the performance of the entire SunTrust loan portfolio."[81]

---

[79] Id. at 13.

[80] Id.

[81] Id. at 14.

Here, ST notes that the initial rate under the 2005 Flow Plan, which governed for the first two years, was based on the most recent seven or eight-year experience of ST's loan portfolio and the quality of the business UG expected in the future. Then, in the third and subsequent years under the 2005 Flow Plan, notes ST, the premium rate was based on the paid loss ratio, which was the ratio of the cumulative losses divided by the cumulative premiums paid by ST for all the loans insured under the policy over the most recent seven years.[82] Critical for ST is that, under both the 2004 Flow Plan and 2005 Flow Plan, the rate factor applied to the outstanding balances of the loans to calculate the premiums owed on the loans had nothing at all to do with the particular risks of the individual loan to which the rate factor was applied. In short, ST argues that the determination of the rate factor was based on aggregate math.

Fourth, ST argues that the maximum cumulative liability reveals the indivisible nature of the policy, since, by way of its operation, "United Guaranty's risk regarding any particular loan depends on the status of the entire loan pool."[83] Fifth, and finally, ST rejects UG's contention that the principles articulated in East Augusta show the policy to be severable on a loan-by-loan basis. Because "both the manner in which premiums

---

[82] Id. at 14-15.

[83] Id. at 17.

are set and limits on liability are established[] are based on the cumulative performance of the insured loans and not on a loan-by-loan basis," ST argues that East Augusta, which recognized the interconnectedness of the risk of insured items as evidencing an indivisible contract, counsels against severability here.

B. **Analysis**

Eschner v. Eschner, 131 S.E. 800 (Va. 1926), states the test for severability in Virginia:

> [p]rimarily the question of whether a contract is entire or severable is one of intention, which intention is to be determined from the language which the parties have used and the subject matter of the agreement. A contract may, both in its nature and its terms, be severable and yet rendered entire by the intention of the parties.

131 S.E. at 802 (internal quotation marks omitted). Furthermore, "[t]he divisibility of the subject matter of the contract will not determine the entire or severable character of the contract, although it may often assist in determining the intention of the parties." Id. (internal quotation marks omitted). In assessing the intention of the parties, "regard is to be had to the situation of the parties, the subject matter of the agreement, the object which the parties had in view at the time and intended to accomplish." Id. (internal quotation marks omitted). "If the intent is expressed in writing, it of course

controls; if not, it is to be discovered with the aids referred to in the Eschner case as well as by the practical consideration given the contract by the parties themselves." O'Quinn v. Looney, 74 S.E.2d 157, 159 (Va. 1953).

The record clearly demonstrates that the insurance policy is not severable on a loan-by-loan basis.[84] It is true that the policy has indicia of severability at the individual loan level. For, as UG emphasizes, multiple provisions of the policy speak to the submission of a "Loan" for coverage, the extension of coverage to a "Loan," and the cancellation or exclusion from coverage of a "Loan." And, undeniably, UG's maximum cumulative liability for a pool is dependent on each individual loan to the extent that terminating coverage on a loan, and hence removing it from a pool, decreases UG's coverage obligation for that pool commensurate with the removed loan's value. Moreover, the premiums paid under both the 2004 Flow Plan and 2005 Flow Plan were loan-specific in that they were calculated by applying a rate factor (unique to each kind of loan product under the 2004 Flow Plan and applied policy-wide under the 2005 Flow Plan) to

---

[84] At oral argument, the Court raised the notion, without commenting on its merit, of the policy being severable on a product-by-product basis as opposed to a loan-by-loan basis. UG acknowledged that severing the policy thusly was a possibility, but it did not meaningfully press that argument further at oral argument or in its post-trial brief. Accordingly, the Court does not address that argument here, except to say that the record does not support a finding that the policy was severable on a product-by-product basis.

the outstanding balances of individual loans. Further, each bill that UG sent ST, in addition to showing a gross premium for the month, showed the premium owed for each loan insured under the policy. And, it cannot be reasonably maintained that the language of the policy supports an argument that the cancellation of coverage on a single loan ended either party's duties with regard to the other loans insured under the policy.

But, when one considers these features of the policy in relation to the broader context of how the policy came to be and how the parties operated under it, it must be concluded that ST and UG intended to implement an indivisible contract of insurance by way of the Master Plan and, later, the 2004 Flow Plan and 2005 Flow Plan. To the extent that the policy called for coverage to be extended and terminated on a loan-by-loan basis, it did so out of convenience and necessity rather than a desire on the part of the parties to create thousands of individual contracts of insurance for each loan insured under the policy.

