IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SUNTRUST MORTGAGE, INC.,

     Plaintiff,

v.                                                        Civil Action No. 3:09cv529

UNITED GUARANTY RESIDENTIAL
INSURANCE COMPANY OF NORTH
CAROLINA,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court after a bench trial conducted on July 18, 2011, on the issue of damages and prejudgment interest on Count I of the THIRD AMENDED COMPLAINT (Docket No. 121) ("TAC"). Before trial, the parties stipulated to the amount of covered Count I claims as of May 31, 2011, as being $34,152,634.[1]  The parties also stipulated that, if prejudgment interest is found to be available and appropriate, the amount of prejudgment interest for the six loan pools at issue in Count I of the TAC through July 18, 2011, would be $5,794,420; and that the amount of prejudgment interest awardable on a per diem basis thereafter through the date of

---

[1] See ST Ex. 201.  UG has reserved the right to petition the Court to order this amount reduced if, on or after June 1, 2011, it pays additional claims of ST that warrant reducing the judgment for ST on Count I of the TAC.

entry of a final judgment on Count I of the TAC would be $5,819.[2] In light of these stipulations, and the Court already having entered summary judgment for ST on the issue of liability on Count I of the TAC,[3] the only issues that remain to be decided on Count I of the TAC are whether SunTrust Mortgage, Inc. ("ST") is entitled to damages in the amount of the covered Count I claims and, if so, whether ST should be awarded prejudgment interest.

For the reasons set forth below, judgment will be entered for ST on Count I of the TAC in the amount of $34,152,634, with prejudgment interest thereon of $5,980,628, reflecting the sum of the stipulated amount of prejudgment interest through July 18, 2011, $5,794,420, and the product of the stipulated per diem prejudgment interest amount of $5,819 and thirty-two (32), the number of days from July 18, 2011, through entry of the accompanying judgment order.

## DISCUSSION

The facts underlying Count I of the TAC, Count IV of DEFENDANT UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA, INC.'S ANSWER TO PLAINTIFF'S AMENDED COMPLAINT AND COUNTERCLAIM (Docket No. 47) ("Counterclaim"), and ST's first material breach affirmative defense to Count IV of UG's

---

[2] See ST Ex. 213.

[3] See ORDER (Docket No. 476).

Counterclaim have been set forth extensively in prior opinions of the Court.[4]  Accordingly, they need not be repeated here.

Though the parties' briefing on damages preceded the Court's ruling on ST's first material breach defense, UG briefed the damages issue as if it had been held to have materially breached the insurance policy.  UG's assumption in its brief is now reality, as the Court held in the ORDER (Docket No. 547) and MEMORANDUM OPINION (Docket No. 546) that UG materially breached the policy by denying claims on the 1,305 loans at issue in Count I of the TAC and by continuing to bill for and collect premiums on thousands of performing loans the claims for which it knew it would deny.

## I.  ST Is Entitled To Damages In The Amount Of The Covered Count I Claims of $34,152,634

ST is entitled to its claimed damages in the amount of $34,152,634.  As the agreed-to covered Count I claims, this figure represents the amount of coverage to which ST is entitled as insurance due on the 1,305 loans at issue in Count I of the TAC, taking into account UG's coverage obligation (in the policy's nomenclature, "maximum cumulative liability") for the six loan pools into which the loans were placed as of May 31,

---

[4]  See generally MEMORANDUM OPINION (Docket No. 403); MEMORANDUM OPINION (Docket No. 448); MEMORANDUM OPINION (Docket No. 451); MEMORANDUM OPINION (Docket No. 518); MEMORANDUM OPINION (Docket No. 546).

2011, and UG's satisfaction of its coverage obligation for those pools as of May 31, 2011.

Although it stipulates to the amount of covered Count I claims as being $34,152,634, UG argues that ST is not entitled to damages in that amount. In fact, UG argues that ST is not entitled to any damages at all. According to UG, ST's claimed damages of $34,152,634 must be reduced by the $92 million that, UG claims, the record shows ST will avoid having to pay as a result of UG's material breach of the policy. UG argues first that "ST presented no evidence regarding the amount of the future premiums payments it admittedly would have paid had UG fully performed." UG continues: "[b]ecause ST failed to meet its burden of proving both its losses (unpaid claims) and its saved costs of performance (premium payments), it has failed to prove the essential element of damages."[5] UG argues second that, "[e]ven if the Court does not find a failure of proof by ST, the undisputed record compels the conclusion that ST has not been damaged if, as ST urges, it is relieved of its contractual duty to pay future premium payments because of UG's breach." In support of this contention, UG argues that it "presented uncontroverted evidence that the amount of premiums owed by SunTrust is roughly $92 million." "Thus," argues UG,

---

[5] DEFENDANT UNITED GUARANTY RESIDENTIAL INSURANCE COMPANY OF NORTH CAROLINA'S POST-TRIAL BRIEF REGARDING DAMAGES AND PREJUDGMENT INTEREST (Docket No. 537) ("UG's Response") at 1.

