

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SUNTRUST MORTGAGE, INC.,

    Plaintiff,

v.                        Civil Action No. 3:09cv529

AIG UNITED GUARANTY CORPORATION,
<u>et</u> <u>al.,</u>

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT UNITED GUARANTY'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES INCURRED IN CONNECTION WITH ITS MOTION FOR SANCTIONS AND RELATED MATTERS (Docket No. 480). For the reasons that follow, the motion will be granted in part and denied in part.

## PROCEDURAL HISTORY

On July 16, 2009, SunTrust Mortgage, Inc. ("ST") filed in state court a complaint against the defendant, United Guaranty Residential Insurance Company of North Carolina ("UG"), alleging breach of contract, actual fraud, and constructive fraud. UG removed the action to this Court. ST's Complaint was dismissed with leave to amend. (Docket No. 36.) ST then filed its FIRST AMENDED COMPLAINT ("FAC"). (Docket No. 42).

As an important aspect of the claims therein asserted, the FAC cited, _inter_ _alia_, a "February 2008 email" sent by UG officer Pam Gavin to ST Senior Vice-President Mary Pettitt. _Id._ ¶ 19. Specifically, ST alleged that the Gavin to Pettitt email was evidence of UG's representation to ST that certain loans satisfied UG's internal criteria for coverage by the Mortgage Insurance Policy. _Id._ That email was not attached to the FAC, but in response to a request from counsel, ST sent UG a copy of the February 2008 email. UG's counsel compared the email with the version in UG's files and discovered several discrepancies.

That discovery led to fifteen months of investigation, discovery, and a hearing into spoliation of evidence that disclosed that Pettitt had altered the February 2008 email and several others and that culminated with the issuance of a 75-page opinion finding that UG was entitled to sanctions for ST's willful spoliation of evidence. Sanctions Opinion (Docket No. 403). As a sanction for the spoliation, the Court held that ST must pay the attorneys' fees and costs associated with UG's investigation of, discovery about, and litigation over ST's spoliation of evidence. The Court denied UG's requests for other sanctions such as dismissal, an adverse inference jury instruction, and preclusion of certain evidence. _Id._ at 71-75; Mar. 29 Order (Docket No. 404). In particular, the March 29 Order directed that:

[ST] shall pay as a sanction the reasonable attorney's fees and expenses associated with [UG's] MOTION FOR SANCTIONS (Docket No. 270) and related motions, discovery proceedings, evidentiary hearings, and briefing, spanning the period of time in which the altered nature of the February 22, 2008 email became known to [UG's] counsel to the date of this Order [March 29, 2011].

UG thereafter filed the pending motion for attorneys' fees with a supporting memorandum and supporting materials. ST filed its opposition and UG filed its reply.

Then, on July 1, 2011, ST filed its MOTION TO STRIKE THE DECLARATION OF PETER J. BARRETT (Docket No. 519). ST argued that UG had improperly attached the Barrett Declaration to UG's reply in support of its motion for attorneys' fees. A response and reply to the motion to strike were timely filed. In a separate ORDER entered this day, the motion to strike the Barrett declaration was granted.

The fee request filed by UG is ready for determination.

## FACTUAL BACKGROUND RESPECTING THE SPOLIATION INVESTIGATION AND HEARINGS

UG asserts that it is entitled to an award of $3,848,879.69 in attorneys' fees and expenses that were incurred because of the spoliation. UG explains its claim by describing the fees and costs incurred during six phases of its spoliation investigation and the ensuing hearings on the subject. The

3

phases and the general activities that took place during each phase are described below.

**1.    December 2009**

In December 2009, UG discovered the discrepancies between the two versions of the Pettitt email and sought to determine the reason for the discrepancies.  To that end, UG retained KPMG to analyze the metadata of the ST version of the email; UG also interviewed Gavin (the email sender); and it reviewed related documents.  After concluding that ST's version was altered, UG filed a MOTION FOR EMERGENCY RELIEF PRESERVING EVIDENCE AND GRANTING EXPEDITED DISCOVERY REGARDING SPOLIATION OF EVIDENCE BY PLAINTIFF SUNTRUST MORTGAGE, INC. (Docket No. 52).  The Court granted the motion in part, ordering examination of Pettitt's computer and hard drive, additional depositions, production of documents, responses to an interrogatory, and preservation of evidence.  Dec. 29, 2009 Order (Docket No. 59).

**2.    December 30, 2009 - February 3, 2010**

ST asked for additional time to produce the discovery required by the December 29, 2009 Order.  A status hearing was held on January 8, 2010.  UG began to review discovery documents, prepared for depositions, and conducted legal research on spoliation.

**3.    February 4, 2010 - March 29, 2010**

On February 3, 2010, ST filed a response to UG's MOTION FOR EMERGENCY RELIEF in which it revealed the existence of two additional altered emails.  (Docket No. 74).  UG, with the aid of KPMG, continued its research with respect to the initial Pettitt email and into the newly identified emails.  UG also took the depositions of Pettitt, Joanne Clack (Pettitt's supervisor), and SunTrust in-house counsel, Susan Thurman.  And, UG also prepared Gavin so that ST could take her deposition.  Meanwhile, during the status hearing on January 8, the Court ordered ST to file an amended complaint, omitting any reference to the Pettitt email.  After ST complied with that order, filing its SECOND AMENDED COMPLAINT on February 18, UG revised its motion to dismiss and its answer.  (Docket Nos. 100, 102).

Also, during the February - March 2010 time frame, ST withheld certain discovery on privilege grounds, and UG sought to compel discovery of the assertedly privileged documents.  (Docket Nos. 82, 85, 90).  Two motions for protective order and a motion to compel were filed and fully briefed.  The parties then prepared for oral argument, which was held on March 26.  The Court granted UG's motion to compel, ordering production of the privileged documents.  Mar. 26, 2010 Hrg. Tr. 41-43 (Docket No. 107).