The record relating to the execution of the Master Policy substantiates this. ST and UG executed the Master Policy to insure second-lien mortgage loans originated as part of ST's Combo Loan program. Under the Master Policy, each month, ST submitted the loans that it had originated for coverage. UG, in turn, issued each loan a unique certificate number, which

confirmed coverage pursuant to the terms of the Master Policy and performed the necessary functions of allowing UG to track the loans, verify that premiums had been paid on them, and, qualify and process claims on them.  The parties chose this method of doing business, and wrote it into the Master Policy, to provide a means by which UG could insure in bulk ST's Combo Loan products—which were diverse and oftentimes changing—without UG having to pre-approve each loan, which, of course, would have delayed the lending process.  If the Master Policy can be said to have done one thing, it was to implement a streamlined method of insuring large quantities of loans with wide-ranging and variable characteristics under one contract of insurance.

The Master Policy's definition of the "Policy" as "this contract of insurance and all applications, attachments, Exception Approvals, Commitments, Certificates, amendments, endorsements and schedules related thereto, which are incorporated herein and made a part hereof with respect to the Loans to which they relate," ST Ex. 3 § 1.32 (emphasis added), confirms that the Master Policy established a single contract of insurance.  Rather than defining the "Policy" as a conglomeration of individual "Certificates" or "Loans," which themselves equate to individual contracts of insurance, Section 1.32 defined the "Policy" as "this contract of insurance"—

singular—which "incorporates" the "Certificates" and made them "a part" of one cohesive whole.

The 2005 Flow Plan further reinforces the Master Policy, and hence the policy as a whole, as a document intended to insure ST's loans efficiently on a global scale. It developed in response to ST's increasing requests for UG to insure additional types of Combo Loans and to offer ST sweeping discounts on its premiums. And, further illustrative of its purpose, it resulted in UG's instituting an "Experience Rating Plan," under which the rate factor applied to all the loans insured under the policy would be "based on the cumulative loss ratio of the insured business," with the cumulative loss ratio being the quotient of the aggregate losses over the most recent seven years for all the loans insured under the policy and the aggregate realized premiums for the most recent seven years of all the loans insured under the policy, all without regard to particular loans or loan types. ST Ex. 5. This aggregate method of calculating premiums, which took into account the performance of ST's entire loan portfolio with UG, followed another method of calculating premiums that had been used under the 2004 Flow Plan, which likewise did not rely on any loan-specific rate factor. Under this earlier method of calculating premiums, UG's actuaries calculated a rate factor for each type of Combo Loan product based on the twenty-year performance of

all the loans UG had insured with all of its lenders.   UG then
applied the rate factors derived to the Combo Loan products to
which the calculated risk corresponded.

Under both the 2005 Flow Plan and the 2004 Flow Plan, UG
calculated   the   premiums   for   each   loan   using   each   loan's
outstanding balance as the base against which the rate factor
was applied to determine the premium owed.   But, neither the
fact that the premium was calculated as to each loan nor the
fact that the outstanding balance of each loan factored into the
premium   counsels   for   severing   the   policy   on   a   loan-by-loan
basis.   East Augusta instructs that the "nature and entirety of
the risk" must be considered in assessing the divisibility of a
"contract of insurance for a gross premium on several items of
property separately valued."   250 S.E.2d at 352.   "[W]here the
property is so situated that the risk of one item affects the
risk on the other, the contract is entire and not divisible."
Id.   Here, the 2005 Flow Plan, in basing the rate factor for
each loan on the aggregate cumulative performance of all the
loans insured under the policy, effectively made the risk of
insuring any one loan under the policy necessarily bound up
with, and thus inseparable from, the risk of insuring all of the
other loans under the policy.   Under such circumstances, East
Augusta teaches that the policy should be regarded as entire and

indivisible.[85]    UG   is   correct   to   indicate   that   the   risk

---

[85] In addition to relying on East Augusta, UG cites and discusses at length United Guaranty Mortgage Indemnity Co. v. Countrywide Financial Corp., 660 F. Supp.2d 1163 (C.D. Cal. 2009).   UG argues that the insurance policy at issue here is "virtually indistinguishable in all material respects from the policy at issue [in Countrywide]," UG's Proposed Facts and Law at 23, which the court found severable on a loan-by-loan basis, 660 F. Supp.2d at 1191-92.