> the only conclusion that can be drawn from
> the record is that if UG's breach relieves
> ST of its obligation to pay future premiums
> on in-force loans . . . , the $92 million in
> savings to ST resulting from UG's breach far
> exceed the $34 million in losses [claimed by
> ST], and therefore ST was not damaged by
> UG's breach."[6]

UG's position is untenable.   ST has met its burden of proving damages.

## A.   The Controlling Legal Framework

In Virginia, where there is a "failure to comply with a contract to pay money at a stipulated time . . . the measure of damages for the breach of the contract is the principal sum due, and any interest thereon."   Bethel v. Salem Imp. Co., 25 S.E. 304, 307 (Va. 1896).[7]   25 Williston on Contracts § 66:96 (4th ed.) confirms this: "[w]here the defendant is under a unilateral or independent contractual obligation to pay a liquidated sum of money, the ordinary measure of damages for nonperformance is the sum of money itself with interest at the legal rate from the

---

[6] Id. at 1-2.

[7] UG objects to Bethel and its progeny because, according to it, they were decided many years ago and illustrate instances where courts were limiting the damages available to a plaintiff when the breach alleged was failure to pay a liquidated amount of money to recovery of the amount owed plus interest, not consequential damages, such as profits.   Id. at 10-11.   But, despite their age, Bethel and its progeny remain binding precedent, and, even if their intent was to limit the damages available when the breach alleged was failure to pay a liquidated claim, they also state the time-honored measure of damages in Virginia in such instances as the principal sum due, plus interest on that sum.

time when performance was due . . . ."  The record shows that, as of the filing of this action in July 2009 and continuing to the present, ST has been entitled to payment for losses on the loans at issue in Count I of the TAC up to the coverage obligation of UG for the loan pools containing those loans.  The parties have stipulated that, as of May 31, 2011, the amount of covered losses on the Count I loans was $34,152,634.  UG therefore owes that amount to ST under the policy, and, indeed, it has owed that amount to ST for a long time.[8]  Having shown the principal amount due under the policy, ST has met its burden of proving damages on Count I of the TAC.

### B.   UG's "Avoided Cost"/"Offset" Argument

The Court recognizes that, to prove contract damages, a plaintiff must oftentimes establish both the loss in value of the other party's performance and any cost or other loss that the non-breaching party has avoided by not having to perform. See Ceres Assoc. Sales & Mktg., Inc. v. Veridian Corp., No. 208217, 2003 WL 22785037, at *3 (Va. Cir. Ct. Oct. 16, 2003); Restatement (Second) of Contracts § 347; see also 24 Williston

---

[8] In fact, UG has likely owed ST considerably more than this amount on the loans at issue in Count I of the TAC during the pendency of this action.  UG denied about $63 million in claims on Count I loans.  Whereas, at the time of filing suit, ST was likely entitled to all, or substantially all, of that amount, it is now entitled to a lesser amount as a result of UG's payment of claims on other loans insured under the policy, which has had the effect of reducing UG's coverage obligation for losses on the Count I loans.

on Contracts § 64:2 (4th ed.) ("[T]o avoid overcompensating the promisee, any savings realized by the plaintiff as a result of the defendant's breach, such as any costs that are avoided by the plaintiff not having to perform the balance of his or her own obligations under the contract, must be deducted from the recovery.").

UG uses this line of authority to argue that its first material breach of the insurance policy allowed ST to avoid paying the future premiums that would have been due under Section 3.4 of the Master Policy.[9]  And, says UG, because ST offered no proof of this aspect of the damages calculus, ST cannot recover on Count I at all.  Relatedly, UG says that its own evidence showed the avoided cost to be $92 million, an amount which far exceeds the more than $34 million in coverage due under Count I (even with prejudgment interest added thereto).  UG's arguments must be rejected.