### 4.   March 30, 2010 - August 20, 2010

After the hearing on March 26, ST began producing documents respecting the altered emails, the use thereof, and the facts related thereto.   The documents were produced on an expedited and rolling basis.   UG reviewed these documents and attempted to negotiate with ST over deficiencies in its production, asking the Court to intervene with respect to one document ST refused to produce (Thurman's September 30, 2008 notes).   UG also took the depositions of Joshua Gold, Miles Dumville, Deborah Lee Hovatter, and Sterling Edmunds.   UG also resumed the depositions of Mary Pettitt and Susan Thurman.

Having uncovered from the depositions and the documents clear evidence of spoliation, UG next began working on a motion for sanctions which it filed on August 20, 2010.   MOTION FOR SANCTIONS (Docket No. 147).

### 5.   August 21, 2010 - November 3, 2010

After UG's motion was filed, ST filed a motion requesting that briefing on the sanctions motion remain under seal. (Docket No. 152).   A response and reply were filed, and the Court granted the motion.   Thereafter, ST submitted its response to the MOTION FOR SANCTIONS, and UG submitted its reply.   A status conference was held on October 5, 2010, and the Court scheduled an evidentiary hearing on the matter for November 1-3. UG took several additional depositions in preparation for the

hearing and filed a motion for additional discovery.   At the hearing, UG called six witnesses.

**6.   November 4, 2010 – January 3, 2011**

After the November hearing, the Court ordered the parties to file briefs respecting ST's activities and the legal standards for the imposition of sanctions.   UG filed two 30-page memoranda (Docket Nos. 298, 299), ST filed opposition memoranda, and UG filed replies.   On December 8, 2010, the Court held an additional day of oral argument.   After the hearing, the Court requested briefing on the issue of whether the testimony of Joshua Gold and Miles Dumville was admissible at trial.

## DISCUSSION

In the Sanctions Opinion, the Court held that UG was entitled to recover attorneys' fees and costs reasonably and necessarily incurred in the investigation into ST's spoliation and in the successful prosecution of its motion for sanctions on account of the spoliation.   In its opening brief, UG proposed that the fee calculus should be the so-called "prevailing party" approach for fee shifting statutes outlined in Hensley v. Eckerhart, 461 U.S. 424 (1983) and its progeny, as informed by the familiar twelve-factor analysis set by Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974) which, of course, has been the formulation approved in this

circuit.  Barber v. Kimbrell's, Inc., 577 F.2d 216, 226 n. 28 (4th Cir. 1978).[1]  In its response brief, ST proposed the same approach.[2]

In its reply brief, in passing and without any real analysis, UG floated the notion that, because the fees here were being imposed as sanctions, it was not necessary to "rely on principles governing fee awards in the statutory context."[3]  As support for that proposal, UG cited Robbins & Meyers, Inc. v. J.M. Huber Corp., No. 01-CV-00201, 2011 U.S. Dist. LEXIS 45386, at *10 (W.D.N.Y. April 27, 2011), a case in which a fee was awarded as a discovery sanction under Fed. R. Civ. P. 37(a)(5)(A).  That argument reflects a mistaken view of the decision in Huber which actually followed the Hensley prevailing-party approach, but used "out-of-district rates" in

---

[1] MEMORANDUM IN SUPPORT OF DEFENDANT UNITED GUARANTY'S MOTION FOR AN AWARD OF ATTORNEYS FEES AND EXPENSES INCURRED IN CONNECTION WITH ITS MOTION FOR SANCTIONS AND RELATED MATTERS (Docket No. 481) ("UG Opening Brief"), at 12-13. However, UG's approach to determination of a reasonable rate is, as will be addressed below, somewhat unorthodox.

[2] RESPONSE OF SUNTRUST TO UNITED GUARANTY'S MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES IN CONNECTION WITH MOTION FOR SANCTIONS AND RELATED MATTERS (Docket No. 507) ("ST Response"), at 4.

[3] REPLY IN SUPPORT OF DEFENDANT UNITED GUARANTY'S MOTION FOR AN AWARD OF ATTORNEYS FEES AND EXPENSES INCURRED IN CONNECTION WITH UG'S MOTION FOR SANCTIONS AND RELATED MATTERS (Docket No. 514) ("UG Reply"), at 2.

determining the reasonable hourly rate to be used in following the Hensley approach in the Huber case.

The use of "out-of-district" rates in assessing sanctions is permitted in the Second Circuit. On Time Aviation, Inc. v. Bombardier Capital, Inc., 354 F. App'x 448, 452 (2d Cir. 2009). However, in our circuit, the Court of Appeals recently has "counsel[led] against adopting different standards with different shades and nuances in different [fee setting] contexts." Abrams & Abrams, P.A. v. National Union Fire Ins. Co., 605 F.3d 238, 244 (4th Cir. 2010). Thus, the Court declines UG's invitation to apply the Second Circuit rule here, finding, instead, that "reasonableness" of a rate is a concept that does not vary depending on whether the hourly rate (or the fee for that matter) is assessed for compensatory purposes or for punitive purposes.

Neither UG nor ST addressed the significance of the Supreme Court's more recent pronouncement on fee awards under the Hensley prevailing-party approach in Perdue v. Kenny A., 559 U.S. 542, 130 S. Ct. 1662 (2010). Because, in Perdue, the Supreme Court gave guidance, if not outright instruction, respecting the role of the twelve Johnson factors in calculating the reasonableness of a fee award, it is appropriate to reflect upon Perdue's test.