The outcome in Countrywide should not control here for several reasons.   First, Countrywide's severability analysis, and ultimately its holding, relied on California's test for severability of insurance contacts articulated in Coca Cola Bottling Co. of San Diego v. Columbia Casualty Co., 14 Cal. Rptr. 2d 643 (Cal. Ct. App. 1992), which calls for consideration of "special factors" that the Supreme Court of Virginia has not recognized as having such status.   Second, even assuming that the "special factors" articulated in Coca Cola Bottling are applicable here, those factors do not show the policy to be severable.   The first two Coca Cola Bottling factors inquire whether the policy called for separate and distinct liability limits   for   each   loan   and   whether   the   policy   called   for separately rated premiums for each loan.   In contrast to Countrywide, both questions must be answered in the negative here.   The Master Policy capped UG's coverage obligation at a percentage of the total loan amounts insured in a loan pool (meaning, therefore, that the policy did not call for separate and distinct liability limits for each loan), and, under the 2004 Flow Plan and 2005 Flow Plan, UG applied different rate factors to different categories of loan products (based on UG's actuaries' assessment of the risk associated with the loan categories) and a single rate factor to all the loans insured under the policy (based on the performance of all the loans as informed by cumulative loss ratio), respectively (meaning, therefore, that the policy did not call for separately rated premiums for each loan).   It should be noted, too, that the Countrywide court seemed to misapply the second Coca Cola Bottling factor in finding that application of "a single multiplier based on the . . . overall loan profile" to all loans insured under the policy resulted in premiums being separately rated as to each loan.   Id. at 1192.   Universal application of a single rate factor to all loans insured under a policy—especially when the rate factor is predicated on the performance of the entire loan portfolio—does not result in the policy's loans having separately rated premiums.   In order to have

associated with any one particular loan insured under the policy did not actually depend on the risk associated with any of the other loans insured under the policy, since one loan's default was an event unto itself. But, tellingly, the policy did not treat the risk of each loan as independent; rather, it treated the risk of each loan as interdependent. It must be concluded, therefore, that the parties rejected an arrangement that would give rise to standalone contracts of insurance for each loan ST insured with UG.

UG's coverage obligation under the policy further reveals the non-severable nature of the contract. With UG's maximum

---

separately rated premiums for each loan, separate rates (not separate premiums) must be applied to the loans. The Countrywide court failed to appreciate this subtlety. Third, and finally, as the third Coca Cola Bottling factor (inquiring whether "global rescission would work the absurdity of inviting litigation on irrelevant statements") suggests, the context in which the Countrywide court assessed severability is materially different from the one here. In Countrywide, the insurance company was seeking global rescission of all of the loans insured under the policy based on alleged misrepresentations of the insured that, by concession of the insurance company, did not relate to all the loans insured under the policy. Id. at 1190. The effect of the court not finding the policy severable, therefore, would have been that the insurance company would have been able to execute a global rescission of the policy based on misrepresentations of the insured that, it was uncontested, were of isolated import. ST's first material breach defense not involving an insurer's attempt to rescind coverage on loans, and certainly not involving an insurer's attempt to rescind coverage on all loans insured under a policy based on select misrepresentations of the insured, the Court's interests here respecting severability are materially different than the court's interests in Countrywide. This is all to say that Countrywide does not counsel for the result that UG claims it does.

cumulative liability being capped for each pool based on a percentage of the total amount of loans insured in a pool, UG's coverage obligation was intertwined not with the individual performance of any one loan, but rather the performance of the mass of different loans in each pool. The removal of a loan from a pool affected UG's coverage obligation for the pool; however, given the number of loans in each pool, the effect was trivial in relation to the sum of all the loan amounts in the pool. The locus of UG's coverage obligation was the aggregate total of the loans insured in each pool, not events pertaining to any one individual loan.

In arguing for severability, UG contends that not finding the contract severable would result in the Court having to find "unreasonably" that the "parties intended to let a single, isolated breach (or even the breach of several loans with the same characteristic) unravel the entire contract." This is hyperbole. The only manner relevant to the Court's purposes here in which the contractual relationship of the parties would, to borrow UG's words, "unravel" by function of the law is if one party materially breached the policy; and, as the Court's analysis on the issue of materiality evinces, "material" breaches of contracts are not usually found on an "isolated breach." UG materially breached the insurance policy by denying coverage on more than thirteen hundred IOF Combo 100 Loans and

continuing to demand and collect premiums on many thousands more which it knew it would not insure. That conduct—which hardly can be said to be an "isolated breach"—is the reason why ST will not be obligated to perform further under the policy.

The prevailing purpose of the insurance policy, the policy's implementation of premium rates and liabilities, and the parties' conduct under and pursuant to the policy demonstrate that the parties intended to create one contract of insurance to insure second-lien loans en masse. The policy therefore must be held entire and indivisible. The effect of the Court's holding is that UG's ST's first material breach defense not only bars UG from a judgment obligating ST to continue to pay renewal premiums on performing IOF Combo 100 Loans on the Partlow list, but also bars UG from a judgment obligating ST to continue to pay renewal premiums on all other performing loans insured under the policy because the policy is not severable from the former category of loans.

### CONCLUSION

For the reasons stated above, ST has met its burden on its first material breach defense, and judgment will be entered for ST on Count IV of UG's Counterclaim.

It is so ORDERED.

_____ /s/       _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August 18, 2011