Under the applicable measure of damages formula, ST was not required to prove the so-called "avoided cost" of future performance at all.  This is because ST was owed insurance coverage that was at issue in Count I of the TAC not more than sixty days from the time it submitted claims on the Count I

---

[9] In the MEMORANDUM OPINION (Docket No. 451), the Court construed Section 3.4 of the Master Policy to require that ST pay renewal premiums for the life of the insured loans, notwithstanding UG's coverage obligation having been met for losses on those loans.

loans.  See ST Ex. 3 § 6.3 ("Whenever a Loss becomes payable,
the Company [UG] shall pay to the Insured [ST], within sixty
(60) days after the Insured [ST] has filed a claim [the covered
loss].").  That is, ST's entitlement to have its covered losses
insured under the policy was not dependent on some future
performance of ST.  In paying premiums in a timely fashion up
until it submitted claims on the Count I loans, ST secured its
right to insurance for covered losses on those loans within
sixty days of submission of the claims irrespective of ST's
continuing to pay future premiums on those loans.  The corollary
of ST's right to insurance coverage being independent of its
continued payment of renewal premiums is that, to the extent
that ST will not have to pay future premiums as a result of UG's
first material breach, it will not have "avoided" costs or other
losses as that term is used in the treatises and caselaw on
which UG relies.  And, because no such costs or losses will have
been avoided, ST was not required to produce evidence about such
costs or losses (there being none) to meet its burden on
damages.

UG's position erroneously equates proof of damages under
this contract of insurance with proof of damages under
employment contracts, sales contracts, and the like.  In those
latter categories of contracts, it is necessary for the
plaintiff seeking damages to show its costs of performance,

since, without accounting for such costs (which the plaintiff expected to incur in securing performance from the other party), it is impossible to measure the expected value, and thus damages, to the plaintiff of the performance that was not rendered.   See 25 Williston on Contracts § 66:96 (4th ed.) ("Where the defendant's obligation to pay money is dependent on an obligation of the plaintiff, still at least partially unperformed, to furnish property or services, the measure of damages has been considered in connection with contracts of employment, or of sale.").   By contrast, the contract of insurance here provided that ST was due its expected performance notwithstanding any further costs of performance (its payment of renewal premiums).   Therefore, to measure the expected value to ST of the performance that UG did not render, it is not necessary to take into consideration future performance that ST will not have to make as a result of UG's material breach of the policy.   None of the authorities that UG cites for the proposition that, to meet its burden on damages ST must prove the future premiums that it will not have to pay owing to UG's material breach, see UG's Response at 7-10, 12-13, speak to a situation such as that produced by this contract.   In consequence, those authorities are neither controlling nor persuasive on the burden of proof on damages here.

Awarding ST $34,152,634 for covered losses under the policy, while not requiring it to show future premiums it would have owed had UG not materially breached the contract does not, as UG argues, effect an impermissible "double recovery." Contract law affords a mechanism by which a defendant may "recoup" the value of the performance to which it is entitled under a contract. See First National Bank v. Master Auto. Serv. Corp., 693 F.2d 308, 310 n.1 (describing recoupment as "the right of the defendant to have plaintiff's monetary claim [reduced] by reason of some claim that defendant has against the plaintiff arising from the very contract giving rise to plaintiff's claim"); see also Restatement (Second) of Contracts § 354 ("If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.").

The rights of recoupment—or "set-off," as it is sometimes called—does not factor into the plaintiff's burden on damages. Rather, the burden of proving a set-off falls on the defendant who asserts it.   Regency Commc'n v. Cleartel Commc'n, Inc., 304 F. Supp. 2d 1, 6-7 (D.D.C. 2004) (holding that setoff is either an affirmative defense or a compulsory counterclaim to be affirmatively pled by the defendant).   In pleading a recoupment,

the defendant has an opportunity to deduct from any damages awardable to the plaintiff amounts to which it has shown it is due under the same contract, thus avoiding a recovery that may unduly over-compensate the plaintiff.