To begin, it is significant that "[r]easonableness is the touchstone of any award of attorneys' fees and expenses. That is true whether the award is made as a consequence of a fee-shifting statute or as a sanction." E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc., 2013 WL 458532, at *2 (E.D. Va. Feb. 6, 2013).[4] By far, most of the authorities addressing the question of reasonableness have been made in context of awards made under fee-shifting statutes and, thus, they provide sound instruction in how to measure the reasonableness of a requested fee. Id. As explained in McAfee v. Boczar, at *3, the Supreme Court in Perdue quite clearly stated a preference for determining reasonableness with reference to what is commonly known as "the lodestar approach." In fact, the Supreme Court, in Perdue, held that the lodestar calculation presumptively yields a reasonable fee. As explained in McAffee:

> There is a 'strong presumption that the lodestar figure . . . represents a reasonable fee.' Pennslyvania v. Delaware Valley Citizen's Council for Clean Air, 478 U.S. 546, 565, 106 S. Ct. 3088, 92 L. Ed. 2d 439 (1986). Indeed, in Perdue, the Supreme Court made clear that the strong presumption for the reasonableness of a lodestar fee figure can only rarely be overcome, 130 S. Ct. at 1673, and then only in 'extraordinary cases' which will be presented in the 'rarest of circumstances.' Id. at 1677

---

[4] McAfee v. Boczar, ___ F. Supp. 2d ___, 2012 WL 5398807, at *3 (E.D. Va. Nov. 2, 2012); Brubaker v. City of Richmond, 943 F.2d 1363, 1387 (4th Cir. 1991); Fed. R. Civ. P. 11(c).

> (Kennedy, J., concurring); see also id. at
> 1678 (Thomas, J., concurring).

McAfee, at *3.

That preference for the lodestar approach was explained in perspective of two alternative fee-setting modes in use in the federal courts: (1) the twelve-factor test devised by the Fifth Circuit in Johnson v. Georgia-Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974); and (2) the lodestar method pioneered by the Third Circuit in Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973); appeal after remand, 540 F.2d 102 (3d Cir. 1976). In relegating the Johnson twelve-factor test to the sidelines in the reasonableness assessment, the Supreme Court held that:

> This method, however, gave very little
> actual guidance to district courts. Setting
> attorneys' fees by reference to sometimes
> subjective factors placed unlimited
> discretion in trial judges and produced
> disparate results.

Perdue, 130 S. Ct. at 1672 (internal quotation and citation omitted). In explaining its preference for the lodestar method for determining a reasonable fee, the Court stated that:

> Although the lodestar method is not perfect,
> it has several important virtues. First, in
> accordance with our understanding of the aim
> of fee-shifting statutes, the lodestar looks
> to the prevailing market rates in the
> relevant community. Developed after the
> practice of hourly billing had become
> widespread, the lodestar method produces an
> award that roughly approximates the fee that

11

the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case.    Second, the lodestar method is readily administerable, and unlike the  Johnson  approach,  the  lodestar calculation is 'objective,' and thus cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results.

Id. (internal quotations and citations omitted).

Further, as explained in McAfee, Perdue forecloses use of most of the Johnson factors because they are subsumed in the lodestar analysis.    McAfee, at * 5-6.    Nonetheless, "the rationale of Perdue leaves room for using, in the reasonableness calculus, four of the Johnson factors that are not subsumed in the lodestar calculation if the facts of a particular case make it appropriate to consider them." E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc., 2013 WL 458532, at *3.[5] One of those potentially relevant remaining Johnson factors is operative here: Johnson Factor 8, and it will be discussed later.

Accordingly, the analytical framework to be used in determining the amount and reasonableness of UG's sanction fee request is the lodestar calculus, with consideration of ST's position that the results obtained warrant a significant

---

[5] The remaining available Johnson factors are: the amount in controversy and the results obtained (Johnson Factor 8); the undesirability of the case (Johnson Factor 10); the nature and length of the relationship between the claiming firm and the client (Johnson Factor 11); and awards in similar cases (Johnson Factor 12).

reduction of the lodestar calculation.   It is UG's burden to prove, by clear and convincing evidence, that its requested fee is reasonable.   Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); Guidry v. Clare, 442 F. Supp. 2d 287, 294 (E.D. Va. 2006).

## 1.   The Lodestar Amount

The first task is to calculate a lodestar fee figure which is determined by multiplying a reasonable hourly rate by the number of hours reasonably and necessarily incurred in performing the services for which the fee application is made.

### A.   A Reasonable Rate

There is no challenge to the reasonableness of the rates of Durrette Bradshaw, UG's local counsel.   The challenge, instead, is to the reasonableness of the rate sought by Gibson Dunn.

The principles respecting determination of a reasonable rate are well-settled in this circuit.   First, it is established that "[t]he community in which the court sits is the appropriate starting point for selecting the proper rate."   National Wildlife Federation v. Hanson, 859 F.2d 313, 317 (4th Cir. 1988).   In National Wildlife, the Court of Appeals acknowledged that "[n]evertheless, '[t]he complexity and specialized nature of a case may mean that no attorney with the required skills, is available locally.'"   Id. (citation omitted).   In that situation, two factors determine whether an exception to the general rule (determining the rate based upon the community in which the

Court sits) should be permitted.  First, the Court should ask "are services of like quality truly available in the locality where the services are rendered; and [second,] did the party choosing the attorney from elsewhere act reasonably in making that choice?" Id.

Of course, it is the burden of the fee applicant to establish the existence of that exception.  To meet that burden, the fee applicant must introduce evidence upon which such a conclusion can be founded.

### (i)  Proposed Use of Extra-Jurisdictional Rates

In this case, the dispute respecting the reasonableness of the rate focuses on that aspect of UG's fee petition that uses the rates charged by lawyers from Gibson Dunn who are based in Washington, D.C., New York and Los Angeles.  ST contends that it is unreasonable to predicate the rate in this fee petition upon the rates charged by those out-of-jurisdiction lawyers, even though those rates reflect a discount from the normal rate charged by those lawyers, which discount has been agreed between UG and Gibson Dunn for all work in this case, as well as for work done by Gibson Dunn in a case in which the firm represents UG's parent company, AIG.