UG would have had the opportunity to seek a recoupment were it not for its own failings.  Even if UG had pled recoupment (which it has not), and, as a result, did not face a procedural bar to arguing it here, the Court's finding in the MEMORANDUM OPINION (Docket No. 546) that UG materially breached the insurance policy substantively precludes UG from seeking recoupment, because, under Virginia law, a party may not enforce an entitlement under a contract that it has materially breached. See, e.g., Horton v. Horton, 487 S.E.2d 200, 204 (Va. 1997) ("If the first breaching party committed a material breach . . . that party cannot enforce the contract" (citing Neely v. White, 14 S.E.2d 337 (Va. 1941))).  The decision in ADC Fairways Corp. v. Johnson Construction, Inc., 343 S.E.2d 90 (Va. 1986), dispels any notion that an offset is not among the entitlements the enforcement of which is lost on account of a party's material breach.  There, the Supreme Court of Virginia denied a party's off-set claim and stated, as the basis for its doing so, the party's material breach of the contract in issue.  ADC Fairways, 343 S.E.2d at 93 ("ADC argues that it is entitled to an offset for expenses incurred in completing the Ivymount project after

Johnson left the job.   But ADC could only recover an offset if it had not breached.   Because the trial court ruled that ADC breached the contract and because we have upheld that ruling, it follows that the trial court did not err in denying ADC's claim of offset.").[10]

It cannot be said, then, as UG argues, that awarding ST $34,152,634 for covered losses, while at the same time not requiring the offset of future premiums ST would have owed had UG not materially breached the contract, offends contract law's

---

[10] Before leaving the issue of recoupment, it also bears mentioning that, even if UG had properly pled recoupment and even if UG was not precluded from claiming recoupment because it had not materially breached the contract, the evidence offered by UG on the amount of future premiums owed by ST under the policy was undeveloped and was too speculative to permit any award of recoupment or off-set.   Mr. Bryant's statement during the bench trial on ST's first material breach defense that ST had an obligation to pay future premiums in an amount approximating $92 million was neither meaningfully explained by Mr. Bryant himself nor confirmed by other record evidence. Additionally, due to the variable nature of the rate factor that is to be applied to all the loans insured under the policy pursuant to the 2005 Flow Plan, it is doubtful that the amount of future premiums could be calculated, on any set date, with the requisite level of specificity to award a recoupment.   And, irrespective of the variable rate factor, the amount of future premiums would no doubt change over time, even for the loan pools where UG's coverage obligation had been met, since loans would be removed from the pools as they were paid off by ST's borrowers.   Indeed, these future happenings, which affect the amount of future premiums due but which are impossible to predict at any set moment in time, were undoubtedly what motivated UG to seek declaratory relief in the form of a judgment requiring ST not to pay a specific sum in future premiums, but to pay future premiums notwithstanding UG's coverage obligation for each pool having been reached pursuant to the general terms of the contract.

proscription against double recoveries.  The fact that ST is not obligated to show premiums it has avoided as a result of UG's material breach is a result of the nature of the contract entered into between the parties, which, though providing for mandatory payment by ST of renewal premiums for the life of the loans notwithstanding UG's coverage obligation for such loans having been met, see n.9, supra, made the payouts on covered losses due within sixty days of submission of claims irrespective of ST's obligation to pay renewal premiums thereafter.  And, ultimately, the fact that ST is not obligated to continue to pay premiums under the policy is a consequence of UG's own conduct and the application of Virginia's first material breach doctrine.  Rather than constituting a distortion of the basic principles of contract law, as UG argues, a $34,152,634 recovery by ST on Count I of the TAC is dictated by such principles.

Were the Court to accept UG's position that a materially breaching party is entitled to reduce the non-breaching party's claim for damages by an amount that, but for the material breach, the breaching party would be entitled to collect in the future, it in effect would be sounding the death knell on the first material breach doctrine in Virginia.  That not only would be inconsistent with the controlling Virginia decisions, which recognize the continued vitality of the first material breach

doctrine and which further state the preclusive effect of a material breach on the breaching party's ability to enforce his rights under a contract,[11] but it also would be inconsistent with the fundamental purpose of the first material breach doctrine, which is to deter parties that enter into contracts from materially breaching those contracts by making the effect of a material breach consequential.

Having met its burden on damages, ST is entitled to $34,152,634 in damages on Count I of the TAC.