In support of its request for hourly rates above those in the Richmond area, the venue in which the Court sits, UG says:

> First and foremost, the issues in this lawsuit are highly complex and the amounts at stake very large. Further, United Guaranty's Counterclaim Count IV, seeking a declaratory judgment regarding Suntrust's obligation to continue making premium payments after policy limits has [sic] been reached, involves (according to UG's actuarial projections) approximately $100 million. It is common for parties to retain national law firms to handle such high-stakes cases.

UG Opening Brief, at 17.

The threshold difficulty with this facet of UG's argument is that "the novelty and complexity of a case generally may not be used as a ground for enhancement because these factors 'presumably [are] fully reflected in the number of billable hours recorded by counsel.'" <u>Perdue</u>, 130 S. Ct. at 1673. In other words, the novelty and complexity of the case is a factor that is to be accounted for in the billable hours component of the lodestar calculation, not as a component of the reasonable rate component of the lodestar calculation.

That perspective is somewhat at odds with the law of the circuit which permits retention of extra-jurisdictional counsel if the <u>complexity and specialized nature of the case</u> means that no attorney with the required skills is available in the community in which the court sits. <u>National Wildlife</u>, 859 F.2d at 317; <u>Rum Creek Coal Sales, Inc. v. Caperton</u>, 31 F.3d 169, 175 4th Cir. 1994); <u>Newport News Shipbuilding & Drydock, Inc. v.</u>

Holiday, 591 F.3d 219, 229 (4th Cir. 2009). However, that apparent inconsistency can be reconciled if one considers that the law of the circuit does not dictate that extra-jurisdictional rates must be used in the reasonable rate calculation of the lodestar, but rather that the circuit simply takes the view that, "[i]n circumstances where it is reasonable to retain attorneys from other communities, however, the rates in those communities may also be considered." Rum Creek Coal Sales, Inc., 31 F.3d at 175. And, it is reasonable to retain extra-jurisdictional counsel if the applicant proves that the services required to deal with the complex and specialized case were truly not available in the visited market. Newport News Shipbuilding & Drydock, Inc., 591 F.3d at 229.

Thus, the first step in examining the extent to which, if at all, extra-jurisdictional rates ought to be considered in setting a reasonable rate in the lodestar calculus is to ascertain whether the case presents issues requiring specialized skills or knowledge to deal with complex and specialized issues.

That analysis necessitates an assessment of the nature of the case. The record here teaches that this case is a contract dispute over the meaning of an insurance contract. At base, as shown in the decisions necessary to resolve the case, the questions presented were those of contract interpretation: (1) the meaning of the insurance contract terms that were in

dispute; (2) the existence of any ambiguity and the law applicable to resolving what happens in the event that an ambiguity in the insurance contract terms is found; and (3) the fundamental contract principle of first material breach and the consequences associated therewith. Those issues present themselves in almost all insurance contract disputes, and the reporters of both state and federal decisions are replete with cases of that sort, involving those issues that, for years, have been litigated by lawyers in the Richmond area.

No doubt, as UG contends, the magnitude of the dispute is of considerable importance to all concerned; however, the quantum of damages sought does not alter the basic issues or make the case one that requires the use of extra-jurisdictional counsel. Nor does the presence of the spoliation issue warrant the use of extra-jurisdictional counsel. Unfortunately, spoliation issues are quite common in all species of cases here and elsewhere.

More importantly, it is incumbent upon UG, as the proponent of the extra-jurisdictional rate, to present specific evidence from which the Court can find that the case is complex and that it requires specialized legal services not available in the Richmond area. There is no evidence to that effect. To the contrary, UG's local counsel, Durrette Bradshaw, is fully

capable of handling cases of this sort and indeed advertises itself as capable of handling such disputes.

The affidavit of Mr. Durrette, however, shows that his firm could not have taken on the extra work entailed in the case or in the spoliation investigation because its resources were otherwise committed during the pertinent time frame. That, of course, is relevant, but it is not dispositive because, in the Richmond area, there are many firms that regularly handle litigation of the degree of sophistication presented by this case.[6]

UG's fee application contains no evidence to support a conclusion that the case was of such a complex nature as to make it necessary to retain Gibson Dunn, in particular, or any other firm outside the Richmond area. Instead, UG relied on unsupported, conclusory assertions in the Millian Declaration and a brief to try to show that necessity. That simply is not sufficient.

UG also tried to show that the rates used in the fee application were reasonable by citing two surveys. Millian Declaration, Exs. K and L. Those surveys show only that Gibson Dunn's rates are consistent with rates in Washington, D.C., New

---

[6] Twenty-one years of practice and almost twenty-one years on the bench have taught that Christian & Barton, Troutman Sanders, Hunton & Williams, LeClairRyan, Williams Mullen and McGuireWoods (when this case began McGuireWoods was not in it), to name a few, are all firms capable of handling cases such as this.

York, and Los Angeles.  That, of course, does nothing to prove the reasonableness of those rates in the Richmond area. Interestingly, the rates sought in the fees application are almost double the average rates for Richmond firms listed in Exhibit K to the Millian Declaration.

UG next argues that ST's own actions demonstrate that it is reasonable to employ extra-jurisdictional counsel because in the early stages of the dispute, ST employed the firm of Anderson, Kill & Olick, a firm with offices in New York, California and Washington, D.C., and a lawyer whose office was in New York. Further, UG points out that Reed Smith, the firm that handled most of the case for ST, is a national firm, as is McGuireWoods, a firm retained by ST in connection with the defense of the spoliation sanctions motion when a Reed Smith lawyer had to testify on the motion.