## II.  ST Is Entitled To Prejudgment Interest

This being a diversity case, Virginia law governs the award of prejudgment interest. See United States v. Dollar Rent A Car Systems, Inc., 712 F.2d 938, 940 (4th Cir. 1983).  Va. Code § 8.01-382 provides that "[i]n any action at law or suit in equity, the final order, verdict of the jury, or if no jury the judgment or decree of the court, may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence."  Whether prejudgment interest should be awarded under § 8.01-382 is within the sound discretion of the trial court.  See Hannon Armstrong & Co. v. Sumitomo Trust & Banking Co., 973 F.2d 359, 369 (4th Cir. 1992); Dairyland Ins. Co. v. Douthat, 449 S.E.2d 799, 801 (Va. 1994). The trial court "must weight the equities in a particular case

---

[11] See generally MEMORANDUM OPINION (Docket No. 546).

to determine whether an award of prejudgment interest is appropriate." Moore Bros. Co. v. Brown & Root, Inc., 207 F.3d 717, 727 (4th Cir. 2000) (citing McDevitt & Street Co. v. Marriott Corp., 754 F. Supp. 513, 515 (E.D. Va. 1991)).

"Prejudgment interest is not an element of damages, but, instead, is a statutory award for the delay in the payment of money due, or compensation for the loss of use of money." McClung v. Smith, 870 F. Supp. 1384, 1409 (E.D. Va. 1994) (citations omitted). The Supreme Court of Virginia has stated: "The justification for the award of interest on damages . . . in a civil lawsuit, has been recognized since the earliest days of this Commonwealth: '[N]atural justices [requires] that he who has the use of another's money should pay interest on it.'" Upper Occoquan Sewage Auth. v. Blake Const., 655 S.E.2d 10, 22 (Va. 2008) (quoting Jones v. Williams, 6 Va. (2 Call) 102, 106 (1799)) (brackets in original). "Prejudgment interest is normally designed to make the plaintiff whole . . . ." Dairyland, 449 S.E.2d at 801 (quotations marks omitted).

The parties have stipulated that, if the Court awards prejudgment interest, the annual rate of six percent under Va. Code § 6.2-302(B) shall apply. And, employing that interest rate, the parties also have stipulated to the amount of prejudgment interest, should such interest be available and appropriate, for the six loan pools at issue in Count I of the

TAC through July 18, 2011, as being $5,794,420 and the amount of prejudgment interest awardable on a per diem basis thereafter through the date of entry of a final judgment on Count I of the TAC as being $5,819.  The question the Court must answer is whether prejudgment interest is available and appropriate here.

The record shows that prejudgment interest is both available and appropriate.  By stipulation of the parties, ST's covered Count I claims are $34,152,634.  In Section I above, the Court has just held that ST is entitled to that amount in damages on Count I of the TAC.  Under the terms of the insurance policy, specifically Section 6.3 of the Master Policy,[12] UG was obligated to pay that amount in claims within 60 days of ST's filing claims, which UG did not do (and still has not done). Being that the policy designated a period in which claims were to be paid on covered losses and that UG failed to pay ST's claims in the time prescribed, this is precisely the instance spoken to by the Supreme Court of Virginia where "natural justice" counsels that UG, the party who has improperly retained money due to ST, should pay interest on it, thus making ST whole for the loss of timely payment of insurance for which it bargained and of which it has been deprived for many months. This result is in accord with Virginia caselaw providing the general measure of damages on a contract to pay money at a

---

[12] See ST Ex. 3 § 6.3.

specified time.  See, e.g., Bethel, 25 S.E. at 307 (stating when there has been a "failure to comply with a contract to pay money at a stipulated time . . . the measure of damages for the breach of the contract is the principal sum due, and any interest thereon" (emphasis added)).

UG argues that the Supreme Court of Virginia's decision in Dairyland, 449 S.E.2d 799, bars awarding ST prejudgment interest in an amount greater than $292,922, plus any applicable per diem amount.  According to UG, Dairyland "held unequivocally that in an action by the policyholder against his carrier . . . 'an insurer has no duty to pay prejudgment interest in excess of its policy limits, absent a contractual provision to the contrary.'"[13]  UG continues:  "Dairyland remains Virginia's definitive statement on the intersection of prejudgment interest and policy limits, and the rule it expounds has been adopted by courts nationwide."[14]  In support of the latter contention, UG quotes from 12 Couch on Insurance § 172:55:  "where no state statutes require payment of pre-judgment interest, an insurer has no duty to pay pre-judgment interest in excess of its policy limit, absent contractual provision to the contrary."[15]

---

[13] UG's Response at 22.

[14] Id.

[15] Id. at 23.