That argument proves too much.  First, the issue is not where a firm has offices.  The issue is whether the services necessary to litigate the case are truly available in the relevant market which is presumptively the community in which the Court sits.  The fact that firms such as Reed Smith and McGuireWoods have offices in various cities throughout the country does nothing to advance UG's proofs on that issue.  The fact that ST hired a lawyer in New York originally to handle the investigation of the case and to draft the complaint is a factor

to be considered, but the bulk of the services provided in the litigation were provided, on ST's side, by lawyers from the Richmond area, the situs that is presumptively the predicate for determining the relevant market.[7]

In sum, the record does not establish that this case was so complex that it required specialized skills that were not available in the Richmond legal market. Therefore, in this case, the general rule must apply, and the Court concludes therefore that reasonable rates in the Richmond area provide the appropriate rate component for the lodestar calculation.

### (ii) The Reasonable Rate

The question remains what does the record demonstrate respecting the reasonableness of the rates for the services here at issue. The services were the reviewing of documents by associates and legal assistants and, to some extent, partners; the taking of depositions; working with expert consultants respecting document analysis; the preparing of briefs on fairly

---

[7] UG makes the point that the fee motion reflects lower than standard rates agreed upon between UG and Gibson Dunn for work on this case and that those rates are the same rates paid by UG's parent in other litigation in which Gibson Dunn represents UG's parent company. That information is not of particular use in determining what is a reasonable rate in the relevant market here.

Nor is UG correct in asserting that the relevant market is "the market for major national law firms." UG Opening Brief, at 18. That simply is not the test. Thus, the survey documents offered to support the reasonableness of the rates of lawyers in Washington, D.C., New York and Los Angeles are of no material value in determining a reasonable rate in this case.

basic issues of Virginia and Fourth Circuit law; and the presentation of evidence respecting the questions raised by Pettitt's conduct.  The record shows that the prevailing market rate in the Richmond area for the services at issue can be measured by looking at the rates charged by Durrette Bradshaw, Reed Smith, and McGuireWoods, firms within this jurisdiction that actually performed the services at issue.  The billing rate in 2010 for the average partner at McGuireWoods was $543 per hour and the average associate billing rate at McGuireWoods was $355 per hour during that period.  Mr. Durrette, the senior litigation partner at Durrette Bradshaw, had a billing rate of $485 per hour during that period.  The rate for the only associate from Durrette Bradhsaw who worked on the case was $195 per hour.  The rate for all Reed Smith partners (and one associate who was more senior than two of the partners) during the appropriate period was billed to ST at $350 per hour.  The record does not show a separate associate rate for the Reed Smith associate or a legal assistant rate.  The record also does not show a legal assistant rate for McGuireWoods. The rates actually charged by McGuireWoods to ST for the principal partners in the spoliation case was $695 per hour.

From the fact that Mr. Dumville's normal rate in 2010 was $475 per hour, see fee award decision in Smith v. EVB, 2010 U.S. Dist. LEXIS 135562, at *6, vacated and remanded on other

grounds, 438 F. App'x 176 (4th Cir. 2011), it would appear that the rate charged to ST in this case is a reduced rate not reflective of the prevailing market rate. Also, in <u>Smith v. EVB</u>, Judge Spencer acknowledged a range of rates in the Eastern District of Virginia during 2010 of up to $600 per hour. <u>Id.</u>

Considering the entire record, the Court concludes that it is reasonable to award to Gibson Dunn, the firm that did most of the work on the spoliation motion for UG, the same legal rate for Gibson Dunn partners as was charged by the ST lawyers who did most of the legal work on the spoliation part of the case. That rate is $695 per hour as billed by Messrs. Schill and Spahn on behalf of McGuireWoods for ST. For like reasons, the associate rates should be the average associate rate for McGuireWoods during the period, which was $310 per hour. The rates for paralegal services also should be the rate charged to ST by McGuireWoods.[8]

### B.   The Number Of Hours Reasonably Spent

It is by now thoroughly settled that, in the lodestar method of fee determination, the fee applicant must demonstrate that "the number of hours for which compensation is sought also must be reasonable." <u>E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.</u>, 2013 WL 458532, at *4. To meet this burden,

---

[8] As noted previously, the record does not show those rates. If, for some reason, UG considers those rates to be too high, it can address the point later.

22

the fee applicant must document the need to have devoted the amount of time for which it seeks compensation. To do so, the applicant must tender reliable billing records, and it must exercise billing judgment to excise from its claim time not properly shown to have been incurred in pursuit of the matter at issue or that is otherwise not reasonable in amount or not necessarily incurred. Hensley v. Eckerhart, 461 U.S. at 433-34.

When assessing the reasonableness of attorneys' fees sought as a sanction for spoliation, it is necessary to make the assessment of reasonableness as to the number of hours expended in context of the nature of the sanctionable conduct, the nature and extent of the inquiry necessary to ascertain and resolve issues respecting the sanctionable conduct, and the nature of the sanction obtained. That, then, is the next task.

The sanctions issue arose in December 2009, and the Sanctions Opinion was issued at the end of March 2011. Much of 2010 was devoted by the parties to discovery respecting the spoliation. That work included the review of documents produced by ST, the taking of depositions of ST, the examination of information by UG's lawyers and its experts and consultants, and the filing of briefs before and after the hearing respecting spoliation. The hearing, which occurred over three days, involved the testimony of six witnesses, and it was followed by the filing of a number of briefs. In addition, there were a

23

number of claims of privilege that had to be resolved and that necessitated ancillary briefing as well during the discovery period.

It is important to remember that the investigation, discovery, and briefing respecting the spoliation issue was occurring simultaneously with trial preparation on the merits of the case. Also, it bears mention that, upon discovery of the spoliation, UG reasonably concluded that the conduct involved could have a significant impact on the outcome of the case.[9] Those two factors are important components of the analysis of the reasonable time component in this case.

### (i) The Number Of Lawyers Used

UG's application seeks compensation for 6,654.4 hours of time devoted to the spoliation investigation, briefing, and hearing. Of that total, lawyers from Durrette Bradshaw spent 220 hours, and lawyers from Gibson Dunn spent 6,434 hours. ST does not challenge the reasonableness of the time spent by Durrette Bradshaw. Instead, ST takes the view that the time devoted by Gibson Dunn is unreasonable. As ST puts it: "The Gibson Dunn lawyers "adopted a 'scorched earth,' 'take no prisoners,' 'gang tackle' approach." ST Response, at 11.