Applying Dairyland to the facts at hand, UG notes that "it is undisputed that three of the six loan pools at issue—the 2005, 2006, and 2007 loan pools—will hit the policy limit once UG pays the Count I claims."  "Consequently," argues UG, "any payment of prejudgment interest on loans in those three pools, which totals $5,501,498 as of July 18, 2011, would be payments in excess of the policy limits."[16]  UG argues that Dairyland forecloses the possibility of payments in excess of UG's coverage obligation because, first, "the ST-UG contract (Master Policy and Flow Plans) does not require UG to pay prejudgment interest in excess of policy limits" and, second, "no applicable statute requires payment of prejudgment interest after the policy limits are hit."[17]

Dairyland does not bar an award of prejudgment interest here.  This is so notwithstanding that the insurance policy at issue here does not specify that UG is to pay interest in excess of policy limits and no Virginia statute requires payment of prejudgment interest after the policy limits are hit.  In Dairyland, the plaintiff brought a personal injury action against an insured tortfeasor and was awarded $95,000 in damages, with prejudgment interest on that amount from the date of the accident.  449 S.E.2d at 800.  Shortly before entry of

---

[16] Id. (citations to trial exhibits omitted).

[17] Id.

the tort judgment, the tortfeasor's insurer paid the plaintiff its policy limit of $25,000. Also, the plaintiff's insurer paid the plaintiff $75,000, which was its policy limit under the uninsured/underinsured motorist coverage provision of the plaintiff. Id. The plaintiff thus received the entire $95,000 damages award, in addition to $5,000 in prejudgment interest. The plaintiff nevertheless sued both the tortfeasor's insurer and her own insurer for the unpaid amount of prejudgment interest awarded in the tort action. Id.

Noting that "[n]either of the policies issued by the insurers specifically addressed the subject of prejudgment interest," id., the court held that the insurers had no obligation to pay the remaining prejudgment interest sought by the plaintiff, since, in the court's determination, "the trial court [in holding for the plaintiff] effectively rewrote the parties' insurance contracts in the absence of any overriding statutory requirement, and . . . imposed on the insurers an obligation that they had not contracted to assume," id. at 802. "[A]n insurer," wrote the court, "has no duty to pay prejudgment interest in excess of its policy limits, absent a contractual provision to the contrary." Id.

It is this last sentence on which UG bases its argument that it cannot be required to pay prejudgment interest in excess of its coverage obligation for the loans pools. Taken in

isolation, the sentence seems to support UG's position. But the broader context of Dairyland shows it to be limited to a situation wholly unlike the one here, where the insurer timely pays either a damages judgment against its insured under a liability policy or a claim by its insured under an uninsured/underinsured motor vehicle policy, or both, and then a claim is brought against it to pay prejudgment interest in excess of the liability limit, or risk, to which it agreed to assume in the policy. Indeed, the decisions cited in Dairyland all involved that narrow set of facts. Id. In line with those decisions, Diaryland held for the insurers, reasoning that a contrary holding would in effect rewrite the policies executed between the parties, which did not provide for payment of prejudgment interest in excess of the policies' limits.

Here, however, awarding ST prejudgment interest on the covered Count I claims, which should have been paid long ago pursuant to the clear terms of the insurance policy, does not "rewrite" the policy executed between ST and UG. Therein lies the crucial distinction, which UG misses, between the factual context here and that which animated the decision in Dairyland.

There is a fundamental difference between the contractual liability agreed to in a policy pertaining to the insured's risks, on the one hand, and an insurer's obligation to pay interest on monies that it has held from the insured in breach

of the policy, on the other.    An insurer's failure to pay a claim in a timely manner is compensable under the law.   Cf. American Auto. Ins. Co. v. Fulcher, 201 F.2d 751, 757 ("The interest in question is awarded by law as damages for non-payment of money when due. . . . The interest in question does not represent any liability on account of or for the accident or the policy, but is a liability imposed by law for the delay of the defendant in paying the judgment which, as between the parties, it was legally obligated to pay. . . . Nor does the obligation to pay interest impose any additional loss upon the insurance company.   From the date the insured's liability became fixed . . . the insurance company has been holding to its own use of money rightfully due to the plaintiff." (internal quotation marks omitted)).