---

[9] As it turned out, that was not the case, but UG could not know that the evidence would not be admissible until it had uncovered what had actually happened. Indeed, UG would have been remiss not to have pursued the investigation until it understood all the facts that the investigation ultimately revealed.

According to ST, "there were too many professionals and/or too many hours devoted to the sanctions-related issues. . . ." Id. Relying on Signature Flight Support Corp. v. Landow Aviation P'shp, 730 F. Supp.2d 513, 522 (E.D. Va. 2010), ST argues that the "'total number of hours expended on this case suggests a lack of billing judgment exercised by [the movant's] counsel.'" Id. ST offers several reasons for its position, some of which have merit. They are considered below.

First, ST argues that much of the work was unnecessary. ST Response, at 6-7. That, says ST, was caused in the first instance by the failure of UG's counsel to work with ST's counsel to find a resolution to the sanctions motion after it was filed. It is regrettable that the parties were not able to sort this matter out short of the extensive discovery, briefing, and hearing that ensued the efforts to arrive at some compromised resolution, but they were unable to come to a compromise resolution. The record respecting why that occurred is insufficient to fault UG's counsel for pressing forward.

Second, ST asserts that UG used too many lawyers and that too many hours were devoted to the motion for sanctions considering what was at stake and what was achieved. According to ST and the records, Gibson Dunn employed the service of six partners, ten associates, three paralegals, and three litigation specialists in the sanctions component of the case, and Durrette

25

Bradshaw used seven timekeepers, five of whom were partners.  ST takes the view that the "overkill" is evident based on the total time expended in pursuit of the sanctions motion.  However, ST points only to two examples to make that point.

The first example is a status conference held on October 5, 2010 where ST was represented by two lawyers, and seven lawyers (four partners and three associates) appeared on behalf of UG. The total fees claimed for that day was $40,646.48 (excluding any expenses of travel, hotel and meals).  ST then points to the second day of the sanctions hearing, which occurred on November 2, 2010.  Two lawyers (both partners) represented ST on that day, whereas UG had ten timekeepers present: five partners, four associates, and a paralegal.  The total fee claimed by UG for that day was $92,634.68 (again excluding expenses).  According to ST, these examples prove that UG used too many professionals and billed too many hours devoted to the sanctions issues.

These examples are probative of ST's position, but they are not sufficient to carry the load that ST puts on them because the examples address only two events in a lengthy process.  That is an insufficient predicate to condemn as overkill the entire time component of the fee application.[10]

---

[10] These two examples bespeak a lack of billing judgment, and there is nothing in the fee application that shows why it was reasonable for UG to have staffed those events as heavily as it did.  Unfortunately, UG did not even address the examples in its

Moreover, the information provided by UG establishes that, for the most part, it prudently staffed the spoliation investigation and the briefing and hearings on the subject. That is particularly so given that the spoliation process was operating parallel to the discovery proceedings and trial preparation on the merits.

The issue of spoliation was a serious one with potentially far-reaching consequences. A full development of it was important to UG's case because of the potential impact the issue might have had. It thus was reasonable and necessary for UG to have pursued the issue as it did. Fully aware of the serious nature of the spoliation issue and the time that was required to resolve it, the Court concludes that the number of lawyers and other staff used by UG was reasonable and reasonably necessary to a full development of the facts.

That is particularly so considering that UG has shown that the bulk of the sanctions-related discovery was conducted by a core team of four lawyers from Gibson Dunn who were based in Washington, D.C. (Millian, Baldrate, Brennan and Caughey) assisted by Mr. Durrette. And, UG has shown that, at the

---

reply brief. Therefore, the Court cannot conclude, as to these two events, that the expended time was reasonable. It would not be fair to eliminate the charges in their entirety. However, it is reasonable to reduce them. To that end, they will be reduced by fifty percent (50%) considering that the number of lawyers is both large and unexplained.

hearings held in court, of which there were ten that were related substantially to sanctions matters, ST "introduced" 3.8 attorneys and UG "introduced" 3.6 attorneys. It is true that on several occasions there were many more lawyers representing UG than there were representing ST but, on balance, the number of lawyers was roughly equivalent.

As explained previously, the sanctions matter was proceeding in pace and in parallel with the discovery and trial preparation for the merits of the case. And, the sanctions matter had to be resolved before the trial could be held. The discovery was conducted by UG in a reasonable manner, allocating one lawyer to attend depositions except in one instance. The total number of lawyers brought into the case by UG for the sanctions hearing was appropriate considering that the sanctions hearing was scheduled approximately one month before the original trial date of December 6, 2010. It was therefore important for UG to have lawyers who devoted their attention to the sanctions issue as well as to the trial issues that were proceeding simultaneously. Thus, on this record, the Court cannot conclude that the case was over-lawyered.