This must be the case because, were it not, the sixty-day payment deadline for claims specified in Section 6.3 of the Master Policy would be of no consequence.   Absent liability for prejudgment interest on covered losses that were not timely paid, UG could simply refuse to pay ST's claims, retain monies saved for its own use and investment, and, without penalty, await the day when a court orders it to pay the past-due coverage.   The prospect of an award of prejudgment interest discourages such improper conduct and furthers the worthy objectives of delivering prompt compensation to the insured and

deterring gamesmanship on the part of an insurance company that might delay payment until its value has diminished.  See Potomac Ins. Co. v. Howard, 813 S.W.2d 557, 558 (Tex. App. 1991).

That UG erroneously employs Dairyland for the overly broad proposition that an insurer never has a duty to pay prejudgment interest in excess of its policy limits, absent a contractual provision to the contrary, is evidenced by the very authorities on which UG relies.   12 Couch on Insurance § 172:55, which is quoted in UG's Response at 24, deals with liability insurers (which UG is not) in instances where the liability giving rise to the claim is the wrongful conduct of someone other than the insurer.   The pertinent section of Couch, which UG does not cite, is 12 Couch on Insurance § 172:56.   That section speaks to insurers' failure to pay claims and states that prejudgment interest generally is available from the date of the improper claim denial.   Similarly, another secondary source on which UG relies, Alexander C. Black, Liability of insurer for prejudgment interest in excess of policy limits for covered loss, 23 A.L.R. 5th 75 (1994), which cites to Dairyland, is careful to distinguish between "cases that involve insurance policies covering liability arising out of perils such as automobile accidents, medical malpractice, or products liability, where prejudgment interest may be owed in the underlying action between the insured and the third party" and "cases involving

22

interest that may be owed in an action involving only the insured and the insurance company." 23 A.L.R. 5th 76 § 1 & n.2. The distinction drawn between the two categories of insurance cases is not surprising, since their significantly different facts implicate significantly different interests in setting the bounds of insurer liability.

It is true that an insurer may seek to limit its liability for prejudgment interest by the terms of the insurance contract. UG claims that Section 6.3 of the Master Policy, which provides that, "[o]n of after the date on which the aggregate Losses paid by the Company [UG] for a Policy Year equal the Maximum Cumulative Liability for such Policy Year, the Company [UG] shall have no further obligation with respect to Loans insured hereunder," ST Ex. 3 § 6.3, limits UG's liability for damages, including prejudgment interest, to the coverage limit of the policy.[18] But Section 6.3 does not work to this effect. Even if Section 6.3's reference to "obligation" could be read to include all damages that UG might be made to pay, including prejudgment interest, the clause in which "obligation" is located is predicated on the "aggregate Losses" being "paid" by UG. The record is clear that UG has not paid losses on the loans at issue in Count I of the TAC. Thus, Section 6.3 is of no consequence here.

---

[18] Id. at 25.

Neither is Section 6.4.   That section immediately follows Section 6.3, which imposes an obligation on UG to pay a claim within sixty days of claims being submitted, and is titled in part "Discharge of Obligation."   It provides: "Any payment by the Company [UG] pursuant to Section 6.3 (Payment of Loss) shall be a full and final discharge of the Company's [UG's] obligation with respect to such Loss under the Policy."   Id. § 6.4.   Like Section 6.3, Section 6.4 predicates a "discharge" of UG's obligation on the payment of claims by UG (and, in providing that payment must be made "pursuant to Section 6.3," it is clear that the payment must not only be made, but also must be timely).   Furthermore, Section 6.4 only discharges UG's obligation with respect to "Losses."   And, with Section 1.25 of the Master Policy defining "Loss" as "the liability of the Company [UG] with respect to a Loan calculated in accordance with this Policy" (emphasis added), "losses" in Section 6.4 clearly mean the amount of the claim relating to the insured loan.   In short, the insurance policy is silent on the issue of prejudgment interest.   Nothing in the policy precludes, much less even speaks to, UG's paying prejudgment interest in excess of its coverage obligation.

ST is entitled to prejudgment interest in accordance with the stipulated amounts.

## CONCLUSION

For the reasons set forth above, judgment will be entered for ST on Count I of the TAC in the amount of $34,152,634, with prejudgment interest thereon of $5,980,628, reflecting the sum of the stipulated amount of prejudgment interest through July 18, 2011, $5,794,420, and the product of the stipulated per diem prejudgment interest amount of $5,819 and thirty-two (32), the number of days from July 18, 2011, through entry of the accompanying final judgment order.

It is so ORDERED.

            /s/        *REP*
_____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August 19, 2011