### (ii) Travel Time

However, the lawyers and legal assistants that UG used during discovery and at the hearing were from Washington, D.C., Los Angeles, and New York. The fee petition requests recompense

for travel time for those lawyers and legal assistants.   It is one thing to say that the number of lawyers was not excessive. It is quite another matter entirely to say that ST should be required to pay the travel time necessary for lawyers and legal staff to travel to Richmond when the services provided were available in Richmond.   To the contrary, it is not reasonable to require ST to bear that burden any more than it is to require ST to pay extra-jurisdictional rates, and for the same reason.[11]

### (iii) Block Billing And The Billing Records

ST further objects to the fee sought because, in its view, Gibson Dunn's time records are inherently defective and unreliable and thus provide an insufficient basis for computing hours reasonably devoted to the sanctions issue.   In Hensley v. Eckerhart, 461 U.S. at 433, the Supreme Court held that the party seeking an award of fees must submit evidence to support the hours worked and that, "[w]here the documentation of hours is inadequate, the district court may reduce the award accordingly."   As Judge Ellis explained in Guidry v. Clare, 442 F. Supp.2d 282 (E.D. Va.), "[p]roper documentation is the key to ascertaining the number of hours reasonably spent on legal

---

[11] ST also legitimately objects that the fee application seeks compensation for work performed outside the parameters of the March 29, 2011 Order that defined the period for which attorneys' fees would be awarded.   That now is a moot issue because UG has agreed to delete that quantum of time from its fee petition.

tasks." Id. at 294 (citation omitted).  "[I]ndeed, fee claimants must submit documentation that reflects 'reliable contemporaneous recordation of time spent on legal tasks that are described with reasonable particularity,' sufficient to permit the Court to weigh the hours claimed and exclude hours that were not 'reasonably expended.'" Id. (citation omitted). And, "[i]nadequate documentation includes the practice of grouping, or 'lumping,' several tasks together under a single entry, without specifying the amount of time spent on each particular task." Id. (citation omitted).

Accordingly, "[l]umping and other types of inadequate documentation are thus a proper basis for reducing a fee award because they prevent an accurate determination of the reasonableness of the time expended in a case." Id. The reduction "can be accomplished in one of two ways: (i) by identifying and disallowing specific hours that are not adequately documented, or (ii) by reducing the overall fee award by a fixed percentage or an amount based on the trial court's familiarity with the case, its complexity and the counsel involved." Id.; McAfee v. Boczar, ___ F. Supp. 2d ___, 2012 WL 5398807, at *11-12.  As Judge Smith explained in Project Vote/Voting for America, Inc. v. Long, 2012 WL 3638546, (E.D. Va. 2012), "[w]hile perhaps 'block billing' is not prohibited, it simply does not provide the court with the sufficient

breakdown to meet [the applicant's] burden to support its fee request in specific instances." Id., at *8. As Project Vote so aptly puts it, "[t]he court's role is not to labor to dissect every individual entry to hypothesize if the different tasks in the same entry could reasonably result in the requested time." Id., at *9.

In EEOC v. Nutri/System, Inc., 685 F. Supp. 568, 575-76 (E.D. Va. 1988), Judge Ellis explained that the Court can reduce or deny a requested fee award if the applicant fails to submit proper documentation. See also Vocca v. Playboy Hotel of Chicago, Inc., 686 F.2d 605, 607-08 (7th Cir. 1982). Proper documentation was defined to be that which "reflects reliable contemporaneous recordation of time spent on legal tasks that are described with reasonable particularity." Guidry, 442 F. Supp. 2d at 294 (citing EEOC v. Nutri/System, Inc., 685 F. Supp. at 573).

The precepts in Guidry, Project Vote, Nutri/System and McAfee are the controlling principles in this district. And, for good reason. A fee applicant cannot establish the reasonable time component of the lodestar approach by clear and convincing evidence without time records that meet the test set by those cases.

ST makes the related point that it would have been appropriate (and, indeed, relatively easy) for Gibson Dunn to

have established a separate matter number in its files so that its timekeepers could record time spent on the sanctions related issues separately from that spent on issues related to the merits of the case.   That would have been especially appropriate given that discovery and trial preparation on the merits were proceeding simultaneously and many of the Gibson Dunn lawyers were working on both facets of the case.

In support of the fee application, Gibson Dunn's lead lawyer, Mr. Millian, sought to review records some seventeen months antecedent in an effort to reconstruct how much of each entry was sanctions related.   The Court has no doubt that Mr. Millian, as an officer of the Court, attempted honestly and in good faith to do his best in that regard, but, in fact, he was simply guessing, as to his own time as well as to the time of other timekeepers.   As explained in McAfee:

> [I]n reality, it is nigh onto impossible to reconstruct old billing entries accurately. Estimates of the sort made here [an attempt to cure a block billing problem], while attempted in good faith, are actually little more than guesses where made for entries logged long in the past.

McAfee v. Boczar, at *12.[12]

Moreover, counsel who have filed motions for sanctions are charged with the knowledge: (a) that a fee award is a possible

---

[12] In McAfee, the retroactive reallocation covered the span of a year.  Here, the effort reached back almost a year and a half.

sanction; (b) that the fee applicant must prove the reasonableness of the time component of a fee application by clear and convincing evidence; (c) that to do so, the applicant must have accurate time records; and (d) that block billing (or lumping) often results in a fee reduction.[13] If a party seeking sanctions disregards that knowledge, it must accept the consequences. That certainly is so where, as here, it was fairly obvious from the outset that the sanctions process was to be a lengthy one.

ST contends that the consequence of lumping should be denial of a fee award in its entirety. And, indeed, as made clear in Nutri/System, inadequate billing documentation can be the basis for denying a fee award. EEOC v. Nutri/System, Inc., 685 F. Supp. 568, 575-76 (E.D. Va. 1988).

The fee documentation here is defective because of block billing and, to some extent, because of unintelligible and inconsistent time entries, as well. However, the defects here are not sufficient to warrant a denial of the entire award. But, they are sufficiently extensive to necessitate a substantial percentage reduction for block billing. Based on the Court's familiarity with the complexity of the spoliation issues, the schedule and pace of the discovery on the issue at

---

[13] See McAfee, at *12. McAfee involved a fee claim under 42 U.S.C. § 1983, but the same principles apply here with equal force.

the same time as discovery and trial preparation on the merits, the briefing, and the work of counsel, a twenty percent (20%) reduction in the claimed hours will result in a reasonable time component for the lodestar calculation.[14]

### C.   The Lodestar Fee Calculation

For the reasons set forth above, the hourly rates for the Gibson Dunn lawyers in making the reasonable rate calculation will be the McGuireWoods rates for partners, associates and legal assistants.[15]   The Durrette Bradshaw rates will be as claimed.   The reasonable time component for Durrette Bradshaw will be as claimed.   The reasonable time component for Gibson Dunn will be the claimed hours reduced by: (1) the agreed reductions reflected in the fee application and the briefing; (2) the agreed reduction for work after the Sanctions Opinion; (3) the reduction for over-staffing the two examples cited by ST; and (4) the reduction for all travel time from Washington, D.C., New York, or Los Angeles.   That reduced sum will be totaled and then reduced by twenty percent (20%) for block billing and for the inconsistent time descriptions.

---

[14] That reduction will be made after the deductions to which UG previously has agreed on its own.

[15] The Reed Smith rates are the product of a special fee arrangement.   The McGuireWoods rates best reflect the market rate in the relevant legal community.

The product of the approved rates multiplied by the allowed time will be separately set forth for the lawyer or legal assistant whose work is being billed at the adjusted rate(s). Then, total sums will be stated in a Revised Fee Application.

### D.   The Result Obtained

ST contends that the quantum of the fee is excessive in perspective of the end result.  ST Response, at 5-6.   The argument is presented as Johnson Factor 8 which, in our circuit, was defined to be "the amount in controversy and the results obtained."   McAfee v. Boczar, at *4.   This, as explained in McAfee, is one of the Johnson factors that remains available for assessment after Perdue as a predicate for enhancing, or reducing, a lodestar fee.  McAfee v. Boczar, at *5.

ST points out that UG sought, as sanctions, dismissal of the action, an adverse inference jury instruction, and a fee award, but was successful only in securing a fee award. Moreover, says ST, the evidence around which the sanctions investigation, hearing and decision revolved (the falsified Pettitt emails) was ultimately found not to be admissible.  ST is correct on the points that it makes, but it is in error to say that a reduction of the properly calculated lodestar fee is the necessary consequence of those points.

ST's argument must be placed in perspective of what UG confronted when it uncovered Pettitt's conduct.  At that time,

it was early days and it reasonably appeared to UG that it faced a significant fraud that could significantly affect the validity of ST's claims and UG's defenses.   On this record, it was reasonable for UG to have pursued the truth fully.  That, as the Sanctions Opinion makes clear, took some doing.  Indeed, having been aware of how matters progressed from the outset, the Court finds that UG's efforts were reasonable given what reasonably appeared to be at stake. Moreover, UG's spoliation investigation and the ensuing proceedings served the important function of uncovering the truth and ST, contrary to the conciliatory position it took after the investigation, persisted in disputing the extent of Pettitt's spoliation.

Viewed in perspective, UG reasonably took the matter of Pettitt's spoliation seriously and pursued it until the truth was determined.   UG could not have known how useful the spoliation evidence would be until it had run the matter to ground.

Thus, even though the result of UG's timely and diligent actions did not secure dismissal of the case against it and even though it lost on the merits of the breach of contract case, it is only appropriate that UG should receive a substantial fee award for the spoliation-related investigation and the proceedings that ensued the investigation.

## 2.   Expenses

UG seeks $228,994.00 in sanctions-related expenses. That sum reflects the amounts deducted pursuant to the Second Declaration of John C. Millian, ¶¶ 39 and 42. For reasons previously explained, all travel expenses incurred in bringing any lawyer or staff from Washington, D.C., New York, or Los Angeles must be deducted from the expense claim because the requisite legal services were available in Richmond had UG chosen to retain a local firm. Those expenses would include charges for transportation, lodging and meals.

It appears that UG rightly has deleted charges for overnight deliveries to experts in the case (Flaherty, Hershman, and Gron). Further, given that UG had local counsel in the Durrette Bradshaw firm and that the services necessary to deal with this case were available in the local market, the rental of any office space may not be charged against UG's adversary.

ST objects to the charges incurred by UG in respect of its consultant, FTI Consulting. That claim is for $68,479.69. ST correctly points out that the end product of FTI Consulting was not particularly useful in the hearing. However, the graphics were used in the presentation, and charges for the graphics appear to be reasonable.

It has not been shown why seven people were required to prepare the graphics, and why it was necessary to have brought a

team of consultants to Richmond from Chicago and Los Angeles. The time charged for FTI Consulting in traveling, as well as its expenses in connection therewith, was not necessary.  Nor has it been shown why there was a need to have employed an out-of-area firm in order to present those graphics in court.  In any event, the presentation of the graphics could have been accomplished by a legal assistant trained in the proper use of the technology. Accordingly, ST will not be required to pay any aspect of the FTI Consulting bill except the charge for preparing the graphics that were used at the hearing.

The expense component of the fee application will be reduced accordingly.

## CONCLUSION

For the foregoing reasons, DEFENDANT UNITED GUARANTY'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES IN CONNECTION WITH ITS MOTION FOR SANCTIONS AND RELATED MATTERS (Docket No. 480) is granted in part and denied in part.

UG must submit a revised fee application wherein it calculates the lodestar fee using the rates approved in this opinion and claiming only such time as has been approved in this opinion and claiming only such expenses as approved in this opinion. UG shall make the presentation in a simple straightforward way so that ST can review it appropriately.

It is suggested that each law firm assign one experienced lawyer who is familiar with the Sanctions Opinion, this Memorandum Opinion and the motions that it resolves, and that those two individuals review the Revised Fee Application to identify and resolve any objection to the Revised Fee Application for failure to comply with the instructions herein. If any differences of view cannot be sorted out by agreement, the Court will resolve them.[16]

It is so ORDERED.

                                        /s/        REP
                              _____
                              Robert E. Payne
                              Senior United States District Judge


Richmond, Virginia
Date: March 7, 2013

_____

[16] It is anticipated that there will be few, if any, issues to be resolved by the Court if the Revised Fee Application is prepared properly, and, in any event, it is expected that counsel will be able to resolve any difficulties that do appear.